**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO. 24-31596** |
| **MMA LAW FIRM, PLLC** | § | |
| | § | |
| **DEBTOR** | § | |
| | § | |
| **MMA LAW FIRM, PLLC** | § | **ADVERSARY NO.** |
| | § | **24-03130** |
| **Plaintiff** | § | |
| **v.** | § | |
| | § | |
| **DALY & BLACK, P.C.** | § | |
| | § | |
| | § | |
| **Defendant** | § | |

## COMPLAINT

MMA LAW FIRM, PLLC, (**"MMA"** or **"Debtor"**), files this Complaint against Daly & Black, P.C., pursuant to FED. R. BANKR. P. 7001(1) and (7), and respectfully shows the Court as follows:

### JURISDICTION, VENUE AND PARTIES

1.      This is an adversary proceeding brought by the Debtor for a declaratory judgment regarding the determination of property of the bankruptcy estate and turnover of property of the estate.

2.      This Court has subject matter jurisdiction over this adversary proceeding, pursuant to 28 U.S.C. §§ 157 and 1334(b).

3.      This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (2) and this Court may enter a final order consistent with these statutes and Article III of the United States Constitution.

4. Venue is proper in the Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), pursuant to 28 U.S.C. § 1409.

5. MMA Law Firm, PLLC is the Debtor in Case No. 24-31596 pending in the Southern District of Texas and can be served through its undersigned proposed counsel.

6. Daly & Black P.C. can be served with this Complaint and summons through its registered agent, Capitol Corporate Services, Inc., 8550 United Plaza Building II, Suite 305, Baton Rouge, LA 70809.

7. The Debtor hereby states that it consents to the entry of final orders or judgments by the Bankruptcy Court if it is determined that the Bankruptcy Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTS

### RELEVANT BACKGROUND FACTS

8. MMA Law Firm, PLLC ("**Debtor**") is a litigation law firm based in Texas.

9. Following hurricanes Laura, Delta, Zeta, and Ida, the Debtor represented thousands of storm victims with property damage claims against their insurance companies (**"MMA Clients"**).

10. The Debtor executed contingency fee contracts with the MMA Clients, entitling it to a contingency fee and reimbursement of expenses.

11. The Debtor prosecuted claims and filed thousands of lawsuits on behalf of the MMA Clients throughout Louisiana (**"MMA Cases"**).

12.     On March 3, 2023, Judge James D. Cain, Jr., a United States District Judge for the Western District of Louisiana, issued an order suspending the law licenses of all attorneys affiliated with the Debtor for ninety days (**"Suspension Order"**).

13.     Pursuant to the Suspension Order, the Debtor was ordered to notify the MMA Clients of the suspension and inform them of their option to retain new counsel or remain with the Debtor.

## THE DEBTOR AND DALY & BLACK

14.     In May 2023, the Debtor was approached by John Black, a named partner at Daly & Black, PC ("**D&B**"), who was eager to assist the MMA Clients.

15.     Following the Suspension Order, D&B expressed interest in the lucrative opportunity presented by the MMA Cases, potentially worth millions.

16.     The Debtor and D&B agreed that D&B would take over representation of the MMA Clients, and D&B agreed that it would not object to the Debtor receiving 45% of the attorney's fees and reimbursement of expenses from the MMA Cases (the **"Agreement"**)[1].

## PERSONAL CONFLICT CONCERNS WITH FEDERAL JUDGES

18.     Despite reaching an Agreement, D&B was apprehensive about collaborating with the Debtor due to concerns about potential repercussions from federal judges who had previously issued negative orders against the Debtor in the MMA Cases. Specifically, D&B was concerned about getting "crosswise with any of the Federal Judges."[2]

19.     The judges that caused D&B concern included the following:

---

[1] Exhibit 1: Agreement
[2] Exhibit 2: Email 6-1-2023

1. <u>Judge Cade Cole</u> was the special master appointed by federal judges in Louisiana to expedite hurricane-related litigation, including all of the MMA Cases.[3]

2. <u>Judge North</u> is the federal magistrate handling many of the hurricane cases in the Eastern District of Louisiana, including the MMA Cases pending in his district.

3. <u>Judge Cain</u>, who issued the Suspension Order, was handling thousands of the MMA Cases in the Western District of Louisiana.

4. <u>Judge Kay</u> was the federal magistrate handling the MMA Cases pending in the Western District of Louisiana.

20.     It was well known to D&B and within the Louisiana legal community that multiple federal judges involved with the MMA Cases had taken personal offense regarding matters related to Mr. Moseley and the Debtor.

21.     For instance, Judge Kay, a federal magistrate in Louisiana, presided over a show cause hearing involving the Debtor and its handling of the MMA Cases. Mr. Moseley appeared and testified at the show cause hearing. One month after the show cause hearing, Judge Kay sent *an ex parte* email to Mr. Moseley, copying Judge Cain and Judge North.  The email subject was, "In secret audio, lawyer accused of fraud lays out plans to keep Louisiana insurance lawsuits going," and in the body of the email, Judge Kay wrote, "Just in case you missed it." In response to the email, Judge North wrote, "another one coming tonight."[4]

---

[3] The Debtor refers to Cade Cole as "Judge Cade Cole" based on representations on his website where he refers to himself as "judge". The Debtor does not imply that his title as "Judge" means that he acted in a judicial capacity in the MMA Cases. Instead, Judge Cole was appointed as the special master by federal judges in Louisiana to oversee the hurricane cases, which included the MMA Cases. <u>See Exhibit 3</u>: Judge Cade Cole's Website

[4] <u>Exhibit 4</u>: Judge Kay and Judge North Email

22.     In another instance, Judge Cain expressed his personal discontent with the Debtor, warning, "Tell your partners in Houston to stay the frick out my court with this kind of trash. You see this person right over here? That's Marshal Gallow with the United States Marshal Service."[5]

23.     In yet another example of Judge Cain conducting his own investigation, after the conclusion of a hearing,  Mr. Moseley told Judge Cain, "*An imperfect process doesn't equate to a scheme. I know you think that we had nefarious action ...*"  Judge Cain interrupted him, revealing that Judge Cain was conducting his own independent investigation and engaging in *ex parte* communications: "The reason I think it is my – from **very reliable sources, and mine are pretty reliable…**"[6]

22.     These examples likely contributed to D&B's desire to ensure that their Agreement with the Debtor would not lead to any personal conflicts with the federal judges.

## COMMUNICATION WITH THE JUDGES

24.     To alleviate their concerns, D&B decided to contact Judge Cole and Judge North to seek their approval of the Agreement with the Debtor.

26.     According to an email from Mr. Black on June 1, 2023, Mr. Black represented that he spoke with Judge Cole regarding steps forward with the MMA Clients and that Judge Cole stated that he "was going to reach out to the Court in the Easter district to help pave a smoother path for us.  I suspect the Louisiana folks are growing tired of Texas lawyers in their state."[7]

27.     Later that day, Mr. Black informed the Debtor of what he referred to as a "new development", specifically that Mr. Black was very likely to have a private audience with Judge

---

[5] <u>Exhibit 5:</u> October Transcript (Page 51, Lines 11-14)
[6] <u>Exhibit 6:</u> August Hearing Transcript (Page 159, Lines 2-6)
[7] <u>Exhibit 7:</u> Email re Judge Cole (Page 2)

North in Florida where Mr. Black "would seek counsel and guidance" on how they could proceed with the MMA Cases.[8]

28.      Mr. Black subsequently attended a University of Texas football game with other attorneys and Judge Cain. While at the game, Mr. Black sent a text message to Mr. Moseley, informing him that he was with Judge Cain. Additionally, Mr. Black shared a screenshot with Mr. Moseley of a text message exchange between himself and Judge Cole, in which Mr. Black informed Judge Cole that D&B had filed approximately 1,500 cases in the Eastern District of Louisiana. Mr. Black also conveyed to Judge Cole in his text message that he had met with Judge Cain in Austin and described him as a "great guy".  Judge Cole responded to this text, saying, "That's helpful, next time I'm asking him things will help put a face to it".[9]

### THE DEBTOR TRANSFERS THE MMA CASES TO DALY & BLACK

28.      On June 2, 2023, Mr. Black emailed the Debtor and stated, "based on communications with the Western District's Special Master, Cade Cole, that the appropriate path forward is for MMA to send a letter and fee agreement for client signature, which can be followed by something from our firm." In response, Debtor's counsel questioned whether Judge Cole had spoken to Judge North prior to approving the strategy, to which Mr. Black responded, "Yes. He has. I was instructed to get things moving by Cade."[10]

29.      The Debtor and D&B agreed to the contents of the template letter that would be sent to thousands of the MMA Clients.[11] On June 6, 2023, at Mr. Black's direction, the Debtor

---

[8] Exhibit 8: Special Meeting
[9] Exhibit 9: Text Message
[10] Exhibit 10: Email re Letter from Mr. Black 6-2-2023
[11] Exhibit 11: Template

began sending letters to the MMA Clients, transmitting the new engagement agreement with D&B for their execution. Attached is an example of one such letter sent to an MMA Client (**"Letter"**)[12].

30.     The Letter advised the MMA Clients that the Debtor could no longer serve as their counsel and suggested that D&B would step in to represent them, highlighting D&B's extensive experience and their willingness to represent the clients on the same contingent fee basis that the Debtor agreed to.  Attached to the Letter was a fee agreement from D&B that the clients could execute to transfer their files from the Debtor to D&B immediately.

31.     From June 2023 through November 2023, the Debtor communicated with D&B on a nearly daily basis, including weekends, working around the clock to assist the clients.  During this period, the Debtor helped D&B with the following tasks: 1) sending letters and retainer agreements to the MMA Clients to encourage them to hire D&B; 2) assisting D&B with executing retainer agreements on their behalf; 3) helping D&B create case management software to facilitate the transfer of client file documents; 4) assisting with mass communications to the clients; 5) creating templates for additional filings necessary in the cases, including motions for stay; and 6) answering case-specific questions and conducting research.

32.     After approximately five months of assisting D&B with the transfer the MMA Clients, the Debtor is aware that D&B entered into agreements that provided it with attorney's fees and reimbursement of expenses in 1,331 of the MMA Cases (**"DB/Debtor Cases"**).

33.     Attached as Exhibit 13[13] is a spreadsheet of all of the DB/Debtor Cases that the Debtor is aware of to date.

34.     D&B agreed that it would not object to the Debtor receiving 45% of any contingency fee D&B received from the DB/Debtor Cases, including reimbursement of expenses.

---

[12] Exhibit 12: Letter
[13] Exhibit 13 – Spreadsheet of DB/Debtor Cases

## DALY & BLACK WALKS AWAY FROM THE DEBTOR AND THE AGREEMENT

35.     With an interest in at least 1,331 DB/Debtor Cases, D&B was positioned to earn tens of millions of dollars.

36.     However, by November 2023, D&B abruptly ceased all communications with the Debtor regarding the DB/Debtor Cases in Louisiana without providing any reasonable explanation.

36.     Subsequently, many of the DB/Debtor Cases were settled and/or won, resulting in D&B earning contingency fees.  However, D&B never remitted any portion of the fees to the Debtor based on the work previously performed, as agreed. Furthermore, D&B failed to reimburse the Debtor for expenses incurred in the DB/Debtor Cases.

37.     The Debtor was left without the income from the DB/Debtor Cases and was liable for debts it could not pay to creditors who incurred expenses related to these cases.  For example, the Debtor owes thousands of dollars to estimators who performed work on the DB/Debtor Cases and are still owed money.

## BANKRUPTCY FILED AND NOTICE PROVIDED

38.     On April 9, 2024, the Debtor filed a Chapter 11 bankruptcy petition.

39.     In its bankruptcy schedules, the Debtor disclosed claims against D&B for "possession of attorney's fees and expenses that belong to the Debtor, and other related causes of action."[14] Specifically, the Debtor performed significant legal work, including filing lawsuits, and incurring expenses in the DB/Debtor Cases, asserting that it is entitled to attorney's fees and expenses from D&B.

40.     On April 23, 2024, the Debtor sent D&B notice of its bankruptcy to four separate email addresses, including Mr. Daly and Mr. Black (the **"Notice"**)[15].

---

[14] Exhibit 14: Debtor's Schedules (Page 132)
[15] Exhibit 15: Notice to D&B of bankruptcy filing.

41.     In the Notice, the Debtor specifically 1) notified D&B of its bankruptcy filing; 2) explained that the bankruptcy petition operates as a stay including attempts to obtain possession of the Debtor's property; 3) provided D&B with contact information for the Debtor's counsel; and 4) attached a spreadsheet with the MMA Clients.

42.     Additionally, on April 12, 2024, the Bankruptcy Noticing Center provided D&B with notice of the Debtor's bankruptcy filing via U.S. mail.[16]

43.     Finally, in its bankruptcy schedules, the Debtor disclosed numerous creditors who are owed money for work performed on the DB/Debtor Cases who were not paid as D&B did not reimburse the Debtor for expenses incurred in these cases (See Exhibit 14 – Schedule F).

## STIPULATION AND AGREED ORDER

44.     On August 14, 2024, the Court entered a Stipulation and Agreed Order between the Debtor and D&B (**"Agreed Order"**).[17]

45.     Pursuant to the Agreed Order, the automatic stay was modified to allow D&B to continue prosecuting the DB/Debtor cases and was ordered to hold 45% of any attorney's fees it receives in these cases, pending settlement with the Debtor or final resolution by a Court.

46.     D&B represented to the Debtor that it has always set aside 45% of all attorney's fees in the DB/Debtor cases.

47.     Multiple attempts have been made by the Debtor to reach a resolution with D&B regarding the estate's interest in the DB/Debtor Cases, but no agreements have been reached.

---

[16] Exhibit 16: BNC Notice
[17] Exhibit 17: Agreed Order

## CAUSE OF ACTION #1 – DECLARATORY JUDGMENT

48.     The Debtor incorporates Paragraphs 8-16, 28-34, 36-41, 44-47 into Cause of Action #1.

49.     The Debtor seeks a declaratory judgment pursuant to 11 U.S.C. § 541 affirming the Debtor's interest in the attorney's fees and costs in all of the DB/Debtor Cases (identified in Exhibit 13) is property of the bankruptcy estate.

50.     To date, the Debtor is aware of 1,331 DB/Debtor Cases that D&B has an interest in.

51.     When considering a declaratory judgment action, the Court must engage in a three-step inquiry: (1) whether an "actual controversy" exists between the parties in the case; (2) whether it has authority to grant declaratory relief; and (3) whether "to exercise its broad discretion to decide or dismiss a declaratory judgment action." *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 895 (5th Cir. 2000).

52.     An actual controversy exists between the Debtor and D&B regarding the Debtor's interest in the DB/Debtor Cases. The Debtor asserts that it performed work and incurred costs and expenses in the DB/Debtor Cases for which it executed contingency fee agreements.  Therefore, the Debtor asserts that it is entitled to its fair share of the contingency fee and reimbursement of expenses that D&B receives in the DB/Debtor Cases ("**Fees and Costs**").

55.     To date, the Debtor has not received Fees and Costs from any party in the DB/Debtor Cases.  D&B acknowledges the dispute over the Fees and Costs in the DB/Debtor Cases, as evidenced by the Agreed Order, which provides that D&B shall hold 45% of any attorney's fees it receives from the DB/Debtor Cases in trust, "pending a final determination, either by settlement or entry of an order by a court of competent jurisdiction" of the Debtor's entitlement to fees and/or costs in the DB/Debtor Cases. The Debtor has not relinquished its right to claim an interest in any portion of the settlement proceeds from the DB/Debtor Cases.

56.     Under Louisiana law, when two attorneys provide legal services to the same client on a contingency-fee basis and one attorney is discharged before resolution, the client is obligated to pay only one contingency fee, which the court allocates between the attorneys. *Saucier v. Hayes Dairy Products, Inc.*, 373 So.2d 102 at 108 (La. 1979).

57.     The amount of the fee is determined by the highest ethical contingency percentage agreed upon in any of the contingency fee contracts executed by the client. *O'Rourke v. Cairns,* 683 So. 2d 697, 702 (La. 1996).

58.     Fee apportionment considers factors such as: 1) the time and labor required; 2) novelty and difficulty of questions involved; 3) skill required to perform legal services; 4) amount involved and the results obtained; and 5) nature and length of the professional relationship with the client. *Saucier v. Hayes Dairy Products, Inc.*, 373 So.2d 102 (La. 1979).

59.     This ensures a reasonable division of fees based on each attorney's contributions. If the first attorney was not discharged for cause, this analysis concludes the determination. However, if discharged for cause, the court must assess the nature and gravity of the discharge to determine if the discharged attorney is entitled to any fees. *O'Rourke v. Cairns,* 683 So. 2d 697, 702 (La. 1996).

60.     Here, the Debtor was not discharged for cause, but even if the Court were to determine that it was, the Debtor is still entitled to a determination of fees and costs under the reasonableness factors discussed above. Therefore, there is a live controversy between the Debtor and D&B regarding who is entitled to the Fees and Costs arising from each of the DB/Debtor Cases as outlined in the attached spreadsheet at Exhibit 13.

61.     The Bankruptcy Court has authority to grant relief and the Debtor respectfully requests that the Bankruptcy Court exercise its broad discretion to decide this declaratory judgment

action. A bankruptcy court's jurisdiction is governed by 28 U.S.C. § 1334. District courts, and therefore bankruptcy courts, have exclusive jurisdiction over "all cases under title 11," including jurisdiction over "all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate." 28 U.S.C. § 1334(e); *In re TMT Procurement Corp.,* 764 F.3d 512, 523 (5th Cir. 2014).

## CAUSE OF ACTION #2: TURNOVER OF PROPERTY OF THE ESTATE

62.     The Debtor incorporates Paragraphs 8-16, 28-34, 36-41, 44-47 into Cause of Action No. 3.

63.     Pursuant to Section 541(a)(1) of the Bankruptcy Code, "property of the estate" encompasses "all legal and equitable interest of the debtor in property as of the commencement of the case". 11 U.S.C. §541.

64.     Section 542(a) mandates that an entity possessing property of the estate must deliver and account for such property, or its equivalent value, to the bankruptcy estate. 11 U.S.C. § 542.

65.     To date, the Debtor is aware of 1,331 MMA Cases that D&B acquired an interest in following the Suspension Order (the **"DB/Debtor Cases"**).  The Debtor performed significant work and incurred costs and expenses in the DB/Debtor Cases.

66.     The Debtor asserts that it performed work and incurred costs and expenses in the DB/Debtor Cases for which it executed contingency fee agreements.  Therefore, the Debtor asserts that it is entitled to its fair share of the contingency fee and reimbursement of expenses that D&B received in the DB/Debtor Cases ("**Fees and Costs**").

67. To date, the Debtor has not received Fees and Costs from any party in the DB/Debtor Cases. D&B previously agreed that it would not object to the Debtor receiving 45% of the attorney's fees and reimbursement of expenses in the DB/Debtor Cases.

67. Therefore, in the present matter, the Debtor has an interest in the Fees and Costs associated with the DB/Debtor Cases that have not been turned over to the Debtor and this constitutes property of the estate.

68. The Debtor has not waived its rights to the Fees and Costs in the DB/Debtor Cases.

70. D&B currently holds and/or has received attorney's fees and costs in the DB/Debtor Cases, which were obtained through the settlement of these cases, both prior to and subsequent to the filing of the Debtor's Chapter 11 petition.

71. The Debtor asserts that the Debtor has an interest in the Fees and Costs and respectfully requests that the Court issue an order compelling D&B to provide the Debtor with a comprehensive accounting of all funds received in connection with the DB/Debtor Cases to date.

71. The Debtor further requests that this Court issue an order directing turnover of the Fees and Costs from the DB/Debtor Cases that D&B has received to date.

Dated: November 5, 2024

<div style="margin-left:40%">

Respectfully submitted,
By: /s/Miriam T. Goott
  Miriam T. Goott
  SBN #24048846
  COUNSEL FOR DEBTOR

</div>

OF COUNSEL:
WALKER & PATTERSON, P.C.
P.O. Box 61301 Houston, TX
77208-1301 (713)956-5577
Phone (713)956-5570 Fax
mgoott@walkerandpatterson.com