## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **MMA LAW FIRM, PLLC,** | § | |
| | § | **Case No. 24-31596** |
| Debtor. | § | |

### EQUAL ACCESS JUSTICE FUND, LP AND EAJF ESQ FUND, LP'S AMENDED OBJECTION TO SUPPLEMENT TO DEBTOR'S MOTION FOR ORDERS AUTHORIZING THE USE OF CASH COLLATERAL AND BRIEF IN SUPPORT

**TO THE HONORABLE EDUARDO V. RODRIGUEZ,**
**CHIEF UNITED STATES BANKRUPTCY JUDGE:**

Secured Prepetition Lenders Equal Access Justice Fund, LP and EAJF ESQ Fund, LP (collectively, "**EAJF**"), by and through their attorneys, submit the following Amended Objection and Brief in Support (the "**Objection**") to the Debtor's *Supplement to Debtor's Motion for Orders Authorizing the Use of Cash Collateral* [ECF No. 353] (the "**Supplement**").

### INTRODUCTION

1.      The Debtor filed its Supplement challenging the extent and validity of EAJF's liens under 11 U.S.C. § 552 and seeking to wholly exclude the post-petition proceeds of EAJF's collateral in EAJF's secured claim. The Official Committee of Unsecured Creditors ("Committee") has joined the Debtor's cause.[1]  Their arguments remain at odds with the express terms of the loan documents executed by the Debtor and its members and statements made by the Debtor prior to the filing of its Supplement. The liens of EAJF are intact, and the Debtor does not perform the type of work which would qualify for consideration as requested in the Supplement.  Further, EAJF has

---

[1] See *The UCC's Statement Supporting the Supplement to Debtor's Motion for Orders Authorizing Use of Cash Collateral* [ECF No. 358]; see also, *The UCC's Statement Supporting the Debtor's Motion to Reconsider* the Order striking the Debtor's Supplement [ECF No. 380].

completely funded the Debtor's operations from its cash collateral, and any value achieved by the estate has come at the expense of EAJF.  For the reasons set forth herein, EAJF objects to the relief requested in the Supplement and respectfully requests that the Court deny the relief requested by the Debtor and the Committee.

## BACKGROUND

2.      The Debtor's Supplement seeks an order stating that "neither Equal Access Justice Fund, LP nor EAJF ESQ Fund, LP has any interest in cash or income generated or collected from pending litigation in Louisiana," and "neither Equal Access Justice Fund, LP nor EAJF ESQ Fund, LP has any interest in attorney fees generated from the operation of the Debtor's business as a law firm," which would effectively invalidate EAJF's lien on the Law Firm Proceeds, as such term is clearly and explicitly defined in the loan and security documents executed by the Debtor and Moseley. *See* ECF No. 353-1; Proofs of Claim Nos. 50 and 51.

3.      EAJF filed its *Objection to Debtor's Supplement to Debtor's Motion for Orders Authorizing the Use of Cash Collateral* [ECF No. 356] (the "**Supplement Objection**") on October 21, 2024, and incorporates herein the Supplement Objection by this reference.

4.      On October 29, 2024, the Court, *sua sponte*, entered an order striking the Supplement [ECF No. 368]. However, following a motion to reconsider filed by the Debtor and a hearing on the same, the Court vacated the order striking the Supplement and set the Supplement for hearing on January 14, 2025.

5.      In its pleadings, the Debtor asserts that it owns interests in "many mass tort claims which are currently pending, *i.e.*, approximately 722 Roundup exposure cases; approximately 3,149 Zantac cases; approximately 2,132 APAP cases; and approximately 138 NEC cases" and "approximately 25,000 property damage/insurance claim cases in the state of Louisiana."

Supplement at p. 2, ¶ 7. The Debtor further asserts that "any income derived post-petition in this case will only be as a result of the Debtor's labor (ignoring the mass tort docket and any potential recovery therefrom)." Supplement at p. 5, ¶ 19. However, Debtor fails to allege that it has generated any revenue which has its genesis in its post-petition engagements. Thus, all fee agreements and representations related to current post-petition revenue originated pre-petition. Further, many, if not most, of these cases rely upon non-Debtor "handling firms" to complete the work, not the Debtor or its employees.

6.      The Debtor argues that its post-petition revenue is free of encumbrances pursuant to 11 U.S.C. § 552(a), and that such revenue does not fall within the exceptions set forth in section 552(b), as crucial and transformative services of the Debtor are required to generate such revenue.

7.      As stated herein, the Debtor's arguments rely on distinguishable case law and are inapposite in light of the facts in the present case.

8.      The exception set forth in section 552(b)(1) applies to the case at bar because EAJF's security interest in the Debtor's accounts receivable specifically and explicitly extends to proceeds derived from its pre-petition cases, inclusive of ***all*** contingency fee matters. This broad definition includes the Louisiana cases.  Because the security agreement covered the Debtor's accounts receivable—property acquired before the bankruptcy proceedings—its security interest attached to the proceeds therefrom, including the fees received by the Debtor post-bankruptcy on account of such pre-petition receivables. Further, to the extent that post-petition services contributed value to the Debtor's pre-petition receivables, such services were acquired using EAJF's pre-petition cash collateral, and thus, post-petition receivables generated from such services are also proceeds of EAJF's pre-petition cash collateral.

9.      Because the Debtor's post-petition revenue generated from pre-petition contingency fee agreements and cases is EAJF's cash collateral, EAJF is entitled to the related protections set forth in the Bankruptcy Code and specifically in sections §§ 363 and 506.

### ARGUMENTS AND AUTHORITIES

10.     The Bankruptcy Code defines cash collateral as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest ***and includes the proceeds, products, offspring, rents, or profits of property*** and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title." 11 U.S.C. § 363(a) (emphasis added).

11.     Section 552(b)(1) of the Bankruptcy Code provides:

> Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and ***if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property***, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b)(1) (emphasis added).

12.     "A creditor must meet two requirements under § 552(b) for a security agreement to [extend to property acquired post-petition]: 1) the security agreement must extend to after-acquired property of the designated categories; and 2) the after-acquired property must fit within the five enumerated categories of § 552(b)." *Matter of T-H New Orleans Ltd. P'ship*, 10 F.3d 1099, 1104 (5th Cir. 1993); *See In re Cafeteria Operators, L.P.*, 299 B.R. 400, 405–06 (Bankr. N.D. Tex. 2003).

"The express terms of the security agreement generally govern the first prong, while state law generally governs the second prong," including the state's version of the Uniform Commercial Code ("UCC"). *Cafeteria Operators*, 299 B.R. at 405.[2] "Section 552's primary design is to permit creditors to take security interests in proceeds pursuant to applicable state law, such as U.C.C. Article 9 or whatever state law applies to security interests in real property" and "reflects Congress' historical concern that property rights usually should be controlled by state law instead of the 'mere happenstance' of bankruptcy." *Id.* at 444.

13.     While Section 552(b) permits a bankruptcy judge to deviate from state law "based on the equities of the case," it "clearly requires application of state law unless appellant can avail itself of the section 363 exception." *Id.* "In the course of such consideration the court may evaluate any expenditures by the estate relating to proceeds and any related improvement in position of the secured party." *In re Laurel Hill Paper Co*., 393 B.R. 89, 93 (Bankr. M.D.N.C. 2008) (citing 124 Cong. Rec. H 11,097–98 (daily ed. Sept. 28, 1978); S 17,414 (daily ed. Oct. 6, 1978)). "[T]he 'equities of the case' provision ... is designed, among other things, to prevent windfalls for secured creditors and to give the courts broad discretion to balance the protection of secured creditors, on the one hand, against the strong public policies favoring continuation of jobs, preservation of going concern values and rehabilitation of distressed debtors, generally." *In re Laurel Hill Paper Co*., 393 B.R. 89, 93 (Bankr. M.D.N.C. 2008) (citing 140 Cong. Rec. H 10,768 (October 4, 1994). Further, "[the equities of the case exception] is designed to cover the situation where ***the estate expends funds*** that result in an increase in the value of collateral … to cover the situation where

---

[2] *See also Unsecured Creditors Comm. v. Marepcon Fin. Corp. (In re Bumper Sales, Inc.)*, 907 F.2d 1430 (4th Cir. 1990) (employing 4-part test: (1) does a prepetition security agreement cover prepetition accounts and inventory; (2) post-petition, did the debtor receive proceeds of prepetition accounts and inventory; (3) is post-petition inventory second generation proceeds of prepetition inventory and accounts, and are Postpetition accounts proceeds of post-petition inventory; and (4) did the lender's consent to the use of proceeds end its security interest?); *Matter of Vill. Properties, Ltd.*, 723 F.2d 441, 443 (5th Cir. 1984).

raw materials, for example, are converted into inventory, or inventory into accounts, at some expense to the estate, thus depleting the funds available for general unsecured creditors." *In re Laurel Hill Paper Co.*, 393 B.R. 89, 93 (Bankr. M.D.N.C. 2008) (citing H. Rep. No. 95–595, 95th Cong., 1st Sess. 376–77 (1977)) (emphasis added).[3]

14.     However, "[p]ayments at the expense of secured creditors rather than at the expense of the estate do not support an equities of the case award to the unsecured creditors." *Id.* at 94 (finding that an increased value of estate assets arising from work performed by CRO, whose salary was paid from cash collateral, did not constitute a windfall for the secured claimant nor create an equitable consideration that would warrant reducing recovery to secured claimant).[4] Accordingly, many opinions interpreting and applying the "equities of the case" exception, including those relied upon by the Debtor, focus their analysis on whether unencumbered assets contributed to generation of the post-petition proceeds at issue and trace assets post-petition to reach an equitable result.[5]   In the case at bar, we know the Debtor has operated to collect its pre-petition receivables by virtue of EAJF's cash collateral, and does nothing to transform a raw

---

[3] *See also In re Tower Air, Inc.,* 397 F.3d 191, 205 (3rd Cir.2005) (quoting *In re Bennett Funding Group, Inc.,* 255 B.R. 616, 634 (N.D.N.Y.2000)) ("Section 552(b) is normally relevant in a Chapter 11, 'to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee/debtor-in-possession's use of other assets of the estate.' "); *In re Delbridge,* 61 B.R. 484, 490 (Bankr.E.D.Mich.1986) (quoting *In re Crouch,* 51 B.R. 331, 332 (Bankr.D.Or.1985)) (" 'The purpose behind the "equities of the case" rule of 11 U.S.C. § 552(b) is, in a proper case, to enable those who contribute to the production of proceeds during Chapter 11 to share jointly with pre-petition creditors secured by proceeds.'").

[4] *See also In re Muma Services, Inc.,* 322 B.R. 541, 559 (Bankr.D.Del.2005) ("In this case, neither the Debtors nor the Trustee invested any unencumbered funds available to the general unsecured creditors to enhance the value of the assets which were sold ... On the contrary, since all assets were the security of Bank Group, it was only through the use of the Bank Group's cash collateral (and the financing provided by Wells Fargo) that the estate was able to continue to operate and maintain the value of the assets. Wells Fargo has been paid from the proceeds of the ... sale. The equities of this case do not support further eroding the Bank Group's collateral position under section 522(b)(1)."); *In re Airport Inn Assocs., Ltd.,* 132 B.R. 951, 959 (Bankr. D. Colo. 1990).

[5] *See In re Skagit Pac. Corp.*, 316 B.R. 330, 340 (B.A.P. 9th Cir. 2004) (finding 552(b)(1) did not apply where creditor could not trace proceeds among commingled funds); *In re Qmect, Inc.*, 2006 WL 2038367, at *4 (Bankr. N.D. Cal. June 2, 2006) (where a prepetition proceeds lien was traced to post-petition collateral, any post-petition increase in value is also part of the proceeds of the prepetition lender's collateral).

product into something anew.  And, Debtor's counsel is not being paid from encumbered estate assets.  It promised, as a part of its Application to Employ, not to seek payment from funds needed to satisfy secured claims, such as those held by EAJF. [ECF Nos. 3 and 173].  To the extent the Supplement is contradictory, any relief must be denied. There is no depletion of funds otherwise available to unsecured creditors on account of any work being performed by Debtor's counsel.

     **A.**     **The plain language of the loan documents explicitly includes proceeds from legal cases as collateral of the Lender.**

     15.     EAJF's loan documents and financing statements clearly and explicitly include all proceeds and rights to payment as collateral. *See* Proofs of Claim No. 50 and 51. EAJF incorporates by this reference Proofs of Claim No. 50 and 51 with all exhibits thereto.

16.     For example, the Amended and Restated Loan Agreement between the Debtor and

EAJF            defines            "Law            Firm            Proceeds"            as:

> *"Law Firm Proceeds"* means all funds and other property or value received directly or indirectly by or on behalf of the Borrower or an Affiliate (and not the client's share) on account of (i) any and all gross, pre-tax monetary awards, damages, recoveries, judgments or other property or value awarded to or recovered by or on behalf of (or reduced to a debt owed to) the client on account or as a result or by virtue (directly or indirectly) of a Case, whether by negotiation, arbitration, mediation, diplomatic efforts, Lawsuit, settlement or otherwise, and includes all of the Borrower's legal and/or equitable rights, title and interest in and/or to any of the foregoing, whether in the nature of ownership, lien, security interest or otherwise; (ii) any consequential, recessionary, punitive, exemplary or treble damages, pre-judgment interest (including damages comparable to pre-judgment interest), post-judgment interest, penalties, attorneys' and other fees and costs awarded or recovered on account thereof, and reimbursed expenses; (iii) any recoveries against attorneys, accountants, experts, directors, officers or other related parties in connection with any of the foregoing or the pursuit of the Case and amounts received on account of fees and expenses in connection with any of the forgoing, in each case, whether in the form of cash, real estate, negotiable instruments, intellectual or intangible property, choses in action, contract rights, membership rights, subrogation rights, annuities, claims, refunds, and any other rights to payment of cash and/or transfer(s) of things of value or other property (including property substituted therefor), whether delivered or to be delivered in a lump sum or in installments, in relation to any Case or negotiation with any Person in relation to the Case, and only to the extent such value is actually received by the Borrower or such Affiliate; (iv) any and all other gross revenues received by Borrower in connection with its provision of legal services, including but not limited to services rendered in connection with litigation, transactional or consulting services and regardless of whether any such revenues were pursuant to a contingency, hourly, flat-fee, or other payment agreement; *provided, however,* that "Law Firm Proceeds" shall not include (a) the amount of the recovery actually due and payable to the client, and (b) any amounts actually due and payable to a referral or handling Law firm or attorney that is not employed by or on retainer with Borrower, an Affiliate of Borrower or otherwise related (including by marriage) to Borrower, any Guarantor or any employee of Borrower or Guarantor.

Amended and Restated Loan Agreement at Section 1.1 [Claim 50 Part 5 at p. 91]. *See also* Loan Agreement at Section 1.1 [Claim 51 Part 5 at p. 9-10].

17.     Such Law Firm Proceeds are also subject to an express trust in favor of EAJF, and

the Debtor holds fiduciary duties to the Lender in connection with the Law Firm Proceeds:

(d)      Law Firm Proceeds received by Borrower are subject to an express trust in favor of Lender in the amount of Mandatory Payments due or becoming due to Lender.  Borrower and each Guarantor hold such Law Firm Proceeds as a fiduciary for the benefit of Lender and any use of any Law Firm Proceeds that is not permitted under this Agreement or authorized by Lender is a defalcation by Borrower and any Guarantor or other Loan Party utilizing those trust funds. Likewise, Borrower acknowledges that the information provided to Lender by Borrower and Borrower's representations are to obtain money, or an extension, renewal, or refinancing of credit, that Lender is relying upon all of the information and representations, that Lender's reliance is reasonable, and that falsity, fraud, or misapplication of proceeds by Borrower will render Borrower's Obligations to Lender non-dischargeable in bankruptcy under 11 U.S.C. §523(a)(2) and (4).

Amended and Restated Loan Agreement at Section 5.3 [Claim 50 Part 5 at p. 104]. *See also* Loan Agreement at Section 5.3 [Claim 51 Part 5 at p. 22].

18.      The Loan Agreement futher defines "Collateral" as:

*Section 10.1.*  Collateral.  The Obligations shall be secured by valid, perfected, and enforceable Liens on all right, title, and interest of the Borrower in all of its real property, personal property, and fixtures, including all of the Law Firm Proceeds of all Cases, whether now owned or hereafter acquired, and all proceeds thereof, but excluding any Excluded Property. The Borrower acknowledges and agrees that the Liens on the Collateral shall be granted to the Lender and shall be valid and perfected first priority Liens, in each case pursuant to one or more Collateral Documents from such Persons, each in form and substance satisfactory to the Lender; provided that until a Default has occurred and the Lender shall have requested, the Borrower shall not be required to deliver a mortgage with respect to any of its real property. When, if ever, Borrower is requested by Lender to deliver a mortgage with respect to any of its real property, Borrower will deliver such fully-executed mortgage to Lender, in form and substance satisfactory to the Lender, within ten (10) days of Lender's request. Upon Borrower's failure to deliver such fully-executed mortgage to Lender within ten (10) days of Lender's request, if any, Borrower hereby grants Lender an irrevocable limited power of attorney which is coupled with an interest to execute the mortgage on the Borrower's behalf, to record the fully-executed mortgage in the real property records, to execute any and all other required documents on behalf of the Borrower to accomplish recordation of the mortgage, and, if default is not cured, to proceed with foreclosure on the

mortgage by any methods allowed by the state in which the real property is located. Borrower authorizes Lender to file UCC-1 financing statements to set up liens on all Borrower's real property, personal property, and fixtures, including all of the Law Firm Proceeds of all Cases.

Amended and Restated Loan Agreement, Section 10.1 [Claim 50 Part 5 at p. 120-121] and Security Agreements [Claim 50 Parts 8 and 9]. *See also* Loan Agreement at Section 10.1 [Claim 51 Part 5 at p. 39] and Security Agreement [Claim 51 Part 8].

19.     EAJF's UCC financing statements also explicity define collateral to include all proceeds of the Debtor's cases:

8. **COLLATERAL CHANGE:** Check only one box: ☐ ADD collateral ☐ DELETE collateral ☑ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

All assets of the Debtor whether owned as of September 30, 2021 or thereafter acquired and wherever located, except for any reimbursable case expenses. For the avoidance of doubt, the collateral includes all fees, proceeds or other rights to payment earned by or owed to the Debtor from any legal matter or case, including but not limited to, fees and/or proceeds earned by the Debtor from the following case types or claims Zantac, Tylenol, Necrotizing Enterocolitis (NEC), Roundup, and weather damage.

Claim 50 Part 7 at p. 1. *See* Claim 51 Part 7 at p. 1.

8. **COLLATERAL CHANGE:** Check only one box: ☐ ADD collateral ☐ DELETE collateral ☑ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

All assets of the Debtor whether owned as of June 10, 2022 or thereafter acquired and wherever located, except for any reimbursable case expenses. For the avoidance of doubt, the collateral includes all fees, proceeds or other rights to payment earned by or owed to the Debtor from any legal matter or case, including but not limited to, fees and/or proceeds earned by the Debtor from the following case types or claims Zantac, Tylenol, Necrotizing Enterocolitis (NEC), Roundup, and weather damage.

Claim 50 Part 7 at p. 2. *See* Claim 51 Part 7 at p. 2.

20.     As such, and pursuant to state law, the liens of EAJF extend to the proceeds of its pre-petition collateral, including fees, proceeds, and rights to payment relating to all cases in which the Debtor held an interest pre-petition and such proceeds received post-petition.

**B.     EAJF's liens extend to the Debtor's post-petition receipts under state law.**

21.     As in *Cafeteria Operators*, state law governs the agreement between the Debtor and EAJF, and thus, we look to Delaware law to determine whether EAJF's liens extend to the Debtor's post-petition receipts and to Texas law to determine whether such liens are perfected. *See* Proof of Claim Nos. 50 and 51; 6 Del. C. § 9-301.[6]

---

[6] "Except as otherwise provided in Sections 9-303 through 9-306B, the following rules determine the law governing perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral:

22.     As an initial matter, both Texas and Delaware law allow an attorney to assign accounts receivable "consisting of current or future, earned or unearned, attorney fees as property securing a transaction," finding such assets to be "accounts" under the applicable versions of the UCC. C*ouns. Fin. Servs., L.L.C. v. Leibowitz*, 2013 WL 3895331, at *8 (Tex. App. July 25, 2013).[7]

### *(i)     Delaware UCC Provisions*

23.     Under Delaware law, "[a] security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral, unless an agreement expressly postpones the time of attachment." 6 Del. C. § 9-203(a).

Except as otherwise provided in subsections (c) through (i), a security interest is enforceable against the debtor and third parties with respect to the collateral only if:

(1) value has been given;

(2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

---

(1)  Except as otherwise provided in this section, while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral.

(2)  While collateral is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a possessory security interest in that collateral.

(3)  Except as otherwise provided in paragraph (4), while negotiable tangible documents, goods, instruments, or tangible money is located in a jurisdiction, the local law of that jurisdiction governs: (A) perfection of a security interest in the goods by filing a fixture filing; (B) perfection of a security interest in timber to be cut; and (C) the effect of perfection or nonperfection and the priority of a nonpossessory security interest in the collateral."

6 Del. C. § 9-301.

[7] *See also Hennigan v. Hennigan*, 666 S.W.2d 322, 325 (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.) (concluding that future attorney's fees constitute "accounts" under section 9.106 of the Uniform Commercial Code); *PNC Bank, Del. v. Berg,* 1997 WL 527978 at *9 (concluding that both the hourly billing and contingency fee contracts are accounts under Article 9 of the UCC); *U.S. Claims, Inc. v. Yehuda Smolar, P.C.,* 602 F.Supp.2d 590, 597–600 (E.D.Pa.2009) (holding that the assignment of amounts owed under contingency fee agreement governed by Article 9 of the UCC); *U.S. Claims, Inc. v. Flomenhaft & Cannata, LLC,* 519 F.Supp.2d 515, 521 (E.D.Pa.2006) (finding that fee contracts created rights to receive payment for services to be rendered by the law firm on behalf of its clients and thus fell squarely within definition of account); *see also ACF 2006 Corp. v. Merritt,* 2013 WL 466603, at *3 (W.D. Okla. Feb. 7, 2013), *aff'd,* 557 F. App'x 747 (10th Cir. 2014).

(3) one of the following conditions is met:

(A) the debtor has authenticated a security agreement that provides a description of the collateral and, if the security interest covers timber to be cut, a description of the land concerned;

(B) the collateral is not a certificated security and is in the possession of the secured party under Section 9-313 pursuant to the debtor's security agreement;

(C) the collateral is a certificated security in registered form and the security certificate has been delivered to the secured party under Section 8-301 pursuant to the debtor's security agreement; or

(D) the collateral is deposit accounts, electronic chattel paper, investment property, or letter-of-credit rights, and the secured party has control under Section 9-104, 9-105, 9-106, or 9-107 pursuant to the debtor's security agreement.

6 Del. C. § 9-203(a).

24.　　The term "collateral" includes: "(A) proceeds to which a security interest attaches; (B) accounts, chattel paper, payment intangibles, and promissory notes that have been sold; and (C) goods that are the subject of a consignment." 6 Del. C. § 9-102(a)(12). "'Proceeds,' except as used in Section 9-609(b), means the following property: (A) whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral; (B) whatever is collected on, or distributed on account of, collateral; (C) rights arising out of collateral; (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the collateral; or (E) to the extent of the value of collateral and to the extent payable to the debtor or the secured party, insurance payable by reason of the loss or nonconformity of, defects or infringement of rights in, or damage to, the collateral." 6 Del. C. § 9-102(a)(64).

25.　　While 6 Del. C. § 9-301 determines the law governing perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral, section 9-315

specifically governs a secured party's rights on disposition of collateral and in proceeds, including the perfection of a security interest in proceeds:

> (a) *Disposition of collateral: continuation of security interest or agricultural lien; proceeds.* — Except as otherwise provided in this Article and in Section 2-403(2):
>> (1) a security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien; and
>> (2) a security interest attaches to any identifiable proceeds of collateral.
>
> (b) *When commingled proceeds identifiable.* — Proceeds that are commingled with other property are identifiable proceeds:
>> (1) if the proceeds are goods, to the extent provided by Section 9-336; and
>> (2) if the proceeds are not goods, to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principles, that is permitted under law other than this Article with respect to commingled property of the type involved.
>
> (c) *Perfection of security interest in proceeds.* — A security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected.
>
> (d) *Continuation of perfection.* — A perfected security interest in proceeds becomes unperfected on the 21st day after the security interest attaches to the proceeds unless:
>> (1) the following conditions are satisfied:
>>> (A) a filed financing statement covers the original collateral;
>>> (B) the proceeds are collateral in which a security interest may be perfected by filing in the office in which the financing statement has been filed; and
>>> (C) the proceeds are not acquired with cash proceeds;
>> (2) the proceeds are identifiable cash proceeds; or
>> (3) the security interest in the proceeds is perfected other than under subsection (c) when the security interest attaches to the proceeds or within 20 days thereafter.
>
> (e) *When perfected security interest in proceeds becomes unperfected.* — If a filed financing statement covers the original collateral, a security interest in proceeds which remains perfected under subsection (d)(1) becomes unperfected at the later of:
>> (1) when the effectiveness of the filed financing statement lapses under Section 9-515 or is terminated under Section 9-513; or
>> (2) the 21st day after the security interest attaches to the proceeds.

6 Del. C. § 9-315.[8]

26.     Here, EAJF's liens meet the requirements for enforceability pursuant to 6 Del. C. § 9-203(a). EAJF provided the Debtor with ***actual new money*** totaling over $30,000,000 before interest, late fees, and other charges during the time period from October 2021 through the Petition Date. *See* Claim 50 Part 4; Claim 51 Part 4. The Debtor also had the right to assign its receivables to EAJF as collateral, and it did so. Not only did the Debtor own the assets pledged to EAJF as collateral, including rights to the Law Firm Proceeds under its own engagement agreements, but, applicable state law specifically allows such law firm proceeds to be assigned as collateral.[9] Further, the Debtor has authenticated the loan documents including collateral descriptions via testimony provided by its corporate representative, John Zachary Moseley ("**Moseley**"), during his September 10, 2024 deposition. Moseley Deposition at p. 70, ln. 11 – p. 110, ln. 15. Thus, EAJF's lien are enforceable under 6 Del. C. § 9-203(a).

27.     Further, EAJF's liens are perfected, as discussed below, and liens against the proceeds of the original collateral are perfected as a result under Delaware law. The proceeds are also identifiable cash proceeds, as discussed herein, and are subject to EAJF's continuing security interest post-petition.

---

[8] To the extent section 9-301 applies to perfection against proceeds, the Texas Business and Commerce Code mirrors Delaware's provision in its corresponding section regarding a secured party's rights on disposition of collateral and in proceeds. *See* Tex. Bus. & Com. Code § 9.315.

[9] Under both Texas and Delaware law, an attorney may assign accounts receivable "consisting of current or future, earned or unearned, attorney fees as property securing a transaction," as such assets are "accounts" under the applicable versions of the UCC. *Couns. Fin. Servs., L.L.C. v. Leibowitz*, 2013 WL 3895331, at *8 (Tex. App. July 25, 2013). *See also In re PNC Bank, Delaware v. Berg*, 1997 WL 527978, at *8-9 (Del. Super. Ct. Jan. 31, 1997) (concluding that an unmatured contingency attorney fee contract is an account under Article 9 of the UCC); *Hennigan v. Hennigan*, 666 S.W.2d 322, 325 (Tex.App.-Houston [14th Dist.] 1984, writ ref'd n.r.e.) (concluding that future attorney's fees constitute "accounts" under section 9.106 of the Uniform Commercial Code).

*(ii)*     ***Texas UCC Provisions***

28.     In the present case, the Debtor has its principal place of business in Houston, Texas, and its primary operating and IOLTA accounts are held by Veritex Community Bank, which is also Texas-based. Thus, pursuant to Delaware law, Texas law applies regarding the "perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral." 6 Del. C. § 9-301(1) and (3).

29.     In Texas, a financing statement must be filed to perfect security interests, with some exceptions. Tex. Bus. & Com. Code § 9.310. Importantly, the Debtor's accounts and the Law Firm Proceeds, as such term is described in the Loan Documents, do require a financing statement to be filed. *See* Tex. Bus. & Com. Code § 9.310.

30.     EAJF filed the following financing statements with the Texas Secretary of State evidencing its liens against assets of the Debtor:

| File Date | Filing Number | Description | Amendment Type |
|---|---|---|---|
| 10/12/2021 | 21-0044998138 | UCC Financing Statement | |
| 08/01/2022 | 22-0037965357 | UCC Financing Statement | |
| 05/10/2023 | 23-00205792 | Amendment to UCC Financing Statement No. 21-0044998138 | Party Information Change |
| 05/10/2023 | 23-00205802 | Amendment to UCC Financing Statement No. 22-0037965357 | Party Information Change |
| 10/19/2023 | 23-00450977 | Amendment to UCC Financing Statement No. 21-0044998138 | Restatement of Covered Collateral |
| 10/19/2023 | 23-00452139 | Amendment to UCC Financing Statement No. 22-0037965357 | Restatement of Covered Collateral |

31.     The UCC Financing Statements identified herein (the "**UCC Financing Statements**") are attached to EAJF's proofs of claim and are incorporated herein by this reference.

Claim 50 Parts 5 and 7; Claim 51 Parts 5 and 7. EAJF also filed additional UCC Financing Statements in Colorado. Claim 50 Part 6; Claim 51 Part 6.

32.     As described *supra*, the UCC Financing Statements include detailed collateral descriptions which explicitly include the proceeds of the Debtor's accounts, including the Law Firm Proceeds.

33.     Such statements filed with the Texas Secretary of State result in perfection of EAJF's liens against all assets of the Debtor, including its right to post-petition proceeds.

34.     Further, all pre-petition cash of the Debtor was encumbered as of the petition date. Thus, EAJF's Collateral includes all of the Law Firm Proceeds of all Cases, and in this case, all Cases existing as of the Petition Date, and all proceeds thereof.

35.     To the extent the Debtor used cash in its accounts to thereafter pay its employees and attorneys, it used cash collateral to pay for such services, and any funds received were proceeds of such cash collateral.

### C.     The "Equities of the Case" Exception Is Not Appropriate in this Case.

36.     In the present case, all cash used to generate post-petition revenue, including cash the Debtor has used and continues to use to pay its employees, was and is fully encumbered by EAJF's liens, and thus, the "equities of the case" exception and labor-related arguments of the Debtor are not applicable.

37.     The Debtor relies heavily on *Cafeteria Operators*[10] to support its assertion that all of its post-petition revenue is generated by the addition of the Debtor's labor and services, which

---

[10] *In re Cafeteria Operators, L.P.*, 299 B.R. 400 (Bankr. N.D. Tex. 2003). In *Cafeteria Operators*, as in the present case, the prepetition lender and debtor agreed to an initial, limited use of cash collateral, but were unable to agree on terms of a final order, with the opinion arising from hearing on the debtor's use of cash collateral and adequate assurance provisions related thereto. *Id.*

cannot be encumbered. *See* Supplement at pp. 2-5. However, *Cafeteria Operators* is distinguishable, as are the cases underlying its opinion. In *Cafeteria Operators*, the court held that only a portion of the post-petition revenue from the operation of a restaurant, specifically proceeds from the sale of inventory, was cash collateral of the secured lender and granted as adequate protection replacement liens in inventory only, where the secured lender held pre-petition security interests in "[a]ll personal and fixture property of every kind and nature including without limitation all furniture, fixtures, equipment, raw materials, inventory, other goods, accounts, ... deposit accounts, rights to proceeds of letters of credit and all general intangibles." *Cafeteria Operators*, 299 B.R. at 410. In reaching its decision, the Bankruptcy Court for the Northern District of Texas looked to *Local Loan Co. v. Hunt*[11] and other cases involving the services and labor of an ***individual debtor***, and not that of companies paying employees with a secured creditor's cash collateral. *Id.* at 404-405.[12] *Cafeteria Operators* further focused on the lender's liens on restaurant inventory and pulled examples from hotel and restaurant cases referencing liens on inventory and/or real property, rather than liens on pre-petition cash collateral used to fund post-petition payroll and operations. *Id.* at 406-408.

38.     Likewise, in *In re Premier Golf Properties, LP*,[13] there was no assertion that the lender's pre-petition cash collateral was used to fund post-petition services adding value to the

---

[11] *Local Loan Co. v. Hunt*, 292 U.S. 234 (1934) (enjoining collection against discharged individual debtor's wages).

[12] *See Smoker v. Hill & Assocs., Inc.*, 204 B.R. 966 (N.D. Ind. 1997) (involving individual Chapter 13 debtors). The Debtor further cites additional cases involving individual debtors, including *In re Rumker*, 184 B.R. 621 (Bankr. S.D. Ga. 1995) (involving an individual Chapter 13 debtor); *In re Lawrence*, 41 B.R. 36, 38 (Bankr. D. Minn.), *aff'd*, 56 B.R. 727 (D. Minn. 1984) (involving individual farmers and farm products); *In re Soto*, 667 F.2d 235, 237 (1st Cir. 1981) (enjoining collection against discharged individual debtor's wages); *Johnson v. Cottonport Bank*, 259 B.R. 125 (W.D. La. 2000) (debtor's monthly per-capita distributions as member of Indian tribe remain subject post-petition to prepetition security interest of bank notwithstanding section 552(a), because they were not derived from Johnson's post-bankruptcy labor or assets).

[13] *In re Premier Golf Properties, LP*, 477 B.R. 767 (B.A.P. 9th Cir. 2012).

estate. In that case, the debtor segregated cash collateral from the incoming green fees and driving range fees at issue, and the bank focused its argument on use of the real estate collateral, specifically, to generate such fees. *Premier Golf Properties*, 477 B.R. at 767.

39.     Other courts have examined circumstances more analogous to the present case. For example, the court in *Creditors Committee v. Marepcon Financial (In re Bumper Sales, Inc.)*[14] approved the grant of a second generation post-petition lien to the lender under § 552(b) and the UCC where "all of the value added by others was completely paid for by the lender's collateral, and only by the lender's collateral," while the court *In re Package Design & Supply Co., Inc.*[15] found that the debtor had no unencumbered assets on the petition date and that all post-petition operations had been funded through the use of cash collateral. *Package Design & Supply Co., Inc.*, 217 B.R. at 426 (citing *Bumper Sales,* 907 F.2d at 1439). In essence, where all of the Debtor's assets are encumbered by liens of one pre-petition lender, and no additional funds are added for post-petition operations, value contributed by services paid for with cash collateral are no less proceeds of collateral than would be inventory or a piece of equipment purchased with the secured creditor's cash collateral.[16]

---

[14] *Creditors Committee v. Marepcon Financial (In re Bumper Sales, Inc.)*, 907 F.2d 1430 (4th Cir.1990).

[15] *In re Package Design & Supply Co., Inc.*, 217 B.R. 422 (Bankr. W.D.N.Y. 1998).

[16] Christopher W. Frost, *Secured Credit and Effective Entity Priority*, 2019 U. CONN. L. REV. 575 (2019); Douglas G. Baird, *The Rights of Secured Creditors After* ResCap, 2015 U. ILL. L. REV. 849, 860 (2015) ("If a secured creditor has a fully perfected security interest in everything of value to Firm, including all of its cash, any assets acquired postpetition necessarily are proceeds of its collateral. To be sure, the proceeds might have been derived in part from the work of Firm's employees, but this work was paid for with the cash in which the senior creditor had a security interest. The secured creditor may not be able to show exactly how Firm generated value prepetition, but as only assets in which it had a security interest were responsible for the value generated postpetition, it does not need to."). *See also* Baird 2015 U. ILL. L. REV. at 854-860 (discussing value created in bankruptcy and secured creditors' rights to such value).

40.     *Cadle Co. v. Schlichtmann*[17] involved a security interest in a law firm's accounts receivable. In *Cadle Co.*, the plaintiff's predecessor loaned money to a law firm secured by the firm's accounts receivable, with fees under a contingency fee agreement to be paid to the firm at the conclusion of the subject litigation. *Cadle Co.*, 267 F.3d at 16. Four months following entry of a court order approving settlement in the litigation matter, but before related funds were distributed to the law firm, one of the law firm's partners filed a petition for relief under Chapter 7 of the Bankruptcy Code and received a discharge. *Id.* While the individual debtor continued to perform work in the case, the law firm dissolved, and the fee payment, received after dissolution, was distributed among the debtor and his former law partners individually. *Id.* On appeal, the First Circuit held that the "post-dissolution work of the debtor did not alter the rights as a secured creditor," as "[p]artners cannot eliminate a security interest in the partnership's anticipated fees by transferring (without the creditor's written consent) the client files, whether by dissolution of the partnership or otherwise." *Id.* at 18-19 (citing *PNC Bank, Delaware v. Berg,* 1997 WL 527978 (Del.Super.Ct.1997)). The court further found that debtor's individual discharge did not eliminate plaintiff's lien against the litigation proceeds because, under section 552(b)(1), plaintiff's security interest in the firm's accounts receivable – property acquired before the bankruptcy – extends to proceeds from the subject litigation matter, including the contingency fee received. *Id.* at 19-21.

41.     The Debtor fails to allege that it has generated any revenue which has its genesis in its post-petition engagements, and thus, all post-petition receipts related to pre-petition accounts of the Debtor.

42.     Accordingly, MMA's post-petition revenue is by default proceeds of the EAJF's collateral, up to the amount of the EAJF's claims.

---

[17] *Cadle Co. v. Schlichtmann*, 267 F.3d 14 (1st Cir. 2001).

43. EAJF denies that it would constitute a windfall for EAJF to receive the benefit of its bargain with the Debtor and the value it is entitled to as a result of its perfected liens, by receiving payment thereon as part of the Debtor's bankruptcy proceedings.

44. Further, to the extent the Debtor argues that its contingency fee counsel is providing services that should be considered, such an argument would require the Court to ignore the fact that when employed, the Debtor and Debtor's counsel agreed its counsel would not to seek attempt to surcharge secured creditors for any work being performed [ECF. Nos. 3 and 173]. To now argue EAJF's lien should be cut off as a result of any such work is disingenuous and would constitute an inequitable result. Those are not services being performed by the Debtor, and counsel's work when employed by a chapter 11 debtor does not constitute revenue generated by the addition of the Debtor's labor and services, which is what is required for its § 552(b) argument to lie.

## CONCLUSION

45. EAJF's liens clearly extend to proceeds of its pre-petition collateral received by the Debtor, post-petition. EAJF and the Debtor executed pre-petition security agreements; those agreements by their terms extend to the debtor's pre-petition property and to the proceeds, product, offspring, or profits of such property; and the applicable non-bankruptcy law of Delaware and Texas both permit the security agreements to extend to such after-acquired property. As those three preconditions exist, the EAJF lien and security agreements extend to postpetition proceeds, products, offspring, or profits of such property. Further, the Debtor does not enhance or transform the proceeds of receivables secured by the EAJF liens, nor does it pay for any expenditures relating to collection of proceeds so as to enhance recovery for EAJF, such that the equitable exceptions contained in 11 U.S.C. § 552(b)(1) should apply. EAJF requests the Court deny the Supplement.

Respectfully submitted,

**SPENCER FANE LLP**

By: */s/ Misty A. Segura*
MISTY A. SEGURA
TX Bar No. 24033174
Fed. No. 30751
3040 Post Oak Blvd., Ste. 1400
Houston, TX 77056
Office: (713) 212-2643
E-mail: msegura@spencerfane.com

***Attorneys for Equal Access Justice Fund,
LP and EAJF ESQ Fund, LP***

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on February 5, 2025, a true and correct copy of the foregoing document was served by electronic service via the Court's ECF filing system on those parties registered to receive service.

*/s/ Misty A. Segura*_____
MISTY A. SEGURA