**EXHIBIT 8**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | **Case No. 24-31596 (EVR)** |
| **MMA LAW FIRM, PLLC,** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |
| | § | |

### JASON J. JOY & ASSOCIATES, PLLC'S OBJECTION TO CONFIRMATION OF DEBTOR'S THIRD AMENDED JOINT PLAN OF LIQUIDATION
**[Relates to ECF No. 1577]**

Jason J. Joy & Associates, PLLC ("***JJA***"), by and through undersigned counsel, respectfully files this Objection to Confirmation of the *Third Amended Joint Plan of Liquidation* [ECF No. 1577] (the "***Plan***") filed by MMA Law Firm, PLLC (the "***Debtor***" or "***MMA***") and the Official Committee of Unsecured Creditors (the "***Committee***"), and in support thereof respectfully represents as follows:

### PRELIMINARY STATEMENT

1.    The Plan, as drafted, contains exculpation, gatekeeping, and injunction provisions that are impermissible under Fifth Circuit law.  As applied to JJA, these provisions would improperly extinguish, channel, or impose unauthorized barriers on the prosecution of JJA's potential claims against John Zachary Moseley ("***Moseley***").  Additionally, the Plan's treatment of executory contracts with "handling firms" fails to accurately identify which contracts MMA is assuming or provide for the cure of breaches under those contracts prior to assumption.  *See* Plan, § 6.1.

2.    Accordingly, JJA respectfully requests that the Court deny confirmation of the Plan, or in the alternative, require the Debtor to (i) modify the Plan's exculpation, gatekeeper, and Stay

1

Party injunction provisions to conform with applicable law as a condition of confirmation and (ii) clarify the treatment of assumed executory contracts under section 6.1 of the Plan.

## BACKGROUND

### A. The Bankruptcy Case

3. On April 9, 2024 (the "**Petition Date**"), MMA filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in this Court, after the number of the Debtor's attorneys had been suspended from the practice of law in Louisiana.

4. On July 1, 2026, the Debtor and the Committee jointly filed the Plan and the Third Amended Disclosure Statement [ECF No. 1576] (the "**Disclosure Statement**"). The liquidating Plan does not contemplate MMA continuing as a going concern, and the Debtor expressly does not receive a discharge under section 1141(d)(3) of the Bankruptcy Code. *See* Plan § 9.3. The Plan proposes the appointment of Allison Byman as Plan Administrator with sole authority to liquidate estate assets and prosecute Causes of Action retained by the estate. The Plan also proposes to retain Moseley, Katy Ohlsson, and Morgan Weaver-Gallacher as winddown consultants, which will include compensation and maintaining health insurance. *See* Plan, §§ 5.6, 5.8. They would receive protections under the Plan that render the Plan unconfirmable.

### B. JJA's Relationship with MMA and the Former MMA Client Docket

5. In early June 2023, Mr. Moseley contacted Jason Joy to introduce himself and request JJA's assistance in salvaging roughly 6,000 former MMA clients that had not yet obtained new counsel following MMA's suspension in March 2023. Joy did not know Moseley and was only loosely familiar with MMA's situation in the Louisiana Courts. Moseley contacted Joy because of Joy's reputation for successfully litigating large numbers of injured Louisiana victims

2

18552062

in mass disaster litigation. Joy also maintained extensive personal and professional ties to south Louisiana and the legal community in that state.

6.     Moseley impressed upon Joy the extreme urgency of the situation as several thousand lawsuits needed to be (properly) filed ahead of the rapidly approaching two-year statute of limitations[1] for claims arising out of Hurricane Ida. After considerable due diligence, Joy determined to help the victims as few firms were willing to be associated with Mr. Moseley or MMA thereby leaving thousands of innocent victims stranded.

7.     JJA and MMA entered into a Secondment Agreement on or about June 23, 2023, under which MMA agreed to transfer former MMA clients and thousands of case files to JJA. *See* ECF No. 1427-1. These former MMA clients had not yet retained new counsel following MMA's suspension from the practice of law. Under the Secondment Agreement, JJA agreed to hold forty-five (45%) of fees in trust pending resolution of MMA's claimed interest. *See* ECF No. 1427-1 at 1. The Secondment Agreement was negotiated and drafted by Mr. Sangisetty of the Sangisetty Law Firm, PLLC ("**SLF**") while acting as JJA's attorney in fact, beginning in June 2023. In exchange, MMA was supposed to transfer client files to JJA for continued representation. MMA was obligated to deliver complete and usable files, including accurate case information, correct insurer identification, and supporting documentation. MMA failed to do so. JJA was forced to remediate approximately 974 Louisiana hurricane cases at its own expense, impairing the settlement posture of numerous matters. JJA agreed to hold 45% of fees in trust pending resolution of MMA's claimed interest.

8.     On or about July 2, 2023, JJA and SLF entered into a written Joint Venture Agreement (the "***Joint Venture Agreement***") to jointly represent Louisiana hurricane claimants

---

[1] Or, prescriptive period, in Louisiana legal parlance.

18552062

(the "**JJA-SLF Cases**"); it was modified in September 2023, following the Hurricane Ida prescriptive deadline (August 29, 2023). The Joint Venture Agreement established a co-counsel framework: SLF would serve as Louisiana counsel of record and handle the day-to-day, case-specific litigation tasks, including mediations and hearings. JJA would assume "joint responsibility" for each JJA-SLF Client "as defined under Texas Disciplinary Rules of Professional Conduct Rule 1.04 and its official comments," and JJA would provide know-how and advance costs and expenses to finance the joint venture and assist SLF as requested and needed, including the hiring and retention of additional attorneys.

9. JJA is engaged in multiple lawsuits involving SLF and other non-debtor third parties related to the former MMA cases.[2] JJA may also have claims against Moseley related to his misconduct arising from the facts surrounding the lawsuits involving SLF.

10. At Moseley's strong recommendation, JJA and its then-co-counsel SLF implemented the SmartAdvocate case-management system (the same system MMA had previously used) for the sole use and benefit of the JJA-SLF clients and joint venture. JJA advanced nearly $30,000 to implement the system for the sole use and benefit of the JJA-SLF clients and the joint venture with JJA and SLF. The SmartAdvocate system logs all user activity, including case access, document views, edits, and deletions.

11. After MMA was terminated as counsel and affected clients executed fee agreements with JJA and SLF, MMA personnel unlawfully accessed JJA's SmartAdvocate case management

---

[2] There is currently a lawsuit between SLF and JJA pending under Case No. 2:25-cv-01561 (E.D. La.) ("**Louisiana Case**"). The Louisiana Case involves an alleged fee-splitting dispute between SLF and JJA. SLF filed suit against JJA in Terrebonne Parish, and JJA removed the case to the Eastern District of Louisiana. There is also a proceeding in the 32nd Judicial District Court for the Parish of Terrebonne, Louisiana, styled *Sangisetty Law Firm, LLC v. Xpand Legal, LLC*, Case No. 200581 (the "**Xpand Case**"). SLF filed the Xpand Case against Xpand Legal, LLC on August 14, 2024, alleging breach of contract. The contract is between SLF, JJA, and Xpand. On March 17, 2025, the court sustained SLF's exception of nonjoinder, ruling that JJA is an indispensable party. JJA has since joined the litigation. JJA is also the plaintiff in a lawsuit against several non-debtor third parties involving the former MMA cases JJA took over from MMA. *Jason Joy & Associates, PLLC v. Ravi K. Sangisetty, et al.*, Case No. 4:26-cv-04083 (S.D. Tex.).

18552062

system without JJA's knowledge or authorization.  It is unknown if SLF provided MMA with login credentials or access—if so, it was without JJA's knowledge or approval.  Through this unauthorized access, JJA believes MMA personnel accessed approximately 2,084 cases, deleted approximately 26 documents, and generated a total activity index of approximately 18,381 actions in JJA's proprietary system.  JJA also believes that MMA obtained JJA's confidential legal-malpractice fee agreement template—a proprietary and privileged document—which MMA later attached to its own court filing at ECF No. 402-7 (Nov. 10, 2024).  MMA's unauthorized access caused harm and loss to JJA, including the compromise of confidential client and firm materials, impairment of JJA's proprietary systems, and costs incurred to investigate and remediate the unauthorized access.

12.     JJA raised these potential claims in *Jason J. Joy & Associates, PLLC's Amended Limited Objection Regarding Debtor's Motion to Compromise Controversy with Sangisetty Law Firm, PLLC* [ECF No. 1427] to specifically preserve JJA's claims.  *See* ECF No. 1427, ¶ 16.  The order approving MMA's compromise with SLF provides, "nothing in this Order, the attached Settlement Agreement, or the compromise approved herein shall be construed as resolving, adjudicating, releasing, impairing, or otherwise affecting any rights, claims, causes of action, or defenses that Jason Joy & Associates, PLLC may have (if any) against any party or property, including (but not limited to) claims and causes of action against Sangisetty, or that Sangisetty may have against Joy, all of which are expressly preserved in full."  ECF No. 1509 at 1.

13.     Although JJA later filed a *Notice of Withdrawal of its Amended Limited Objection* [ECF No. 1505] based on revisions to the proposed order resolving the SLF compromise, JJA has at all times continued to reserve its rights, claims, causes of action, and defenses against MMA and related parties—including Moseley—for these acts.

18552062

## ARGUMENT

**I.    The Plan's Exculpation, Gatekeeper, and Stay Party Injunction Provisions Are Independently Impermissible Under Fifth Circuit Law.**

14.    The Plan's exculpation, gatekeeper, and Stay Party injunction provisions are impermissible under binding Fifth Circuit precedent. The Court should deny confirmation or, at minimum, require modification of each provision as a condition of confirmation.

15.    JJA has potential claims against Moseley, including for (among other things) the unauthorized access to and use of JJA's confidential legal-malpractice fee agreement template. That template was filed on this Court's docket at ECF No. 402-7 on November 10, 2024—seven months after the Petition Date.  While the Plan Administrator retains authority to pursue estate causes of action against Moseley, (Plan, §§ 5.16–5.18), JJA's potential claims do not belong to the estate and are not protected by the Plan Administrator's pursuit of estate claims.  Accordingly, JJA's potential claims cannot properly be subject to the Plan's release, exculpation, injunction, or gatekeeper provisions.  Likewise, the claims against Moseley may not be released, exculpated, enjoined, or limited under applicable Fifth Circuit law.

### A. The Exculpation Provision (Plan §§ 1.1.33 and 9.5) Is Overbroad Under Fifth Circuit Law

16.    Section 1.1.33 of the Plan defines "Exculpated Parties" to include:

(a) the Debtor, (b) the Committee; and (c) with respect to each of the foregoing, such Entity's and its current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisors, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, in each case acting in such capacity at any time on or after the Petition Date.

Plan, § 1.1.33.

17.    Section 9.5 of the Plan (Exculpation) provides that Exculpated Parties shall have no liability for acts taken or omitted "from the Petition Date to the Effective Date" in connection

6

18552062

with the case, except for bad faith, actual fraud, willful misconduct, or gross negligence determined by Final Order. Plan § 9.5. The final sentence of section 9.5 states: "For the avoidance of doubt, and consistent with Sections 524(e) and 105 of the Bankruptcy Code, the exculpation provided shall extend only to the Debtor and other estate fiduciaries, and solely for conduct within the scope of their duties in connection with the Case." There is an internal inconsistency between the broad section 1.1.33 definition of "Exculpated Parties" and the narrower final sentence of section 9.5. The Plan simultaneously extends exculpation to non-fiduciary agents, employees, attorneys, accountants, investment bankers, and "other professionals," and then purports to limit it "only to the Debtor and other estate fiduciaries." Furthermore, it is not clear who is an "other estate fiduciary" and whether that term includes Mr. Moseley, against whom JJA independently has claims.

18. The Fifth Circuit has established a clear, well-settled rule governing the permissible scope of exculpation in Chapter 11 plans: "our precedent and § 524(e) require any exculpation in a Chapter 11 reorganization plan be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties." *NexPoint Advisors, L.P. v. Highland Capital Management, L.P. (In re Highland Capital Management, L.P.)*, 48 F.4th 419, 437–38 (5th Cir. 2022) ("**Highland I**"); *see also In re Pacific Lumber Co.*, 584 F.3d 229, 251–53 (5th Cir. 2009).

19. In *Pacific Lumber*, the Fifth Circuit saw "little equitable about protecting the released non-debtors from negligence suits arising out of the reorganization. In a variety of contexts, this court has held that Section 524(e) only releases the debtor, not co-liable third parties" and determined that "the non-debtor releases must be struck except with respect to the Creditors Committee and its members." 584 F.3d at 252–53.

7

18552062

20.     In *Highland I*, the Fifth Circuit confirmed that the permissible scope extends only to a "limited qualified immunity to creditors' committee members for actions within the scope of their statutory duties" and "a limited qualified immunity to bankruptcy trustees unless they act with gross negligence." 48 F.4th at 437 (citing *In re Smyth*, 207 F.3d 758, 762 (5th Cir. 2000); *In re Ondova Ltd. Co.*, 914 F.3d 990, 993 (5th Cir. 2019)).  Independent directors serving in a quasi-trustee capacity may also receive limited immunity for conduct short of gross negligence or willful misconduct.  *See In re Instant Brands Acquisition Holdings*, Case No. 23-90716, 2025 Bankr. LEXIS 503, at *9–10 (Bankr. S.D. Tex. Mar. 3, 2025).

21.     The Plan's section 1.1.33 definition of "Exculpated Parties" violates this rule on its face. It extends exculpation to, among other things: (i) current and former officers, directors, managers, principals, and members; (ii) employees, agents, advisors, and advisory board members; (iii) financial advisors, partners, attorneys, accountants, investment bankers; and (iv) consultants, representatives, and "other professionals."

22.     These categories include numerous persons who are *not* estate fiduciaries (e.g., "employees," "agents," "accountants," "consultants," and "other professionals").  The Fifth Circuit does not recognize exculpation for such non-fiduciary parties, and section 524(e) prohibits it.  *See Highland I*, 48 F.4th at 435–36 (holding the exculpation "partly runs afoul of that statutory bar on non-debtor discharge by reaching beyond Highland Capital, the Committee, and the Independent Directors").  Moseley, Katy Ohlsson, and Morgan Weaver-Gallacher cannot be exculpated parties under applicable Fifth Circuit law.

23.     The internal inconsistency within the Plan itself confirms the provision's deficiency.  The final sentence of section 9.5 states: "the exculpation provided shall extend *only* to the Debtor and other estate fiduciaries, and solely for conduct within the scope of their duties."

18552062

This narrowing sentence—plainly inserted to recite the correct legal standard—is irreconcilable with section 1.1.33's sweeping definition that encompasses scores of non-fiduciary persons. The Plan cannot be confirmed with this contradiction intact. *See Highland I*, 48 F.4th at 435 ("We must reverse and strike the few unlawful parts of the Plan's exculpation provision."). The U.S. Trustee's objection [ECF No. 1589] raises materially identical concerns and proposes narrowing section 1.1.33's definition coextensively. JJA agrees that the definition of "Exculpated Party" should be narrowed so long as "other estate fiduciary" is properly defined, including whether that term includes Mr. Moseley.

### B. The Gatekeeper Provision (Plan § 9.7) Unlawfully Expands the *Barton* Doctrine Beyond Estate Fiduciaries.

24. The gatekeeper provision in section 9.7 of the Plan is unlawful because its operative sentence requires prior court authorization for any claim "that may be subject to the foregoing exculpation *and injunction* provisions." This ties the gatekeeping function not only to the exculpation provision in section 9.5 but also to the separate injunction in section 9.6 and potentially the non-debtor "Stay Parties" stay in sections 5.6 and 5.8.

25. Section 9.6 of the Plan (Injunction) enjoins holders of claims from commencing or continuing any action "against the Debtor or the Reorganized Debtor or its assets." Similarly, section 9.7 (Gatekeeper Provision) requires that "[n]o Person or Entity may commence, continue, amend, or otherwise pursue … a Claim or Cause of Action of any kind that may be subject to the foregoing exculpation and injunction provisions" without first obtaining a determination that the claim is "colorable" and specific authorization from the Bankruptcy Court. Plan, § 9.7. The final sentence of section 9.7 states the provision "is limited to the Exculpated Parties and to the exculpation provisions of this Plan and does not extend to any party beyond the Exculpated Parties," but its operative language ties gatekeeping to both "the foregoing exculpation *and*

18552062

*injunction* provisions," creating an ambiguity that potentially expands the gatekeeping function beyond its stated limitation. *Id.* Because sections 5.6 and 5.8 provide for a "stay" (i.e., an injunction) as to Moseley, Ohlsson, and Weaver-Gallacher, claims against them are potentially subject to the Gatekeeper Provision in section 9.7 as well.

26. This is the construction the Fifth Circuit condemned in *Highland II*. In *Highland II*, the court held that "injunctions … may not be entered to protect non-debtors not legally entitled to release," 132 F.4th at 358, and that bankruptcy courts have "never extended the *Barton* doctrine to give bankruptcy courts gatekeeping power over claims against non-debtors." *Highland Capital Management Fund Advisors, L.P. v. Highland Capital Management, L.P. (In re Highland Capital Management, L.P.)*, 132 F.4th 353, 359 (5th Cir. 2025) ("**Highland II**"). The court further held that any attempt to expand a gatekeeper clause beyond that scope would be "patently beyond the power of an Article I court under § 105." *Id.* at 362.

27. The Southern District of Texas recently applied *Highland II* in *Epstein v. Container Store Group, Inc. (In re Container Store Group, Inc.)*, 676 B.R. 356 (S.D. Tex. 2026). As the Fifth Circuit held in *Highland II*, the proper reading of *Highland I* required that "the definition of 'Protected Parties' used in the gatekeeper provision of the reorganization plan to be coextensive with the definition of 'Exculpated Parties' in the exculpation provision." *Id.* at 394 (citing *Highland II*, 132 F.4th at 360).

28. The *Barton* doctrine authorizes gatekeeping *only* for claims against estate fiduciaries for acts within the scope of their fiduciary duties. *See Barton v. Barbour*, 104 U.S. 126 (1881); *Villegas v. Schmidt*, 788 F.3d 156, 159 (5th Cir. 2015) (a party must "obtain leave of the bankruptcy court before initiating an action in district court when the action is against the trustee or other officer, for acts done in the actor's official capacity"); *In re Craig's Stores of Tex., Inc.*,

18552062

266 F.3d 388, 390 (5th Cir. 2001) (bankruptcy court retains post-confirmation jurisdiction only over "matters pertaining to the implementation or execution of the plan").

29.     Section 9.7's tethers the gatekeeper function to the "injunction provisions" of section 9.6 (which protects the Debtor and Reorganized Debtor generally) and sections 5.6 and 5.8 (which provide an 18-month stay that protects Moseley, Ohlsson, and Weaver-Gallacher) and improperly expands the gatekeeping mechanism beyond claims against estate fiduciaries in their fiduciary capacities. The cure is straightforward: "and injunction" must be stricken from section 9.7, consistent with the U.S. Trustee's proposed redline language, and the gatekeeper's scope must be narrowed proportionately with the permissible scope of the revised exculpation provisions.

30.     The final sentence of section 9.7 itself purports to limit the provision to "the Exculpated Parties and to the exculpation provisions of this Plan," but this limitation is defeated by the earlier operative language expressly incorporating the "injunction provisions." The inconsistency renders the provision facially impermissible. *See In re AIO US, Inc.*, 677 B.R. 509, 562 (Bankr. D. Del. 2025) (questioning any gatekeeping role extending the injunction "past the scope of the exculpation and other appropriate releases of estate claims themselves").

**C. The Stay Party Injunction (Plan, §§ 5.6, 5.8 and 9.3) Functions as an Impermissible Non-Consensual Third-Party Release.**

31.     The Plan's Stay Party injunction—staying "ALL PERSONS AND ENTITIES" from pursuing "ANY" action against Moseley, Ohlsson, and Weaver-Gallacher in their "INDIVIDUAL OR PERSONAL CAPACITY" for 18 months—functions as a de facto non-consensual third-party release protecting non-debtors. It fails to satisfy the constitutional and statutory requirements for such relief under binding Fifth Circuit and Supreme Court authority.

**1.  Non-Consensual Third-Party Releases Are Prohibited.**

11

18552062

32. The Supreme Court's decision in *Purdue Pharma* definitively holds that "the bankruptcy code does not authorize a release and injunction that, as part of a plan of reorganization under Chapter 11, effectively seeks to discharge claims against a nondebtor without the consent of affected claimants." *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 227 (2024). The Supreme Court emphasized that the touchstone is *consent by affected claimants*—consent JJA has never given.

33. Bankruptcy courts have reached the same result, holding that a plan's discharge of non-debtor obligations without creditor consent "manifestly contravenes the public policy of the United States." *In re Vitro, S.A.B. de C.V.*, 473 B.R. 117, 133 (Bankr. N.D. Tex. 2012). The Fifth Circuit affirmed, holding that the bankruptcy court did not abuse its discretion in determining that the plan sought to discharge non-debtor obligations and in declining, on that basis, to enforce the plan in the United States. *See In re Vitro S.A.B. de C.V.*, 701 F.3d 1031, 1059–60 (5th Cir. 2012); *see also Pacific Lumber*, 584 F.3d at 252–53 (non-debtor releases must be stricken except for limited qualified committee immunity).

### 2. The Stay Party Injunction Lacks the Required Consent and Necessity Showing.

34. Plan sections 5.6 and 5.8 establish a "Stay Party" injunction. Upon entry of the Confirmation Order and continuing for 18 months, "ALL PERSONS AND ENTITIES ARE STAYED AND ENJOINED FROM COMMENCING OR CONTINUING, IN ANY MANNER OR IN ANY PLACE, ANY JUDICIAL, ADMINISTRATIVE, ARBITRAL, OR OTHER ACTION OR PROCEEDING OF ANY KIND AGAINST ANY OF THE STAY PARTIES [i.e., Moseley, Ohlsson, and Weaver-Gallacher] IN HIS OR HER INDIVIDUAL OR PERSONAL CAPACITY." Plan, § 5.8. The sole carve-out from this stay is for EAJF's preserved guaranty

18552062

claims against Moseley under the EAJF Settlement (ECF No. 588). There is no carve-out for JJA's (or any party's) claims against Moseley.

35.     First, JJA never voted for, opted into, or consented to any release or stay of its claims against Moseley. JJA has preserved those claims in its filings in this case. *See* ECF Nos. 1424, 1427, and 1505.

36.     Second, the Plan and Disclosure Statement identify no extraordinary or exceptional circumstances establishing that the Stay Party injunction is necessary to the administration of the estate *as to JJA's claims*. No evidence has been presented that staying claims against Moseley for 18 months will generate any incremental value for the estate or facilitate any estate function.

37.     Third, the Plan is a *liquidating* plan with no reorganization to protect. The traditional justification for non-debtor injunctions—that they are "necessary to the reorganization"—is wholly absent. There is no going concern to protect, no fresh-start equity infusion conditioned on release of claims against the Stay Parties, and no evidence that JJA's prosecution of its potential claims against Moseley would impair the Plan Administrator's independent, retained causes of action against insiders.

> ### 3. Section 9.9 of the Plan Confirms the Stay Party Injunction Cannot Reach JJA's Claims.

38.     The Plan's section 9.9 provides: "nothing in the release provisions in this Plan shall operate as a third-party discharge or affect the liability of any non-debtor party in contravention of 11 U.S.C. § 524(e)." This provision is an admission by the Plan's proponents that the Plan's release provisions cannot lawfully extinguish or stay claims against non-debtors like Moseley without consent. The Stay Party injunction, which does precisely that, is irreconcilable with Plan section 9.9 and with section 524(e) of the Bankruptcy Code as a matter of law.

13

18552062

39. At minimum, JJA's potential claims against Moseley must be expressly carved out from the Stay Party injunction, or the injunction must be modified to apply only to claims the holder has consensually released.

## II. Article VI of the Plan Fails to Specify the Cure of Breaches Under Assumed Executory Contracts.

40. Section 6.1 of the Plan provides that "all Executory Contracts … not previously assumed by the Debtor by Final Order of the Court, or that were not included in a motion to assume pending on the Confirmation Date, will be deemed rejected …". Plan, § 6.1. Section 6.1 goes on, however, to state that, "[t]o the extent necessary, all contracts with handling firms are assumed and shall remain in full force and effect, with assumption occurring with the Confirmation of the Plan. All Agreements approved by this Court during this Bankruptcy Proceeding, to the extent executory are specifically assumed." *Id.*

41. Under Bankruptcy Code section 365(b)(1), a debtor may not assume a contract,

> unless, at the time of assumption of such contract or lease, the trustee … cures, or provides adequate assurance that the trustee will promptly cure, such default … (b) compensates, or provides adequate assurance that the trustee will promptly compensate … for any actual pecuniary loss to such party resulting from such default; and … provides adequate assurance of future performance …

11 U.S.C. § 365(b)(1). MMA is obligated to promptly cure defaults under the "contracts with handling firms" and compensate JJA for its actual pecuniary losses, including any contractual interest and attorneys' fees, and provide adequate assurance of future performance.

42. MMA has failed to specify which contracts with "handling firms" (i) it maintains are executory and (ii) that it is seeking to assume. It has also not set forth (iii) the proposed cure for each of those contracts and (iv) has not given an opportunity for "handling firms" to object to the proposed cure amounts. JJA and MMA are party to the Secondment Agreement under which JJA has potential breach of contract claims against MMA that MMA would need to cure prior to

14

18552062

assumption. *See* ECF No. 1427-1. The Plan cannot be confirmed until MMA specifies treatment of "handling firm" executory contracts and provides an opportunity for objections.

## CONCLUSION

WHEREFORE, JJA respectfully requests that the Court:

    i.    Deny confirmation of the Plan as currently drafted; or

    ii.    in the alternative, require modification of the Plan's offending provisions as a condition of confirmation, including:

        a.    Narrowing the definition of "Exculpated Parties" (§ 1.1.33) to conform with *Highland I* and *Pacific Lumber* by limiting it to the Debtor, the Committee and its members (for conduct within their statutory duties under § 1103(c)), and any party serving in a trustee or quasi-trustee capacity (for conduct within the scope of their fiduciary duties and short of gross negligence);

        b.    Striking "and injunction" from section 9.7 and narrowing the Gatekeeper Provision to extend only to estate fiduciaries for acts taken in their fiduciary capacity, consistent with applicable law;

        c.    Expressly carving out from the Stay Party injunction (Plan, §§ 5.6 and 5.8) all of JJA's claims against Moseley, or alternatively modifying the Stay Party injunction so that it applies only to claims the holder has consensually released; and

        d.    Declaring that Plan §§ 9.5, 9.6, and 9.7 do not and cannot reach, channel, enjoin, or impose gatekeeping requirements on JJA's claims against Moseley.

    iii.    Granting JJA such other and further relief as the Court deems just and equitable. JJA expressly preserves all objections, claims, defenses, rights, and arguments for appeal.

15

18552062

Dated: July 22, 2026
Houston, Texas.

Respectfully submitted,

**PORTER HEDGES LLP**

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl; TX Bar No. 24038592
Heather K. Hatfield; TX Bar No. 24050730
Michael B. Dearman; TX Bar No. 24116270
1000 Main Street, 36th Floor
Houston, Texas 77002
Telephone: (713) 226-6000
Facsimile: (713) 226-6248
jwolfshohl@porterhedges.com
hhatfield@porterhedges.com
mdearman@porterhedges.com

**COUNSEL TO JASON J. JOY &
ASSOCIATES, PLLC**

## CERTIFICATE OF SERVICE

I certify that on July 22, 2026, I caused a copy of the foregoing document to be served by electronic transmission to all registered ECF users appearing in this case as of the date hereof.

*/s/ Joshua W. Wolfshohl*
Joshua W. Wolfshohl

16

18552062

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **In Re:** | § | |
| | § | **Case No. 24-31596 (EVR)** |
| **MMA LAW FIRM, PLLC,** | § | |
| | § | **Chapter 11** |
| **Debtor.** | § | |
| | § | |
| | § | |

## ORDER DENYING CONFIRMATION OF THIRD AMENDED PLAN
[Relates to ECF No. 1577]

On this day the Court considered confirmation of the Third Amended Joint Plan of Liquidation [ECF No. 1577] (the "***Plan***") filed by MMA Law Firm, PLLC and the Official Committee of Unsecured Creditors. Due notice and opportunity for hearing having been given to all parties by the Clerk, and the Court having considered the Plan, the objections thereto, any reply, any evidence, and arguments of counsel, and it having been shown to the satisfaction of the Court, it is hereby

**ORDERED** that confirmation of Debtor's Third Amended Joint Plan of Liquidation is **DENIED**.

Signed this _____ day of _____, 2026.

_____
HONORABLE EDUARDO V. RODRIGUEZ
CHIEF UNITED STATES BANKRUPTCY JUDGE

18552062