United States District Court
Southern District of Texas
**ENTERED**
February 04, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § § § § | CIVIL ACTION NO. 4:24-CV-4446 |
| MMA LAW FIRM, PLLC | § § | ADVERSARY PRO. NO. 24-3127 |
| | § § § | |

### <u>CERTIFICATION REQUEST FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS TO THE HONORABLE SUPREME COURT OF LOUISIANA</u>

**TO THE HONORABLE SUPREME COURT OF LOUISIANA AND THE JUSTICES THEREOF:**

This certification request arises out of a number of disputes over attorneys' fees and costs incurred in Louisiana. These cases are pending in the Southern District of Texas due to a bankruptcy filed in the Houston Division of the Southern District of Texas. While the bankruptcy proceedings are pending here in Houston, this Court has withdrawn the reference for the matters pertaining to this certification request. These disputes stem from hundreds, if not thousands, of Hurricane Ida cases-the vast majority of which were pending or are still pending-in the State of Louisiana.

After Hurricane Ida, McClenny Moseley & Associates, PLLC ("MMA"), a Houston-based law firm and the Debtor in the current bankruptcy, represented or purported to represent thousands of plaintiffs across the State of Louisiana in cases against their insurance companies. Eventually, some courts became concerned with the quality of MMA's representation of its clients. *See, e.g., Franatovich v. Allied Tr. Ins. Co.,* 2023 WL 7005861, at *1, *11 (E.D. La. Mar. 16, 2023) (stating that MMA likely "violated multiple ethical rules and, quite possibly Louisiana law"); *In re*

EXHIBIT 6

*McClenny, Moseley & Associates, PLLC*, No. 3:23-mc-00062 (W.D. La. Aug. 22, 2023) (Doc. No. 37), *rev'd on other grounds*, 2024 WL 2874371 (5th Cir. 2024) (describing MMA's "continued unethical behavior including but not limited to mishandling of client trust funds, failure to deposit client funds into a properly registered IOLTA trust account in the State of Louisiana, and MMA's clear abrogation of their representation of alleged clients evidenced by sending out emails and text messages with the phone number of this District Court to their alleged Louisiana Clients and instructing them to contact this Court for status updates on their cases"). Even the Supreme Court of Louisiana[1] found that one of the lead Louisiana lawyers for MMA, Richard William Huye III, participated in inappropriate conduct. He was suspended on an interim basis for "threat of harm" to the public. *In re: Richard William Huye III*, No. 2023-B-00277 (La. Mar. 3, 2023). According to a filed Declaration of John Zachary Moseley ("Moseley Declaration"), the managing member of MMA, "[a]fter negative orders were entered by Louisiana District Courts and the licenses of MMA's attorneys were suspended in Louisiana, MMA was no longer able to represent its clients in [Louisiana]." (Bankr. No. 24-3127, Doc. No. 94-1 at ¶ 13).[2] It is undisputed that MMA either withdrew from representation or was discharged from virtually all of the remaining cases.[3]

---

[1] Since there are (and have been) multiple courts involved in this litigation, in the interest of clarity, this certification request will refer to this Honorable Court as the "Supreme Court of Louisiana" or "Supreme Court." The certification request refers to the undersigned Court as "this Court."

[2] The Declaration was clearly referencing the "negative orders" in the cases cited above that either threatened to impose or actually imposed certain sanctions on MMA or its lawyers. *Franatovich*, 2023 WL 700586; *In re McClenny, Moseley & Associates, PLLC*, No. 3:23-mc-00062; *In re: Richard William Huye III*, No. 2023-B-00277.

[3] In this Certification Request, this Court frames the factual background and its questions hypothetically, as it has not yet had to decide whether MMA, its lawyers, or agents actually committed any acts of misconduct. Although the allegations referenced in this certification permeate the pleadings in the cases pending in this Court and in various courts in Louisiana, the parties dispute the allegations. The Moseley Declaration, however, recognizes that the allegations of misconduct—whether true or not—resulted in MMA being no longer able to continue its

EXHIBIT 6

Despite the serious disciplinary allegations in Louisiana, MMA initiated adversary proceedings in this District against a number of successor law firms—law firms that took over these Hurricane Ida cases after MMA withdrew from representation—to collect attorneys' fees and costs from these firms. The successor firms (the defendants in these adversary proceedings) are almost uniformly Louisiana law firms. A number of these successor law firms contend that the fee agreements between MMA and Hurricane Ida clients should be considered absolute nullities under Louisiana law and ethical standards of conduct, including Article 2030 of the Louisiana Civil Code, and therefore that MMA should be barred from collecting any fees or costs—even under a theory of *quantum meruit* or quasi-contract.

This issue of Louisiana state law is of critical importance to the overall resolution of the adversary cases pending in Houston—for the Debtor and its creditors here in the bankruptcy proceeding, for the successor law firms, and perhaps for some of the underlying plaintiffs who are awaiting finality. This Court respectfully seeks the Supreme Court of Louisiana's input, and in order to demonstrate why, it hereby provides an overview of what is perceived as the existing legal framework and factual background of this litigation and respectfully requests the answers to the enumerated questions of state law below.

## I.    The Existing Legal Framework in Louisiana as Presented to This Court

The litigants concede that Louisiana law controls the issues, and they focus on five state cases and one article in the civil code to frame their legal arguments as to whether MMA may be entitled to attorneys' fees or costs. This Court does not read these collective sources to be dispositive of the issues pending in Texas.

---

representation of its Louisiana clients, (Bankr. No. 24-3127, Doc. No. 94-1 at ¶ 13), but this Court has not made any findings of fact regarding the allegations of misconduct.

3

EXHIBIT 6

In 1974, the Supreme Court of Louisiana held that a contingent fee arrangement in a divorce action was void as against public policy, but that the attorneys could nonetheless recover legal fees using a *quantum meruit* or quasi-contract theory. *Succession of Butler*, 294 So. 2d 512, 515 (La. 1974). In its analysis, the Supreme Court largely focused on the sanctity of the institution of marriage, the public policy of the state concerning marriage, and the roles of the husband and wife in a divorce settlement. It also expounded on the application of contingent fee arrangements specifically to divorce actions. The Supreme Court held that the classic justification for contingent fee arrangements, "that it allows one who could not otherwise afford counsel to procure adequate representation," does not apply to divorce proceedings. *Id.* at 514. The Supreme Court noted that the law firm in question had entered into the fee arrangement as an accommodation and that no "evil result grew out of the contract in the case at bar." *Id.* Nonetheless, it found the fee arrangement was still a nullity as a matter of law because of a violation of Louisiana's public policy. *Id.*

Two years later, a Louisiana appellate court reached a different result in a case involving attorney misconduct and the unauthorized practice of law. In *Gray v. Atkins*, an attorney collaborated with a private investigator to obtain business for his practice. 331 So. 2d 157, 163–65 (La. Ct. App. 3rd Cir. Apr. 14, 1976). The investigator communicated with the client, offered legal advice, and aided her in the process of signing legal documents. *Id.* The appellate court found that this constituted as the unauthorized practice of law, and since the attorney was coordinating with this non-lawyer investigator, the attorney–client agreements were in "contravention of prohibitory law" and thus, null and void. *Id.* at 166. The appellate court held that the fact that the fee contract was a nullity due to attorney misconduct prohibited the attorney from collecting fees. *Id.* It did not reach the question of whether the attorney was entitled to court costs (or any other

4

EXHIBIT 6

form of non-contractual compensation), as there was insufficient evidence admitted in the trial court to support this demand for reimbursement. *Id.*

After another two years, in 1978, the Supreme Court of Louisiana adopted what has been referred to often in the Texas litigation as the *Saucier* framework to allocate attorneys' fees in cases with successor attorneys. *Saucier v. Hayes Dairy Products, Inc.*, 373 So. 2d 102 (La. 1978) (on rehearing). The Supreme Court held that an attorney discharged (without cause), and replaced by a second attorney who took the case to completion, is entitled to a share of the "highest ethical" contingency fee. *Id.* at 118. The Supreme Court reasoned that the first attorney should receive compensation for his time and labor on the case. *Id.* Nevertheless, it also held the client should not have to compensate both the original and successor attorney under the terms of the contingency agreements because that practice would result in the client paying two separate contingency fees. *Id.* at 117. Therefore, the Supreme Court held that the attorneys should split the "highest ethical" contingency agreement based on the following factors:

1. the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

2. the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

3. the fee customarily charged in the locality for similar legal services;

4. the amount involved and the results obtained;

5. the time limitations imposed by the client or by the circumstances;

6. the nature and length of the professional relationship with the client;

7. the experience, reputation and ability of the lawyer and lawyers performing the services;

8. whether the fee is fixed or contingent.

EXHIBIT 6

*Id.* at 116. Though not expressly addressed, the Supreme Court did note that under the Louisiana Code of Professional Conduct, courts can "assur[e] that unethical conduct, such as solicitation on the part of one attorney of another's client, will not be countenanced or rewarded." *Id.* at 118.

Several years later, the Louisiana legislature enacted Article 2030 of the Louisiana Civil Code in 1985. La. Civ. Code art. 2030. The Article states:

> A contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral. A contract that is absolutely null may not be confirmed.
>
> Absolute nullity may be invoked by any person or may be declared by the court on its own initiative.

*Id.* At least one Louisiana appellate court (outside of this Hurricane Ida litigation) has applied Article 2030 to contingency fee agreements. *See Skannal v. Jones Odom Davis & Politz, L.L.P.*, 124 So. 3d 500, 515 (La. Ct. App. 2nd Cir. Sep. 25, 2013).[4]

In *Vidrine v. Abshire*, a Louisiana appellate court addressed the issue of "case running." 558 So. 2d 288 (Ct. App. 1990). In that case, an attorney entered into a fee-splitting arrangement with a "case runner" to recruit clients and manage his docket. *Id.* at 290. The appellate court held that the "case runner" could not use this fee agreement as collateral for a loan because the agreement was unethical. *Id.* While the appellate court did not address whether the attorney was entitled to collect fees from the client, it condemned the practice of "case running." *Id.* It held that

---

[4] In this case, the state appellate court held that a contingency fee portion of a hybrid attorneys' fee agreement was a nullity under Article 2030 and the Rules of Professional Conduct. *Id.* The appellate court emphasized that "the Supreme Court of Louisiana has exclusive authority to regulate the practice of law in [the] state" and "any dispute relative to an attorney–client relationship is subject to the close scrutiny of the Louisiana Supreme Court." *Id.* at 12. It held that because the contingency fee was not "contingent on the outcome of the matter for which the service was rendered," it was a nullity. *Id.* at 14. The court relied on Article 2030 as a basis to declare it a nullity. *Id.* at 17, 25 ("[A]n absolutely null provision of a contract in violation of public policy may not be confirmed." (citing La. Civ. Code arts. 2030, 1842)).

6

EXHIBIT 6

"a 'running' contract is unenforceable" and a violation of the Rules of Professional Conduct. *Id.* at 293. The Western District of Louisiana has applied the discussion in *Vidrine* to the Hurricane Ida litigation. *See, e.g., Trahan v. Allstate Vehicle & Prop. Ins. Co.*, 2023 WL 8457282, at *3 (W.D. La. Oct. 5, 2023) ("A contract to pay a third party for client contacts in violation of the 'case running' rule is null and unenforceable.").

In 1996, the Supreme Court ruled in *O'Rourke v. Cairns* in a manner extending the *Saucier* framework, albeit, in a modified fashion. 683 So. 2d 697 (La. 1996). While the *Saucier* opinion was focused on attorneys terminated without cause, the *O'Rourke* opinion created a framework for the distribution of legal fees for an attorney that was terminated for cause. *Id.* In *O'Rourke*, the trial court found that an attorney was terminated for "just cause" because the attorney "seldom communicated" with the client and "was not even aware of certain key aspects of the litigation." *Id.* at 703. Relying on the factual finding that the attorney was terminated for cause, the Supreme Court held that an attorney representing a client pursuant to a contingent fee agreement that was discharged for cause was nonetheless still entitled to a share of the resulting attorneys' fees based upon the *Saucier* factors—with one caveat: courts can reallocate the distribution based on the "nature and gravity" of the conduct leading to the discharge. *Id.* at 704. The *O'Rourke* Court labeled this as a "modified *quantum meruit* analysis" and adopted this approach to permit courts to consider "the conduct of attorneys which mar the profession and client confidence by requiring dismissal for cause." *Id.*

Fast forward to today, courts across Louisiana have applied these cases to the Hurricane Ida litigation—specifically related to the MMA law firm, the Debtor in this case. *See, e.g., Duplantis v. Certain Underwriters at Lloyds London*, 2023 WL 8444382 (W.D. La. Oct. 5, 2023); *Bowie v. Shelter Mutual Ins. Co.*, 2023 WL 9659935 (W.D. La. Oct. 5, 2023); *Jones-Bell v.*

7

EXHIBIT 6

*Imperial Fire & Cas. Ins. Co.*, 2023 WL 6247963 (W.D. La. Sep. 22, 2023); *Ricks v. Imperial Fire & Cas. Ins. Co.*, 2024 WL 1750738 (E.D. La. Apr. 5, 2024); *Franatovich v. Allied Tr. Ins. Co.*, 2023 WL 7005861 (E.D. La. Mar. 16, 2023); *In re Hurricane Ida Claims*, Order Regarding Settlement of Former MMA Cases (E.D. La. Dec. 19, 2024) (en banc). Many judges have used strong language when discussing the alleged conduct and imposed harsh sanctions on the law firm and its lawyers. *See, e.g., Franatovich*, 2023 WL 7005861, at *1 ("William Huye, Zach Moseley, and McClenny, Moseley & Associates have been nothing less than a scourge on this State and its citizens, the Court, and the Bar."). The vast majority of these courts held that the contingency fee agreements between MMA and its clients were unenforceable as a violation of public policy and, as a result, MMA was not entitled to any attorneys' fees or costs from the clients or successor law firms. While the Louisiana courts all seem to agree that the alleged conduct was diametrically opposed to the Rules of Professional Conduct, MMA has now turned to the Bankruptcy Court in the Southern District of Texas (and, on appeal, to this Court) to determine whether it can collect attorneys' fees from various successor law firms through bankruptcy adversary proceedings.

## II.    An Overview of the MMA Litigation in the Southern District of Texas

The Justices of the Supreme Court of Louisiana, in all likelihood, are quite familiar with the facts and circumstances of the litigation spawned by Hurricane Ida. Nevertheless, this Court will present a limited background of the facts as they have been represented to this Court. Obviously, the narrative begins with the aftermath of Hurricane Ida, including devastating rain and flood damage. A Houston-based law firm, MMA, represented (or, at least, represented that it represented) thousands of Louisiana claimants whose homes were damaged by the storm. The vast majority of these lawsuits were filed by homeowners against their insurance companies. Though it is a matter of a factual dispute in this Court exactly how MMA's representation of these clients

8

EXHIBIT 6

was initiated, it is undisputed that MMA utilized some form of a marketing firm to publicize their services. Opponents argue that this marketing firm was a glorified "case running" entity in violation of the Rules of Professional Conduct and Louisiana state law. MMA has denied any wrongdoing.

The Moseley Declaration filed in the Bankruptcy Court stated that after Louisiana courts began to address the allegations of unethical behavior and/or the unauthorized practice of law, MMA "was no longer able to represent its clients" in Louisiana. (Bankr. No. 24-3127, Doc. No. 94-1 ¶ 13). Eventually, MMA withdrew from its representation of most, if not all, of the plaintiffs across the state. Some cases were pending in state court; many were pending in federal court. A number of successor law firms took over these cases to help bring the cases to conclusion.

After its exodus from the Hurricane Ida litigation, MMA filed for Chapter 11 bankruptcy in the Bankruptcy Court for the Southern District of Texas. Subsequently, MMA filed multiple adversary proceedings against the successor law firms, seeking reimbursement for its attorneys' fees and costs for its work on the Hurricane Ida cases. MMA contends that these fees and costs must be included in its bankruptcy estate. These adversary proceedings remain pending. If MMA is successful, the fees and costs awarded to it will become part of MMA's bankruptcy estate, and the Bankruptcy Court will ultimately determine how those assets will be distributed. Since the successor law firms have demanded jury trials, this Court will preside over any such trial, if indeed that becomes necessary. All sides agree that any trial will be controlled by Louisiana law and its ethical rules.

MMA denies any wrongdoing or unethical conduct, and nothing the Court has said in this certification request (or any other order to date) should be taken as a finding by this Court one way or the other. That being said, in its pursuit to recover fees and costs, MMA relies upon the

9

EXHIBIT 6

combination of *Saucier* and *O'Rourke* to stand for the proposition that under Louisiana law, it is entitled to a share of the fees later obtained by the successor law firms, and the costs it expended, when the case(s) were (or are still in the process of being) settled. MMA argues that whether it withdrew or was discharged with or without cause is not a matter of concern, as the *Saucier/O'Rourke* framework establishes that MMA can collect under a *quantum meruit*/quasi-contract theory of recovery regardless of the manner by which its representation ceased.

In opposition, the successor law firms in the adversary proceedings have argued that this alleged misconduct, including allegations that the attorney–client fee arrangements were obtained unethically (or perhaps, even illegally), require this Court to find that any fee agreement must be an absolutely nullity either under Article 2030 or under the laws and ethical rules of the State of Louisiana. The successor law firms rely on *Gray*, *Vidrine*, and the wording of Article 2030 to argue that MMA is not entitled to any attorneys' fees or costs as a result of their conduct—even through a *Saucier/O'Rourke* modified *quantum meruit* theory of recovery. They argue that any compensation would, in effect, reward the alleged unethical/illegal activity.

### III.  Questions for Consideration by the Supreme Court

With this factual background of the ongoing proceedings in the Southern District of Texas and considering that the primary disputes in this case are focused on (1) attorney–client relationships in Louisiana and (2) the relationship between a predecessor law firm and the successor law firm in Louisiana, this Court requests the Honorable Supreme Court of Louisiana to accept this certification and answer the following questions of law, which will aid this Court in expediting resolution of these cases:

1. Setting aside any federal requirements for standing, Louisiana Civil Code Article 2030 states that "any person" may invoke the claim/fact that a contract is an absolute nullity. While this Court is normally inclined to follow the clear wording of a statue, the parties

10

EXHIBIT 6

in the Texas proceedings have raised standing as an issue. Therefore, this Court requests the Supreme Court to answer the following:

    A.  Can a successor law firm, in a lawsuit filed against it by a predecessor law firm seeking fees and costs, who either no longer could continue the representation and withdrew or was discharged by the client or the court, raise the defense that the predecessor law firm's earlier misconduct renders the predecessor's contingent fee contract an absolute nullity?

2.  In *Succession of Butler*, the Supreme Court found a contingent fee contract to be against public policy in divorce (dissolution or reconciliation) cases but nevertheless allowed the attorney to seek fees or costs via a request for *quantum meruit*. 294 So. 2d 512. The reasoning in this case seemed to center around the nature of the institution of marriage, and the reasoning that a fee in such a case "should not be an inducement to either reconcile the parties or dissolve the marital relation." *Id.* at 514–15. While not directly found by the Supreme Court of Louisiana, it seems implicit that the Supreme Court found no misconduct on the contracting attorney's part, as he entered the contingent fee contract as an "accommodation to Mrs. Butler." *Id.* at 514. With that background, this Court asks the following:

    A.  If an attorney–client contingent fee contract was entered into as the result of either unethical or illegal means implemented by an attorney or someone acting on his or her behalf, or during the representation of the client the attorney practiced in an unethical or illegal manner, is that contingent fee contract a nullity?

    B.  If the answer to Question 2(A) is yes—that the contingent fee contract is a nullity—can that attorney still seek attorneys' fees and costs on any basis, including a non-contractual (be it quasi-contract or *quantum meruit*) basis?

    C.  If the answer to Question 2(B) is yes—that the attorney can seek fees and costs despite his or her misconduct—against whom can he or seek fees: the former client, the successor law firm, or both?

3.  The *Saucier/O'Rourke* framework addresses the allocation of attorneys' fees and costs in situations in which a law firm either (1) was terminated from representation without cause or (2) was terminated for cause. In many, if not all, instances, MMA was not terminated, but the firm withdrew from representation based on the series of orders that hindered its lawyers from continuing representation. With this background in mind:

    A.  Does the *Saucier/O'Rourke* framework apply to a case in which a law firm is not discharged but instead withdraws from representation because it was no longer able to represent the client, or would the withdrawal from such cases render the withdrawing firm ineligible for the collection of attorneys' fees and costs?

11

EXHIBIT 6

B. Assuming an attorney with a contingent fee contract withdraws from the representation of a client in an attempt to either avoid an adverse ruling by a court or to avoid sanctions or accusations due to some form of misconduct by the attorney or his or her employees or agents, can that attorney subsequently recover his or her fees and/or costs on any basis from the successor law firm who takes up the case and represents the client from the point of withdrawal to conclusion?

4. In *O'Rourke v. Cairns*, the Supreme Court found that the trial court properly found that a predecessor attorney was terminated for "just cause" for communication problems and general case mismanagement. 683 So.2d at 703. However, the Supreme Court did not make an express finding that the predecessor attorney participated in any illegal or unethical conduct. With that background in mind:

A. Assuming an attorney with a contingent fee contract was found to have participated in illegal conduct or conduct in violation of the Louisiana Rules of Professional Conduct, as opposed to mere neglect or negligence, can that attorney subsequently recover his or her fees and/or costs on any basis from the successor law firm who takes up the case and represents the client from the point of withdrawal to conclusion?

5. If the "modified *quantum meruit* analysis" espoused in *O'Rourke v. Cairns* is found to apply to the matters pending in Texas, who would reallocate the attorneys' fees and costs based on the "nature and gravity" of the misconduct—the Court or the jury?

The Attorneys and Parties in the above-referenced proceedings are as follows:

Johnie J. Patterson, II
Miriam Trubek Goott
Walker & Patterson PC
4815 Dacoma Street
Houston, Texas 77092
jjp@walkerandpatterson.com
mgoott@walkerandpatterson.com
**Counsel for Debtor/Plaintiff/Appellee, MMA Law Firm, PLLC**

Matthew Brian Probus
The Probus Law Firm
10497 Town & Country Way, Suite 930
Houston, Texas 77024
matthewprobus@theprobuslawfirm.com

Rebekka C. Veith
Kerry James Miller
Monica Leigh Bergeron
Miller, Thibodeaux, Dysart, Veith & Paschal, LLC
643 Magazine Street, Suite 405

EXHIBIT 6

New Orleans, LA 70130
rveith@mtdvp.com
kmiller@mtdvp.com
mbergeron@mtdvp.com
**Counsel for Appellant/Defendant, Morris Bart, LLC**

The above-referenced attorneys have been diligent and cooperative in the representation of their respective clients. This Court is confident that if the Supreme Court desires additional briefing from the Parties, these attorneys would do their best to accommodate the request.

**Respectfully submitted.**

Signed on this the ___4ᵗʰ___ day of February 2026.

Andrew S. Hanen
United States District Judge

13

EXHIBIT 6