**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § § § § § | |
| **MMA LAW FIRM, PLLC** | | **CASE NO. 24-31596** |
| **DEBTOR** | | **CHAPTER 11** |

**THIRD AMENDED DISCLOSURE STATEMENT IN SUPPORT OF**
**SECOND AMENDED JOINT PLAN OF LIQUIDATION**

**MMA Law Firm, PLLC,** the debtor in this case ("**Debtor**" and/or the "**Company**"), files this Third Amended Disclosure Statement pursuant to the provisions of 11 U.S.C. § 1125 in support of their Amended Joint Plan of Liquidation (the "**Plan**").

**I.**
**INTRODUCTION**

"**Plan**" means the accompanying First Amended Joint Plan of Liquidation. Information contained in this Disclosure Statement summarizes the Plan and should not be solely relied upon for voting purposes. Creditors and Interest Holders are urged to read the Plan carefully and are further urged to consult with their counsel in order to understand the Plan fully. The Plan is a legally binding document.

**IN THE OPINION OF THE DEBTOR, THE TREATMENT OF CREDITORS AND THE INTEREST HOLDERS UNDER THE PLAN PROVIDES A GREATER CHANCE OF RECOVERY THAN THAT WHICH IS LIKELY TO BE ACHIEVED UNDER OTHER ALTERNATIVES REGARDING THE LIQUIDATION OF THE DEBTOR. ACCORDINGLY, THE DEBTOR BELIEVES THAT CONFIRMATION OF THE PLAN WOULD BE IN THE BEST INTERESTS OF CREDITORS AND RECOMMEND ACCEPTANCE OF THE PLAN.**

**1.01 REPRESENTATIONS.**

**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE COURT AS CONTAINING "ADEQUATE INFORMATION" AS DEFINED IN SECTION 1125(a) OF THE CODE FOR USE IN SOLICITATION OF ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN. THE FILING AND DISSEMINATION OF THIS DISCLOSURE STATEMENT ARE NOT INTENDED TO BE, AND SHOULD NOT IN ANY WAY BE CONSTRUED AS, A SOLICITATION OF VOTES ON THE PLAN, NOR SHOULD THE INFORMATION CONTAINED IN THIS PROPOSED DISCLOSURE STATEMENT BE RELIED UPON FOR ANY PURPOSE BEFORE THE COURT DETERMINES THAT THE PROPOSED DISCLOSURE STATEMENT CONTAINS ADEQUATE INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, AS FAR AS IS REASONABLY PRACTICABLE IN LIGHT OF THE NATURE AND**

**HISTORY OF THE DEBTOR AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS, THAT WOULD ENABLE A HYPOTHETICAL INVESTOR OR CREDITOR OF THE RELEVANT CLASS TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN. THE DEBTOR RESERVES THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT ANY TIME BEFORE THE HEARING TO CONSIDER WHETHER THE SAME CONTAINS "ADEQUATE INFORMATION" AND AUTHORIZE THE SOLICITATION OF ACCEPTANCES AND REJECTIONS OF THE PLAN. A SEPARATE NOTICE OF HEARING WILL BE SERVED TO NOTIFY PARTIES IN INTEREST OF THE DATE AND TIME SCHEDULED FOR A HEARING ON THE APPROVAL OF THIS PROPOSED DISCLOSURE STATEMENT.**

### A.     Introduction

The Debtor submits this Disclosure Statement for use in the solicitation of votes on the First Amended Joint Plan of Liquidation for MMA Law Firm, PLLC (the "Plan"). The Plan is annexed as Exhibit 1 to this Disclosure Statement. Capitalized terms used in this Disclosure Statement shall have the meaning given to them in the Plan.

The following is a nonexclusive list of certain key terms in the Plan:

- This is a Plan of Liquidation. Upon the Effective Date, MMA Law Firm, PLLC shall cease operations as an active law firm. The Plan does not contemplate, and does not provide for, the Debtor continuing as a going concern. The Debtor will not receive a discharge.

- Payment in full of all Allowed Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims;

- Appointment of Allison Byman as Plan Administrator with sole authority to liquidate all assets of the Estate, prosecute and resolve all Causes of Action, make distributions to Holders of Allowed Claims, and wind down and dissolve the Debtor;

- Dissolution of the Unsecured Creditors Committee on the Effective Date and replacement by an Oversight Committee comprising one (1) representative of EAJF and two (2) members designated by the Unsecured Creditors Committee;

- Retention of John Zachary Moseley, Katy Ohlsson, and Morgan Weaver-Gallacher as Consultants to the Plan Administrator (capped at fifteen (15) hours per week absent further approval) to preserve institutional knowledge necessary to maximize recoveries on prepetition assets and Causes of Action;

- An eighteen (18)-month stay of actions against the Consultants (the "Stay Parties") in their individual or personal capacities;

- Implementation of the EAJF Settlement (ECF No. 588) approved by the 9019 Order (ECF No. 683), including the agreed Allowed Secured Claim of EAJF in the aggregate amount of $25,000,000.00 (capped) and the agreed Allowed General Unsecured Claim of EAJF in the amount of $17,000,000.00;

- Extinguishment of all Equity Interests in the Debtor as of the Effective Date, with any residual distribution to Equity only if all Allowed Claims in Classes 1 through 4 are paid in full.

The sources of funding for the Plan include the prosecution of claims and causes of action against multiple law firms to recover fees and expenses earned for the representation of thousands of clients with casualty claims and the potential sale of the Debtor's four (4) separate mass tort dockets currently being prosecuted by partnered handling firms. There are no other significant assets.

This Disclosure Statement sets forth certain relevant information regarding the Debtor's pre-petition operations and financial history, the need to seek Chapter 11 protection, significant events that have occurred during the Case, and the resultant analysis of the expected treatment of the Debtor's Creditors and Interest Holders. This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of Confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. Additionally, this Disclosure Statement discusses the confirmation process and the voting procedures that Holders of Claims and Interests must follow for their votes to be counted.

All descriptions of the Plan set forth in this Disclosure Statement are for summary purposes only. To the extent there are any inconsistencies between this Disclosure Statement and the Plan, the Plan shall control. You are encouraged to review the Plan in full.

**YOU ARE BEING SENT THIS DISCLOSURE STATEMENT BECAUSE YOU ARE A CREDITOR, INTEREST HOLDER, OR OTHER PARTY IN INTEREST OF THE DEBTOR. THIS DOCUMENT DESCRIBES A CHAPTER 11 PLAN OF LIQUIDATION WHICH, WHEN CONFIRMED BY THE COURT, WILL GOVERN HOW YOUR CLAIM OR INTEREST WILL BE TREATED. THE DEBTOR URGES YOU TO CAREFULLY REVIEW THE DISCLOSURE STATEMENT AND THE PLAN.**

**THE DEBTOR AND THE COMMITTEE BELIEVE THAT ALL CREDITORS ENTITLED TO VOTE SHOULD VOTE IN FAVOR OF THE PLAN.**

**B.      Summary of the Plan**

This is a Plan of Liquidation. Upon the Effective Date, MMA Law Firm, PLLC shall cease operations as an active law firm and a Plan Administrator shall be appointed to liquidate the Estate, prosecute and resolve all Causes of Action, make periodic distributions to Holders of Allowed Claims in accordance with the priority scheme set forth in the Plan, and take all steps necessary to wind down and dissolve the Debtor. Allison Byman is appointed as Plan Administrator as of the Effective Date. The retention of certain former personnel as Consultants is solely to assist the Plan Administrator in the liquidation of prepetition assets and claims and shall not be construed as a continuation of the Debtor's law firm operations in any form.

Under the Plan, Claims and Interests are classified, and each Class has its own treatment. Holders of Allowed Claims will be paid a percentage or portion of their Claim either on the Effective Date as set forth in the Plan or periodically over time pursuant to the specific treatment of such Class of Claims. Distributions shall be made upon resolution of the many causes of action the Debtor is currently pursuing against law firms for earned fees and costs, as well as upon the proposed sale or monetization of the Debtor's significant mass tort dockets. The payment of classified Claims is entirely contingent upon the Plan Administrator's ability to prosecute and

recover on the Estate's claims and on the sale or monetization of the Mass Tort Dockets, and at this point is entirely speculative.

The table below describes each Class of Claims and Interests, which Holders of Claims and Interests belong in each Class, the treatment of each Class of Claims or Interests, and the expected recovery of each Holder of Claims or Interests in the respective Class.

| Class Description | Voting and Treatment |
|---|---|
| **Unclassified Claims** | |
| **Administrative Claims** (Including Professional Fee Claims)<br>**Estimated Amount:** $550,000.00<br>**Estimated Recovery:** $550,000.00 (100%) | Except to the extent that a Holder of an Allowed Administrative Claim and the Debtor agree to less favorable treatment for such Holder, each Holder of an Allowed Administrative Claim (including all Professional Fee Claims and Claims for fees and expenses pursuant to Section 1930 of Chapter 123 of Title 28 of the United States Code) shall be paid in full in cash on the later of (a) the Effective Date, or (b) the date on which such Administrative Expense Claim becomes an Allowed Administrative Claim, or as soon as reasonably practicable thereafter. Alternatively, all Allowed Administrative Claims (excluding Professional Fee Claims and Claims for fees and expenses pursuant to Section 1930) may be assumed by the Reorganized Debtor and paid in the ordinary course.<br><br>Except for Professional Fee Claims, unless previously filed, requests for payment of Administrative Claims must be filed and served on the Debtor no later than forty-five (45) days after the Effective Date.<br><br>The estimated amount of Administrative Claims set forth above reflects estimated accrued and unpaid Professional Fee Claims and other Administrative Claims as of the anticipated Effective Date and does not include ongoing post-Effective-Date Permitted Expenses, which are described in, and will be projected in the Wind-Down. |
| **Priority Tax Claims**<br>**Estimated Amount:** $0.00<br>**Estimated Recovery:** N/A | Except to the extent that a Holder of an Allowed Priority Tax Claim and the Debtor agree to less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, treatment in a manner consistent with Section 1129(a)(9)(C) of the Code. |
| **Classified Claims** | |
| **Class 1: Other Priority Claims** | Class 1 consists of any Allowed Other Priority Claims against the Debtor. Each Holder of a Class 1 Claim will be paid on the |

4

| Class Description | Voting and Treatment |
|---|---|
| **Estimated Amount:** $0.00<br>**Estimated Recovery:** N/A | later of: (i) the Effective Date or as soon as practicable thereafter or (ii) if such Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order allowing such Claim becomes a Final Order, or as soon as reasonably practicable thereafter, or at such time and upon such terms as may be agreed upon by such Holder and the Debtor. Except to the extent that a Holder of a Class 1 Claim and the Debtor agree to less favorable treatment, each Holder of an Allowed Other Priority Claim shall receive, in full and final satisfaction of such Claim, one of the following treatments, in the sole discretion of the Debtor: (i) full payment in cash of its Allowed Priority Claim, or (ii) treatment of its Allowed Priority Claim in a manner that leaves such Claim Unimpaired.<br><br>**The Holders of Claims in Class 1 are Unimpaired.** In accordance with Section 1126(f) of the Code, the Holders of these Claims are conclusively presumed to accept this Plan and are not entitled to vote. |
| **Class 2: Secured Claim of EAJF**<br>**Allowed Amount:** $25,000,000.00 (capped)<br>**Estimated Recovery:** $4,000,000.00 – $17,000,000.00 | Class 2 consists of the Secured Claim of Equal Access Justice Fund, LP and EAJF ESQ, LP (collectively, "EAJF"), which is deemed Allowed in the aggregate amount of $25,000,000.00 pursuant to the terms of the EAJF Settlement (ECF No. 588) and 9019 Order (ECF No. 683). Except to the extent that EAJF agrees otherwise in writing, EAJF shall, in full and final satisfaction of such Allowed Secured Claim, be paid the EAJF Funds; provided, however, that:<br><br>(i) EAJF shall under no circumstances be entitled to receive in excess of $25,000,000.00 on account of the Secured Claim of EAJF from any source and shall not be entitled to any postpetition interest, fees, or costs related to the Secured Claim of EAJF regardless of whether the EAJF Funds exceed $25,000,000.00;<br><br>(ii) EAJF's entitlement to distributions is subject to Section 3.c of the EAJF Settlement, which provides that EAJF's right to receive 90% of the proceeds of the "Two Cases" (as defined in the EAJF Settlement) shall be deferred for a period of one (1) year following the Confirmation Date, and during such one-year deferral period the Estate's retained share of Two Cases proceeds shall constitute Available Funds and shall be available for distribution to Holders of Allowed Claims in Class 4; and<br><br>(iii) EAJF shall under no circumstances be entitled to any Allowed Claim in Class 4 on account of any deficiency in recovery on its Secured Claim regardless of whether such |

| Class Description | Voting and Treatment |
|---|---|
| | recovery is less than $25,000,000.00 (other than the agreed Allowed General Unsecured Claim of EAJF in the amount of $17,000,000.00 pursuant to the terms of the EAJF Settlement). <br><br> The treatment and payment of Class 2 provided herein shall be consistent with the terms and conditions of the EAJF Settlement and the 9019 Order, which are incorporated as if fully set forth herein. Any inconsistencies shall be governed by the terms of the EAJF Settlement and the 9019 Order. <br><br> **Class 2 is Impaired** and EAJF as the Holder of such Claim is entitled to vote. |
| **Class 3: Other Secured Claims** <br><br> **Estimated Amount:** $0.00 <br><br> **Estimated Recovery:** N/A | Class 3 consists of any Other Secured Claims against the Debtor. Except to the extent agreed otherwise in writing by such Holder, each Holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction of such Claim, either (a) payment in full of the Allowed Amount of such Other Secured Claim (as determined in accordance with Section 506(a) of the Code) by the Debtor in cash on the Effective Date or in the ordinary course of business as and when due, or (b) return of the collateral securing such Allowed Other Secured Claim on the Effective Date or as soon as practicable thereafter. Any Holder of an Allowed Other Secured Claim may agree to any treatment of such Claim, including preservation of such Holder's Lien, provided that such treatment shall not provide a return having a present value in excess of the Allowed Amount of such Claim. <br><br> **The Holders of Class 3 Claims are Unimpaired.** In accordance with Section 1126(f) of the Code, such Holders are conclusively presumed to accept this Plan and are not entitled to vote. |
| **Class 4: General Unsecured Claims** <br><br> **Estimated Amount:** $27,000,000.00 (including EAJF's $17,000,000.00 Allowed GUC) <br><br> **Estimated Recovery:** $0.00 – $5,000,000.00 | Class 4 consists of any General Unsecured Claims against the Debtor, including, for the avoidance of doubt, an Allowed General Unsecured Claim of EAJF in the amount of $17,000,000.00 pursuant to the terms of the EAJF Settlement. Except to the extent agreed otherwise in writing by such Holder, each Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction of such Claim, such Holder's Pro Rata Share of the GUC Funds. <br><br> "GUC Funds" means all proceeds of Estate assets held or received at any time by the Plan Administrator, including those proceeds that are not EAJF Funds, after (i) satisfaction of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured |

| Class Description | Voting and Treatment |
|---|---|
| | Claims, and (ii) payment of Permitted Expenses (including any appropriate Reserves for anticipated Permitted Expenses). The Plan Administrator shall continue to prosecute Causes of Action until all claims are either determined to be not cost effective or have been resolved. Distributions shall be made on no less than a bi-annual basis. **Class 4 is Impaired.** The Holders of these Claims are entitled to vote to accept or reject the Plan. |
| **Class 5: Equity Interests** **Estimated Amount:** N/A **Estimated Recovery:** $0.00 | Class 5 consists of any Interests in the Debtor. Because this is a Plan of Liquidation, all Equity Interests shall be extinguished as of the Effective Date. Holders of Equity Interests shall receive no distribution on account of such Interests unless and until all Holders of Allowed Claims in Classes 1 through 4 have been paid in full. Upon payment in full of all Allowed Claims and satisfaction of all wind-down expenses and obligations of the Estate, any remaining funds shall be distributed to Holders of Allowed Equity Interests in Class 5 in accordance with their respective membership interests. **Class 5 is Impaired.** In accordance with Section 1126(g) of the Code, the Holders of Interests in Class 5 are impaired and entitled to vote. |

### C. Filing of the Debtor's Case

On April 9, 2024 (the "**Petition Date**"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Code in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. The Debtor filed the Case to preserve the value of its estate and to restructure its financial and legal affairs. To such end, the Debtor has continued to manage its business as debtor in possession in accordance with Sections 1107 and 1108 of the Code. An official committee of unsecured creditors was appointed by the United States Trustee on April 30, 2024 (ECF No. 23).

### D. Purpose of Disclosure Statement

The purpose of this Disclosure Statement is to enable creditors whose Claims are Impaired to make an informed decision in exercising their right to vote to accept or reject the Plan. Approval of this Disclosure Statement does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered under the Plan. The Court's approval does indicate, however, that the Court has determined that the Disclosure Statement contains adequate information to permit a Creditor to make an informed judgment regarding acceptance or rejection of the Plan.

**E.      Hearing on Approval of Disclosure Statement**

The Court has scheduled a hearing to consider final approval of this Disclosure Statement (the "Disclosure Statement Hearing") on [DATE] at [TIME] .m., Central Time, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. Once commenced, the Disclosure Statement Hearing may be adjourned or continued by announcement in open court with no further notice.

**F.      Hearing on Confirmation of Plan**

Pursuant to Section 1128 of the Code, the Court has scheduled a hearing to consider confirmation of the Plan (the "Confirmation Hearing") on [DATE] at [_____.m.], Central Time, in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. Once commenced, the Confirmation Hearing may be adjourned or continued by announcement in open court with no further notice.

**G.      Disclaimers**

THIS DISCLOSURE STATEMENT IS PROVIDED FOR USE SOLELY BY HOLDERS OF CLAIMS AND INTERESTS AND THEIR ADVISERS IN CONNECTION WITH THEIR DETERMINATION TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY OTHER ENTITY FOR ANY OTHER PURPOSE.

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY IMPACT ON YOUR DECISION TO ACCEPT THE PLAN. PLEASE READ THIS DOCUMENT WITH CARE.

FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS THE REPRESENTATION OF THE DEBTOR ONLY AND NOT OF THEIR ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS. FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECTED TO AN AUDIT BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT. THE FINANCIAL PROJECTIONS AND OTHER FINANCIAL INFORMATION, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, NECESSARILY WERE BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY UNCERTAIN AND MAY BE BEYOND THE CONTROL OF THE DEBTOR AND THE DEBTOR'S MANAGEMENT.

THE DEBTOR IS NOT ABLE TO CONFIRM THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT INCLUDE ANY INACCURACIES. HOWEVER, THE DEBTOR HAS MADE ITS BEST EFFORT TO PROVIDE ACCURATE INFORMATION AND ARE NOT AWARE OF ANY INACCURACY IN THIS DISCLOSURE STATEMENT.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN INDEPENDENTLY INVESTIGATED BY THE COURT AND HAS NOT YET BEEN APPROVED BY THE COURT. IN THE EVENT THIS DISCLOSURE STATEMENT IS APPROVED, SUCH APPROVAL DOES NOT CONSTITUTE A DETERMINATION BY THE COURT OF THE FAIRNESS OR MERITS OF THE PLAN

OR OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT.

THE ONLY REPRESENTATIONS THAT ARE AUTHORIZED BY THE DEBTOR THE DEBTOR, THE VALUE OF THEIR ASSETS, THE EXTENT OF THEIR LIABILITIES, OR ANY OTHER FACTS MATERIAL TO THE PLAN ARE THE REPRESENTATIONS MADE IN THIS DISCLOSURE STATEMENT. REPRESENTATIONS CONCERNING THE PLAN OR THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT ARE NOT AUTHORIZED.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE, AND ALL SUCH HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR OWN ADVISERS.

THE DEBTOR HAS NO ARRANGEMENT OR UNDERSTANDING WITH ANY BROKER, SALESMAN, OR OTHER PERSON TO SOLICIT VOTES FOR THE PLAN. NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS IN CONNECTION WITH THE PLAN OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT AND, IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATIONS SHOULD NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED. THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS CORRECT AS OF ANY TIME AFTER THIS DATE OR THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT OR IN THE AFFAIRS OF THE DEBTOR SINCE THIS DATE. ANY ESTIMATES OF CLAIMS AND INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE FINAL AMOUNTS OF CLAIMS OR INTERESTS ALLOWED BY THE COURT. SIMILARLY, THE ANALYSIS OF ASSETS AND THE AMOUNT ULTIMATELY REALIZED FROM THEM MAY DIFFER MATERIALLY.

THE DESCRIPTION OF THE PLAN CONTAINED IN THIS DISCLOSURE STATEMENT IS INTENDED TO BRIEFLY SUMMARIZE THE MATERIAL PROVISIONS OF THE PLAN AND IS SUBJECT TO AND QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS OF THE PLAN.

THE DEBTOR IS MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THIS DATE UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTOR MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THEY HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT

9

**HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTOR RESERVES THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.**

## II.
## VOTING PROCEDURES AND CONFIRMATION REQUIREMENT

### A. Ballots and Voting Deadline

Holders of Claims and Interests who are entitled to vote on the Plan in this Case will receive instructions for submitting a Ballot to vote to accept or reject the Plan. After carefully reviewing the Disclosure Statement, each Holder of a Claim or Interest (or its authorized representative) entitled to vote should follow the instructions to indicate its vote on the Ballot. All Holders of Claims or Interests (or their authorized representatives) entitled to vote must (i) carefully review the Ballot and the instructions for completing it, (ii) complete all parts of the Ballot, and (iii) submit the Ballot by the specified deadline for the Ballot to be considered. Holders of Claims or Interests entitled to vote must either (i) send the Ballot(s) by electronic mail to jjp@walkerandpatterson.com and mgoott@walkerandpatterson.com, or (ii) send the Ballot(s) by First Class Mail to the Debtor at the following address: Walker & Patterson, P.C., c/o Johnie Patterson, 4815 Dacoma, Houston, TX 77092. Holders of Claims or Interests may contact the Debtor's counsel, Miriam T. Goott, by telephone at (713) 956-5577, or by email at mgoott@walkerandpatterson.com.

The Court has directed that, in order to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be received by the Debtor by no later than [DATE] at [TIME] [].m. prevailing Central Time (the "**Voting Deadline**"). **BALLOTS SUBMITTED IN PAPER FORM MUST BE SUBMITTED SO AS TO BE ACTUALLY RECEIVED BY THE DEBTOR OR THEIR COUNSEL NO LATER THAN THE VOTING DEADLINE. ANY BALLOTS SUBMITTED AFTER THE VOTING DEADLINE MAY NOT BE COUNTED UNLESS AGREED TO BY THE DEBTOR.**

### B. Holders of Claims Entitled To Vote

Any Holder of a Claim against the Debtor whose Claim is Impaired under the Plan is entitled to vote if such Claim has not been Disallowed and either (i) the Claim is evidenced by a Proof of Claim that has been timely filed by the Claims Bar Date and as to which the Debtor or any other party in interest has not filed an objection, or (ii) the Claim has been listed in the Schedules in an amount greater than $0.00 and such Claim is not scheduled as unknown, disputed, contingent, or unliquidated.

Any Holder of a Claim that is otherwise not entitled to vote may seek the temporary allowance of such Claim, by filing a motion, in an amount that it deems proper for the purpose of accepting or rejecting the Plan. Such motion must be heard and determined by the Court on or before the Voting Deadline.

In addition, a vote may be disregarded if the Court determines that the acceptance or rejection was not solicited or procured in good faith or in accordance with the applicable provisions of the Code.

**C.      Claims and Interests Impaired or Unimpaired Under the Plan**

Classes 2, 4, and 5 are Impaired under the Plan. Holders of Claims in Classes 2, 4 and 5 are eligible, subject to the voting requirements described above, to vote to accept or reject the Plan.

Classes 2, 4, and 5 are Impaired because the proposed treatment of each of these Classes alters the legal, equitable, or contractual rights of Holders of Allowed Claims and Interests in such Classes.

Allowed Claims in Classes 1 and 3 are Unimpaired under the Plan. Holders of Claims in these Classes are conclusively presumed to accept the Plan and will not be entitled to vote on the Plan pursuant to Section 1126(f) of the Code.

**D.      Information on Voting and Vote Tabulations**

**1.      Transmission of Ballots to Holders of Claims and Interests**

Instructions for completing and submitting Ballots are being provided to all Holders of Claims entitled to vote on the Plan in accordance with the Bankruptcy Rules. In the event a Holder of a Claim entitled to vote does not vote, the Court may deem such Holder of a Claim to have accepted the Plan. Those Holders of Claims whose Claims are Unimpaired under the Plan are conclusively presumed to have accepted the Plan under Section 1126(f) of the Code, and therefore need not vote with regards to the Plan. Under Section 1126(g) of the Code, Holders of Claims or Interests who do not either receive or retain any property under the Plan are deemed to have rejected the Plan.

**2.      Ballot Tabulation Procedures**

The Debtor shall count all Ballots filed on account of (i) Claims evidenced by a Proof of Claim that have been timely filed by the Claims Bar Date and as to which neither the Debtor nor any other party in interest, as of the Voting Record Date, has filed an objection, or (ii) Claims that have been listed in the Schedules in an amount greater than $0.00 and such Claims are not scheduled as unknown, disputed, contingent, or unliquidated. The foregoing general procedures will be subject to the following exceptions and clarifications:

- if a Claim is Allowed under the Plan or by order of the Court, such Claim is Allowed for voting purposes in the Allowed amount set forth in the Plan or order;

- any Ballot received after the Voting Deadline unless the Debtor, in its sole discretion, grant an extension of the Voting Deadline with respect to such Ballot, shall not be counted;

- any Ballot that is illegible or contains insufficient information to permit identification of the voter shall not be counted;

- any Ballot cast by a Person that does not hold a Claim or Interest in a Class that is entitled to vote to accept or reject the Plan shall not be counted;

- any duplicate Ballot will only be counted once; and

- any unsigned Ballot or paper Ballot that does not contain an original signature shall not be counted.

### 3. Execution of Ballots by Representatives

To the extent applicable, if a Ballot is submitted by trustees, executors, administrators, guardians, attorneys-in-fact, officers of corporations, or others acting in a fiduciary or representative capacity, such Persons must indicate their capacity when submitting the Ballot and, at the request of the Debtor, must submit proper evidence satisfactory to the Debtor of their authority to so act. For purposes of voting tabulation, a Ballot submitted by a representative shall account for the total number of represented parties with respect to the numerosity requirement set forth in this Article.

### 4. Waivers of Defects and Other Irregularities Regarding Ballots

Unless otherwise directed by the Court, all questions concerning the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtor, in its sole discretion, whose determination will be final and binding. The Debtor reserves the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of counsel, be unlawful. The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtor (or the Court) determine. Neither the Debtor, nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots, nor will any of them incur any liability for failure to provide such notification; provided, however, that the Debtor will indicate on the ballot summary the Ballots, if any, that were not counted and will provide copies of such Ballots with the ballot summary to be submitted at the Confirmation Hearing. Unless otherwise directed by the Court, delivery of such Ballots will not be deemed to have been made until any irregularities have been cured or waived. Unless otherwise directed by the Court, Ballots previously furnished, and as to which any irregularities have not subsequently been cured or waived, will be invalidated.

### 5. Withdrawal of Ballots and Revocation

The Debtor may allow any claimant who submits a properly completed Ballot to supersede or withdraw such Ballot on or before the Voting Deadline. In the event the Debtor does permit such supersession or withdrawal, the claimant, for cause, may change or withdraw its acceptance or rejection of the Plan in accordance with Bankruptcy Rule 3018(a).

## E. Confirmation of Plan

### 1. Solicitation of Acceptances

The Debtor is soliciting your vote.

**NO REPRESENTATIONS OR ASSURANCES, IF ANY, CONCERNING THE DEBTOR OR THE PLAN ARE AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE BY ANY PERSON TO SECURE YOUR VOTE, OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT, SHOULD NOT BE RELIED ON BY YOU IN ARRIVING AT YOUR DECISION, AND SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO DEBTOR'S COUNSEL FOR APPROPRIATE ACTION.**

**THIS IS A SOLICITATION SOLELY BY THE DEBTOR, AND IS NOT A SOLICITATION BY ANY SHAREHOLDER, ATTORNEY, ACCOUNTANT, OR OTHER PROFESSIONAL FOR THE DEBTOR. THE REPRESENTATIONS, IF ANY, MADE IN THIS DISCLOSURE STATEMENT ARE THOSE OF THE DEBTOR AND NOT OF SUCH SHAREHOLDERS, ATTORNEYS, ACCOUNTANTS, OR OTHER PROFESSIONALS, EXCEPT AS MAY BE OTHERWISE SPECIFICALLY AND EXPRESSLY INDICATED.**

### 2. Requirements for Confirmation of Plan

At the Confirmation Hearing, the Court shall determine whether the requirements of Section 1129 of the Code have been satisfied, in which event, the Court shall enter an order confirming the Plan. The Debtor believes that the Plan satisfies all the statutory requirements of the Code for Confirmation because, among other things:

- The Plan complies with the applicable provisions of the Code;

- The Debtor has complied with the applicable provisions of the Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment or distribution made or promised by the Debtor, or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in connection with the Plan has been disclosed to the Court, and any such payment made before the Confirmation of the Plan is reasonable, or if such payment is to be fixed after Confirmation of the Plan, such payment is subject to the approval of the Court as reasonable;

- The Debtor will have disclosed the identity and affiliation of the Plan Administrator and the members of the Oversight Committee proposed to serve after Confirmation of the Plan; the appointment of such individuals is consistent with the interests of Holders of Claims and Interests and with public policy;

- Any government regulatory commission with jurisdiction (after Confirmation of the Plan) over the rates of the Debtor has approved any rate change provided for in the Plan, or such rate change is expressly conditioned on such approval;

- With respect to each Impaired Class of Claims or Interests, either each Holder of a Claim or Interest of the Class will have accepted the Plan, or will receive or retain under the Plan on account of that Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such Holder would so receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Code. If Section 1111(b)(2) of the Code applies to the Claims of a Class, each Holder of a Claim of that Class will receive or retain under the Plan on account of that Claim property of a value, as of the Effective Date, that is not less than the value of that Holder's interest in the Debtor's interest in the property that secures that Claim;

- Each Class of Claims or Interests will have accepted the Plan or is not Impaired under the Plan, subject to the right of the Debtor to seek cramdown of the Plan under Section 1129(b) of the Code;

13

- Except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense and Priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date or as soon as reasonably practicable after the Effective Date (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), and that Priority Tax Claims will receive either payment in full on the Effective Date or as soon as reasonably practical after the Effective Date, or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

- If a Class of Claims or Interests is Impaired under the Plan, at least one such Class of Claims or Interests will have accepted the Plan determined without including any acceptance of the Plan by any insider holding a Claim or Interest of that Class;

- Because this is a Plan of Liquidation, Confirmation of the Plan is not likely to be followed by the need for further financial reorganization of the Debtor; the Plan provides for the orderly liquidation of all or substantially all of the property of the Estate and the wind-down and dissolution of the Debtor;

- All court fees, as determined by the Court at the Confirmation Hearing, will have been paid or the Plan provides for the payment of such fees on the Effective Date; and

- The Plan provides that all transfers of property shall be made in accordance with applicable provisions of non-bankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

The Debtor asserts that they have proposed the Plan in good faith and believe that they have complied, or will have complied, with all the requirements of the Code governing confirmation of the Plan.

### 3. Acceptances Necessary to Confirm the Plan

Voting on the Plan by each Holder of an Impaired Claim or Interest (or its authorized representative) is important. Chapter 11 of the Code does not require that each Holder of a Claim or Interest vote in favor of the Plan in order for the Court to confirm the Plan. Generally, under the acceptance provisions of Section 1126(a) of the Code, each Class of Claims has accepted the Plan if Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims of such Class actually voting in connection with the Plan vote to accept the Plan. With regard to a Class of Interests, more than two-thirds of the shares actually voted must accept to bind that Class. Even if all Classes of Claims and Interests accept the Plan, the Court may refuse to confirm the Plan.

### 4. Cramdown

In the event that any Impaired Class of Claims or Interests does not accept the Plan, the Court may still confirm the Plan at the request of the Debtor if (i) at least one Impaired Class has voted to accept the Plan and (ii) as to each Impaired Class that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." A Chapter 11 plan does not discriminate unfairly within the meaning of the Code if no Class receives more than it is legally

entitled to receive for its Claims or Interests. "Fair and equitable" has different meanings for Holders of secured and unsecured Claims and Interests.

With respect to a Secured Claim, "fair and equitable" means either (i) the Impaired secured Creditor retains its Liens to the extent of its Allowed Claim and receives deferred Cash payments at least equal to the allowed amount of its Claims with a present value as of the effective date of the plan at least equal to the value of such Creditor's interest in the property securing its Liens; (ii) property subject to the Lien of the Impaired secured Creditor is sold free and clear of that Lien, with that Lien attaching to the proceeds of sale, and such Lien proceeds must be treated in accordance with clauses (i) and (iii) of this paragraph; or (iii) the Impaired secured Creditor realizes the "indubitable equivalent" of its Claim under the plan.

With respect to an Unsecured Claim, "fair and equitable" means either (i) each Impaired Creditor receives or retains property of a value equal to the amount of its Allowed Claim or (ii) the Holders of Claims and Interests that are junior to the Claims of the dissenting class will not receive any property under the Plan.

With respect to Interests, "fair and equitable" means either (i) each Impaired Interest receives or retains, on account of that Interest, property of a value equal to the greater of the allowed amount of any fixed liquidation preference to which the Holder is entitled, any fixed redemption price to which the Holder is entitled, or the value of the Interest or (ii) the Holder of any Interest that is junior to the Interest of that Class will not receive or retain under the Plan, on account of that junior equity interest, any property.

The Debtor believes that the Plan does not discriminate unfairly and is fair and equitable with respect to each Impaired Class of Claims and Interests. If the Debtor seeks confirmation of the Plan pursuant to Section 1129(b) of the Code, the Court will determine at the Confirmation Hearing whether the Plan is fair and equitable and does not discriminate unfairly against any rejecting Impaired Class of Claims or Interests.

### 5. Conditions Precedent to Confirmation and Effectiveness of the Plan

In addition to the requirements of the Code, Article 10 of the Plan contains certain conditions precedent to Confirmation and effectiveness of the Plan, including: (a) the Court shall have approved a Disclosure Statement with respect to the Plan in form and substance acceptable to the Debtor; (b) the Confirmation Order, Plan, and any Plan Documents shall be in form and substance acceptable to the Debtor; (c) the Court shall have entered the Confirmation Order in form and substance acceptable to the Debtor, and the Confirmation Order shall be a Final Order; and (d) the Debtor shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan.

### III.
### THE DEBTOR AND ITS BUSINESS

**A.** **History of the Debtor**

MMA Law Firm, formerly McClenny Moseley & Associates PLLC ("MMA"), is a boutique law firm based out of Houston, Texas, managed by Zach Moseley. MMA focuses on first-party storm damage cases, assisting clients with resolving claims against their insurance

companies following a severe storm (hail, wind, hurricane, etc.). The firm operates on a contingency fee basis, receiving a percentage of the settlement attained on behalf of its clients.

MMA was founded in May 2016 by James McClenny and Zach Moseley. During the first year of operations, Mr. McClenny and Mr. Moseley worked from Mr. Moseley's home. With little to no money for advertising, they spent that first year driving across the state of Texas, delivering donuts, kolaches, and sandwiches to roofing contractors and public adjusters. During these networking encounters, MMA gave presentations on the laws that impact contractors and adjusters as they relate to first-party storm claims. MMA began receiving referrals, and over the next few years, MMA experienced remarkable growth, hiring new attorneys, expanding into additional states, and opening new offices, truly cementing itself as a mainstay of the first-party insurance world.

In 2021, after Hurricanes Laura, Delta, Zeta, and Ida hit the coast of Louisiana within a 12-month span, MMA was approached by and ultimately joint-ventured with several other law firms to build the first mass-action hurricane law firm in the United States. Together, the firms raised just shy of $60M for case advertising. The firms successfully flooded the market with television, radio, social media, billboard, and bus advertising. From the end of 2021 through the end of 2022, MMA was able to process over 25,000 inquiries into storm damage claims in Louisiana, resulting in more than 16,000 retained cases. MMA had more storm cases than the next five largest law firms combined in the state of Louisiana. Docket projections reached over $1.2B in settlement value with over $400M in attorneys' fees.

This was accomplished, in large part, due to MMA's significant investment in technology. MMA attempted to automate every possible step of the claims process to reduce not only cost, but also delay. Letters of representation would go out seconds after a client hired the firm. Experts were assigned, properties were inspected, and estimation reports were uploaded into MMA's system, then delivered to clients' insurance companies within 30 days of the clients retaining MMA. With these technological advancements, MMA was able to offer help to as many hurricane victims as possible.

Due to the volume of cases, insurance carriers mediated cases with MMA in bulk. This was made possible, in large part, due to MMA's ability to process and present massive amounts of data on each client's claim accurately and clearly. A significant number of insurance carriers resorted to invoking appraisal (arbitration) *en masse*. The appraisal provision allowed for panels to take hundreds of claims at a time. Early projections in January 2023 indicated that the Debtor could settle 2,500 cases per month by the end of 2023 and 5,000 cases per month by the end of 2025.

Had the advertising campaigns and referrals not stopped in late 2022, the Debtor believes it would have processed over 50,000 insurance claims in Louisiana alone. Florida, Texas, and Colorado likely would have each had similarly sized dockets by the end of 2025.

### What Happened in Louisiana?

MMA's dominance in storm litigation proved to be a double-edged sword. Although MMA employed close to 60 people that lived in Louisiana and had a large office on St. Charles Avenue in New Orleans, the Debtor was still considered an out-of-state law firm by many in Louisiana. Local plaintiffs' firms pushed back against MMA due to the volume of work. The defense bar pushed back because they simply could not keep up. Judges pushed back because of the volume

16

of lawsuits filed by MMA – one instance involved approximately 1,800 lawsuits filed in the span of three days.

One particular defense counsel resorted to filing false allegations against MMA with numerous authorities, including the Louisiana Department of Insurance. Despite having no jurisdiction over law firms and even without a hearing, a request for a response, or any semblance of due process, the LDI issued a cease-and-desist order and a fine against MMA. Once news outlets picked up this story, the momentum could not be stopped. News stories ran frequently, often featuring confused former clients who had been coached into making false representations. The courts took note of these stories, as well, even going so far as to email Mr. Moseley links to them.

In March 2023, a Louisiana district court suspended the law license of the Debtor's former attorney, who managed the Debtor's New Orleans office (the "Suspension"). Following the Suspension, a Louisiana federal district court *sua sponte* ruled that the Debtor was not entitled to attorney's fees or costs in the thousands of MMA Cases in Louisiana and determined that the Debtor had no property or ownership interest in any settlement proceeds resulting from these cases. The Debtor appealed the Order to the Fifth Circuit, which subsequently vacated the Order; however, the damage had been done. Louisiana clients hired new law firms to represent them and conclude their claims. The Debtor believes that it is entitled to receive payment for fees and reimbursable expenses from contingency fees collected by the subsequent law firms. These claims form the bulk of the assets of the Debtor – the claims against the subsequent firms.

Currently, the Debtor is focused on collecting the fees for work performed and the reimbursable expenses from the fallout in Louisiana. The Debtor has more than 20,000 cases from which to collect attorneys' fees from the subsequent firms.

MMA's current docket consists of two (2) different case types:

- Claims against subsequent law firms for payment of fees and reimbursable expenses; and

- Mass Tort Docket consisting of the following:
  NEC (Approx. 135 Cases)
  Roundup (Approx. 720 Cases)
  Tylenol (Approx. 2,100 Cases)

### B.    History of the Bankruptcy Case

Since the commencement of this Chapter 11 case, the Debtor has navigated an extraordinarily litigious and contested post-petition landscape. Despite near-constant objections and aggressive litigation tactics by multiple creditors, and ongoing scrutiny from the Office of the United States Trustee, the Debtor has consistently met its obligations under the Bankruptcy Code.

Throughout the pendency of the case, the Debtor has filed all required monthly operating reports, maintained full compliance with the Court's orders and local rules, and continued operating its law practice in the ordinary course of business. Shortly after filing, the Debtor sought approval to employ Walker & Patterson, P.C. as its bankruptcy counsel. The application faced

vigorous opposition from EAJF, the UST, and the UCC, leading to a contested evidentiary hearing. Ultimately, the Court granted the application and overruled all objections.

To ensure uninterrupted operations, the Debtor filed several early motions, including an emergency motion to use cash collateral and a motion to continue its cash management systems. Both faced objections, but after evidentiary hearings and extensive briefing, both were granted, allowing the Debtor to maintain financial stability. After the UST appointed the UCC, the Debtor filed a motion to disqualify the Committee's proposed counsel, Okin Adams Bartlett Curry LLP, based on conflicts and professional conduct issues. The motion was hotly contested but ultimately granted after a full evidentiary hearing. The Committee's subsequent effort to retain new counsel, Kane Russell Coleman Logan PC, also resulted in a contested hearing, after which the firm withdrew its employment application. The Committee subsequently retained Lawson & Moshenberg PLLC as its counsel, who, along with the Debtor, are joint proponents of the Plan.

The Debtor was forced to defend itself against repeated discovery demands, including an emergency motion to compel responses to expedited discovery filed by EAJF in connection with contested cash collateral hearings. The Debtor filed a timely opposition, and the motion was ultimately not prosecuted.

As part of its reorganization efforts, the Debtor retained key professionals including Maddox, Thomson & Associates as accountants and David Middleman as valuation and marketing consultant related to the Mass Tort docket.

EAJF sought appointment of a Chapter 11 trustee. The Debtor opposed these attempts and, following extensive litigation, EAJF ultimately withdrew the motion pursuant to a stipulation and agreed order that also resolved several ancillary disputes. Thereafter, the Debtor, the Committee, and EAJF reached a global resolution memorialized in the EAJF Settlement (ECF No. 588), which the Court approved by the 9019 Order entered on May 14, 2024 (ECF No. 683). The terms of the EAJF Settlement are incorporated as an integral part of the Plan and are fully enforceable as provisions of the Plan.

**Pending Adversary Proceedings and Related Litigation**

**Filed Cases**

| Case Title | Case No. | Date Filed | Status | Settlement[1] | ECF |
|---|---|---|---|---|---|
| MMA et al v. Morris Bart, LLC | 24-03127 | 06/24/2024 | Pending | — | — |
| MMA v. Laborde Earles Law Firm LLC | 24-03130 | 06/28/2024 | Pending | — | — |
| MMA v. The Voorhies Law Firm | 24-03134 | 07/02/2024 | Settled | $285,426.37 | 877 |
| MMA v. Equal Access Justice Fund, LP et al | 24-03208 | 10/06/2024 | Settled | — | 683 |
| MMA et al v. Allied World Insurance Company et al | 24-03212 | 10/10/2024 | Dismissed | — | — |

---

[1] Settlement Amounts are approximate and do not include future amounts. Reference each Settlement Agreement for details.

| Case Title | Case No. | Date Filed | Status | Settlement[1] | ECF |
|---|---|---|---|---|---|
| MMA v. Daly & Black, PC | 24-03223 | 11/05/2024 | Settled | $759,000.00 | 1409 |
| MMA v. The Sangisetty Law Firm | 24-03230 | 11/10/2024 | Settled | $570,629.06 | 1379 – Pending Approval |
| MMA v. Hair & Shunnarah Trial Attorneys, LLC | 24-03269 | 12/17/2024 | Pending | — | — |
| MMA v. Broussard Injury Lawyers, LLC | 25-03017 | 01/28/2025 | Settled | $56,955.94 | 1478 – Pending Approval |
| MMA v. Barcus Arenas, PLLC | 25-03018 | 01/28/2025 | Pending | — | — |
| MMA v. Broussard & Dove, a Professional Law Corporation | 25-03021 | 01/31/2025 | Settled | $167,792.85 | 1280 |
| MMA v. Chehardy, Sherman, Williams, Recile & Hayes, L.L.P. | 25-03026 | 02/05/2025 | Settled | $77,612.78 | 1279 |
| MMA v. New Orleans Legal, LLC | 25-03027 | 02/05/2025 | Pending | — | — |
| MMA v. Pandit Law Firm, LLC | 25-03028 | 02/05/2025 | Pending | — | — |
| MMA v. The Chopin Law Firm LLC | 25-03029 | 02/06/2025 | Pending | — | — |
| MMA v. Cox, Cox, Filo, Camel, Wilson & Brown, LLC | 25-03032 | 02/07/2025 | Settled | $100,000.00 | 1371 – Pending Approval |
| LIGA v. MMA | 25-03429 | — | Settled | $100,000.00 | 834 |
| MMA v. Cristobal M. Galindo P.C. | 25-03633 | 08/22/2025 | Settled | $250,000.00 | 832 |
| MMA v. Morris Bart, LLC | 25-03799 | 10/31/2025 | Pending | — | — |
| MMA v. Robichaux, Mize, Wadsack, Richardson & Watson, L.L. | 26-03001 | 01/02/2026 | Pending | — | — |
| MMA v. Hair Shunnarah Trial Attorneys, LLC | 26-03028 | 02/03/2026 | Pending | — | — |
| MMA v. Houghtaling Law Firm, LLC | 26-03065 | 03/09/2026 | Settled | ** | 1418 – Pending Approval |
| MMA v. The Morgan Law Group of Louisiana, LLC | 26-03097 | 04/07/2026 | Pending | — | — |
| MMA v. Dunlap & Shipman, P.A. | 26-03098 | 04/07/2026 | Pending | — | — |
| MMA v. Ben Baker, Attorney At Law, PLLC | 26-03099 | 04/07/2026 | Pending | — | — |
| MMA v. Houghton Bradford Whitted PC, LLO | 26-03100 | 04/07/2026 | Dismissed | — | — |
| MMA v. Glago Williams, LLC | 26-03101 | 04/07/2026 | Pending | — | — |
| MMA v. Montiel Hodge, LLC | 26-03102 | 04/07/2026 | Pending | — | — |
| MMA v. Godbey Giardina Law Group, LLC | 26-03103 | 04/08/2026 | Pending | — | — |
| MMA v. Merlin Law Group, P.A. | 26-03104 | 04/08/2026 | Pending | — | — |

| Case Title | Case No. | Date Filed | Status | Settlement[1] | ECF |
|---|---|---|---|---|---|
| MMA v. Scandurro & Layrisson, LLC | 26-03105 | 04/08/2026 | Dismissed | — | — |
| MMA v. AMO Trial Lawyers, LLC | 26-03106 | 04/08/2026 | Pending | — | — |
| MMA v. The Monson Law Firm, LLC | 26-03107 | 04/08/2026 | Pending | — | — |
| MMA v. Chauvin Law Firm, LLC | 26-03109 | 04/08/2026 | Pending | — | — |
| MMA v. Loftin Law Group, LLC | 26-03110 | 04/08/2026 | Pending | — | — |
| MMA v. Cueria Law Firm, LLC | 26-03111 | 04/08/2026 | Settled | $8,335.98 | 1470 – Pending Approval |
| MMA v. LaHatte Law Firm, LLC | 26-03112 | 04/08/2026 | Pending | — | — |
| MMA v. Jim S. Hall & Assoc., LLC | 26-03113 | 04/08/2026 | Pending | — | — |
| MMA v. Vilar & Green, LLC | 26-03114 | 04/08/2026 | Pending | — | — |
| MMA v. Huber Thomas, LLP | 26-03115 | 04/08/2026 | Pending | — | — |
| MMA v. Heath Law Group, LLC | 26-03116 | 04/08/2026 | Pending | — | — |
| MMA v. Equal Access Justice Fund, LP et al | 26-03135 | 04/24/2026 | Pending | — | — |

**Unfiled Claims**

| Firm / Claimant | Status | Settlement | ECF |
|---|---|---|---|
| Joubert Law Firm | Settled | $12,483.33 | 1155 |
| Bolen, Parker, Brenner, Lee and Miller, Ltd. | Settled | $8,282.06 | 1092 |
| Irpino Law Firm, LLC | Settled | $81,413.21 | 838 |
| Alvendia, Kelly & Demarest, LLC | Settled | $153,743.52 | 837 |
| Craven Perry, LLC | Settled | $265,406.73 | 836 |
| Becnel Law | Settled | $3,832.95 | 835 |
| Bagget McCall, LLC | Settled | $22,670.45 | 833 |

*\*\* Settlement Agreement should be referred to for details.*

## C.    The Mass Tort Docket.

Description and current status. The Debtor holds contingent positions in a portfolio of mass tort cases historically referred to as the "Mass Tort Docket." The cases are administered by partnered handling firms, and the Debtor's interest is a contractual right to a share of attorneys' fees and expenses upon the settlement or other resolution of the underlying claims. As of the date of this Disclosure Statement, the Debtor's Mass Tort Docket consists of three remaining dockets: Roundup (approximately 720 cases), Tylenol/APAP (approximately 2,100 cases), and NEC (approximately 135 cases). A fourth docket, Zantac (approximately 3,150 cases), was sold during

this case; the net proceeds of that sale (approximately $1,250,000) are included in the Debtor's cash on hand and were allocated 25% to the Estate and 75% to EAJF under the EAJF Settlement.

Whether the dockets can be monetized. The Debtor has actively marketed the three remaining dockets through David Middleman, the valuation and marketing consultant whose employment was approved by the Court and whose credentials were provided to all parties entitled to notice. That marketing process has produced no meaningful offers to purchase the dockets. Accordingly, the Debtor's estimate of the dockets' value on a forced, expedited sale in a Chapter 7 liquidation ($100,000 to $300,000) is based on the offers (and absence of offers) actually received through that marketing effort. By contrast, the Debtor estimates that holding the docket positions to resolution under the Plan would realize $850,000 to $5,000,000. The single largest driver of the difference between the Plan and a Chapter 7 liquidation is the ability to hold these positions to resolution rather than sell them at a forced-sale discount.

Effect on the payment of claims. Under the EAJF Settlement (which binds any Chapter 7 trustee), proceeds of the Mass Tort Docket are allocated 75% to EAJF and 25% to the Estate in either chapter. The Estate's 25% share constitutes Available Funds for distribution to Class 4. Because the Mass Tort Docket recovery is contingent and may range from a forced-sale figure (as low as $100,000) to a hold-to-resolution figure (as high as $5,000,000), the amount ultimately reaching Class 4 from this asset is correspondingly uncertain; at the low end it is nominal, and even at the high end the Estate's share is limited to 25% of proceeds. The payment of Class 4 Claims is not dependent on the Mass Tort Docket alone — the Debtor's fee-recovery Causes of Action are the larger value driver — but a failure to monetize or resolve the dockets would reduce the funds available to creditors by the Estate's 25% share of the foregoing range.

Basis for the assumptions. The valuation ranges in the Liquidation Analysis are derived from (i) the marketing process conducted by Mr. Middleman and the offers received through it (which support the Chapter 7 forced-sale range), and (ii) the Debtor's assessment, with the assistance of its personnel's institutional knowledge, of the value realizable by holding the positions to resolution under the Plan.

Recent legal development affecting the Roundup docket. On June 25, 2026, the United States Supreme Court decided *Monsanto Co. v. Durnell*, No. 24-1068, 609 U.S. ___ (2026), holding (7–2) that the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) expressly preempts state-law failure-to-warn claims against the manufacturer of Roundup where EPA approved the product label without the warning at issue. Failure-to-warn has been the principal theory underlying the largest Roundup verdicts. The decision is expected to reduce the settlement value and litigation leverage of Roundup claims that depend on a failure-to-warn theory, and to channel many such claims toward the manufacturer's pending class settlement (reported at approximately $7.25 billion, with per-claimant payments subject to caps and a multi-year payout). The decision does not, by its terms, eliminate claims resting on other theories (such as design defect), but it materially increases the risk, and reduces the likely sale value, of a Roundup case inventory. The Debtor discloses this development as a material, adverse post-petition event bearing on the value and monetizability of the Roundup docket.

**D. The Non-WP Cases.**

The "Non-WP Cases" are the category of cases so defined in the EAJF Settlement — generally, the first-party property and storm-insurance contingency-fee matters in which the Debtor was retained as counsel and that are not prosecuted by Walker & Patterson, P.C. as special litigation counsel (the "WP Cases"). The Non-WP Cases are identified on Exhibit B to the EAJF Settlement.

As of June 30, 2026, there are approximately 876 Non-WP Cases. The cases arise from weather-related first-party insurance claims spread across 29 states, concentrated in Florida (approximately 309 cases), Mississippi (approximately 268), and Texas (approximately 149), with the balance in Alabama, Oklahoma, and 24 other states. The underlying losses stem principally from Hurricane Ian (approximately 297 cases), Hurricane Ida (approximately 211), Hurricane Zeta (approximately 59), and Hurricane Laura (approximately 27), together with other named storms, hail, and wind events, with incident dates concentrated in the 2020 through 2022 storm seasons.

Of the Non-WP Cases, approximately 524 involve co-counsel or affiliated counsel — principally Webster Law (approximately 263 cases) and VG Law Group (approximately 213) — and the remaining approximately 352 were handled by the Debtor directly. The Debtor's recovery on each Non-WP Case consists of the contingent attorneys' fee earned as the underlying insurance claim is resolved. The cases are in various stages of resolution. As of June 30, 2026, the Non-WP Cases have generated approximately $772,684.06 in fees collected by the Estate since the Petition Date.

Under the EAJF Settlement, the proceeds of the Non-WP Cases are allocated ninety percent (90%) to EAJF and ten percent (10%) to the Estate; the Estate's ten percent (10%) share constitutes Available Funds for distribution to Class 4. Because the Debtor's contingent fees on the Non-WP Cases are collected in the ordinary course as the underlying claims resolve and are received into and distributed from the Estate's cash together with the Debtor's other fee recoveries, the recovery attributable to the Non-WP Cases is not separately broken out as a discrete line item in the Liquidation Analysis. The amount and timing of any further recovery on the Non-WP Cases is uncertain and is subject to the risks described in Article VII.

**IV.**

**MEANS OF IMPLEMENTATION OF THE PLAN**

**A. Plan of Liquidation; Cessation of Law Firm Operations**

The Plan is a Plan of Liquidation. Upon the Effective Date, MMA Law Firm, PLLC shall cease active law firm operations. The Debtor shall not undertake any new client engagements, enter into any new fee agreements, or otherwise operate as an active law firm from and after the Effective Date. Any actions taken after the Effective Date shall be limited to those reasonably necessary to preserve, liquidate, and monetize existing Estate assets and to wind down the Debtor's affairs.

**B. Appointment and Authority of the Plan Administrator**

Allison Byman is appointed as the Plan Administrator as of the Effective Date. As Plan Administrator, Ms. Byman shall succeed to all rights and powers of the Debtor-in-possession, and

shall have the sole authority to: (i) manage all overhead and administrative expenses of the Estate; (ii) manage, prosecute, settle, or abandon all prepetition claims and Causes of Action for the benefit of creditors, with the Plan Administrator retaining final decision-making authority; (iii) make periodic distributions to Holders of Allowed Claims pursuant to the priority and waterfalls established in the Plan; (iv) make all staffing and employment decisions necessary to carry out the liquidation and wind-down of the Debtor, including the engagement and termination of Consultants and professionals; (v) hire and fire such personnel or professionals as necessary to effectuate the purposes of the Plan; (vi) sell assets of the Reorganized Debtor; and (vii) object to Claims.

**C.      Formation of Oversight Committee; Dissolution of the UCC**

On the Effective Date, the Unsecured Creditors Committee ("UCC") shall cease to exist (except for the limited purposes set forth in Section 5.18 of the Plan) and shall be replaced by an Oversight Committee vested with authority to review, appear, and be heard on material decisions and activities of the Reorganized Debtor, including compensation and staffing, litigation settlements that the Reorganized Debtor may enter into, and any decision to sell all or a portion of the Mass Tort Dockets. The Oversight Committee shall consist of three (3) members: (i) one (1) representative designated by Equal Access Justice Fund, LP and EAJF ESQ, LP (collectively, "EAJF"), and (ii) two (2) members designated by the Unsecured Creditors Committee. The members of the Oversight Committee shall be identified in a notice filed by the Debtor with the Court not less than seven (7) days prior to the Confirmation Hearing.

The Oversight Committee shall have the right to: (a) request information from the Plan Administrator regarding the administration of the Estate and the prosecution and resolution of Causes of Action; and (b) bring objections to the Bankruptcy Court if the Oversight Committee disagrees with the business judgment of the Plan Administrator, with the Bankruptcy Court retaining jurisdiction to resolve any such dispute. The fees, costs, and expenses of the Oversight Committee, its members, and any professionals retained by the Oversight Committee shall **not** be paid by the Estate or the Plan Administrator. The Oversight Committee shall remain in existence until entry of a final decree closing the Case. For the avoidance of doubt, the Oversight Committee's rights to review, to appear and be heard, and to object before the Bankruptcy Court apply to any act, decision, or proposed action (or failure to act) of the Plan Administrator and are not limited to the "material" decisions and activities or other matters specifically enumerated, with the Bankruptcy Court retaining jurisdiction to resolve any such objection.

**D.      Consulting Commitments**

To preserve institutional knowledge necessary to identify, liquidate, and maximize recovery on prepetition assets and Causes of Action, the following individuals have agreed to serve as Consultants to the Plan Administrator solely in connection with the liquidation and wind-down activities, at the pleasure of the Plan Administrator. Each Consultant shall be available to perform wind-down consulting services at the direction of the Plan Administrator for up to fifteen (15) hours per week. Compensation shall be earned only for hours actually worked at the specific request and direction of the Plan Administrator. In no event shall any Consultant's compensable hours exceed fifteen (15) hours in any calendar week without either (i) the prior written approval of the Oversight Committee or (ii) a Final Order of the Bankruptcy Court authorizing additional

hours upon a showing of good cause, after notice and a hearing. The Consultants and their compensation are as follows:

- John Zachary Moseley: $350.00 per hour (which rate may be modified by the Bankruptcy Court if warranted), with continuation of the same or comparable health insurance as is currently provided, and Mr. Moseley shall receive the benefit of the eighteen (18)-month stay of actions set forth in the Plan;

- Katy Ohlsson: $250.00 per hour (which rate may be modified by the Bankruptcy Court if warranted), with continuation of the same or comparable health care insurance as is currently provided, and Ms. Ohlsson shall receive the benefit of the eighteen (18)-month stay of actions set forth in the Plan; and

- Morgan Weaver-Gallacher: $125.00 per hour (which rate may be modified by the Bankruptcy Court if warranted), with continuation of the same or comparable health care insurance as is currently provided, and Ms. Weaver-Gallacher shall receive the benefit of the eighteen (18)-month stay of actions set forth in the Plan.

The continuation of the same or comparable health insurance for each Consultant is a negotiated and integral component of the Consultants' below-market compensation and is provided in consideration of the Consultants' agreement to remain available to assist the Plan Administrator during the wind-down. The hourly rates set forth above are materially below the rates that would be required to retain comparably knowledgeable professionals, and the continuation of existing health coverage was a condition of the Consultants' agreement to provide ongoing services. The Debtor has determined that preserving the Consultants' cooperation—and the institutional knowledge described in Articles V and VI below—on these terms is substantially less costly to the Estate than the diminution in recoveries that would result from the loss of that knowledge.

The health insurance referenced above consists of health/dental/vision coverage for each of the three Consultants. The estimated cost to the Estate for the coverage is approximately $6,415.72 per month — $2,774.76 for Mr. Moseley, $2,045.32 for Ms. Ohlsson, and $1,595.64 for Ms. Weaver-Gallacher — or approximately $76,988.64 per year. The Plan Administrator will pay these premiums from Estate funds as a Permitted Expense. The coverage will continue only for so long as the applicable Consultant continues to provide services to the Plan Administrator. The Debtor estimates the aggregate cost of this coverage over the anticipated wind-down period at approximately $115,482.96[2], which is reflected in the Permitted Expenses. The Debtor has determined that the cost of this coverage is materially less than the diminution in Estate recoveries that would result from the loss of the Consultants' institutional knowledge.

E.      **Eighteen-Month Stay of Actions Against the Stay Parties**

As additional consideration for the agreement of John Zachary Moseley, Katy Ohlsson, and Morgan Weaver-Gallacher (collectively, the "**Stay Parties**") to provide ongoing services to the Plan Administrator and the Debtor for the benefit of creditors and the Estate, and because the institutional knowledge and continued involvement of the Stay Parties is essential to the recovery

---

[2] $6,415.72 (monthly estimated cost) x 18 months = $115,482.96.

24

of value on the Causes of Action and the Mass Tort Dockets, upon entry of the Confirmation Order and continuing for a period of eighteen (18) months thereafter (the "**Stay Period**"), all Persons and Entities are stayed and enjoined from commencing or continuing, in any manner or in any place, any judicial, administrative, arbitral, or other action or proceeding of any kind against any of the Stay Parties in his or her individual or personal capacity, whether on account of any claim, demand, debt, liability, obligation, or cause of action arising prior to or during the Stay Period, including, without limitation, the enforcement, attachment, collection, or recovery by any manner or means of any judgment, award, decree, or order against any of the Stay Parties, the creation, perfection, or enforcement of any lien or encumbrance against the property of any of the Stay Parties, and the assertion of any right of setoff, recoupment, or subrogation against any of the Stay Parties. The Bankruptcy Court shall retain exclusive jurisdiction to enforce, modify, terminate, or extend the stay for cause shown after notice and a hearing.

For the avoidance of doubt, this stay (i) is a Plan injunction issued pursuant to Sections 105 and 1123 of the Bankruptcy Code in furtherance of consummation of the Plan, (ii) does not constitute a discharge of any claim, demand, debt, liability, obligation, or cause of action against any of the Stay Parties, (iii) shall expire by its own terms at the end of the Stay Period unless extended by Final Order of the Bankruptcy Court, and (iv) may be extended beyond the Stay Period by Final Order of the Bankruptcy Court upon motion by any Stay Party for cause shown, after notice and a hearing.

**Disclosure of legal risk concerning the Stay.** The Debtor discloses that the enforceability of a non-consensual stay of actions against the Stay Parties in their individual or personal capacities is contested and subject to material legal risk, and that the Court may decline to approve disclosure of, or to confirm, a plan containing such a provision. Holders of Claims and Interests should consider this risk in evaluating the Plan. The Debtor believes that the relief is supported by adequate consideration in the form of the continued availability and below market rate compensation agreed to by the Stay Parties. The Debtor believes that the independent, adequate consideration sufficiently supports the institution of the stay.

The Debtor further discloses that the EAJF Settlement (ECF No. 588), as approved by the 9019 Order (ECF No. 683), preserves EAJF's guaranty and related claims against Mr. Moseley. The stay set forth in this Section does not release, discharge, or impair those preserved claims. The Debtor reserves the right, in a further amended Plan, to remove this provision, to restructure it as a consensual mechanism binding only those creditors who affirmatively opt in, or to seek any temporary injunctive relief through a separate adversary proceeding under Bankruptcy Rule 7065 and Section 105(a) of the Code upon a proper evidentiary showing.

The Plan further provides that, during the Stay Period, all applicable statutes of limitation and repose, and any laches or delay-based defense, are tolled as to any claim that is stayed under the Plan, and that the holder of any such stayed claim shall have until the later of the original limitations or repose period or sixty (60) days after the stay terminates to commence its claim. This tolling is for the benefit of the holders of the stayed claims, including EAJF's preserved guaranty and related claims against Mr. Moseley.

For the avoidance of doubt, and notwithstanding the preservation of the Retained Causes of Action described in Section IV.L (including avoidance and recovery claims under Sections 544, 547, 548, 549, 550, and 553 of the Code), the Estate does not hold, has not identified, and does not

25

assert any avoidance or other Chapter 5 cause of action against Katy Ohlsson or Morgan Weaver-Gallacher. Neither the eighteen-month stay nor the related tolling provision set forth in this Section IV.E preserves, revives, or extends any Chapter 5 or avoidance claim against Ms. Ohlsson or Ms. Weaver-Gallacher, as none exists. The tolling provision operates solely for the benefit of the holders of stayed claims (including EAJF's preserved guaranty and related claims against Mr. Moseley) and does not create, preserve, or toll any claim by the Estate against any Stay Party. The Estate's expressly preserved Causes of Action against Mr. Moseley as an insider (see Section IV.L) are unaffected by this paragraph.

**Basis for the Eighteen-Month Duration.** The Debtor has requested that the stay remain in effect for eighteen (18) months following confirmation. The requested duration is an estimate based on the Debtor's good-faith assessment of the time necessary to resolve the significant litigation and appellate matters arising from and related to this Chapter 11 case, the outcome of which will determine the Debtor's entitlement to the fee recoveries that are the principal source of distributions under the Plan.

First, the Debtor is currently involved in appellate proceedings before the United States Court of Appeals for the Fifth Circuit in its litigation against Morris Bart, LLC. The appeal concerns issues that will determine whether the Debtor is entitled to recover fees from successor law firms in the Eastern District of Louisiana. Briefing is expected to be completed within approximately sixty (60) days, and the Debtor anticipates that it may take at least six months thereafter before the Fifth Circuit issues a decision. The Fifth Circuit's ruling is expected to affect not only the Morris Bart litigation but also multiple related adversary proceedings involving similar fee-apportionment issues in cases that were pending in the Eastern District of Louisiana.

Second, in connection with the Morris Bart litigation, the United States District Court for the Southern District of Texas certified questions to the Louisiana Supreme Court regarding whether the Debtor is entitled to recover fees under Louisiana law. The certified questions concern issues that may affect the Debtor's entitlement to fees generally, regardless of judicial district. Oral argument before the Louisiana Supreme Court occurred approximately sixty (60) days ago.

The Debtor anticipates that, following the Louisiana Supreme Court's decision, discovery in the underlying litigation will reopen in the Bankruptcy Court. The parties are expected to conduct additional discovery, file dispositive and other pretrial motions, and prepare the matter for trial. The Debtor estimates that approximately eighteen (18) months will be required before these matters are ready for trial and final adjudication. During this period, the continued availability and cooperation of the Stay Parties, whose institutional knowledge is essential to proving the Estate's entitlement to fees, is necessary to preserve and realize the value of the Causes of Action for the benefit of creditors. Accordingly, the Debtor believes that an eighteen-month stay period is reasonable and necessary and is tied to the anticipated duration of the litigation that will determine the Estate's recoveries.

## F.     EAJF Settlement

The Plan implements the EAJF Settlement (ECF No. 588) approved by the 9019 Order entered on May 14, 2024 (ECF No. 683). Pursuant to the EAJF Settlement: (i) EAJF holds an Allowed Secured Claim in the aggregate amount of $25,000,000.00 (capped), which is treated in

Class 2; (ii) EAJF holds an Allowed General Unsecured Claim in the amount of $17,000,000.00, which is treated in Class 4; (iii) under no circumstances shall EAJF receive in excess of $25,000,000.00 on account of its Secured Claim from any source, and EAJF shall not be entitled to postpetition interest, fees, or costs on the Secured Claim; and (iv) EAJF's right to receive 90% of the proceeds of the "Two Cases" (as defined in the EAJF Settlement) shall be deferred for a period of one (1) year following the Confirmation Date, and during such one-year deferral period the Estate's retained share of Two Cases proceeds shall constitute Available Funds available for distribution to Class 4. The terms of the EAJF Settlement are incorporated as an integral part of the Plan and are fully enforceable as provisions of the Plan.

To assist Holders in understanding the sources and order of distributions, and as further described in the Distribution Waterfall in Section IV.G below, the EAJF Settlement[3] allocates the proceeds of the Estate's asset categories substantially as follows: (i) seventy-five percent (75%) to EAJF and twenty-five percent (25%) to the Estate with respect to the Mass Tort Dockets; (ii) ninety percent (90%) to EAJF and ten percent (10%) to the Estate with respect to the Non-WP Cases; and (iii) ninety-five percent (95%) to EAJF and five percent (5%) to the Estate with respect to the WP Cases (each as defined in the EAJF Settlement), in each case subject to the $25,000,000.00 cap on EAJF's Secured Claim and the one-year deferral of EAJF's ninety percent (90%) share of the proceeds of the Two Cases described above. The Estate's retained share of each category constitutes a source of Available Funds for distribution to Class 4. For the avoidance of doubt, the EAJF Settlement as incorporated into the Plan is the agreement as modified by the 9019 Order, including Paragraph 7 thereof, which modifies Section 4 and Exhibit D of the Settlement Agreement to exclude all claims and causes of action against Allied World Insurance Company; and no proceeds of any insurance policy fund any obligation under the EAJF Settlement.

## G.    Distribution Waterfall

Proceeds of Estate assets shall be distributed in the following priority: (i) first, payment of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Other Secured Claims, plus the payment of Permitted Expenses (including any appropriate Reserves for anticipated Permitted Expenses); (ii) second, the EAJF Funds shall be paid to EAJF on account of its Class 2 Secured Claim, subject to the $25,000,000.00 cap and the one-year deferral provisions described above; (iii) third, the GUC Funds shall be distributed to Holders of Allowed General Unsecured Claims in Class 4 on a Pro Rata Share basis (including EAJF's $17,000,000.00 Allowed General Unsecured Claim); and (iv) fourth, any residual amounts after payment in full of all Allowed Claims in Classes 1 through 4 shall be distributed to Holders of Allowed Equity Interests in Class 5.

The foregoing waterfall operates in accordance with the priority scheme of Section 507 of the Code. Distributions of the proceeds of Estate assets shall be applied in the following order: (1) first, to Allowed Administrative Claims (including Professional Fee Claims and fees payable under 28 U.S.C. § 1930) entitled to priority under Section 507(a)(2), together with the Permitted Expenses (including any appropriate Reserves); (2) second, to Allowed Priority Tax Claims under Section 507(a)(8) and any Allowed Other Priority Claims, and to Allowed Other Secured Claims in accordance with their treatment; (3) third, to EAJF on account of its Class 2 Allowed Secured

---

[3] The EAJF Settlement and its terms is incorporated into the Plan, and any inconsistency in this Disclosure Statement or the Plan shall be governed by the Settlement.

Claim, subject to the $25,000,000.00 cap and the one-year deferral of the Two Cases proceeds; (4) fourth, to Holders of Allowed General Unsecured Claims in Class 4, Pro Rata; and (5) fifth, any residual to Holders of Allowed Equity Interests in Class 5.

To assist Holders of Claims in evaluating the Plan, and as contemplated by Section IV.G above, the Debtor provides the following example of the operation of the distribution waterfall. The example traces how the proceeds of Estate assets move through the two sequenced allocations that govern distribution and illustrates, in particular, the dilutive effect of EAJF's Allowed General Unsecured Claim of $17,000,000.00 on the recovery available to the non-EAJF Holders of Class 4 General Unsecured Claims. The dollar figures are drawn from the Liquidation Analysis, are estimates, are rounded, and assume the low end of the estimated Chapter 11 recovery range (the conservative, or "base," case). All allocations are governed by the EAJF Settlement (ECF No. 588) as approved by the 9019 Order (ECF No. 683), the terms of which control in the event of any inconsistency.

### *A Two-Step Structure*

Distribution under the Plan is governed by two sequenced allocations that, although described separately in the Plan and the EAJF Settlement, operate together. **First (the Settlement allocation),** the gross proceeds of each category of Estate asset are divided between EAJF and the Estate "off the top," before any distribution under the priority scheme of the Code. EAJF, as the secured lender, is allocated a fixed percentage of each category; that percentage depends only on the category from which the proceeds are derived. **Second (the statutory priority waterfall),** the Estate's retained share then descends the priority ladder of Section 507 of the Code and the Plan, funding Permitted Expenses and senior Claims and, finally, the Pro Rata distribution to Class 4. The practical consequence is that EAJF is allocated its contractual share of each asset category before the Code priority waterfall begins, and the Estate's retained share is the fund from which Permitted Expenses, senior Claims, and the Class 4 distribution are paid.

28

*Step One — The Settlement Allocation (Division "Off the Top")*

Each category of Estate asset carries its own EAJF/Estate allocation under the EAJF Settlement, as follows:

| Category of Estate Asset | EAJF Share | Estate Share |
|---|---|---|
| Mass Tort Dockets (Roundup, Tylenol/APAP, and NEC) | 75% | 25% |
| Non-WP Cases (Exhibit B) | 90% | 10% |
| Two Cases — EAJF's share deferred one year* | 90% | 10% |
| WP Cases | 5% | 95% |
| Cash on hand | 5% | 95% |
| — except $1,250,000 of Zantac docket sale proceeds | 75% | 25% |
| Insider / Moseley clawback recoveries | 5% | 95% |

*\* The deferral of EAJF's share of the Two Cases is described below.*

Three features modify this allocation:

- **Deferral.** EAJF's 90% share of the Two Cases is deferred for one (1) year following the Confirmation Date. During that one-year period, 100% of the Two Cases proceeds constitute Available Funds and are available for distribution to Class 4; EAJF is repaid its deferred share thereafter.

- **Counsel fee.** The 40% contingency fee of special litigation counsel, Walker & Patterson, P.C., is paid from the Estate's portion of recovery.

- **Cap.** EAJF's aggregate recovery on its Class 2 Secured Claim is capped at $25,000,000.00 from any source, with no postpetition interest, fees, or costs. Once EAJF has received $25,000,000.00 in the aggregate on account of its secured slices, it collects no further amounts as a secured creditor.

*Step Two — The Statutory Priority Waterfall (the Estate's Retained Share)*

The Estate's retained share from Step One is then distributed in strict order of priority. No Class receives any distribution until each senior Class has been paid in full:

(1) **Allowed Administrative Claims, Priority Tax Claims, Other Priority Claims, and Other Secured Claims, plus Permitted Expenses** (including the compensation of the Plan Administrator and Court-approved professionals and appropriate Reserves). On the estimates set forth in Article III, the Allowed Priority Tax, Other Priority, and Other Secured Claims are each $0, and Administrative Claims are modest; accordingly, substantially all of the Estate's retained share constitutes GUC Funds.

(2) **EAJF's Class 2 Secured Claim,** satisfied from the EAJF slices allocated in Step One, subject to the $25,000,000.00 cap and the one-year deferral of the Two Cases proceeds.

(3) **Class 4 General Unsecured Claims,** paid Pro Rata from the GUC Funds, and including, for this purpose, EAJF's $17,000,000.00 Allowed General Unsecured Claim.

29

(4) **Class 5 Equity Interests,** only if all Allowed Claims in Classes 1 through 4 are first paid in full, which is not expected to occur, such that Class 5 is projected to receive nothing.

### *EAJF Occupies Two Positions in the Waterfall*

A feature of the structure that materially affects the recovery of ordinary creditors is that EAJF participates at two different levels. In addition to its Class 2 Secured Claim (satisfied from the Step-One slices), EAJF holds an Allowed General Unsecured Claim of $17,000,000.00 that shares Pro Rata in Class 4 alongside the ordinary unsecured creditors. The total amount of Allowed Class 4 Claims is estimated at approximately $27,000,000.00, of which EAJF's $17,000,000.00 represents approximately 63%. As a result, when the GUC Funds are divided Pro Rata, EAJF is allocated roughly two-thirds of the Class 4 pool, materially diluting the amount available to the non-EAJF Holders of Class 4 Claims.

As a partial offset, Section 7.8 of the Plan applies the customary one-satisfaction rule: any amount EAJF collects from Mr. Moseley on its preserved personal guaranty reduces EAJF's Allowed Claims dollar-for-dollar, first the $25,000,000.00 Secured Claim and then the $17,000,000.00 General Unsecured Claim, so that EAJF cannot recover more than once on the same underlying indebtedness, and any such guaranty recovery inures to the benefit of the Estate and the other Holders of Allowed Claims.

### *Example (Base Case)*

Applying the foregoing to the low end of the estimated Chapter 11 recovery range produces the following:

| Step | Amount |
|---|---|
| Total gross recoveries (all asset categories) | $9,035,845 |
| Less: special litigation counsel fee (40% of the 95%) | ($2,027,384) |
| **Net proceeds available for distribution** | **$7,008,462** |
| Step One — EAJF's allocated secured slices (Class 2) | ($1,921,792) |
| **Estate's retained share (Available Funds)** | **$5,086,670** |
| **GUC Funds available for Class 4 distribution†** | **$5,086,670** |

*† The Estate's retained share first bears Allowed Administrative Claims and Permitted Expenses. Because the Allowed Priority Tax, Other Priority, and Other Secured Claims are each estimated at $0 and Administrative Claims are modest, substantially the entire retained share constitutes GUC Funds, consistent with the Liquidation Analysis above.*

The GUC Funds are then distributed Pro Rata among all Allowed Class 4 Claims. With approximately $27,000,000.00 of Allowed Class 4 Claims, the base-case distribution rate is approximately 18.8 cents on the dollar, allocated as follows:

| Holder Group | Allowed Class 4 Claim | Share of Pool | Distribution |
|---|---|---|---|
| EAJF (Allowed General Unsecured Claim) | $17,000,000 | ~63% | $3,202,718 |

| Holder Group | Allowed Class 4 Claim | Share of Pool | Distribution |
|---|---|---|---|
| All other Class 4 creditors | ~$10,000,000 | ~37% | $1,883,952 |
| **Total (GUC Funds)** | **~$27,000,000** | **100%** | **$5,086,670** |

### *The Dilutive Effect, Illustrated*

The dilutive effect is best seen by comparison. If EAJF's $17,000,000.00 Allowed General Unsecured Claim did not share in Class 4, the same $5,086,670 of GUC Funds would be distributed among only the approximately $10,000,000.00 of non-EAJF Class 4 Claims — a recovery of approximately 50.9 cents on the dollar. Because EAJF's Claim is included, the non-EAJF Holders instead recover approximately 18.8 cents on the dollar. EAJF's participation in Class 4 thus reduces the percentage recovery of the ordinary unsecured creditors by roughly two-thirds, even as it increases EAJF's own recovery.

| Non-EAJF Class 4 Recovery | Cents on the Dollar | Aggregate to Non-EAJF Creditors |
|---|---|---|
| If EAJF's $17M Claim did not share in Class 4 | **~50.9¢** | $5,086,670 |
| With EAJF's $17M Claim in Class 4 (actual) | **~18.8¢** | $1,883,952 |

At the high end of the estimated Chapter 11 range, the GUC Funds rise to approximately $6,298,020, the Class 4 distribution rate increases to approximately 23.3 cents on the dollar, and the non-EAJF Holders share approximately $2,332,600. Across the estimated range, therefore, the non-EAJF Class 4 recovery is approximately 18.8 to 23.3 cents on the dollar — before giving effect to any reduction of EAJF's Claims through collection on the Moseley guaranty, which would further increase the non-EAJF recovery.

Section 7.8 of the Plan (Claims Paid by Third Parties) implements the customary "one-satisfaction" rule and addresses the effect of EAJF's separate guaranty against Mr. Moseley. EAJF may pursue and collect its preserved guaranty and related claims against Mr. Moseley in accordance with the EAJF Settlement. However, any payment EAJF receives from Mr. Moseley or any other third party on account of those claims will reduce EAJF's Allowed Claims under the Plan dollar-for-dollar, applied first to EAJF's $25 million Allowed Secured Claim in Class 2 (consistent with the Plan's provision that EAJF shall not receive more than $25 million on account of its Secured Claim from any source) and, after the Secured Claim has been reduced to zero, to EAJF's $17 million Allowed General Unsecured Claim in Class 4. The effect is to prevent EAJF from recovering more than once on the same underlying indebtedness and to preserve for the Estate and the other Holders of Allowed Claims the benefit of any guaranty recovery, while leaving EAJF free to enforce its preserved claims against Mr. Moseley.

## H. Permitted Expenses

The Plan Administrator is authorized to pay from Estate funds from and after the Effective Date the following categories of expenses (the "Permitted Expenses"): (i) Plan Administrator compensation as approved by the Bankruptcy Court; (ii) Consultant compensation as set forth in

the Plan; (iii) reasonable fees and expenses of Court-approved professionals retained by the Plan Administrator, including Walker & Patterson, P.C. in its capacity as special litigation counsel; (iv) insurance premiums for professional liability tail coverage, malpractice coverage, and directors and officers coverage for the Plan Administrator; (v) document storage and records management costs necessary to satisfy the Debtor's ethical obligations with respect to client files; (vi) costs of dissolution of MMA Law Firm, PLLC under Texas law; (vii) U.S. Trustee fees payable pursuant to 28 U.S.C. § 1930; (viii) litigation costs and expenses; and (ix) any other expense reasonably determined by the Plan Administrator to be necessary for the orderly liquidation of the Estate. No funds of the Estate shall be used for ongoing general firm overhead, office rent or lease payments, employee salaries or benefits, marketing or business development costs, or any expense associated with operating MMA Law Firm, PLLC as a going concern except as otherwise provided in the Plan or as may be temporarily necessary to wind down the Debtor in the judgment of the Plan Administrator.

The Reorganized Debtor will remain obligated to pay quarterly fees to the United States Trustee under 28 U.S.C. § 1930(a)(6) until this case is closed, converted, or dismissed. Those fees are calculated on the basis of disbursements made in each calendar quarter. For each quarter in which disbursements equal or exceed $1,000,000, the fee is one percent (1%) of disbursements, not to exceed $250,000 per quarter; lesser disbursements are subject to the graduated minimums set forth in the statute (with a minimum of $250 per quarter). Based on projected aggregate distributions of approximately $7.0 million to $11.3 million over the anticipated life of the Plan, and depending on the number and timing of quarterly distributions, the Debtor estimates aggregate post-confirmation U.S. Trustee quarterly fees of approximately $70,000 to $113,000. Because distributions are expected to be made on no less than a bi-annual basis, the Debtor estimates per-quarter fees of approximately $5,000.00 in quarters in which distributions are made and the statutory minimum in quarters in which they are not. These fees are a Permitted Expense and are payable ahead of distributions to creditors.

## I.     No Discharge

**PURSUANT TO SECTION 1141(d)(3) OF THE BANKRUPTCY CODE, THE DEBTOR SHALL NOT RECEIVE A DISCHARGE UNDER THE PLAN. THIS IS A PLAN OF LIQUIDATION AND THE DEBTOR IS NOT ENTITLED TO A DISCHARGE BECAUSE: (i) THE PLAN PROVIDES FOR THE LIQUIDATION OF ALL OR SUBSTANTIALLY ALL OF THE PROPERTY OF THE ESTATE; (ii) THE DEBTOR DOES NOT ENGAGE IN BUSINESS AFTER CONSUMMATION OF THE PLAN; AND (iii) THE DEBTOR WOULD BE DENIED A DISCHARGE UNDER SECTION 727(a) OF THE BANKRUPTCY CODE IF THIS CASE WERE A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

## J.     Dissolution of the Reorganized Debtor

Upon completion of the limited purposes set forth in the Plan, the Reorganized Debtor shall seek Court approval of a final distribution and closing of the Case. Upon Court entry of a Final Order approving such final distribution and ordering closing of the Case, the Reorganized Debtor shall be deemed dissolved without further order of the Court, and notwithstanding any otherwise applicable requirements for dissolution under state law.

## K.     Releases, Exculpation, and Injunction

The Plan contains customary release, exculpation, and injunction provisions, including a release of liens, exculpation of the Exculpated Parties (which includes the Debtor, the Committee, and their respective representatives) for actions taken from the Petition Date to the Effective Date in connection with the Case (except for bad faith, actual fraud, willful misconduct, or gross negligence determined by a Final Order), and an injunction against the commencement or continuation of any action against the Debtor or the Reorganized Debtor or its assets. The Plan also includes a gatekeeper provision requiring Court authorization before any party may commence, continue, or pursue any claim or cause of action that may be subject to the exculpation and injunction provisions, which gatekeeper provision shall be limited to the Exculpated Parties as defined above and shall not extend to any party beyond the Exculpated Parties or to claims merely relating to the Case. Holders of Claims and Interests are encouraged to review Article 9 of the Plan in full. The Debtor will conform the definition of Exculpated Parties and the scope of the gatekeeper provision in Article 9 of the Plan to the requirements of Sections 524(e) and 105 of the Code such that exculpation extends only to the Debtor and other estate fiduciaries for conduct within the scope of their duties, with carve-outs for actual fraud, willful misconduct, and gross negligence as determined by Final Order.

## L.  Retained Causes of Action; Preservation of Estate Claims (Including Claims Against Insiders)

Pursuant to Sections 1123(b)(3)(B) and 1141(b) of the Code, all Causes of Action of the Debtor and the Estate that are not expressly released or waived under the Plan are preserved and retained by the Estate and vested in the Plan Administrator, as the representative of the Estate appointed for such purpose, who shall have exclusive authority to investigate, commence, prosecute, settle, compromise, abandon, or otherwise resolve such Causes of Action for the benefit of Holders of Allowed Claims. The Plan specifically and unequivocally retains, and the Plan Administrator specifically and unequivocally intends to investigate and, where colorable and cost-effective, to prosecute, each of the following categories of Causes of Action:

- Claims and Causes of Action against the subsequent and successor law firms for earned attorneys' fees and reimbursable expenses, including each of the pending adversary proceedings and unfiled claims identified above, and any additional such claims hereafter identified;

- Avoidance actions and related recovery claims under Sections 544, 547, 548, 549, 550, and 553 of the Code against any transferee, including any insider of the Debtor;

- Claims and Causes of Action against current and former insiders, principals, managers, members, officers, and employees of the Debtor—including John Zachary Moseley—for, among other things, breach of fiduciary duty, fraudulent transfer, and the recovery of distributions, compensation, or transfers, in each case to the extent colorable;

- Claims and Causes of Action relating to the Non-WP Cases and the Mass Tort Dockets;

- All claims asserted or assertable in any pending litigation; and

- All other claims, rights, and Causes of Action of the Estate, whether arising under the Code or applicable non-bankruptcy law.

33

The estimated recovery on the retained Causes of Action is presently unliquidated and is not capable of precise valuation; the Plan Administrator will investigate each category and pursue those determined to be colorable and cost-effective. The Debtor makes no representation that any particular Cause of Action will be pursued or will result in any recovery. Nothing in this Disclosure Statement or the Plan, and no failure to list any specific Cause of Action, shall be deemed a waiver, release, estoppel, or relinquishment of any Cause of Action; all Causes of Action are expressly preserved and reserved except those, if any, expressly released under Article 9 of the Plan.

For the avoidance of doubt, the retention of John Zachary Moseley, Katy Ohlsson, and Morgan Weaver-Gallacher as Consultants to the Plan Administrator does not release, waive, subordinate, or otherwise impair any Cause of Action of the Estate against any of them, and the Plan Administrator's authority to investigate and, where colorable, to prosecute Causes of Action against the Consultants is unimpaired by their retention. The Consultants' compensation and benefits are independent of, and do not constitute consideration for the release of, any such Cause of Action.

## M. Post-Confirmation Governance; Identity, Qualifications, and Compensation of the Plan Administrator (Section 1129(a)(5)); Retained-Estate Structure

In satisfaction of Section 1129(a)(5) of the Code, the Debtor discloses the following regarding the individual proposed to serve after the Effective Date. Allison Byman is proposed to serve as Plan Administrator. Ms. Byman is an experienced bankruptcy attorney and fiduciary, including currently serving and the Chapter 7 Trustee Panel for the Southern District of Texas. Ms. Byman was selected by the Debtor and the Committee on the basis of her experience, independence, and qualifications. To the Debtor's knowledge, Ms. Byman has no connection to the Debtor, its principals, its professionals, or any major creditor that would impair her independence. The Debtor submits that Ms. Byman's proposed service as Plan Administrator is consistent with the interests of Holders of Claims and Interests and with public policy.

The Plan Administrator shall be compensated for services rendered after the Effective Date at the rate of $500.00 per hour, plus reimbursement of actual, reasonable, and necessary expenses, payable from the Estate as a Permitted Expense, subject to the standards of Section 330 of the Code, to the monthly fee-statement and objection procedure set forth in Section 5.19 of the Plan, and to the continuing jurisdiction of the Bankruptcy Court.

On the Effective Date, the authority of all current officers, managers, and members of the Debtor, including John Zachary Moseley, shall terminate, and no current officer, manager, or member shall serve as a director, officer, manager, member, or voting trustee of the Debtor or the Reorganized Debtor after the Effective Date. All management authority shall vest exclusively in the Plan Administrator, and signature authority over all bank accounts and assets of the Estate shall transfer exclusively to the Plan Administrator. The retention of Mr. Moseley and the other Consultants is solely as consultants for the limited, hourly wind-down services described therein and confers no officer, director, or management authority.

The Plan provides that the assets of the Estate are retained by the Estate and administered by the Plan Administrator pursuant to Sections 1123(b)(3)(B) and 1141(b) of the Code, rather than transferred to a liquidating trust. This structure is authorized by the Code and is in the best interests of Holders of Claims for the following reasons: (i) it preserves the Estate as the named plaintiff in

34

the numerous pending adversary proceedings, avoiding the substitution motions, standing challenges, and delay that a transfer of the claims to a trust would invite; (ii) it preserves the Plan Administrator's standing as the Estate's representative under Section 1123(b)(3)(B); (iii) it avoids the formation, administration, and tax costs associated with a liquidating trust; and (iv) it avoids any adverse tax consequence that a transfer of assets to a trust might trigger. Section 1141(b) revests property of the Estate in the Debtor only "[e]xcept as otherwise provided in the plan," and the Plan provides that the assets remain property of the Estate pending liquidation.

In the event any Consultant or other person fails to cooperate with the Plan Administrator or to turn over property or records of the Estate, the Plan Administrator may pursue all available remedies, including (i) turnover under Section 542 of the Code; (ii) enforcement of the Confirmation Order, including by motion for contempt; (iii) termination of the non-cooperating Consultant's engagement and compensation; and (iv) any other relief available under the Plan or applicable law, with the Bankruptcy Court retaining jurisdiction to adjudicate any such matter.

## N. Insurance Matters; Treatment of Insured Claims; Insurance Neutrality

The Debtor maintained professional liability (malpractice) insurance policies issued by Allied World Insurance Company (the "Allied World Policies"). The proceeds of the Allied World Policies respond to malpractice and related claims asserted against the Debtor and its former attorneys. The United States District Court has ruled that the proceeds of the Allied World Policies are not property of the Estate. Accordingly, neither the Plan nor this Disclosure Statement asserts any interest of the Estate in the proceeds of the Allied World Policies, and nothing in the Plan shall be construed to marshal, redirect, or apply such proceeds for general Estate purposes.

By prior orders of the Bankruptcy Court (ECF Nos. 815, 1281, 1410, and 1411), Allied World has been authorized to pay covered Claim Expenses and Damages in the ordinary course under the Allied World Policies. Because covered malpractice claims are paid from non-Estate insurance proceeds, amounts so paid reduce the claims that would otherwise be asserted against the Estate and are beneficial to Holders of Class 4 General Unsecured Claims.

Under the Plan, no distribution shall be made on account of any Claim that is payable under the Debtor's insurance. Any Claim paid in whole or in part by an insurance carrier shall not receive a distribution from the Estate and shall be deemed satisfied in full, and the unpaid balance of a partially insured Claim shall be disallowed.

The Plan includes an insurance neutrality provision providing that, notwithstanding any other provision of the Plan, the Confirmation Order, or any related document, nothing therein shall alter, modify, amend, impair, or prejudice the legal, equitable, or contractual rights, obligations, claims, and defenses of the Debtor, the Reorganized Debtor, the Plan Administrator, the Estate, the insurers (including Allied World), or any other party under any insurance policy, all of which shall be determined under the insurance policies and applicable non-bankruptcy law. For the avoidance of doubt, the provision (i) preserves the rights of the Debtor, the Estate, and the Plan Administrator to assert claims for coverage, breach, or extracontractual liability; (ii) preserves the rights of any insurer to assert any coverage position or defense; and (iii) neither expands nor contracts the Bankruptcy Court's jurisdiction over insurance disputes.

As described in Section IV.F, the EAJF Settlement as incorporated into the Plan is the agreement as modified by the 9019 Order, including Paragraph 7 thereof, which excludes all

35

claims and causes of action against Allied World; no proceeds of any insurance policy fund any obligation under the EAJF Settlement.

The Debtor does not currently maintain professional liability (malpractice) insurance.

## V.
## FEASIBILITY

Pursuant to Section 1129(a)(11) of the Code, a debtor must demonstrate that a bankruptcy court's confirmation of a plan is not likely to be followed by the liquidation or need for further financial reorganization of the debtor or its successor under the plan, unless such liquidation or reorganization is proposed under the plan. Because this is a Plan of Liquidation, the Plan expressly contemplates and provides for the orderly liquidation of all or substantially all of the property of the Estate, the wind-down of the Debtor's affairs, and the dissolution of the Debtor. Accordingly, the feasibility requirement of Section 1129(a)(11) is satisfied.

The Debtor has no tangible assets beyond office furniture and computer equipment. The assets of value are the pending litigation detailed above and additional claims to be brought, and the value to be generated from the existing Mass Tort Docket. The Plan Administrator must have access to the data and institutional knowledge necessary to prove entitlement to fees and costs in the thousands of cases. To that end, the Plan provides for the retention of Mr. Moseley, Ms. Ohlsson, and Ms. Weaver-Gallacher as Consultants on the terms described above, capped at fifteen (15) hours per week. The value of the Causes of Action is not capable of precise valuation. The proceeds will be utilized to pay Permitted Expenses and make distributions pursuant to the Plan. The Debtor reasonably believes that the Plan Administrator will be able to make distributions under the Plan. Conversion to Chapter 7 likely results in no return to any creditor. Therefore, the Debtor believes the Plan is feasible.

As explained more fully below, because the Debtor's current personnel and their institutional knowledge would not be available to a chapter 7 trustee, the recovery to the Estate in a chapter 7 liquidation would necessarily be reduced to an amount at or near $0.00. The Plan, by contrast, secures the continued availability of that institutional knowledge through the Consulting Commitments, which is what makes meaningful distributions possible and this Chapter 11 Plan not only feasible, but superior to a proceeding under Chapter 7.

## VI.
## ALTERNATIVES TO THE PLAN

### A.    Chapter 7 Liquidation; Liquidation Analysis

As a condition to Confirmation of a plan, Section 1129(a)(7)(A)(ii) of the Code requires that each Impaired Class of Claims or Interests must receive or retain at least the amount of value it would receive if the debtor were liquidated under Chapter 7 of the Code on the effective date of the plan, also called the "best interests" test. The Debtor believes that, under the proposed terms of the Plan, all Holders of Impaired Claims and Interests will receive property with a value not less than the value such Holders would receive in a Chapter 7 liquidation of the Debtor's assets. That belief is based primarily on consideration of the effect that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to Holders of Impaired Claims, including (i) the

increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a Chapter 7 trustee and professional advisors to the trustee, (ii) the substantial increases in Claims, and (iii) the substantial delay in distributions to Holders of Impaired Claims and Interests that will likely ensue in a Chapter 7 liquidation.

Relatedly, liquidation under Chapter 7 of the Code would likely entail the appointment of a Chapter 7 trustee having no experience or knowledge of the Debtor's business, its records, or assets. A substantial period of education would be required in order for any Chapter 7 trustee to effectively wind up the case. Also, in the event litigation were to prove necessary, the Chapter 7 trustee would likely be in an inferior position to prosecute such actions without prior knowledge regarding the Debtor's business and particularly if there were a lack of funding to support such efforts. Under the Plan, by contrast, the Plan Administrator will have the benefit of the institutional knowledge of the Consultants pursuant to the Consulting Commitments described above. The data and institutional knowledge necessary to prove entitlement to fees and costs in the thousands of cases requires the continued involvement of Mr. Moseley and the remaining personnel. A conversion to Chapter 7 would render those potential assets substantially less valuable.

In summary, the Debtor has determined that a Chapter 7 liquidation would result in significant diminution in the recoveries to be realized by Holders of Allowed Claims, as compared to the proposed distributions under the Plan. Consequently, the Debtor has determined that the Plan will provide a greater ultimate return to Holders of Allowed Claims than would a Chapter 7 liquidation of the Debtor.

More specifically, the recoveries projected under the Plan depend almost entirely on the Estate's ability to prove its entitlement to earned attorneys' fees and reimbursable expenses in more than 20,000 underlying cases and to monetize the Mass Tort Dockets. That proof depends on the data, files, and institutional knowledge held by the Debtor's current personnel—principally Mr. Moseley, Ms. Ohlsson, and Ms. Weaver-Gallacher. Upon a conversion to chapter 7, these individuals would not be available to a chapter 7 trustee: their consulting commitments are made to the Plan Administrator under the Plan and would not survive conversion, and there would be no mechanism or funding to retain them. Without their institutional knowledge, a chapter 7 trustee, a stranger to the Debtor's business and records, would be unable, as a practical matter, to establish the Estate's entitlement to fees and costs in the underlying cases or to realize value from the Mass Tort Dockets. The Debtor therefore believes that the recovery to the Estate in a chapter 7 liquidation would necessarily be reduced to an amount at or near $0.00, because the assets that generate value under the Plan would be rendered substantially unrecoverable in the hands of a trustee lacking that knowledge.

The Debtor's assumption that Mr. Moseley, Ms. Ohlsson, and Ms. Weaver-Gallacher would not be available to assist a Chapter 7 trustee rests on the following: (i) the Consultants' commitments to provide services run to the Plan Administrator and are consideration for benefits available only under the Plan, below-market hourly compensation, continuation of health insurance, and the eighteen-month stay, none of which would exist upon conversion; (ii) the Consultants are under no legal obligation to assist a Chapter 7 trustee, and neither the Debtor nor the Plan Administrator could compel their continued cooperation in a converted case; (iii) there is no funding mechanism or budget in a Chapter 7 case to retain the Consultants on terms comparable to those negotiated under the Plan; and (iv) Mr. Moseley, as an insider against whom the Estate holds expressly preserved Causes of Action (see Section IV.L), holds interests adverse to the Estate

and cannot be expected to volunteer the cooperation. In addition, the Consultant's have indicated directly that if the case were converted, they would each seek other full-time employment and would not be available to continue their cooperation and support for continued collection of assets. The Debtor does not contend that these individuals would be legally barred from assisting a trustee; rather, the Debtor's good-faith assessment is that, without the Plan's negotiated incentives, their voluntary cooperation would not be available. A Chapter 7 trustee, a stranger to the Debtor's records and to the more than 20,000 underlying cases, would, as a practical matter, be unable to establish the Estate's entitlement to fees and costs or to realize value from the Mass Tort Docket, which is why the Debtor estimates Chapter 7 recovery on those assets at or near $0.00.

The Plan's comparative advantage is not merely theoretical. With the assistance of the Debtor's personnel, the Estate has already achieved more than eighteen (18) settlements with successor firms, including settlements of $759,000.00 (Daly & Black), $570,629.06 (Sangisetty), and $285,426.37 (Voorhies), among the others identified above. These results were obtained because the Debtor's personnel could identify the cases, marshal the supporting data, and prove the Estate's entitlement. A chapter 7 trustee, proceeding without that knowledge against the same defendants, would be in a materially inferior position and would in many instances be unable to recover at all.

The Debtor is a law firm whose principal assets are (i) cash on hand, (ii) its Causes of Action and claims to recover attorneys' fees and expenses earned in the representation of former clients (prosecuted against successor and co-counsel firms), (iii) its positions in four mass tort dockets, and (iv) tolled claims against an insider. The analysis values each asset class under both chapters.

**Methodology and Key Assumptions**

(1) **The cash waterfall is controlled and determined pursuant to terms of the EAJF Settlement Agreement. To the extent anything provided in this analysis conflicts with the terms of the EAJF Settlement Agreement, the terms of the EAJF Settlement Agreement controls.**

(2) Cash on hand. The Estate holds cash of $2,850,625.62 as of June 22, 2026, available to fund creditor distributions in either chapter. This cash is allocated 95% to the Estate and 5% to EAJF, except for $1,250,000 of Zantac docket sale proceeds, which is allocated 25% to the Estate and 75% to EAJF (per the Settlement Agreement). The Estate-allocated cash ($1,833,094) is available to creditors in both chapters; the EAJF-allocated cash ($1,017,531) is included in the amounts earmarked to EAJF.

(3) Settlement / fee recoveries — 95%/5% split. The Debtor is allocated 95% of gross settlement and fee-recovery amounts. The remaining 5% is earmarked for EAJF's Secured Claim; EAJF has no entitlement to the 95%. Special litigation counsel (Walker & Patterson, P.C.) is paid 40% of the amounts obtained, in both chapters. The 95% net of counsel fees, together with cash, mass-tort proceeds, and insider recoveries, is therefore available for distribution to general unsecured creditors.

(4) Pending fee claims. In Chapter 11 these are valued at 10% of the litigated pending adversaries' high-range exposure (a gross recovery of $1,965,000). In Chapter 7 they are valued at 10% to 25% of that Chapter 11 value (approximately $196,500 to $491,250 gross), reflecting that the Consultants and insiders (including J.Z. Moseley) whose

institutional knowledge is required to prove the claims would be largely unavailable to a trustee.

(5) Mass tort dockets. The Plan permits the Plan Administrator to hold the Debtor's positions in the four mass tort dockets through resolution, with an estimated realization of $850,000 to $5,000,000. In a Chapter 7 liquidation, those positions would be sold on an expedited basis, with an estimated realization of only $100,000 to $300,000. Under the EAJF Settlement, mass tort docket proceeds are distributed 75% to EAJF and 25% to the Estate in either chapter; the Two Cases (Exhibit C) are distributed 90% to EAJF and 10% to the Estate.

(6) Insider claims. Approximately $183,000 of claims against insider Z. Moseley have been tolled. Estimated recovery ranges from $0 to $183,000, is treated as equal in both chapters, and carries a 5% carve-out to EAJF (95% to the Estate), consistent with the WP fee recoveries.

(7) Chapter 7 trustee compensation. A Chapter 7 liquidation incurs statutory trustee compensation under § 326(a), computed on the moneys disbursed to parties in interest. No comparable statutory charge arises under the Plan.

## Recovery Comparison

The following table compares estimated net proceeds available for distribution under each chapter, on both a low-case and high-case basis. Figures are estimates and are rounded.

| Source of Recovery / Distribution | Ch.11 Low | Ch.11 High | Ch.7 Low | Ch.7 High |
|---|---|---|---|---|
| Cash on hand (available to both) | $2,850,626 | $2,850,626 | $2,850,626 | $2,850,626 |
| Settled / 9019 fee claims (gross) | $3,370,220 | $3,370,220 | $3,370,220 | $3,370,220 |
| Pending fee claims (gross) | $1,965,000 | $1,965,000 | $196,500 | $491,250 |
| Mass tort dockets (realization) | $850,000 | $5,000,000 | $100,000 | $300,000 |
| Two Cases — Exhibit C (realization) | $0 | $0 | $0 | $0 |
| Insider claims — tolled v. Z. Moseley | $0 | $183,000 | $0 | $183,000 |
| **Total gross recoveries** | **$9,035,845** | **$13,368,845** | **$6,517,345** | **$7,195,095** |
| Less: special litigation counsel fee (40% of 95%) | ($2,027,384) | ($2,027,384) | ($1,355,354) | ($1,467,359) |
| **Net before Ch.7 trustee compensation** | **$7,008,462** | **$11,341,462** | **$5,161,992** | **$5,727,737** |
| Less: Ch.7 trustee compensation (§ 326(a)) | $0 | $0 | ($178,110) | ($195,082) |
| **NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | **$7,008,462** | **$11,341,462** | **$4,983,882** | **$5,532,655** |
| Memo: earmarked to EAJF (5% WP carve + cash + 75% mass tort + 90% Two Cases + 5% insider) | $1,921,792 | $5,043,442 | $1,270,867 | $1,444,755 |
| Memo: available to general unsecured creditors | $5,086,670 | $6,298,020 | $3,713,015 | $4,087,900 |

| Incremental Value of Chapter 11 over Chapter 7 | Amount |
|---|---|
| Total net proceeds — Low case | $2,024,580 |
| Total net proceeds — High case | $5,808,807 |
| To general unsecured creditors — Low case | $1,373,655 |
| To general unsecured creditors — High case | $2,210,120 |

**Under every scenario the Plan produces substantially greater net proceeds — between approximately $2.02 million (low case) and $5.81 million (high case) more than a Chapter 7 liquidation.**

### Principal Drivers of the Difference

Mass tort dockets. The single largest driver is the Plan's ability to hold the mass tort docket positions. Retained and resolved over time, those positions are estimated to yield $850,000 to $5,000,000; a forced Chapter 7 sale would realize only $100,000 to $300,000 — a swing of roughly $750,000 to $4,700,000 in total proceeds in favor of the Plan. Under the Settlement, 75% of mass tort proceeds are earmarked to EAJF in either chapter, so the portion of this swing reaching general unsecured creditors is the Estate's 25% share.

Pending fee claims. The pending fee-recovery claims contribute an estimated $1,120,050 of net value under the Plan, but only 10% to 25% of that value in Chapter 7 (a gross recovery of roughly $196,500 to $491,250), because the Consultants' institutional knowledge needed to prove entitlement would be largely unavailable to a trustee.

Trustee compensation. A Chapter 7 trustee would be entitled to statutory compensation under § 326(a) of approximately $178,110 (low case) to $195,082 (high case), a cost the Plan avoids:

| § 326(a) Tier | Rate | Ch.7 Low | Ch.7 High |
|---|---|---|---|
| 25% of first $5,000 | 25% | $1,250 | $1,250 |
| 10% of $5,000–$50,000 | 10% | $4,500 | $4,500 |
| 5% of $50,000–$1,000,000 | 5% | $47,500 | $47,500 |
| 3% of amount over $1,000,000 | 3% | $124,860 | $141,832 |
| **Maximum Ch.7 trustee compensation** | | **$178,110** | **$195,082** |

This figure excludes the additional professional fees (trustee's counsel and accountants) a Chapter 7 trustee unfamiliar with the Debtor would necessarily incur, which would further reduce Chapter 7 recoveries.

### Items Equal in Both Chapters

Cash on hand ($2,850,625.62) and the recovery on the tolled insider claims against Z. Moseley ($0 to $183,000) are the same under the Plan and in Chapter 7. The cash, however, is allocated between the Estate and EAJF as follows:

| Cash Component | Amount | Estate | EAJF |
|---|---|---|---|
| Non-Zantac cash (95% / 5%) | $1,600,626 | $1,520,594 | $80,031 |
| Zantac docket sale proceeds (25% / 75%) | $1,250,000 | $312,500 | $937,500 |
| **Total cash on hand** | **$2,850,626** | **$1,833,094** | **$1,017,531** |

*The Estate-allocated cash of $1,833,094 is available for distribution to creditors in both chapters; the EAJF-allocated cash of $1,017,531 is included in the amounts earmarked to EAJF.*

**Valuation of the Causes of Action and the Mass Tort Dockets; Positions of the Parties and Discount Methodology.**

The recoveries projected in the Liquidation Analysis are estimates prepared for the limited purpose of the best-interests test under Section 1129(a)(7) of the Code. Because the Estate's principal assets are contested, unliquidated litigation claims and contingent positions in mass tort dockets, the high and low ranges were derived by beginning with the gross asserted value of each asset category and applying a series of discounts that reflect the risks of recovery and collection. This subsection describes, from a neutral perspective, the gross values, the discount methodology, and the principal arguments the Debtor anticipates adverse parties will raise as to value, together with the Debtor's responses.

**(a) Fee-Recovery Causes of Action (claims against successor and co-counsel firms).** The Estate asserts claims against successor and co-counsel firms for earned attorneys' fees and reimbursable expenses in more than 20,000 underlying cases. The four litigated pending adversary proceedings reflected in the Liquidation Analysis carry an aggregate high-range fee exposure of approximately $19,650,000 (Morris Bart, LLC — $15,000,000; Laborde Earles Law Firm, LLC — $2,000,000; Barcus Arenas, PLLC — $2,000,000; and Hair & Shunnarah Trial Attorneys — $650,000). Additional, investigation-stage claims (including potential claims against the Monson Law Firm, the Louisiana Department of Insurance, and others) are not included in the Liquidation Analysis because they remain unliquidated and speculative.

For purposes of the Plan (Chapter 11), the Liquidation Analysis applies a recovery rate of ten percent (10%) to the aggregate high-range exposure, yielding an estimated gross recovery of approximately $1,965,000 on the litigated pending adversaries. From gross collections, the analysis assumes that ninety-five percent (95%) is realized for the Estate net of amounts that are uncollectible or consumed by cost, and that special litigation counsel (Walker & Patterson, P.C.) is compensated at forty percent (40%) of the amounts obtained, in either chapter. The ten percent (10%) figure is not a prediction of the merits of any single case; it is a blended, probability-weighted estimate across the portfolio that reflects, at each stage: (i) the risk that a defendant firm will contest or defeat the Estate's entitlement to fees; (ii) the risk of an adverse result at trial, including a complete denial of fees; (iii) appellate risk; (iv) the risk that a referred-out or successor firm, even where liability is established, will be unable or unwilling to pay; and (v) collection risk and the time value of a multi-year collection effort.

The Debtor anticipates that adverse parties will argue that certain of these claims are worth little or nothing, principally on the grounds that (i) following the 2023 suspension of the attorney who managed the Debtor's New Orleans office, a Louisiana federal district court ruled sua sponte that the Debtor was not entitled to attorneys' fees or costs in thousands of

Louisiana cases and had no property or ownership interest in the related settlement proceeds, and (ii) in certain matters, successor firms contend that the Debtor performed no compensable substantive work. The Debtor disputes these positions. As to the Louisiana ruling, the United States Court of Appeals for the Fifth Circuit vacated the order, and the Debtor maintains that it is entitled to recover the reasonable value of services rendered and expenses advanced under its contingency-fee contracts and under quantum meruit. As to the "no substantive work" contention, the Debtor's records and the institutional knowledge of its personnel establish the work performed and the resulting entitlement. The Debtor further notes that, with the assistance of that institutional knowledge, the Estate has already entered into more than eighteen (18) settlements with successor firms — including settlements of $759,000 (Daly & Black, P.C.), $570,629.06 (The Sangisetty Law Firm), and $285,426.37 (The Voorhies Law Firm) — which the Debtor submits is concrete, market-based evidence that the "zero value" positions overstate the litigation risk. The aggregate gross value of the settled and Rule 9019 claims reflected in the Liquidation Analysis is approximately $3,370,220.

**(b) Louisiana Cases.** The Louisiana cases comprise the largest single component of the fee-recovery claims and carry asset-specific risk arising from the licensing and suspension events described in the Debtor's history above. For valuation purposes, the same build-up described in subsection (a) applies, with the licensing/suspension risk and the now-vacated no-property-interest ruling treated as the principal additional discount factors specific to the Louisiana book. The Debtor's position is that the Fifth Circuit's vacatur removed the principal legal obstacle to recovery and that the Debtor retains contract and quantum-meruit entitlements to fees and costs collected by successor firms in the more than 20,000 Louisiana cases; adverse parties are expected to contend that the licensing issues bar or substantially reduce recovery. The Liquidation Analysis reflects these competing positions through the blended recovery rate applied to the portfolio rather than through a case-by-case projection.

**(c) Mass Tort Dockets.** The Debtor holds positions in three mass tort dockets (Roundup, Tylenol/APAP, and NEC). At the height of the Louisiana campaign, docket projections were stated to exceed $1.2 billion in aggregate settlement value with more than $400 million in attorneys' fees; those figures describe the historical gross projection of the broader docket and are not the value ascribed to the Estate's retained positions. For best-interests purposes, the Liquidation Analysis values the Estate's ability to hold the docket positions to resolution under the Plan at an estimated $850,000 to $5,000,000, against an estimated $100,000 to $300,000 realizable on a forced, expedited sale in a Chapter 7 liquidation. Under the EAJF Settlement, mass tort docket proceeds are allocated seventy-five percent (75%) to EAJF and twenty-five percent (25%) to the Estate in either chapter. Adverse parties may contend that the Estate's positions have minimal independent value because the dockets are administered by partnered handling firms and because realization depends on future settlement of the underlying tort litigation; the Debtor's position is that retention of the positions through resolution under the Plan, rather than a forced sale, is what preserves their value, and is the single largest driver of the difference between the Plan and a Chapter 7 liquidation. The Debtor has actively marketed the remaining three (3) dockets, with no meaningful offers to purchase and the liquidation value is based upon the offers received through the marketing efforts. The marketing was done through the Court

employed professional, David Middleman. His credentials were provided to all parties entitled to notice in this case and his employment was approved by the Court.

**(d) Summary.** **The high and low ranges in the Liquidation Analysis are intended to bracket the reasonably foreseeable outcomes after giving effect to the foregoing discounts. The Debtor does not represent that any particular case will be won or settled, or in any particular amount, and actual recoveries may differ materially. The Debtor submits that the ranges are reasonable and conservative and are corroborated by the settlements achieved and the marketing results.**

## Distribution and Conclusion

Under the EAJF Settlement, which binds any Chapter 7 trustee, EAJF receives, in either chapter: the 5% carve-out on WP fee recoveries, its allocated share of the cash on hand, 75% of the mass tort docket proceeds, 90% of any Two Cases (Exhibit C) recovery, and a 5% carve-out on insider-claim recoveries. These EAJF allocations total an estimated $1.27 million to $1.44 million in Chapter 7 and $1.92 million to $5.03 million under the Plan. The remainder, the 95% of WP fee recoveries net of counsel fees, the Estate's allocated cash, the Estate's 25% share of mass tort proceeds, the 10% Estate share of the Two Cases, and 95% of the insider recovery, is available for distribution to general unsecured creditors (Class 4, which includes EAJF's agreed $17,000,000 general unsecured claim) after payment of Allowed Administrative, Priority, and Other Secured Claims. On that basis, the amounts reaching general unsecured creditors are an estimated $5.09 million to $6.30 million under the Plan, versus $3.71 million to $4.09 million in Chapter 7.

**Accordingly, the net proceeds available for distribution under the Plan ($7.0–$11.3 million) materially exceed those available in a Chapter 7 liquidation ($5.0–$5.5 million). Each Impaired Class will receive or retain under the Plan property of a value not less than it would receive in a Chapter 7 liquidation, and the Plan provides a greater ultimate return. The best-interests test of § 1129(a)(7) is satisfied.**

## B.      Dismissal

If dismissal of the Case were to occur, the Debtor would no longer benefit from the protections of the Court and the applicable provisions of the Code. In the event of dismissal, it is likely that many Holders of Unsecured Claims would not receive any payment on their Claims. Dismissal would force a race among Creditors to take over and dispose of the Debtor's minimal tangible assets. Even the most diligent Holders of Unsecured Claims would be unlikely to obtain a recovery on their Claims similar to the recovery proposed under the Plan, and many Holders of Unsecured Claims would likely not obtain any recovery on their Claims. The Debtor would also lose the ability to manage the substantial litigation in one court, allowing litigation to once again be spread among state and federal courts across multiple states. The Plan Administrator would be unable to appear and successfully prosecute the Estate's claims.

# VII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

The following is intended as a summary of certain risks associated with the Plan, but it is not exhaustive and must be supplemented by the analysis and evaluation made by each Holder of a Claim or Interest of the Plan and this Disclosure Statement as a whole with such Holder's own advisors.

**A.      Bankruptcy Risks**

There can be no assurance that any Impaired Class of Claims under the Plan will accept the Plan or that the Proponents will be able to use the cramdown provisions of the Code for confirmation of the Plan. The Debtor has made concerted efforts to propose a Plan that would be accepted by a sufficient number of Claimants and a sufficient amount of Claims to confirm the Plan.

**B.      Confirmation Risks**

The following specific risks exist with respect to confirmation of the Plan:

•      Any objection to confirmation of the Plan can either prevent confirmation of the Plan, or delay such confirmation for a significant period of time.

•      Because the Proponents may be seeking to obtain approval of the Plan over the rejection of one or more Impaired Classes of Claims (and Class 5 is deemed to reject), the cramdown process could delay confirmation.

**C.      Conditions Precedent**

Confirmation of the Plan and occurrence of the Effective Date are subject to certain conditions precedent that may not occur. The Debtor, however, is working diligently with all parties in interest to ensure that all conditions precedent are satisfied.

**D.      Risks Relating to Recoveries on Causes of Action and Mass Tort Dockets**

The primary assets of the Estate are (i) Causes of Action against subsequent law firms for fees and reimbursable expenses, and (ii) the Mass Tort Dockets (Roundup, Zantac, Tylenol/APAP, and NEC). The amount and timing of recoveries on these assets is inherently uncertain. The payment of classified Claims is entirely contingent upon the Plan Administrator's ability to prosecute and recover on the Estate's Causes of Action and on the sale or monetization of the Mass Tort Dockets. There is no assurance as to the amount, timing, or even existence of any recovery. Holders of Class 4 General Unsecured Claims may receive significantly less than the estimated recoveries set forth in this Disclosure Statement, including the possibility of no recovery at all.

# VIII.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**THE PLAN AND ITS RELATED TAX CONSEQUENCES ARE COMPLEX. MOREOVER, MANY OF THE INTERNAL REVENUE CODE PROVISIONS DEALING**

**WITH THE FEDERAL INCOME TAX ISSUES ARISING FROM THE PLAN HAVE BEEN THE SUBJECT OF RECENT LEGISLATION AND, AS A RESULT, MAY BE SUBJECT TO AS YET UNKNOWN ADMINISTRATIVE OR JUDICIAL INTERPRETATIONS. THE DEBTOR HAS NOT REQUESTED A RULING FROM THE INTERNAL REVENUE SERVICE (THE "IRS") OR AN OPINION OF COUNSEL WITH RESPECT TO THESE MATTERS. ACCORDINGLY, NO ASSURANCE CAN BE GIVEN AS TO THE INTERPRETATION THAT THE IRS WILL ADOPT. THERE ALSO MAY BE STATE, LOCAL, OR OTHER TAX CONSIDERATIONS APPLICABLE TO EACH CREDITOR. CREDITORS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE, LOCAL, AND OTHER TAX LAWS.**

### IX.
### CONCLUSION

This Disclosure Statement provides information regarding the Debtor's bankruptcy and the potential benefits that might accrue to Holders of Claims against and Interests in the Debtor under the Plan, as proposed. The Plan is the result of extensive efforts by the Debtor, the Committee, and their respective advisors to provide the Holders of Allowed Claims with a meaningful recovery on account of their Claims. The Debtor believes that the Plan is feasible and will provide each Holder of a Claim or Interest against the Debtor with an opportunity to receive greater benefits than those that would be received under any other alternative. The Debtor, therefore, urges interested parties to vote in favor of the Plan.

DATED: July 1, 2026

| | |
|---|---|
| MMA Law Firm, PLLC<br><br>By: */s/ Zach Moseley*<br>    Zach Moseley,<br>    Managing Member<br><br>By: */s/ Johnie Patterson*<br>    Johnie Patterson<br>    Attorney-in-Charge<br>    SBN 15601700<br><br>**WALKER & PATTERSON, P.C.**<br>P.O. Box 61301<br>Houston, TX 77208<br>jjp@walkerandpatterson.com<br>mgoott@walkerandpatterson.com<br>713.956.5577 (telephone)<br>713.956.5570 (fax)<br>Counsel for the Debtor | |

**LIQUIDATION ANALYSIS — RECOVERY COMPARISON**

*MMA Law Firm, PLLC | Case No. 24-31596 | Chapter 11 Plan vs. Chapter 7 — Low/High Recovery Ranges*

| Source of Recovery / Distribution | Ch. 11 — Low | Ch. 11 — High | Ch. 7 — Low | Ch. 7 — High |
|---|---|---|---|---|
| Cash on hand (available to both; see Cash Allocation) | $2,850,625.62 | $2,850,625.62 | $2,850,625.62 | $2,850,625.62 |
| Settled / 9019 fee claims — WP (gross) | $3,370,219.75 | $3,370,219.75 | $3,370,219.75 | $3,370,219.75 |
| Pending fee claims — WP (gross) | $1,965,000.00 | $1,965,000.00 | $196,500.00 | $491,250.00 |
| Mass tort dockets (realization) | $850,000.00 | $5,000,000.00 | $100,000.00 | $300,000.00 |
| Two Cases — Exhibit C (realization) | - | - | - | - |
| Insider claims — tolled v. Z. Moseley (5% EAJF carve) | - | $183,000.00 | - | $183,000.00 |
| **Total gross recoveries** | **$9,035,845.37** | **$13,368,845.37** | **$6,517,345.37** | **$7,195,095.37** |
| Less: special litigation counsel fee (40% of 95%, WP cases) | ($2,027,383.51) | ($2,027,383.51) | ($1,355,353.51) | ($1,467,358.51) |
| **Net before Chapter 7 trustee compensation** | **$7,008,461.87** | **$11,341,461.87** | **$5,161,991.87** | **$5,727,736.87** |
| Less: Chapter 7 trustee compensation (§ 326(a)) | 0 | 0 | ($178,109.76) | ($195,082.11) |
| **NET PROCEEDS AVAILABLE FOR DISTRIBUTION** | **$7,008,461.87** | **$11,341,461.87** | **$4,983,882.11** | **$5,532,654.76** |
| | | | | |
| Memo: earmarked to EAJF (5% WP carve + cash + 75% mass tort + 90% Two Cases + 5% insider) | $1,921,792.27 | $5,043,442.27 | $1,270,867.27 | $1,444,754.77 |
| Memo: available to general unsecured creditors (Class 4) | $5,086,669.60 | $6,298,019.60 | $3,713,014.84 | $4,087,899.99 |
| | | | | |
| **Incremental value of Chapter 11 over Chapter 7:** | | | | |
| Total net proceeds (Ch.11 Low − Ch.7 Low) | **$2,024,579.76** | | | |
| Total net proceeds (Ch.11 High − Ch.7 High) | **$5,808,807.11** | | | |
| To general creditors (Low) | **$1,373,654.76** | | | |
| To general creditors (High) | **$2,210,119.61** | | | |
| | | | | |
| **CONCLUSION: Total net proceeds under the Plan ($7.0M–$11.3M) materially exceed Chapter 7 ($5.0M–$5.5M). Under the EAJF Settlement (binding on any Ch.7 trustee), EAJF receives the 5% WP carve-out, its allocated cash share, 75% of mass tort docket proceeds, and 90% of the Two Cases; the balance flows to general unsecured creditors (Class 4). On that basis, recoveries available to general creditors are an estimated $5.09M–$6.30M under the Plan vs. $3.71M–$4.09M in Chapter 7. The Plan yields more to every constituency, and the best-interests test of 11 U.S.C. § 1129(a)(7) is satisfied.** | | | | |

## MMA Law Firm, PLLC — Liquidation Analysis

*Case No. 24-31596 (Bankr. S.D. Tex., Houston Division)*

### Key Assumptions (blue cells are inputs — change to run scenarios)

| Assumption | Value | Basis / Source |
|---|---|---|
| Amounts obtained for the estate (% of settlement) | 95.0% | *Per debtor counsel: collections net of uncollectible/cost = 95% of settlement amount* |
| Special litigation counsel fee (% of amounts obtained) | 40.0% | *40% contingency to Walker & Patterson, P.C. (Permitted Expense in Ch.11; same fee in Ch.7)* |
| Pending-case recovery rate — Chapter 11 (% of high-range exposure) | 10.0% | *Applied to litigated pending adversaries' high-range exposure; Ch.7 = 0%* |
| Pending-case recovery rate — Chapter 7 | 0.0% | *$0: insiders (J.Z. Moseley et al.) unavailable to prove up fee entitlement (see Disclosure Stmt. Art. VI)* |
| | | |

### 11 U.S.C. § 326(a) Trustee Compensation Tiers (Chapter 7 only)

| Tier | Rate | |
|---|---|---|
| 25% of first $5,000 | 25.0% | |
| 10% of next $45,000 ($5,000–$50,000) | 10.0% | |
| 5% of next $950,000 ($50,000–$1,000,000) | 5.0% | |
| **Additional Assumptions (added per debtor counsel, 6/22/2026)** | 3.0% | |
| Cash on hand as of 6/22/2026 (available to both Ch.11 and Ch.7) | $2,850,625.62 | *Estate cash on hand; funds creditor distributions in either chapter* |
| EAJF secured carve-out (% of settlement recoveries) | 5.0% | *5% of settlement/fee recoveries earmarked to EAJF's secured claim; EAJF has NO entitlement to the remaining 95%* |
| Mass tort dockets — Chapter 11 realization (low) | $850,000.00 | *Plan retains/holds docket positions through resolution* |
| Mass tort dockets — Chapter 11 realization (high) | $5,000,000.00 | *Upside from holding positions to maturity under the Plan* |
| Mass tort dockets — Chapter 7 realization (low) | $100,000.00 | *Forced/expedited liquidation-sale value in Ch.7* |
| Mass tort dockets — Chapter 7 realization (high) | $300,000.00 | *Forced/expedited liquidation-sale value in Ch.7* |
| Insider claims — tolled v. Z. Moseley (low) | - | *Recovery equal in Ch.11 and Ch.7* |
| Insider claims — tolled v. Z. Moseley (high) | $183,000.00 | *Approx. $183,000 tolled insider claims; recovery equal in both chapters* |
| Ch.7 pending-claim recovery — LOW (% of Ch.11 pending value) | 10.0% | *Per debtor counsel: Ch.7 realizes 10%–25% of the Ch.11 pending-claim value* |
| Ch.7 pending-claim recovery — HIGH (% of Ch.11 pending value) | 25.0% | *Per debtor counsel: Ch.7 realizes 10%–25% of the Ch.11 pending-claim value* |
| Zantac docket sale proceeds included in cash on hand | $1,250,000.00 | *Cash on hand derived from the Zantac docket sale (splits 25/75); remainder splits 95/5* |
| Cash split — Estate share (non-Zantac funds) | 95.0% | *95% of non-Zantac cash allocated to the Estate* |
| Cash split — EAJF share (non-Zantac funds) | 5.0% | *5% of non-Zantac cash allocated to EAJF* |
| Zantac cash split — Estate share | 25.0% | *25% of Zantac sale proceeds allocated to the Estate* |
| Zantac cash split — EAJF share | 75.0% | *75% of Zantac sale proceeds allocated to EAJF (per Settlement Agreement §1)* |
| Mass tort dockets — EAJF share | 75.0% | *Settlement Agreement §1: mass tort sale/resolution proceeds 75% to EAJF* |
| Mass tort dockets — Estate share | 25.0% | *Settlement Agreement §1: 25% to the Estate* |
| Two Cases (Exhibit C) realization — both chapters (INPUT) | - | *INPUT: estimated proceeds from the two Exhibit C cases; default $0* |
| Two Cases — EAJF share | 90.0% | *Settlement Agreement §3: 90% of Two Cases value to EAJF* |
| Two Cases — Estate share | 10.0% | *Settlement Agreement §3: 10% to the Estate* |
| | | |

## Schedule 1 — Settled / Rule 9019 Claims (Estate Recoveries)

*Full settlement totals per court-approved 9019 orders / agreements. Recovery identical under Chapter 11 and Chapter 7.*

| # | Defendant / Settling Party | ECF | Status | Full 9019 Settlement ($) | Interpleaded Galindo Registry ($) | Obtained for Estate (95%) | Special Counsel Fee (40%) | Net to Estate |
|---|---|---|---|---|---|---|---|---|
| 1 | The Voorhies Law Firm | 877 | Approved | $285,426.37 | | $271,155.05 | $108,462.02 | $162,693.03 |
| 2 | Daly & Black, PC | 1409 | Approved | $759,000.00 | | $721,050.00 | $288,420.00 | $432,630.00 |
| 3 | The Sangisetty Law Firm | 1379 | Pending approval | $570,629.06 | | $542,097.61 | $216,839.04 | $325,258.56 |
| 4 | Broussard Injury Lawyers, LLC | 1478 | Pending approval | $56,955.94 | | $54,108.14 | $21,643.26 | $32,464.89 |
| 5 | Broussard & Dove, APLC | 1280 | Approved | $191,692.85 | | $182,108.21 | $72,843.28 | $109,264.92 |
| 6 | Chehardy, Sherman, Williams, Recile & Hayes | 1279 | Approved | $77,612.78 | | $73,732.14 | $29,492.86 | $44,239.28 |
| 7 | Cox, Cox, Filo, Camel, Wilson & Brown | 1371 | Pending approval | $100,000.00 | | $95,000.00 | $38,000.00 | $57,000.00 |
| 8 | Cristobal M. Galindo, P.C. | 832 | Approved | $250,000.00 | | $237,500.00 | $95,000.00 | $142,500.00 |
| 9 | Cueria Law Firm, LLC | 1470 | Pending approval | $8,335.98 | | $7,919.18 | $3,167.67 | $4,751.51 |
| 10 | LIGA — direct cash (registry funds excluded) | 834 | Approved | $100,000.00 | | $95,000.00 | $38,000.00 | $57,000.00 |
| 11 | Joubert Law Firm | 1155 | Approved | $12,483.33 | | $11,859.16 | $4,743.67 | $7,115.50 |
| 12 | Bolen, Parker, Brenner, Lee & Miller, Ltd. | 1092 | Approved | $8,282.06 | | $7,867.96 | $3,147.18 | $4,720.77 |
| 13 | Irpino, Avin & Hawkins Law Firm | 838 | Approved | $250,232.31 | $81,413.21 | $237,720.69 | $95,088.28 | $142,632.42 |
| 14 | Alvendia, Kelly & Demarest, LLC (AKD) | 837 | Approved | $377,365.16 | $153,743.52 | $358,496.90 | $143,398.76 | $215,098.14 |
| 15 | Craven & Perry, LLC | 836 | Approved | $265,406.73 | | $252,136.39 | $100,854.56 | $151,281.84 |
| 16 | Becnel Law | 835 | Approved | $3,832.95 | | $3,641.30 | $1,456.52 | $2,184.78 |
| 17 | Baggett McCall, LLC | 833 | Approved | $22,670.45 | | $21,536.93 | $8,614.77 | $12,922.16 |
| 18 | Kandell, Kandell & Petrie | 9019 set | Pending approval | $30,293.78 | | $28,779.09 | $11,511.64 | $17,267.45 |
| | **TOTAL — Settled / 9019 Claims** | | | **$3,370,219.75** | **$235,156.73** | **$3,201,708.76** | **$1,280,683.51** | **$1,921,025.26** |
| | *Houghtaling Law Firm, LLC (ECF 1418, pending approval).* | | | | | | | |

## Schedule 2 — Pending (Unsettled) Adversary Claims

*Chapter 11: 10% of high-range exposure. Chapter 7: 10%–25% of the Chapter 11 pending-claim recovery (insiders only partially available).*

| Defendant | Adversary No. | High-Range Exposure ($) | Ch.11 Gross Recovery | Ch.11 Obtained (95%) | Ch.11 Counsel Fee (40%) | Ch.11 Net to Estate | Ch.7 Recovery — Low (10%) | Ch.7 Recovery — High (25%) |
|---|---|---|---|---|---|---|---|---|
| Morris Bart, LLC | 24-03127 | $15,000,000 | $1,500,000.00 | $1,425,000.00 | $570,000.00 | $855,000.00 | $150,000.00 | $375,000.00 |
| Laborde Earles Law Firm, LLC | 24-03130 | $2,000,000 | $200,000.00 | $190,000.00 | $76,000.00 | $114,000.00 | $20,000.00 | $50,000.00 |
| Barcus Arenas, PLLC | 25-03018 | $2,000,000 | $200,000.00 | $190,000.00 | $76,000.00 | $114,000.00 | $20,000.00 | $50,000.00 |
| Hair & Shunnarah Trial Attorneys | 25-03269 | $650,000 | $65,000.00 | $61,750.00 | $24,700.00 | $37,050.00 | $6,500.00 | $16,250.00 |
| **TOTAL — Pending Claims** | | **$19,650,000.00** | **$1,965,000.00** | **$1,866,750.00** | **$746,700.00** | **$1,120,050.00** | **$196,500.00** | **$491,250.00** |
| | | | | | | | | |
| **Memo — Speculative / unliquidated potential claims (investigation-stage; NOT included above):** | | | | | | | | |
| *Monson Law Firm* | | *$50,000,000* | | | | | | |
| *Louisiana Dept. of Insurance* | | *$50,000,000* | | | | | | |
| *Allied* | | *$50,000,000* | | | | | | |
| *Newly-filed 2026 adversaries (26-03097 to 26-03116, et al.) and discovery-stage matters (Pandit, Chopin, New Orleans Legal): exposure undetermined; additional unliquidated upside under Ch.11 only.* | | | | | | | | |

| Schedule 3 — Chapter 7 Trustee Statutory Compensation (11 U.S.C. § 326(a)) | | | | | | |
|---|---|---|---|---|---|---|
| *Computed on moneys disbursed to parties in interest (net before trustee comp), Ch.7 Low and High cases.* | | | | | | |
| | | | | | | |
| **Disbursement base (Ch.7 net before trustee comp)** | | $5,161,991.87 | $5,727,736.87 | | | |
| | | | | | | |
| **§ 326(a) Tier** | **Rate** | **Ch.7 Low** | **Ch.7 High** | | | |
| 25% of first $5,000 | 25.0% | $1,250.00 | $1,250.00 | | | |
| 10% of $5,000–$50,000 | 10.0% | $4,500.00 | $4,500.00 | | | |
| 5% of $50,000–$1,000,000 | 5.0% | $47,500.00 | $47,500.00 | | | |
| 3% of amount over $1,000,000 | 3.0% | $124,859.76 | $141,832.11 | | | |
| **Maximum Chapter 7 trustee compensation** | | **$178,109.76** | **$195,082.11** | | | |
| | | | | | | |
| *Note: Ch.7 would also incur trustee professional fees (counsel/accountants) not quantified here.* | | | | | | |

| Schedule 4 — Cash on Hand Allocation (Estate vs. EAJF) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cash on hand splits 95% Estate / 5% EAJF, except Zantac docket sale proceeds which split 25% Estate / 75% EAJF (per EAJF Settlement Agreement §1). | | | | | | | | |
| | | | | | | | | |
| **Total cash on hand (6/22/2026)** | **$2,850,625.62** | | | | | | | |
| Less: Zantac docket sale proceeds (input) | $1,250,000.00 | | | | | | | |
| Non-Zantac cash | $1,600,625.62 | | | | | | | |
| | | | | | | | | |
| **Allocation** | **Estate** | **EAJF** | | | | | | |
| Non-Zantac cash (95% / 5%) | $1,520,594.34 | $80,031.28 | | | | | | |
| Zantac proceeds (25% / 75%) | $312,500.00 | $937,500.00 | | | | | | |
| **Total allocated cash** | **$1,833,094.34** | **$1,017,531.28** | | | | | | |
| | | | | | | | | |
| Note: The Estate-allocated cash is available for creditor distribution in both chapters; the EAJF-allocated cash is included in the amounts earmarked to EAJF. | | | | | | | | |