**Exhibit 7:** C & C Residential (Paradise Settlement / TDI Order 2024-8692).

United States Courts
Southern District of Texas
FILED
*8/25/26*
Nathan Ochsner, Clerk of Court

https://www.franchisetimes.com/franchise_legal/former-homevestors-franchisee-pleads-guilty-to-bilking-investors/article_a00ce68b-d11d-41e2-b650-3174563c57dc.html

# Former HomeVestors Franchisee Pleads Guilty to Bilking Investors

Joe Halpern
Jun 3, 2025




Dallas-based HomeVestors, which was acquired by Bayview Asset Management in 2022, ended 2024 with 1,003 units.

***Charles Carrier, who was terminated by the house flipping franchise in October, faces a 20-year prison sentence after admitting to felony wire fraud involving $200,000. Federal prosecutors in Texas said his Ponzi-like scheme cost investors nearly $40 million.***

HomeVestors of America said it's pleased to see justice play out after one of its former franchisees pleaded guilty to bilking investors in Texas out of tens of millions of dollars.

Charles Carrier, a former HomeVestors franchisee who owned Dallas-based C&C Residential Properties, faces a 20-year prison sentence and the possibility of millions of dollars in fines after agreeing to plead guilty to one count of felony wire fraud involving a $200,000 transfer. As part of his plea deal, Carrier admitted to his involvement in a broader Ponzi-like scheme that federal prosecutors said amounted to nearly $40 million in investment fraud involving 80 investors since 2018.

Carrier, according to court documents, "knowingly and with intent to defraud, devised and executed a scheme to defraud investors and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises," and used wire communications in interstate commerce in the process. Documents noted total investor losses of at least $39,514,300.

A federal judge in Dallas will decide Carrier's sentence.

HomeVestors terminated Carrier's franchise in October after receiving a tip that the franchisee had been defrauding investors for years, according to a report by ProPublica.

Losses to individual investors ranged from $35,000 to $11.6 million, court document show, and Carrier took loans from investors to finance his house-flipping business, initially using the money to buy and renovate older houses to sell for a profit. Carrier promised each loan would be secured by an ownership interest in a house and that he would pay 8 percent to 10 percent interest in monthly installments over the course of the loan.

Carrier admitted to using investor money to "pay personal credit card balances, business operating expenses and interest obligations to earlier investors," according to court documents.

Carrier's lawyer, Tom Pappas, told ProPublica his client didn't intend to defraud anyone. "Pretty much all of his money was put into his business to try and make it successful so investors would be successful," Pappas said. He also pointed out Carrier didn't fund a lavish lifestyle and that changes in the real estate market "overtook" his client and "the thing just got away from him."

A spokesperson for the U.S. attorney's office for the Northern District of Texas said they can't comment on a pending case.

"We take all allegations of misconduct seriously, as demonstrated by our swift actions in this matter, including reporting Mr. Carrier to the Federal Bureau of Investigation," HomeVestors said in a statement to Franchise Times. "HomeVestors terminated Mr. Carrier's franchises within days of learning of the original allegations and supported the FBI throughout their investigation, including helping to identify the assets of Mr. Carrier's companies. We continue to support the FBI's asset recovery efforts in this matter."

HomeVestors, which sued Carrier for infringing on the company's protected trademark, added, "We remain steadfast in our commitment to support our franchisees in meeting sellers' needs with integrity and ensuring all franchisees adhere to our high standards and code of conduct."

HomeVestors was the subject of a series of scathing articles by ProPublica starting in 2023 with the headline, "The Truth Behind 'We Buy Ugly Houses," a slap at the company's tagline, "We Buy Ugly Houses." The coverage continued with a series of in-depth stories by reporters Anjeanette Damon, Byard Duncan and Millie Simon, who uncovered numerous instances of franchisees deceiving home sellers and targeting people in vulnerable situations.



Larry Goodman, CEO of HomeVestors of America

ProPublica's HomeVestors coverage was picked up by major news outlets and, as a result of the fallout, CEO David Hicks stepped down and was replaced by Larry Goodman.

Dallas-based HomeVestors, which was acquired by Bayview Asset Management in 2022, claims to be the largest homebuyer in the country with just over 1,000 outlets and more than 140,000 homes sold since 1996. It generated more than $1.6 billion in sales in 2023 and its franchise disclosure document reported ending 2024 with 1,003 outlets, a net decline of 89 units.

The investment range for a HomeVestors business is $150,000 to $477,250. Item 19 of its FDD does not report average unit volumes and instead lists an average gross price differential for all covered franchises at $616,948. That amount is the total sales prices of all properties sold by a HomeVestors business, less the full purchase prices of such properties. It doesn't include costs incurred by the franchisee for purchasing, rehabbing or selling the properties.

House flipping companies like HomeVestors generally offer about 50 to 70 percent of a home's assessed value, according to reports, before rehabbing the home and putting it back on the market at a higher price.

Goodman, who the company's chief operating officer before moving into the CEO role, told Franchise Times last year the company addressed the issues raised by ProPublica's investigation. Those reports, HomeVestors maintained, focused on only a few bad franchisees in the system.

**Related story: Investigation Prompts Policy Changes as HomeVestors Addresses Franchisee Tactics**

Goodman also said HomeVestors took the necessary steps to ensure franchisees are following company-mandated procedures, and revised its training materials, hired additional auditors to ensure its internal compliance program more quickly identifies and remediates situations in which, as he said, "franchisees fall short of brand standards."

"We have devoted significant resources to reviewing our policies, standards and training materials to determine where there were opportunities for us to improve," Goodman said in an email at the time.

HomeVestors, Goodman said, implemented a major policy change in 2023 to standardize consumer-focused disclosures throughout the system and added a three-day no-questions-asked option period for sellers to terminate their sales contracts. The disclosures and option period are included in a contract addendum that HomeVestors franchisees now include with their purchase transactions with sellers who are not financial institutions, professional investors or are otherwise represented in the sale.

"We call this The HomeVestors Advantage," he said. "We want to ensure that everyone who does business with HomeVestors understands the available options for selling their house and is fully informed regarding our status as a discount homebuyer. We do not know of any other

national real estate company who provides sellers with such an addendum."

---

Joe Halpern
Senior Writer

No. **2024-8692**

**Official Order**
**of the**
**Texas Commissioner of Insurance**

**Date: 6/18/2024**

**Subject Considered:**

Texas Department of Insurance
v.
Paradise Settlement Services, LLC; Diverse Settlement Services, LLC;
Christopher John McLucas; Brandon Dior Green;
Gale Faye Vavrus; Wyndi Wallace; and
Donnovan Ballington Jackson

SOAH Docket No. 454-23-21634.C

**General Remarks and Official Action Taken:**

The subject of this order is the enforcement action brought against Paradise Settlement Services, LLC (Paradise Settlement); Diverse Settlement Services, LLC (Diverse Settlement); Christopher John McLucas; Brandon Dior Green; Gale Faye Vavrus; Wyndi Wallace; and Dr. Donnovan Ballington Jackson (collectively, respondents). This order (1) revokes the title insurance agent licenses held by Paradise Settlement and Diverse Settlement; (2) revokes the escrow officer licenses held by Mr. McLucas, Mr. Green, and Ms. Vavrus; and (3) orders Ms. Wallace and Dr. Jackson to immediately cease and desist from engaging in any unauthorized business of insurance.

**Background**

After proper notice was given, the above-styled case was heard by an administrative law judge for the State Office of Administrative Hearings. The administrative law judge made and filed a proposal for decision containing a recommendation that the Texas Department of Insurance (TDI) (1) revoke the title insurance agent licenses held by Paradise Settlement and Diverse Settlement; (2) revoke the escrow officer licenses held by Mr. McLucas, Mr. Green, and Ms. Vavrus; and (3) order Ms. Wallace and Dr. Jackson to immediately cease and desist from engaging in the violations identified in the proposal for decision. A copy of the proposal for decision is attached as Exhibit A.

The respondents filed exceptions to the administrative law judge's proposal for decision. TDI Enforcement staff did not file a reply to the exception.

In response to the exceptions, the administrative law judge did not recommend revising the proposal for decision. A copy of the administrative law judge's response to the exceptions is attached as Exhibit B.

The administrative law judge's proposed Findings of Fact Nos. 1–47 and 49–52 and proposed Conclusions of Law Nos. 1–34 and 37 are adopted. Proposed Conclusion of Law No. 35 is revised as adopted by this order, and proposed Finding of Fact No. 48 and proposed Conclusion of Law No. 36 are not adopted, for the reasons stated in this order.

**Legal Authority for Changes to Proposal for Decision**

The legal authority for the changes to the proposal for decision made in this order is TEX. GOV'T CODE § 2001.058(e)(1), which provides that "[a] state agency may change a finding of fact or conclusion of law made by the administrative law judge, or may vacate or modify an order issued by the administrative judge, only if the agency determines . . . that the administrative law judge did not properly apply or interpret applicable law, agency rules, written policies [of the agency], or prior administrative decisions. . . ."

**Proposed Conclusion of Law No. 35 – Revised**

Proposed Conclusion of Law No. 35 recommends that the commissioner "issue cease and desist orders directing Ms. Wallace and Dr. Jackson to immediately cease and desist from engaging in the violations identified in this Proposal for Decision." However, when addressing the appropriate sanctions against Ms. Wallace and Dr. Jackson in the introductory language on page 2 and the discussion of sanctions on page 42 of the proposal for decision, the administrative law judge says they should be ordered to "cease and desist engaging *in the unauthorized business of insurance*" (emphasis added).

Under TEX. INS. CODE § 101.103, when the commissioner has reason to believe that a person has violated Insurance Code Chapter 101, the commissioner may issue a cease and desist order. The section does not limit a cease and desist order's applicability to specific acts. Further, TEX. INS. CODE Chapter 101 prohibits the unauthorized business of

insurance in general.[1] To make it clear that Ms. Wallace and Dr. Jackson are ordered to cease and desist in any unauthorized business of insurance, not just the acts addressed by the proposal for decision, this order revises proposed Conclusion of Law No. 35 to use the language from pages 2 and 42 of the proposal for decision.

**Proposed Finding of Fact No. 48 and Proposed Conclusion of Law No. 36 – Not Adopted**

The commissioner is revoking the TDI-issued licenses held by the respondents and ordering that the respondents not licensed by TDI cease and desist engaging in the unauthorized business of insurance, without imposing administrative penalties.

The commissioner's determination to decline administrative penalties is based on the totality of the record and not the analysis of the administrative law judge contained in the proposal for decision regarding the applicability of TEX. INS. CODE § 84.041. The commissioner's determination to revoke the respondents' licenses and issue a cease and desist order in this instance is a sufficient deterrent for future violations.

The determination of punishment for a violation of the Insurance Code is a matter vested in TDI and the commissioner, and the commissioner is charged by law to fix a penalty when a determination has been made that a statute has been violated. *See Sears v. Texas State Bd. of Dental Examiners*, 759 SW. 2d 748, 751 (Tex. App.—Austin 1998, no writ).

Past administrative decisions issued by TDI address applicability of TEX. INS. CODE § 84.041 when imposing an administrative penalty following a contested case hearing.[2] Those decisions reject similar analyses from administrative law judges regarding TEX. INS. CODE § 84.041. The administrative law judge for the current proceeding did not properly apply or follow those decisions.

This order thus rejects the portion of the administrative law judge's proposal for decision that asserts that TDI is required under TEX. INS. CODE § 84.041 to issue a statement of the amount of penalties TDI proposes to impose before the commissioner may assess an administrative penalty following a contested case hearing. Accordingly, this order does not adopt proposed Finding of Fact No. 48, which includes the irrelevant

---

[1] *See* Tex. Ins. Code § 101.102.

[2] *See Dan R. Everett*, Commissioner's Order No. 03-0581 (issued July 3, 2003), and *TDI v. Nelci Chavez and L K Insurance Services, L.L.C.*, Commissioner's Order No. 2023-8114 (issued August 3, 2023).

finding that "Respondents have not been provided with a statement of the amount of penalties the Department proposes to impose against them in this proceeding, or for which specific violations,"[3] and this order does not adopt proposed Conclusion of Law No. 36, which includes the incorrect conclusion that "[t]he Commissioner is authorized to assess monetary penalties against persons who have violated insurance laws but must first give the affected person written notice with a brief summary of each alleged violation and a statement of the amount of the recommended monetary penalty, and the notice must inform the person that they have a right to a hearing to contest the violation, penalty amount, or both."[4]

## Findings of Fact

1. Proposed Findings of Fact Nos. 1–47 and 49–52 as contained in Exhibit A are adopted and incorporated by reference into this order.

2. Proposed Finding of Fact No. 48 is not adopted.

## Conclusions of Law

1. Proposed Conclusions of Law Nos. 1–34 and 37 as contained in Exhibit A are adopted and incorporated by reference into this order.

2. In place of proposed Conclusion of Law No. 35 as contained in Exhibit A, the following conclusion of law is adopted:

    > The Commissioner should issue cease and desist orders directing Ms. Wallace and Dr. Jackson to immediately cease and desist from engaging in the unauthorized business of insurance. TEX. INS. CODE § 101.103(a)(1).

3. The commissioner does not adopt Proposed Conclusion of Law No. 36.

---

[3] This exact wording was previously rejected by Order No. 2023-8114.

[4] This exact wording was also previously rejected by Order No. 2023-8114.

## Order

It is ordered that:

The title insurance agent license held by Paradise Settlement Services, LLC is revoked;

The title insurance agent license held by Diverse Settlement Services, LLC is revoked;

The escrow officer license held by Christopher John McLucas is revoked;

The escrow officer license held by Brandon Dior Green is revoked; and

The escrow officer license held by Gale Faye Vavrus is revoked.

It is also ordered that:

Wyndi Wallace immediately cease and desist from engaging in the unauthorized business of insurance, and

Dr. Donnovan Ballington Jackson immediately cease and desist from engaging in the unauthorized business of insurance.

DocuSigned by:
CBrown
FC5D7EDDFFBB4F8...
Cassie Brown
Commissioner of Insurance

Recommended and reviewed by:

DocuSigned by:
Jessica Barta
5DAC5618BBC74D4...
Jessica Barta, General Counsel

DocuSigned by:
Justin Beam
27ADF3DA5BAF4B7...
Justin Beam, Chief Clerk

2024-8692

Exhibit A

**SOAH Docket No. 454-23-21634 Suffix: C**

# BEFORE THE STATE OFFICE OF ADMINISTRATIVE HEARINGS

**TEXAS DEPARTMENT OF INSURANCE,**
**PETITIONER**
**V.**
**PARADISE SETTLEMENT SERVICES, LLC,**
**DIVERSE SETTLEMENT SERVICES, LLC,**
**CHRISTOPHER JOHN MCLUCAS, BRANDON DIOR GREEN,**
**GALE FAYE VAVRUS, WYNDI WALLACE, AND**
**DONNOVAN BALLINGTON JACKSON,**
**RESPONDENTS**

## TABLE OF CONTENTS

I. Notice, Jurisdiction, and Procedural History ..... 2

II. Allegations ..... 3

III. Evidence ..... 6

A. Paradise Settlement ..... 6

1. Background ..... 6

2. Paradise Settlement, Mr. McLucas, Mr. Green, and Ms. Wallace engaged in the unauthorized business of insurance ........ 8

3. Paradise Settlement misappropriated, converted or illegally withheld escrow money ........ 17

B. Diverse Settlement ........ 20

1. Background ........ 20

2. Diverse Settlement misappropriated, converted or illegally withheld escrow money ........ 21

3. Mr. McLucas and Ms. Vavrus acted fraudulently or dishonestly in the sale of property that funded the reimbursement of the $237,549.50 escrow shortage ........ 25

4. Another $76,361.01 in escrow funds was misappropriated by Diverse Settlement, and the funds are still missing ........ 28

5. Diverse Settlement violated Department Rate Rule R-22 and Procedural Rule P-24 ........ 29

6. Diverse Settlement paid an impermissible kickback to Dr. Jackson in return for his referral of title insurance business ........ 30

IV. Analysis ........ 32

A. Claims Against Paradise Settlement ........ 32

B. Claims against Diverse Settlement ........ 35

C. Claims against Mr. McLucas, Mr. Green, Ms. Vavrus, Ms. Wallace, and Dr. Jackson ........ 38

D. Sanctions ........ 42

1. Cease-and-Desist Order and Revocation ........ 42

2. Monetary Penalties ........ 43

V. Findings of Fact ........ 45

VI. Conclusions of Law ........ 54

**SOAH Docket No. 454-23-21634 Suffix: C**

# BEFORE THE STATE OFFICE OF ADMINISTRATIVE HEARINGS

**TEXAS DEPARTMENT OF INSURANCE,**
**PETITIONER**
**V.**
**PARADISE SETTLEMENT SERVICES, LLC,**
**DIVERSE SETTLEMENT SERVICES, LLC,**
**CHRISTOPHER JOHN MCLUCAS, BRANDON DIOR GREEN,**
**GALE FAYE VAVRUS, WYNDI WALLACE, AND**
**DONNOVAN BALLINGTON JACKSON,**
**RESPONDENTS**

## PROPOSAL FOR DECISION

The Staff of the Texas Department of Insurance (Department) brought this enforcement action against Respondents Paradise Settlement Services, LLC (Paradise Settlement); Diverse Settlement Services, LLC (Diverse Settlement), Christopher John McLucas, Brandon Dior Green, Gale Faye Vavrus, Wyndi Wallace, and Donnovan Ballington Jackson. Staff alleges that Respondents violated Texas Insurance Code provisions and Department rules. Staff seeks: an

order that Ms. Wallace and Dr. Jackson cease and desist from engaging in unauthorized insurance business; revocation of the Department-issued licenses of Respondents; an administrative penalty from Paradise Settlement, Diverse Settlement, Mr. McLucas, Mr. Green, and Ms. Vavrus, and a monetary forfeiture from Diverse Settlement and Dr. Jackson.[1] The Administrative Law Judge (ALJ) finds that Staff proved most of the alleged violations and recommends that: (1) Ms. Wallace and Dr. Jackson be ordered to cease and desist engaging in the unauthorized business of insurance; and (2) the Department-issued licenses of Respondents be revoked. The ALJ makes no recommendation with respect to the amount of a monetary penalty against any Respondent.

## I. Notice, Jurisdiction, and Procedural History

There are no disputed issues of notice or jurisdiction. Therefore, those matters are addressed in the findings of fact and conclusions of law.

The hearing on the merits was held October 9 through October 13, 2023, before ALJ Linda J. Burgess in a hearing room at the State Office of Administrative Hearings at 300 West 15th Street, Austin, Texas, that allows parties and witnesses to participate in person and over Zoom video and telephone conference. Attorneys Casey Seeboth and Latoya Merida represented Staff. Mr. McLucas, Mr. Green, Ms. Varvus, and Dr. Jackson were self-represented. Diverse Settlement was represented by its majority owner, Mr. Green. Paradise Settlement and Ms. Wallace were not present at the hearing, although both Respondents had notice of the

[1] Original Petition at 18-19 (filed June 14, 2023).

hearing.[2] Staff did not move for a default against Paradise Settlement and Ms. Wallace.[3] The participating Parties stipulated to several facts, which were filed of record on October 11, 2023. Staff offered Staff Exhibits 1-49, and 51-187, which were admitted. The participating Respondents offered Respondents Exhibit 1, which was admitted.[4] The record closed on January 11, 2024, after the participating Parties filed post-hearing briefs.

## II. ALLEGATIONS

Staff argues[5] the facts establish that Paradise Settlement, a Texas title insurance agent:

- engaged in the unauthorized business of insurance in violation of Texas Insurance Code §§ 101.051(b)(1), (3), (4), and (8), and 2501.005;
- misappropriated, converted to its own use, or illegally withheld money in violation of Texas Insurance Code § 2651.301(4);
- committed fraudulent or dishonest practices in violation of Texas Insurance Code § 2651.301(5) and deceptive acts in violation of Texas Business and Commerce Code § 17.46(b)(1)-(3), (5), (12), and (24), and Texas Insurance Code § 541.061 ; and
- failed to separately maintain escrow funds from other accounts in violation of Texas Insurance Code § 2651.301(7).

[2] *See* Notice of Hearing (filed June 26, 2023), Answer of Ms. Wallace (filed July 14, 2023), Joint Motion for Continuance (filed Sept. 18, 2023), Amendment to Joint Motion for Continuance (filed Sept. 20, 2023), and Joint Response to Department's Objections to Transfer of Venue (filed Sept. 20, 2023).

[3] Tr. 1 at 8-9.

[4] An Index of all admitted exhibits was filed on February 8, 2024.

[5] Staff Closing Argument (filed Nov. 11, 2023).

Staff argues that Diverse Settlement—a Texas title insurance agent:

- misappropriated, converted to its own use, or illegally withheld money in violation of Texas Insurance Code § 2651.301(4);
- committed fraudulent or dishonest practices in violation of Texas Insurance Code § 2651.301(5);
- failed to separately maintain escrow funds from other accounts in violation of Texas Insurance Code § 2651.301(7);
- failed to implement minimum escrow accounting procedures and internal controls in violation of Section V of the Texas Title Insurance Basic Manual (Basic Manual);
- failed to timely remit premium due to the title insurance company in violation of Rate Rule R-2 of the Basic Manual;
- failed to pay another title agent for title evidence in violation of Procedural Rule P-24 of the Basic Manual; and
- paid a kickback to Dr. Jackson for his referring title insurance business to Diverse Settlement in violation of Texas Insurance Code § 2502.051.

Staff argues that Mr. McLucas:

- engaged in the unauthorized business of insurance in violation of Texas Insurance Code § 101.051(b)(1) and (6)(A) and (C);
- misappropriated, converted to his own use, or illegally withheld money in violation of Texas Insurance Code § 2652.201(4); and
- committed fraudulent or dishonest practices in violation of Texas Insurance Code § 2652.201(5).

Staff alleges that Mr. Green:

- engaged in the unauthorized business of insurance in violation of Texas Insurance Code § 101.051(b)(1), (3), and (8);
- misappropriated, converted to his own use, or illegally withheld money in violation of Texas Insurance Code § 2652.201(4);
- committed fraudulent or dishonest practices in violation of Texas Insurance Code § 2652.201(5); and
- paid a kickback to Dr. Jackson for his referring title insurance business to Diverse Settlement in violation of Texas Insurance Code § 2502.051.

Staff argues that Ms. Vargus:

- engaged in the unauthorized business of insurance in violation of Texas Insurance Code § 101.051(b)(5) and (8);
- committed fraudulent or dishonest practices in violation of Texas Insurance Code § 2652.201(5); and
- did not report Mr. McLucas's fraudulent insurance acts in violation of Texas Insurance Code § 701.051.

Staff argues that Ms. Wallace:

- engaged in the unauthorized business of insurance in violation of Texas Insurance Code §§ 101.051(b)(8) and 2501.005(b).

Staff argues that Dr. Jackson:

- received a kickback from Diverse Settlement for his referring title insurance business to the title agent in violation of Texas Insurance Code § 2502.051.

# III. Evidence

## A. Paradise Settlement

### 1. Background

To engage in the title insurance business in Texas, a title agent must possess: (1) a title agent license issued by the Department; and (2) an underwriter appointment from at least one insurance company that issues title insurance policies.[6] With an appointment, a title agent is authorized by the insurance company to solicit insurance and collect premiums and to issue or countersign policies on the insurer's behalf.[7] During relevant events, Paradise Settlement held a title agent license issued by the Department.[8] Paradise Settlement is a Texas limited liability company owned 97% by Mr. McLucas, with nominal interests held by Dr. Jackson and two other persons.[9] Mr. McLucas was the title agent's Chief Executive Officer and a licensed Texas escrow officer of the title agent, having been licensed for two decades.[10] Mr. Green and Ms. Vavrus were also licensed escrow officers of Paradise Settlement.[11] Ms. Vavrus became a licensed escrow officer in 2019 after

---

[6] Tex. Ins. Code §§ 2651.001, .009-.010.

[7] Tex. Ins. Code § 2501.003(13).

[8] Staff Ex. 1 at 039113. Paradise Settlement's title agent license was cancelled by the Department effective February 4, 2021. *See* Staff Ex. 1 at 039114.

[9] Staff Ex. 1 at 039113; Staff. Ex. 48.

[10] Tr. 5 at 51; Staff Ex. 3 at 039128. Mr. McLucas did not renew his Texas escrow officer license in 2022. Staff Ex. 3 at 039127.

[11] Staff Ex. 4 at 039131; Staff Ex. 5 at 039134.

working as an administrative assistant for over two decades.[12] Mr. Green became a licensed Texas escrow officer in 2014.[13] Ms. Wallace has never held a Department-issued license.[14] All Respondents reside in Texas.[15] At one time, Paradise Settlement held an underwriter appointment from WFG National Title Insurance Company (WFG National Insurance).[16] In 2020, WFG National Insurance was Paradise Settlement's sole appointment.[17]

In January 2020, WFG National Insurance terminated its appointment with Paradise Settlement effective February 15, 2020.[18] Mr. McLucas signed an agreement stating that after the termination date, "Paradise Settlement Services, LLC and its employees shall no longer represent themselves as an agent of, or otherwise hold themselves out as being associated with WFG National Title Insurance Company in any way."[19] About a year later, the Department canceled Paradise Settlement's title agent license.[20] Under Texas law, that a title agent or an

---

[12] Tr. 5 at 4. At the time of the hearing, Ms. Vavrus's Texas escrow officer license was in active status. Staff Ex. 5 at 039134.

[13] Tr. 4 at 155. Mr. Green's escrow officer license is active. Staff Ex. 4 at 039131.

[14] Staff Ex. 7.

[15] Staff. Ex. 3 at 039127; Staff Ex. 4 at 039131; Staff Ex. 5 at 039134; Tr. 3 at 198; *see also* Joint Motion to Transfer Venue at 1, 2 (filed Sept. 11, 2023). Mr. McLucas, Ms. Vavrus, and Ms. Wallace reside in Dallas County, Texas. Mr. Green resides in Dallas, Texas. Dr. Jackson resides in Cibolo, Texas.

[16] Tr. 1 at 41-42; Staff Ex. 1 at 039114.

[17] Tr. 1 at 48 ("Paradise did not obtain an additional underwriter, or any underwriter, after WPG [National Insurance] had canceled them."); Staff Ex. 1 at 039114.

[18] Tr. 1 at 44, 85-86, 89, 114-15; Staff Ex. 179.

[19] Staff Ex. 179 at 039150.

[20] Tr. 1 at 48; Staff. Ex. 1 at 039114.

escrow officer has surrendered or forfeited the license does not affect the former license holder's culpability for conduct before the effective date of a voluntary surrender or forfeiture of the license.[21] Because Paradise Settlement did not perform a final audit of its trust fund accounts as required by Department rule, the Department directed WFG National Insurance to perform the final audit.[22]

### 2. Paradise Settlement, Mr. McLucas, Mr. Green, and Ms. Wallace engaged in the unauthorized business of insurance[23]

#### a) Texas

WFG National Insurance's final audit revealed that *after* the appointment termination, Paradise Settlement continued—purportedly—selling title insurance on behalf of the insurer in Texas in eighty-four transactions.[24] On February 2, 2022, in a report to the Department, WFG National Insurance advised that Paradise Settlement ostensibly sold title insurance in Texas after termination by:

> providing commitments that were not signed at all, included a signed cover page from a previously issued commitment, or included only the

[21] Tex. Ins. Code §§ 2651.201(c) (title agent), 2652.057(c) (escrow officer).

[22] Tr. 1 at 124-25; Staff Exs. 10, 11. *See* Administrative Rule D-1.II.C. of The Basic Manual of Rules, Rates and Forms for the Writing of Title Insurance in the State of Texas (Basic Manual), *available at* https://www.tdi.texas.gov/title/titleman.html. The Department has adopted the Basic Manual into its rules. 28 Tex. Admin. Code § 9.1

[23] Staff argues that while engaging in authorized insurance business, Paradise Settlement, Mr. McLucas, and Mr. Green committed fraudulent and dishonest practices for which the Commissioner is authorized to discipline a license holder under the Texas Insurance Code. As discussed later, the ALJ agrees.

[24] Tr. 1 at 53-55; Staff Ex. 11 at 004193.

> Paradise Settlement countersignature with the WFG [National] Insurance signature block removed. . . . Because Paradise Settlement had no access to WFG [National Insurance]'s portal after February 15, 2020, it is doubtful that insurance policies for these transactions were ever issued.[25]

Records from five of such *post*-termination transactions were presented by Staff. In these transactions, Paradise Settlement acted as settlement agent,[26] and the closing statements reflect a disbursement to it for title insurance premiums. Further, on the Texas Disclosure Form T- 64, WFG National Insurance is identified as underwriter and Brandon Green as escrow officer.[27] A Form T-64 discloses, among other things, the premium split between agent and underwriter. For example, the Form T-64 for one of the five post-termination transactions—208 E. Maple Street Ravenna, Texas—shows that Paradise Settlement retained $506.60 of the $596 premium, with $89.40 in premium to be paid by the agent to underwriter WFG National Insurance:[28]

[25] Staff. Ex. 11 at 004193.

[26] Staff Exs. 30, 35, 39, 43, 47.

[27] Staff Ex. 30 at 016532-33; Staff Ex. 35 at 008883-84; Staff Ex. 39 at 009650-51; Staff Ex. at 43 011400-01; Staff Ex. 47 at 010380-81. The ALJ agrees with Staff that Mr. Green engaged in the unauthorized business of insurance after WFG National Insurance terminated Paradise Settlement's appointment by accepting premium for title insurance and by closing title insurance transactions. Staff Closing Argument at 5.

[28] Staff Ex. 30 at 016532.

**Title Insurance Premiums**

*If you are buying both an owner's policy and a loan policy, the title insurance premiums on this form might be different than the premiums on the Closing Disclosure. The owner's policy premium listed on the Closing Disclosure will probably be lower than on this form, and the loan policy premium will probably be higher. If you add the two policies' premiums on the Closing Disclosure together, however, the total should be the same as the total of the two premiums on this form.*

*The premiums are different on the two forms because the Closing Disclosure is governed by federal law, while this form is governed by Texas law. The owner's policy and loan policy premiums are set by the Texas commissioner of insurance. When you buy both an owner's policy and a loan policy in the same transaction, you are charged the full premium for the owner's policy but receive a discount on the loan policy premium. Federal and Texas law differ on where the discount is shown. Texas law requires the discount to be reflected in the loan policy premium, while federal law requires the discount to be reflected in the owner's policy premium.*

| | | | |
|---|---|---|---|
| **Title Agent:** | **Paradise Settlement Services, LLC** | **Owner's Policy Premium** | **$428.00** |
| | | **Loan Policy Premium** | **$168.00** |
| **Underwriter:** | **WFG National Title Insurance Company** | **Endorsements** | **$0.00** |
| | | **Other** | |
| | | **TOTAL** | **$596.00** |

Of this total amount: $89.40 (or 15%) will be paid to the Underwriter; the Title Agent will retain $506.60 (or 85%); and the remainder of the premium will be paid to other parties as follows:

| Amount ($ or %) | To Whom | For Services |
|---|---|---|

Because Paradise Settlement had no authority to issue title insurance commitments for WFG National Insurance *post*-termination, no insurance policies were issued in the five transactions.[29] This is underscored by the complaint submitted to the Department by the buyer in the Revenna, Texas transaction.[30] The consumer reported:

> We are unable to obtain an Owners Title Policy for the property located at 208 E. Maple Street, Ravenna, Texas 75476. Paradise Settlement Services handled the closing and the title insurance. . . . Settlement date was 4/29/2020. Lenders Coverage and Owners Coverage were both noted and paid on the HUD 1 statement issued at closing. I have renovated the house and am attempting to sell the house. . . . Paradise

[29] Tr. 1 at 63-64.

[30] Tr. 4 at 82-91; Staff Exs. 28-31; Staff Ex. 106.

has been unresponsive to me or my title company. . . . They are unable to either find or send the Owners Title Policy.[31]

#### b) States other than Texas

One of the purposes of the laws governing unauthorized insurance is that "[Texas] not become a safe harbor *for persons* or insurers engaged in the unauthorized business of insurance *in this state*, regardless of whether the insureds or other persons affected by the unauthorized business of insurance are residents of this state."[32] Staff asserts that while situated in Texas, Mr. McLucas, Mr. Green, and Ms. Wallace engaged in the unauthorized business of insurance in 2021 in eight transactions involving persons residing outside of Texas. In these transactions, non-Texas homeowners borrowed money from United Security Financial Corp. (USF) to refinance their home mortgage loans. In defense, Mr. McLucas claims that another Paradise Settlement Services, LLC entity—incorporated in Pennsylvania and not a party here—had appointments from WFG National Insurance in the states involved. Mr. McLucas is an owner of the Paradise Settlement title agency incorporated in Pennsylvania.[33] According to Mr. McLucas, because Respondents acted through the Pennsylvania entity that had appointments, the allegations of unauthorized insurance business with respect to the USF transactions are unfounded. The ALJ is unpersuaded.

---

[31] Staff Ex. 106 at 038849. Staff contends the evidence shows that when engaging in the unauthorized business of insurance, Paradise Settlement falsely represented it had the sponsorship or approval of WFG National Insurance, which is deceptive under the Deceptive Trade Practices-Consumer Protection Act, in violation of § 17.46(b)(1)-(3), (5), (12), and (24) of the Texas Business and Commerce Code, and § 541.061 of the Texas Insurance Code. The ALJ agrees.

[32] Tex. Ins. Code § 101.001(d) (emphasis added).

[33] Tr. 5 at 100.

The preponderance of the credible evidence establishes no Paradise Settlement Services entity had an underwriter appointment after February 2020. A WFG National Insurance representative testified, "it was a global termination of the agency relationship between WFG and Paradise, . . . [a]nd whatever state Paradise had been appointed as an agent of WPG, all of those appointments were being terminated via this letter [Staff Ex. 179]."[34] And contrary to his hearing position, in November 2021, Mr. McLucas advised the Department that "WFG [National] Insurance was the *national* underwriter for Paradise Settlement Services, LLC and the relationship ended in February 2020." (emphasis added).[35] And, in fact, Mr. McLucas informed Adam Crockett, an owner of True Concept Title, that he (Mr. McLucas) "needed" a "solution" to "not lose all their clients in the middle of [trying to find] another [underwriter]."[36] The supposed solution was to form a relationship with True Concept Title, a national title insurance agency. Mr. Crockett testified that business with Paradise Settlement Services started early in 2020 in all states in which Paradise Settlement Services did business, which included a "few" transactions in Texas.[37] Mr. Crockett described the arrangement:

> So we would issue a —they would send us an order, we would give them a title commitment, closing protection letter, wiring instructions, all of the typical stuff . . . . We would issue that to them, they would mostly

---

[34] Tr. 1 at 115.

[35] Staff Ex. 186 at 003246.

[36] Tr. 3 at 23-24. *See also* testimony of Mr. Green wherein he acknowledged that he knew that WFG National Insurance had terminated Paradise Settlement's authority to sell insurance for the insurer. Tr. 4 at 214-15.

[37] Tr. 3 at 23-24.

> finish closing the loan and send us all the documents we would need to examine in order to issue [the] policy and record the mortgages.[38]

Mr. Crocket stated he worked the most with Mr. Green, but "[m]ost everything went through the two of them, Chris [McLucas] or Brandon [Green]."[39]

The evidence also shows that Mr. McLucas and Mr. Green misrepresented the True Concept Title arrangement to not lose USF as a client.[40] On February 18, 2020, Mr. Green provided USF a closing protection letter (CPL) identifying True Concept Title as the title agent for the transaction. A CPL is an agreement from the underwriter that protects a lender from the loss of funds because of the misconduct of the closing agent.[41] USF's lender questioned why the closing letter did not show Paradise Settlement Services as the title agent. The lender stated: "We need a corrected CPL. . . . The CPL shows the issuing agent as True Concept Title not [Paradise Settlement Services]. Please advise or correct for bank to release funds."[42] Mr. McLucas and Mr. Green responded by representing to USF and its lender that True Concept Title was a DBA for Paradise Settlement

---

[38] Tr. 3 at 24. Staff argues that by coordinating with True Concept Title for Paradise Settlement Services to continue soliciting insurance business, Mr. McLucas engaged in the unauthorized business of insurance. The ALJ agrees.

[39] Tr. 3 at 29.

[40] A representative of USF testified that USF had worked with Paradise Settlement Services since 2016, and that "Paradise Settlement Services acted as a fiduciary intermediary who escrowed funds, disbursed them, produced title commitments that showed status of title, and ultimately was supposed to deliver final title policies guaranteeing United Security Financial's position was in first position." Tr. 2 at 173-74.

[41] *See* Form T-50 of the Basic Manual.

[42] Staff Ex. 54 at 000210.

Services, LLC.[43] They also sent USF and its lender an assumed name certificate filed with the Texas Secretary of State that day reflecting that True Concept was the assumed name for Paradise Settlement Services, LLC.[44] This was false.[45] True Concept Title is not the assumed name or the DBA for Paradise Settlement Services LLC, and True Concept Title did not authorize Paradise Settlement Services LLC to use its name.[46]

Over a year later, in May 2021, several non-Texas borrowers—who had had refinance loans recently closed by Paradise Settlement Services—complained to USF that their prior mortgage loans were not paid off as part of the closing.[47] As one borrower told USF: "I just got off the phone with [the loan servicer] and they have 2 ACTIVE loans for me right now. The old loan ending in 9538 was never paid in full from the re-finance. . . . I really need your diligence to resolve this asap."[48]

USF identified eight loan-refinance transactions for which just over $1.7 million was wired on behalf of USF to the credit of Paradise Settlement Services, LLC's National Escrow Account (Chase #7572) to fund the payoff of the

---

[43] Tr. 3 at 6-10; Staff Ex. 54.

[44] Staff Ex. 54 at 000221.

[45] The ALJ agrees with Staff that Mr. McLucas's and Mr. Green's conduct in falsely representing that Paradise Settlement was a DBA for True Concept to facilitate lenders writing loan money to Paradise Settlement for closings was a fraudulent or dishonest practice in violation of § 2651.301(a)(5) of the Insurance Code.

[46] Tr. 3 at 30.

[47] Tr. 2 at 173-74, 182-83; Staff Ex. 55.

[48] Staff Ex. 55 at 002235.

prior mortgage loans.[49] Mr. McLucas admits that the money was wired into the escrow account[50] and that he and Ms. Wallace are the account signatories.[51] USF followed each of the eight wires with Instructions to Escrow Title/Closing Agent, Paradise Settlement Services, LLC (attn: Brandon Green at a Dallas address), and USF was provided a purported title commitment indicating WFG National Insurance would issue a title insurance policy after the transaction closed.[52] Closing disclosures show Mr. Green as the settlement agent and that the borrowers paid Paradise Settlement Services for title insurance.[53]

In response to USF and its lender asking Mr. McLucas why the money "sitting in your Chase account for weeks now," had not been used to pay off the mortgages, Mr. McLucas represented they had been paid: "[W]e funded the transactions and wires were not rejected back to us."[54] This was not true. And when USF asked Ms. Wallace for information from "Chase's website of when the wire was sent, who it was sent to, and the amount," for the transactions, Ms. Wallace told

[49] Tr. 2 at 182-86, 199-200, 213; Tr. 3 at 11-16; Staff Exs. 60-61, 66-67, 72-73, 78-79, 84-85, 90-91, 96-97, 102-03.

[50] Tr. 5 at 103-07.

[51] Tr. 5 at 113-14; Staff. Ex. 105 at 024369-70.

[52] Tr. 2 at 189-92; Staff Exs. 57, 61, 63, 67, 69, 73, 75, 79, 81, 85, 87, 91, 93, 97, 99, 103.

[53] Staff Exs. 59, 65, 71, 77, 83, 89, 95, 101. *See also* Tr. 3 at 34-36.

[54] Staff Ex. 55 at 002375-76.

USF she could not get the information.[55] After two months without a credible explanation about the trust funds, USF directly "paid off the first mortgages for all of the borrowers."[56]

USF's borrowers and USF were harmed by the wrongful conduct.[57] One borrower testified:

> I had started a new job and we just bought this home [] and we just refinanced to get it even cheaper and I didn't even tell [my wife] that we may have just lost everything because I didn't know at that time United Security was going to repay this. . . . So I literally thought we just lost our home. . . . I thought I lost that money and now I have two mortgages in my name, so to say that there was distress would be a gross understatement.[58]

A USF representative testified: "[B]esides th[e reputation] damage, we have so far paid out . . . nearly $1.8 million for which we received nothing and so we're out $1.8 million. And we're going to be out a little bit more . . . , we're going to have

---

[55] Staff Ex. 55 at 002408. The ALJ agrees with Staff that Ms. Wallace engaged in the unauthorized business of insurance by receiving and disbursing money for title insurance transactions as an authorized signer of the Chase #7572 escrow account used in the eight USF transactions. However, the ALJ disagrees with Staff that the evidence shows Ms. Vavrus engaged in the unauthorized business of insurance after the termination by the underwriter by issuing title insurance policies, determining proper execution of title instruments, and assisting with closing title insurance transactions. The record cites in Staff's Closing Argument fall short of establishing such claim. Closing Argument at 2, n.9. Further, Ms. Vavrus testified she did not close transactions as an agent for WFG National Insurance after February 2020. Tr. 5 at 6.

[56] Staff. Ex. 104; Tr. 2 at 194, 199-200.

[57] Tr. 2 at 199.

[58] Tr. 2 at 223-24.

to buy—pay another title company to give us a policy on these loans."[59] USF sued the Paradise Settlement Pennsylvania entity over the transactions. The suit is pending.[60]

### 3. Paradise Settlement misappropriated, converted or illegally withheld escrow money

Staff's claim that Paradise Settlement misappropriated or converted to its own use or wrongfully withheld money belonging to another person is well supported by the evidence. The final audit of Paradise Settlement's custodial escrow accounts showed a shortage of $478,577.92.[61] Charles Hart, the certified fraud examiner who performed the audit, aptly described the nature of escrow funds:

> Every penny held within an escrow account are custodial funds that are required to be managed appropriately according to their responsibility as a custodial escrow agent. Any time you have even a dollar or any disbursement that leaves an account that aren't booked and aren't associated with a guaranty closing file suggests that the money was not used as it was supposed to be as it was deposited in that account.[62]

He further testified:

[59] Tr. 2 at 198-99; Staff Ex. 104. *See also* Tr. 2 at 199 ("We had eight borrowers who refinanced their loans with us who were getting harassed by the subservicer for payments on loans that had been paid off and they had done the whole transaction through us and so that doesn't help our reputation amongst borrowers or people."). The complaints resulted in USF discovering the underwriter had terminated appointments a year earlier. Tr. 2 at 189.

[60] Tr. 5 at 173-74; Tr. 2 at 214.

[61] Tr. 1 at 130, 142; Staff Ex. 10.

[62] Tr. 1 at 155.

> [A]s I documented in my report, I found that the [custodial escrow] accounts . . . had significant liabilities in the form of outstanding checks and file balances that need to be disbursed to the consumers that were involved in the guaranty files that had been closed over time. And because there was zero money in there, those disbursements were never made to the proper parties.[63]

The records for Paradise Settlement reveal how the escrow accounts were short money. There were multiple transfers out of the escrow accounts that were not associated with a guaranty file.[64] Disbursements from an escrow account that were used inappropriately (no entry relating the disbursement to a guaranty file) and misappropriated include:

- On June 4, 2020, $30,000 was disbursed from an escrow account to an account of Land Records Abstract, a company owned by Mr. McLucas, which used almost all the $30,000 that day.[65] There is no book balance report entry that the disbursement related to a guaranty file.[66]

- On June 16, 2020, $160,000 was disbursed by telephone transfer from an escrow account to an unidentified account.[67] Paradise Settlement's book

[63] Tr. 1 at 142.

[64] Tr. 1 at 161-62. Mr. Hart testified that "the multiple transfers out of the escrow account[s] that were not associated with guaranty files are certainly the lead contributors to the shortages."

[65] Tr. 1 at 158; Tr. 5 at 61; Staff Ex. 13 at 004289; Staff Ex. 27 at 028220, 028222; Staff Ex. 48 at 2.

[66] Tr. 1 at 158; Staff Ex. 13 at 004274-79.

[67] Tr. 1 at 157-58; Staff Ex. 13 at 004289.

balance report does not include an entry identifying the disbursement as related to a guaranty file.[68]

- On July 1, 2020, $21,300 was disbursed from an escrow account to an account of Land Records Abstract.[69] Paradise Settlement's book balance report has no entry that the disbursement related to a guaranty file.[70]

- On August 18, 2020, $180,258.57 and $5,000 were disbursed from an escrow account to a Land Records Abstract account, which showed a daily ending balance of $381.90, meaning Land Records Abstract used almost all the $185,258.57 that day.[71] There is no book balance report entry identifying either disbursement as related to a guaranty file.[72]

- On September 2, 2020, Paradise Settlement wired $100,963.48 from an escrow account to another just-opened account controlled by Paradise Settlement.[73] Paradise Settlement's book balance report includes no entry for the disbursement as related to any guaranty file.[74] Paradise Settlement disbursed almost all the money that month to unidentified recipients.[75]

---

[68] Tr. 1 at 157-58. Under Texas Insurance Code § 2651.301(7), a title agent may be disciplined for failing to maintain "a separate and distinct accounting of escrow funds; and [] an escrow bank account or accounts separate and apart from other accounts."

[69] Tr. 1 at 154-57; Tr. 5 at 61; Staff Ex. 14 at 004301-05, 004315; Staff Ex. 27 at 028230.

[70] Tr. 1 at 154-56; Staff Ex. 14 at 004301-05, 004315; Staff Ex. 27 at 028227.

[71] Tr. 1 at 151-54; Tr. 5 at 61; Staff. Ex. 15 at 004329-33, 004344; Staff Ex. at 27 at 028235, 028238.

[72] Tr. 1 at 152; Staff Ex. 15 at 004329-33.

[73] Tr. 1 at 149, Staff Ex. 16 at 004364; Staff Ex. 51 at 031585.

[74] Tr. 1 at 149, Staff Ex. 16 at 004356; Staff Ex. 51 at 031585.

[75] Staff Ex. 51 at 031584, 031586.

As discussed, Paradise Settlement received insurance premiums from Texas consumers, but title polices were never issued.[76] Instead, Paradise Settlement converted the premium money.[77] And as discussed, just over $1.7 million was misappropriated in connection with eight USF out-of-state transactions. However, the record does not support that Respondent Paradise Settlement misappropriated those trust funds. WFG National Insurance's final audit of Respondent shows that the Chase *National* Escrow Account into which the $1.7 million-plus was wired is not among Respondent's escrow accounts.[78] The wrongdoing rests with, among others, the Paradise Settlement entity incorporated in Pennsylvania, which is not a party here. To this point, USF sued that entity for the wrongdoing—not Respondent Paradise Settlement.[79]

### B. Diverse Settlement

#### 1. Background

On September 3, 2020, the Department issued Diverse Settlement, a Texas limited liability company, a title insurance agent license. Mr. Green (51%), Mr. McLucas (48%), and another person (1%) own Diverse Settlement.[80] That same day, Texan Title Insurance Company (Texan Title Insurance) appointed

---

[76] Staff Ex. 30 at 016532-33; Staff Ex. 35 at 008883-84; Staff Ex. 39 at 009650-51; Staff Ex. 43 011400-01; Staff Ex. 47 at 010380-81.

[77] Tr. 1 at 70.

[78] Staff Ex. 10.

[79] Tr. 5 at 173-74; Tr. 2 at 214.

[80] Staff Ex. 2 at 039122; Staff Ex. 48; Staff Ex. 53.

Diverse Settlement as an agent to solicit and issue title insurance policies for the insurer.[81] Mr. McLucas, Mr. Green, Ms. Vavrus, and Ms. Wallace worked for Diverse Settlement, with all but Ms. Wallace licensed as an escrow officer.[82] Mr. Green was ostensibly the title agent's Chief Executive Officer, Chief Operations Officer, and On-Site Manager.[83] Mr. McLucas said he formed Diverse Settlement with Mr. Green after losing a contract bid for work from the City of Detroit. Mr. McLucas explained, "[a]lthough we had veteran status, because of me, we didn't have any minority status, and therefore, we were not awarded the contract, so we decided to start Diverse Settlement Services and — as a minority entity starting in . . . Texas."[84] On March 15, 2023, it was Mr. McLucas who notified the Department that Diverse Settlement was going to wind down business.[85]

### 2. Diverse Settlement misappropriated, converted or illegally withheld escrow money

About six months before Mr. McLucas notified the Department that Diverse Settlement was winding down, the Department performed a compliance audit of Diverse Settlement's escrow operations. Based on the audit results, the Department cited Diverse Settlement for several violations, including misappropriation of escrow money—$237,549.50.[86] The evidence establishes

[81] Staff Ex. 2 at 039123.

[82] Tr. 5 at 80-81; Tr. 4 at 161-64; Staff Ex. 3 at 039128; Staff Ex. 4 at 039131; Staff Ex. 5 at 039134.

[83] Staff Ex. 2 at 039124.

[84] Tr. 5 at 51-52.

[85] Staff Ex. 109.

[86] Staff Ex. 107 at 0500004; Staff Ex. 108.

custodial escrow funds were used to pay employee salaries, a personal credit card of Mr. McLucas, and for other purposes inconsistent with the escrows for which Diverse Settlement had been trusted with the money.

For seven months in a row in 2022, escrow money was used to pay employee salaries:

- On February 9, 2022, $14,502.31 was transferred from an escrow account to an operating account, and then to a payroll account for use by third-party payroll service provider, Paychex.[87]
- A $13,000 disbursement on March 24, 2022, and a $15,287.92 disbursement on April 21, 2022, are also examples of money moving out of escrow accounts and into a payroll account for employee salaries.[88]
- On May 5, 2022, $19,218.13 was transferred out of a file associated with an escrow account to an account of Land Records Abstract (owned by Mr. McLucas) and then to a Diverse Settlement payroll account.[89]
- On June 16, 2022, $18,215.10 was disbursed from an escrow account to another escrow account, and then $18,000 from that account to a payroll account, from which an electric withdrawal of $17,606.91 was made to Paychex.[90]
- In July 2022, two transfers from an escrow account to an operating account were made—$7,259.02 on July 18 and $9,725.45 on July 29—neither booked to a specific guaranty file. On July 18, $16,000 was transferred from

[87] Tr. 2 at 42, 47; Staff Ex. 111 at 031293; Staff Ex. 115 at 030237; Staff Ex. 116 at 030894; Staff Ex. 122 at 0500805.

[88] Tr. 2 at 45-60, 66-72; Staff Ex. 184.

[89] Tr. 5 at 61; Staff Ex. 107 at 0500010, Staff Ex. 115 at 030261; Staff Ex. 116 at 030906; Staff Ex. 134 at 0502797; Staff Ex. 147 at 033584.

[90] Staff Ex. 107 at 0500007; Staff Ex. 111 at 031331; Staff Ex. 115 at 030268; Staff Ex. 116 at 030910, Staff Ex. 120 at 0501179.

the operating account to a payroll account to restore the payroll account from a negative balance resulting from a payment to Paychex.[91] Similarly, on July 29, $8,000 was transferred from the operating account to a payroll account, which restored the payroll account from a negative balance of $8,690.90, from a July 28 payment to Paychex.[92]

- On August 12, 2022, $24,635,52 was transferred from an escrow account to an operating account,[93] from which $19,477.08 was transferred to a payroll account to restore the account from a negative balance created the day before by a payment to Paychex.[94]

The evidence further shows money was transferred directly from an escrow account to pay a personal credit card of Mr. McLucas.[95] In that regard, a $5,000 payment was made on November 20, 2020;[96] a $2,500 payment was made on December 2, 2020;[97] a $5,000 payment was made on November 29, 2021,[98] a $5,000 payment was made on December 22, 2021;[99] a $4,000 payment was made on

---

[91] Staff Ex. 115 at 003274-75; Staff Ex. 116 at 030913-14.

[92] Staff Ex. 115 at 030274-75; Staff Ex. 116 at 030914.

[93] Tr. 2 at 42; Staff Ex. 100 at 32589; Staff Ex. 137 at 502405.

[94] Staff Ex. 115 at 03280; Staff Ex. 116 at 030918. These examples of misuse of trust money and other such examples discussed in this section demonstrate Diverse Settlement did not keep trust money separate and apart from its operating accounts and did not maintain separate and distinct accounting of trust funds, which is a violation of § 2651.301(7) of the Texas Insurance Code.

[95] Staff Ex. 143 (2535 credit card statements).

[96] Staff Ex. 111 at 030950.

[97] Staff Ex. 111 at 030963.

[98] Staff Ex. 111 at 031249.

[99] Staff Ex. 111 at 031268.

May 24, 2022;[100] and a $6,500 payment was made on July 26, 2022.[101] Other credit card payments were made more circuitously. For example, on June 27, 2022, $8,101.50 was moved from a holding file for an escrow account[102] to another account, and then that day $8,700 was transferred to a McLucas Holdings account,[103] from which two $3,000 payments were made to Mr. McLucas's credit card.[104] The evidence further shows the escrow shortage included a $6,858.20 escrow transfer to an operating account on August 1, 2022 (and not booked to a specific guaranty file).[105] Then, from the operating account,[106] $5,500 was transferred to an account belonging to McLucas Holdings, a $920.98 payment was made for a loan on a car driven by Mr. McLucas, a $3,000 payment to Freedom Mortgage was made for Mr. McLucas's mortgage, and three transfers totaling $3,950 were made to a Land Records Abstract account.[107] Without the $6,868.20, Diverse Settlement could not have made all these payments.[108]

The evidence also establishes that accounting maneuvers were employed for Mr. McLucas to take escrow money out in cash for non-trust purposes. On

---

100 Tr. 2 at 91-93; Staff Ex. 107 at 500008; Staff Ex. 112 at 030797; Staff Ex. 127 at 504848.

101 Staff Ex. 110 at 032570.

102 Ex. 107 at 500010; Staff Ex. 110 at 032549; Staff Ex. 133 at 0502662.

103 Staff Ex. 147 at 033588.

104 Staff Ex. 145 at 033772.

105 Staff Ex. 107 at 500008; Staff Ex. 113 at 030616; Staff Ex. 131 at 0504892.

106 Staff Ex. 115 at 030278.

107 Staff Ex. 115 at 030280; Staff Ex. 145 at 033779; Staff Ex. 147 at 033595.

108 Tr. 2 at 85-86.

September 29, 2021, Diverse Settlement made book entries transferring money from *specific* guaranty files to an escheat holding file, where Mr. McLucas then withdrew the money ($20,919.69) via check signed by him and Ms. Vavrus. The $20,919.69 withdrawal was booked as a disbursement against the escheat holding file.[109] On the same day, the same accounting maneuver was made by making book entries transferring money from *specific* guaranty files to an escheat holding file, with $4,159.52 withdrawn by Mr. McLucas via check signed by him and Ms. Vavrus. The $4,159.52 withdrawal was booked as a disbursement against the escheat holding file.[110] Then, on the same day, the two checks, which totalled $25,079.21 were deposited into another escrow account from which Mr. McLucas made cash withdrawals of $10,000 and $15,079.21 (totalling $25,079.21).[111]

### 3. Mr. McLucas and Ms. Vavrus acted fraudulently or dishonestly in the sale of property that funded the reimbursement of the $237,549.50 escrow shortage

Nearly all of the $237,549.50 escrow shortages arose more than two months before the Department audit. Because Diverse Settlement did not reimburse the escrow shortages within 45 days from the closing of the bank statements showing the

---

[109] Tr. 2 at 94-98; Staff Ex. 107 at 0500009-10; Staff Ex. 126 at 0501558, 0501568, 0501575; Staff Ex. 140.

[110] Tr. 2 at 94-98; Staff Ex. 107 at 0500009-10; Staff Ex. 135 at 0502279-80, 0502292; Staff Ex. 140.

[111] Staff Ex. 140 at 0500298-300.

escrow shortages, a Department rule was violated.[112] *After* the Department identified the escrow account shortages, Mr. McLucas transferred money from his companies, McLucas Holdings and Land Records Abstract, to reimburse the escrow accounts.[113] The money Mr. McLucas used to reimburse the escrow shortages was proceeds from the sale of his 2260 Bald Eagle Way property (Eagle Way property).[114] Significantly, Staff argues that the evidence shows Mr. McLucas and Ms. Vavrus acted fraudulently or dishonestly in the sale of the property. The ALJ agrees.

Ms. Vavrus, a licensed escrow officer of Diverse Settlement, acted as escrow agent in the sale of Mr. McLucas's Eagle Way property.[115] The title evidence obtained (from another title agent) for the sales transaction revealed tax and judgment liens against Mr. McLucas of record in the county where the property was situated, and that Mr. McLucas was a defendant in a then-pending suit appurtenant to a bankruptcy proceeding.[116] Despite Ms. Vavrus knowing about the existence of the filed judgments,[117] she furnished a Diverse Settlement title commitment to the purchasers and their lender that did not disclose the filed tax (federal for

---

[112] Stipulations at 10 (filed Oct. 11, 2023). The Department's compliance audit found that Diverse Settlement routinely did not comply with Department minimum escrow accounting procedures and internal controls for title agents. Staff Ex. 107. These procedures and internal controls are to ensure the integrity of trust money that title agents receive and disburse and for the establishment of auditable records. Tr. 2 at 20-23. During the hearing, the participating Parties stipulated that Diverse Settlement violated several of the Basic Manual's Minimum Escrow Accounting Procedures and Internal Controls. Stipulations at 1-5, 10.

[113] Stipulations at 7, 12; Staff Ex. 184 at 3-4 and exhibits referenced therein.

[114] Staff Ex. 107 at 500007; Staff Ex. 145 at 033784-85; Staff Ex. 158; Staff Ex. 170 at 503600-01; Staff Ex. 184 at 3-4.

[115] Tr. 5 at 7; Staff Ex. 7.

[116] Staff Ex. 154; Staff Exs. 161-66 (copies of tax and judgment liens); Staff Ex. 167 (bankruptcy docket sheet).

[117] Tr. 5 at 10-12, 14, 15, 17.

$336,313.04)[118] and judgment liens.[119] A representative of underwriter Texan Title Insurance testified: the nondisclosed judgments were material because "[t]hey are involuntary liens that may affect the title and would prevent the issuance of a first lien policy to the lender unless they're satisfied."[120]

Ms. Vavrus also acted contrary to the lender's instructions that "all liens must be paid in full and released."[121] She had no evidence that the liens were released.[122] Yet, in connection with the transition, Mr. McLucas signed an Affidavit as to Debts and Liens wherein he falsely swore that there were no judgment liens filed against him.[123] The affidavit was made in connection with the "inducement for the issuance of [a title] policy."[124] Ms. Vavrus notarized the affidavit.[125] Ms. Vavrus and Mr. McLucas's wrongful conduct means "[Texan Title Insurance] would have potential liability, if a claim were filed, having to do with these matters . . . . For the life of the owner's policy or until these matters expire – well, and for the loan policy until they expire, or the loan is paid off."[126]

---

118 Staff Ex. 161.

119 Tr. 4 at 106; *compare* Staff Ex. 154 (title evidence) to Staff Ex. 156 (Diverse Settlement title commitment).

120 Tr. 4 at 107.

121 Staff Ex. 157 at 0503917.

122 Tr. 5 at 8-17.

123 Staff Ex. 160 at 0504041-42.

124 Staff Ex. 160 at 0504042.

125 Staff Ex. 160 at 0504042.

126 Tr. 4 at 146.

The evidence further shows that Ms. Vavrus, as escrow officer, did not safeguard the escrow money for the Eagle Way transaction and pay it to the parties who were entitled to it. She did not pay the $573.22 of title insurance premium owed to Texan Title Insurance.[127] She did not pay the other title agent that furnished the title evidence, The Accurate Group, a $125 premium split owed for the title evidence.[128] And the entire 85% split for the title agent's portion of the title insurance premium, $3,263.23, was disbursed to McLucas Holdings.[129] Three days after McLucas Holdings received that money, Ms. Vavrus received $5,000 by Zelle from the McLucas Holdings account.[130]

#### 4. Another $76,361.01 in escrow funds was misappropriated by Diverse Settlement, and the funds are still missing

The evidence shows that in addition to $237,549.50 being misappropriated, another $76,361.01 in escrow funds was misappropriated, and the funds are still missing.[131] A sum of $76,361.01 was "disbursed" by Diverse Settlement from an escrow account into which the purchaser of commercial property deposited escrow money for the seller. When the seller asked for an accounting of the escrow, Diverse Settlement *deleted* the $76,361.01 "disbursement" from the account ledger

127 Tr. 4 at 45-57; Staff Ex. 169 at 0504492-93; Staff Ex. 170 at 050362.

128 Tr. 3 at 175.

129 Staff Ex. 111 at 031356 ($3,263.23 withdrawal from escrow account); Staff Ex. 145 at 032783-86, 033784 (deposit to account); Staff Ex. 170 at 0503601.

130 Staff Ex. 145 at 033785.

131 Tr. 5 at 182, 186-90; Staff Ex. 187 at 504729.

to give the impression that all of the escrow money was being held properly in trust.[132] The seller testified: "I questioned whether the money was all there and [Mr. McLucas] says, it's all here. I'll send you the ledger."[133] Mr. McLucas sent the seller a Diverse Settlement account ledger falsely representing that no money was missing from the escrow account.[134]

### 5. Diverse Settlement violated Department Rate Rule R-2 and Procedural Rule P-24

Basic Manual Rate Rule R-2 requires a title agent to pay the underwriter its share of the insurance premium "no later than the 15th day of the second month following the month in which the premium was collected."[135] It is undisputed that Diverse Settlement still owes underwriter Texan Title Insurance $19,991.15 for title insurance premiums, including the $573.22 premium collected by Diverse Settlement in the sale of Mr. McLucas's Eagle Way property.[136] It is also undisputed that Diverse Settlement contracted with another title agent, The Accurate Group, for title evidence on hundreds of occasions, but never paid the other agent for the evidence.[137] As just highlighted, the title evidence ordered from The Accurate Group for Mr. McLucas's Eagle Way property transaction was not

---

132 *Compare* Staff Ex. 173 at 050044 to Staff Ex. 183 at 2.

133 Tr. 3 at 102.

134 Tr. 3 at 100-04; Staff Ex. 183. As Staff argues, this wrongful conduct by Diverse Settlement is "fraudulent or dishonest" in violation of § 2651.301(5) of the Insurance Code.

135 Basic Manual Rate Rule R-2, available at https://www.tdi.texas.gov/title/titlem3a.html#r2.

136 Tr. 4 at 82, 45-47, 51-57, 64; Staff Ex. 169 at 504492; Staff Ex. 170 at 503602.

137 Tr. 3 at 175-77 ("Well, they did about 400-and-some transactions, and we were not paid for 380-some transactions. So they did not pay us for most of the transactions."); Staff Ex. 171.

paid for, and Diverse Settlement closed the transaction in September 2022.[138] Diverse Settlement does not dispute that it owes the title agent $61,685.20 for title evidence. Under Basic Manual Procedural Rule P-24, premium splits for furnishing and examining title evidence must be paid to the other title agent "no later than the thirtieth (30th) day after the date of recording by the county clerk of an instrument conveying an interest in the land."[139] The record supports that Diverse Settlement violated Basic Manual Rate Rule R-2 and Procedural Rule P-24.

### 6. Diverse Settlement paid an impermissible kickback to Dr. Jackson in return for his referral of title insurance business

Dr. Jackson has a Ph.D. in public health and served in the U.S. Army in that field. After retirement from military service, Dr. Jackson began a career in real estate.[140] He is now a real estate broker, owning Noble Group Realty, LLC and managing a team of real estate agents in Texas.[141] After Dr. Jackson met Mr. McLucas, Dr. Jackson became a nominal, 1% owner in Paradise Settlement.[142] Dr. Jackson does not remember how much he paid to become an owner in the title agency.[143] He testified that he thought—because he "did not do my due diligence" and because Mr. Green was with Diverse Settlement—that Diverse Settlement was

---

138 Tr. 3 at 140, 143-44, 174-75; Staff Ex. 152; Staff Ex. 154.

139 Basic Manual Procedural Rule P-24, available at https://www.tdi.texas.gov/title/titlem4d.html#p24.

140 Tr. 3 at 257-58.

141 Tr. 3 at 192-93; Tr. 4 at 159-60; Staff Ex. 108 at 500485-86.

142 Tr. 3 at 199-201.

143 Tr. 3 at 205.

part of Paradise Settlement.[144] Dr. Jackson has no ownership in Diverse Settlement.[145]

The evidence establishes that Diverse Settlement agreed to pay Dr. Jackson a commission for each real estate transaction that he referred to Diverse Settlement for title insurance services.[146] A written agreement between Diverse Settlement and Dr. Jackson was even signed to that effect.[147] The evidence also shows that between October 2020 and April 2022, Diverse Settlement paid $21,278.81 to Dr. Jackson in return for his referral of title insurance business to Diverse Settlement.[148] Samantha Fore, the Department title examination manager conducting the Diverse Settlement compliance audit, discovered the arrangement. When questioning a check, she was told it was "a disbursement for a commission that Dr. Jackson had earned for these . . . files."[149] The Department's audit report states: "Since Dr. Jackson is a producer, the commission paid for the referral of business was unauthorized and in violation of Section 2502.051 and Procedural Rule P-53."[150] Ms. Fore explained that had Dr. Jackson been an owner in Diverse Settlement, the

---

[144] Tr. 3 at 212.

[145] Staff Ex. 2 at 039112; Staff Ex. 52 (license application of Diverse Settlement).

[146] Tr. 3 at 226-28, 234, 236-37; Tr. 4 at 159-60; Staff Ex. 182.

[147] Staff Ex. 182.

[148] Tr. 1 at 215-16; Tr. 2 at 13-17; Tr. 3 at 238-39; Staff Ex. 180. Because the evidence shows that Diverse Settlement paid, allowed, or permitted the prohibited commission or thing of value to Dr. Jackson, the ALJ does not conclude—as Staff urges—that Mr. Green violated § 2502.051 of the Insurance Code by virtue of his signing the "referral" agreement on behalf of Diverse Settlement. Staff Ex. 182 at 0500024.

[149] Tr. 1 at 199.

[150] Staff Ex. 107 at 0500006.

commission splits paid to Dr. Jackson would not be considered rebating because he would have an affiliated ownership, as an owner. She further testified: "But because he's not an owner of Diverse [Settlement], he doesn't have ownership in Diverse [Settlement], and he's not reflected as an owner on the license, that is why this is an issue."[151]

Under Texas law, "[a] . . . portion of a title insurance premium, or other thing of value may not be directly or indirectly paid . . . by a person engaged in the business of title insurance or received or accepted by a person for engaging in the business of title insurance or for soliciting or referring title insurance business."[152] Further, "[a] person who pays or receives a commission, rebate, discount, or other thing of value for soliciting or referring title insurance business" is engaging in the unauthorized business of insurance.[153] Because Dr. Jackson received the commission or thing of value ($21,278.81) for making referrals of title insurance business, he engaged in the unauthorized business of insurance.

## IV. Analysis

### A. Claims Against Paradise Settlement

The preponderance of the credible evidence supports Staff's claims against Paradise Settlement.

[151] Tr. 2 at 138.

[152] Tex. Ins. Code § 2502.051.

[153] Tex. Ins. Code § 2502.056(a).

Paradise Settlement engaged in the unauthorized business of insurance. The evidence establishes that after WFG National Insurance terminated its appointment with Paradise Settlement in February 2020, the title agent nonetheless—without authorization—continued to accept premiums from Texas consumers for title insurance in violation of § 101.051(b)(4) of the Insurance Code. And, by closing transactions in Texas after the appointment termination, Paradise Settlement engaged in the unauthorized business of insurance as described in §§ 101.051(b)(8) and 2501.005 of the Insurance Code.[154]

Paradise Settlement engaged in deceptive practices and is guilty of fraudulent or dishonest practices. The ALJ agrees with Staff that when engaging in unauthorized insurance, Paradise Settlement committed fraudulent or dishonest practices. Texas consumers paid Paradise Settlement money for title insurance policies, but the consumers were not issued policies. After February 2020, Paradise Settlement understood it could not issue title insurance policies in Texas because it had no appointment. Mr. McLucas, its Chief Operating Officer, signed the termination agreement. As a result, Paradise Settlement's conduct in falsely representing that it—and the title insurance commitments it issued—had sponsorship or approval from underwriter WFG National Insurance was deceptive. Paradise Settlement's concealment of the underwriter termination was purposeful to induce others to continue to trust Paradise Settlement with escrow assets and title

[154] Paradise Settlement's conduct does not fit within the purview of § 101.051(b)(1) because the section concerns conduct "as an insurer," which agent Paradise Settlement is not; nor does Paradise Settlement's conduct fit within the purview of § 101.051(b)(3) because that section concerns taking or receiving insurance applications, on which there is no evidence. Accordingly, the ALJ does not find Paradise Settlement violated those sections of the Insurance Code on unauthorized insurance.

insurance premiums. Paradise Settlement's conduct was fraudulent or dishonest in violation of § 2651.301(5) of the Insurance Code and deceptive conduct prohibited under § 17.46(b)(1)-(3), (5), (12), and (24) of the Texas Business and Commerce Code and § 541.061 of the Texas Insurance Code.

Paradise Settlement misappropriated escrow money. The final audit of Paradise Settlement's escrow accounts shows that Paradise Settlement misappropriated or converted to its own use or wrongfully withheld money belonging to another. The custodial escrow accounts were short $478,577.92. The evidence, including the audit, establishes that the escrow accounts had significant liabilities in the form of outstanding checks and file balances that needed to be disbursed to the consumers involved in the guaranty files, but because there was no money in the accounts, those disbursements were never made to the proper parties. Because Paradise Settlement misappropriated, converted to its own use, or illegally withheld escrow money belonging to someone else, it violated § 2651.301(4) of the Insurance Code.

Paradise Settlement failed to properly maintain escrow funds and accounting. Because Paradise Settlement transferred money out of escrow accounts to other accounts controlled by Paradise Settlement and another entity controlled by Mr. McLucas, Land Records Abstract, for purposes inconsistent with the escrows for which the title agent was holding the money, it failed to maintain a separate and distinct accounting of escrow funds and escrow bank accounts separate and apart from all other accounts in violation of § 2651.301(7) of the Insurance Code.

## B. CLAIMS AGAINST DIVERSE SETTLEMENT

The preponderance of the credible evidence supports Staff's claims against Diverse Settlement.

Diverse Settlement misappropriated escrow money. The evidence shows that Diverse Settlement misappropriated or converted to its own use or wrongfully withheld money belonging to another. At the time of the Department's routine compliance audit in 2022, the custodial escrow accounts were short $237,549.50 as a result of escrow funds previously being used to pay employee salaries, a personal credit card of Mr. McLucas, and for other purposes inconsistent with the escrows for which Diverse Settlement had been trusted with the money. Because the $237,549.50 was not reimbursed within 45 days from the closing of bank statements showing the escrow shortages, the Department's Minimum Escrow Accounting Procedures and Internal Controls Number 17 was violated.[155] Moreover, the evidence shows that another $76,361.01 in escrow funds was misappropriated, and it is still missing. Because Diverse Settlement misappropriated, converted to its own use, or illegally withheld escrow money belonging to someone else, it violated § 2651.301(4) of the Insurance Code.

Diverse Settlement failed to properly maintain escrow funds and accounting. Because Diverse Settlement transferred money out of escrow accounts to other accounts controlled by the title agent and to entities controlled by Mr. McLucas,

[155] Basic Manual, § 5, Minimum Escrow Accounting Procedures and Internal Controls No. 17, available at https://www.tdi.texas.gov/title/titlem5a.html#minescrow.

Land Records Abstract, and McLucas Holdings, for purposes inconsistent with the escrows for which the title agent was holding the money, it failed to maintain a separate and distinct accounting of escrow funds and escrow bank accounts separate and apart from all other accounts in violation of § 2651.301(7) of the Insurance Code.

Diverse Settlement failed to implement basic escrow accounting procedures and internal controls. During the hearing, the participating Parties stipulated that Diverse Settlement violated Basic Manual, § 5, Minimum Escrow Accounting Procedures and Internal Controls Numbers 1, 2, 3, 4, and 17.

Diverse Settlement violated Rate Rule R-2 and Procedural Rule P-24. Diverse Settlement still owes underwriter Texan Title Insurance $19,991.15 for title insurance premium, including the $573.22 premium collected by Diverse Settlement in the sale of Mr. McLucas's Eagle Way property. As a result, the title agent violated Basic Manual Rule R-2. It is also uncontroverted that Diverse Settlement contracted with another title insurance agent to purchase title evidence on hundreds of occasions but never paid the other agent for the title evidence, including for the title evidence Diverse Settlement ordered for Mr. McLucas's Eagle Way property transaction, which closed in September 2022. As a result, Diverse Settlement violated Basic Manual Procedural Rule P-24.

Diverse Settlement is guilty of fraudulent or dishonest practices. The ALJ agrees with Staff that Diverse Settlement is guilty of fraudulent or dishonest practices. The record is replete with such wrongful conduct by the title agent. As an escrow agent, Diverse Settlement had fiduciary duties to conserve and protect

money trusted to it, to follow the instructions of the escrow parties, and to disclose material facts known to it that might affect the principals' transactions. *City of Fort Worth v. Pippen,* 439 S.W.2d 660, 665 (Tex. 1969); *Capital Title Co. v. Donaldson*, 739 S.W.2d 384, 389 (Tex. App.—Houston [1st Dist.] 1987, no writ). The facts show that the title agent did the opposite of conserving and protecting money trusted to it. Instead, Diverse Settlement misappropriated and converted custodial trust money to pay its own employees' salaries. And, in at least one case, after an escrow party questioned whether escrow funds were being properly held, Diverse Settlement sent the escrow party an account ledger falsely representing that no money was missing from the escrow account when, in fact, $76,361.01 is still missing from the account. The facts also show that in the Eagle Way property transaction, the lender provided instructions about the use of the money it trusted to Diverse Settlement, requiring the title agent to "notify Lender as to any defect in title,"[156] but Diverse Settlement did not notify the lender of tax and judgment liens filed of record. The lender also required that "all liens must be paid in full and released,"[157] but Diverse Settlement did not pay the tax and judgment liens nor obtain releases. Instead, the purchasers of the Eagle Way property and their lender were furnished a Diverse Settlement title commitment that did *not* disclose the filed tax and judgment liens burdening the property. The record supports that Diverse Settlement has been guilty of fraudulent or dishonest practices, subjecting it to disciplinary action under § 2651.301(5) of the Insurance Code.

[156] Staff Ex. 157 at 0503915.

[157] Staff Ex. 157 at 0503917.

Diverse Settlement paid Dr. Jackson money for the referral of title insurance business. Between October 2020 and April 2022, Diverse Settlement paid $21,278.81 to Dr. Jackson in return for his referral of title insurance business to Diverse Settlement. Diverse Settlement's payments were made in violation of Texas statute. Under § 2502.051 of the Insurance Code, "[a] . . . portion of a title insurance premium, or other thing of value may not be directly or indirectly paid . . . by a person engaged in the business of title insurance or received or accepted by a person for engaging in the business of title insurance or for soliciting or referring title insurance business."

### C. Claims against Mr. McLucas, Mr. Green, Ms. Vavrus, Ms. Wallace, and Dr. Jackson

As set forth below, the preponderance of the credible evidence supports the following claims by Staff against the individual Respondents.

Mr. McLucas, Mr. Green, Ms. Wallace, and Dr. Jackson engaged in the unauthorized business of insurance. The evidence establishes that after WFG National Insurance cancelled Paradise Settlement's appointment, Mr. McLucas, Mr. Green, and Ms. Wallace engaged in the unauthorized business of insurance. By coordinating with True Concept Title to continue soliciting insurance business, Mr. McLucas engaged in the unauthorized business of insurance, as described in § 101.051(b)(6)(A) of the Insurance Code. After the appointment terminations, Mr. Green engaged in the unauthorized business of insurance by continuing to receive and collect premiums for title insurance and closing title insurance transactions, as described in §§ 101.051(b)(4), (8) and 2501.005-.006 of

the Code. Ms. Wallace engaged in the unauthorized business of insurance by receiving and disbursing money for title insurance transactions as an authorized signer of the Chase #7572 escrow account used in the eight USF transactions, as described in §§ 101.051(b)(8) and 2501.005(b) of the Code. Because Dr. Jackson received a commission or thing of value ($21,278.81) for title insurance referrals to Diverse Settlement, Dr. Jackson engaged in the unauthorized business of insurance as set forth in § 2502.056(a) of the Insurance Code.

Mr. McLucas misappropriated escrow money. The ALJ agrees with Staff that Mr. McLucas misappropriated or converted to his own use escrow monies in violation of § 2652.201(4) of the Insurance Code. The evidence establishes that the final audit of Paradise Settlement's escrow accounts revealed a shortage of $478,577.92. The shortages were from multiple transfers out of escrow accounts that were not associated with guaranty files. The facts further show that on multiple occasions, escrow monies were "disbursed" from Paradise Settlement's escrow accounts *with no entry relating the disbursements to a guaranty file* to an account of Land Records Abstract, which is owned by Mr. McLucas.[158] While Mr. McLucas was with Diverse Settlement, escrow funds were transferred to pay a personal credit card of Mr. McLucas. While at Diverse Settlement, Mr. McLucas maneuvered to withdrawal $10,000 and $15,079.21 of escrow funds in cash via two checks. It is undisputed that Mr. McLucas did not reimburse the $237,549.50 in escrow

[158] With respect to the more than $1.7 million that was wired by USF for its borrowers to the National Escrow Account (Chase #7572) of Paradise Settlement Services LLC (the Pennsylvania entity), the evidence is insufficient to establish the "movement" of the money out of the Chase account to find Mr. McLucas responsible for the conversation of the money as urged by Staff.

shortages—to which he contributed—until the Department's auditors discovered the defalcations.

Staff claims Mr. Green misappropriated or converted to his own use escrow monies in violation of § 2652.201(4) of the Insurance Code. Staff argues that $2,000 from a Diverse Settlement escrow account was used to pay a credit card Mr. Green was authorized to use. But the evidence shows the credit card was not Mr. Green's personal credit card, rather a Diverse Settlement company card.[159] Staff also argues that because Mr. Green knew or should have known escrow money was used to pay his salary and the salary of other Diverse Settlement employees, he misappropriated escrow funds for his own use. The ALJ disagrees. Payment of payroll by Diverse Settlement with escrow funds, without more, is misappropriation by the entity of trust funds for the entity's own use. Important to the ALJ's analysis, Mr. Green testified credibly that he did not know about the escrow shortages until the Department's audit.[160] And with respect to Diverse Settlement's payroll, Mr. Green was asked: "Q: [Y]ou knew that Diverse had difficulty making payroll sometimes, didn't you?" He responded: "A: No, sir, not to my knowledge. Not in – I didn't know that until the audit and I saw the errors. I did not know that at all."[161] Staff also argues Mr. Green misappropriated or converted to his own use the $76,361.01 that is currently missing from a Diverse Settlement escrow account. Staff argues that the evidence shows that the $76,361.01 "disbursement" from the escrow

[159] Tr. 4 at 199.

[160] Tr. 4 at 171-172.

[161] Tr. 4 at 191.

account was in July 2022. However, Staff did not establish that Mr. Green converted those funds to his own use. The preponderance of the evidence does not support that Mr. Green misappropriated or converted to his own use escrow monies in violation of the Insurance Code.

Mr. McLucas, Mr. Green, and Ms. Vavrus are guilty of fraudulent or dishonest practices. The evidence shows that Mr. McLucas, Mr. Green, and Ms. Vavrus are guilty of fraudulent or dishonest practices in violation of § 2652.201(5) of the Insurance Code. Both Mr. McLucas and Mr. Green knew that WFG National Insurance had terminated appointments with Paradise Settlement and the Pennsylvania Paradise Settlement title agent, and both dishonestly misrepresented the True Concept Title arrangement to USF to continue to sell insurance policies. Both went so far as to send USF what can only be characterized as a bogus assumed name certificate indicating that Paradise Settlement Services DBA True Concept. The evidence also shows that both Mr. McLucas and Ms. Vavrus are guilty of fraudulent or dishonest practices in connection with the Eagle Way property transaction. Mr. McLucas and Ms. Vavrus were dishonest with the purchasers and their lender in not disclosing that there were tax and judgment liens filed of record that burdened the Eagle Way property. To obtain a title insurance policy for the property, Mr. McLucas falsely swore in an Affidavit as to Debts and Liens that there were no judgment liens filed against him.

The evidence does not establish a failure to report an insurance fraud claim against Ms. Vavrus. Staff claims that Ms. Vavrus violated Texas statute when she allegedly failed to report insurance fraud to the Department. Under § 701.051 of the

Insurance Code, if a person reasonably suspects that a fraudulent insurance act has been or is about to be committed, the person has a duty to report it to the Department. Importantly, "fraudulent insurance act" is defined by statute to mean "an act" that is "a violation of a penal law" committed while engaging in the business of insurance, as part of an insurance transaction, or as part of an attempt to defraud an insurer.[162] Staff asserts that Ms. Vavrus failed to report to the Department that Mr. McLucas concealed tax and judgment liens from the title insurer in the Eagle Way transaction and that Mr. McLucas removed $25,079.21 in cash from a Diverse Settlement escrow account. Staff did not show that either of these acts is a "violation of penal law." As such, Staff did not establish Ms. Vavrus violated § 701.051 of the Insurance Code.

## D. Sanctions

### 1. Cease-and-Desist Order and Revocation

As sanctions, Staff seeks an order from the Commissioner that Ms. Wallace and Dr. Jackson cease and desist engaging in the unauthorized business of insurance, and that the Department-issued licenses of Respondents be revoked. Staff has proven that Ms. Wallace and Dr. Jackson should be ordered by the Commissioner to cease and desist engaging in the unauthorized business of insurance.[163] Staff has also proven that the Department-issued licenses of Paradise Settlement, Diverse Settlement, Mr. McLucas, Mr. Green, and Ms. Vavrus should be revoked,

---

[162] Tex. Ins. Code § 701.001(2).

[163] Tex. Ins. Code § 101.103(a)(1).

including licenses previously forfeited.[164] Because these Respondents violated insurance law, the licenses may be revoked.[165] And Respondents' licenses should be revoked because the violations of law proven are serious and involved acts of dishonesty, hurting consumers and the insurance industry by undermining public trust. The Department's rules specify that it is "very important that license and authorization holders . . . and any other persons who have the right to control a license or authorization holder . . . be honest, trustworthy, and reliable."[166] The public must be able to place trust in and rely upon licensees.[167]

### 2. Monetary Penalties

Staff also seeks to impose monetary penalties against all Respondents, except Ms. Wallace. Specifically, Staff seeks a monetary administrative penalty against Paradise Settlement, Diverse Settlement, Mr. McLucas, Mr. Green, and Ms. Vavrus, and a monetary forfeiture against Diverse Settlement and Dr. Jackson. Monetary penalties may be imposed in addition to and in combination with license revocation and a cease-and-desist order.[168] Administrative penalties can be as high as

---

[164] Tex. Ins. Code §§ 2651.201(c), 2652.057(c).

[165] Tex. Ins. Code § 82.051.

[166] 28 Tex. Admin. Code § 1.502(c). Though this subchapter is titled "Effect of Criminal Conduct," it also addresses, in addition to criminal offenses, licensees who have engaged in fraudulent or dishonest activity. *See* 28 Tex. Admin. Code § 1.501(a); *see also* Tex. Gov't Code § 311.024 (heading of a title, subtitle, chapter, subchapter, or section does not limit its meaning).

[167] 28 Tex. Admin. Code § 1.502(a).

[168] Tex. Ins. Code §§ 82.052(3), (5), 84.021.

$25,000 per violation, based on certain factors the Department must consider in determining the appropriate amount.[169]

However, under chapter 84 of the Insurance Code, which "applies to each monetary penalty the [D]epartment or [C]ommissioner imposes under this code or another insurance law of this state,"[170] the Department must adhere to procedural due process requirements before a monetary penalty can be imposed. The Department "shall" give the affected person written notice containing a summary of the alleged violation(s) and "a statement of the amount of the recommended penalty," and inform the person that they have a right to a hearing to contest the violation, penalty amount, or both.[171]

During the hearing, Staff put on no evidence that the Department gave written notice to any Respondent of the *amount* of any monetary penalty sought. Significantly, Staff's Original Petition and Notice of Hearing gives no notice to Respondents of the amount of any monetary penalty sought, even though the Original Petition avers that orders for administrative penalties and monetary forfeiture are sought against the Respondents.[172] In short, Respondents were not given the procedural process that the Legislature has declared is due them: written notice from the Department of the amount of the monetary penalty sought at the

[169] Tex. Ins. Code § 84.022.

[170] Tex. Ins. Code § 84.002(a).

[171] Tex. Ins. Code § 84.041(b).

[172] Original Petition (filed June 14, 2023); Notice of Hearing (filed June 26, 2023).

hearing. Without notice of the amount of penalty sought, Staff naturally put on no evidence as to the calculation of a monetary penalty and did not differentiate between any of the proven violations against a particular Respondent. And because there was no notice of the amount of a monetary penalty sought, Respondents had no contemporaneous opportunity to contest any penalty amount at hearing or to choose the right to appear with counsel to contest the amount. The ALJ concludes that the record evidence is insufficient to support imposition of a monetary penalty—be it an administrative penalty or monetary forfeiture—against any Respondent.

In support of these recommendations, the ALJ makes the following findings of fact and conclusions of law.

## V. FINDINGS OF FACT

1. The Texas Department of Insurance (Department) issued Respondent Paradise Settlement Services LLC, a Texas limited liability company (Paradise Settlement) a title agency license in 2008 that was cancelled by the Department in 2021.

2. Respondent Christopher John McLucas (Mr. McLucas) owns 97% of Paradise Settlement. Respondent Donnovan Ballington Jackson (Dr. Jackson) owns 1% of Paradise Settlement. During relevant events, Mr. McLucas served as the Chief Executive Officer of Paradise Settlement.

3. Mr. McLucas was issued an escrow officer license by the Department in 2003, but he did not renew the license in 2022.

4. Respondents Brandon Dior Green (Mr. Green) and Gale Faye Vavrus (Ms. Vavrus) each hold an escrow officer license issued by the Department.

5. The Department has never issued Respondent Wyndi Wallace (Ms. Wallace) a license.

6. Dr. Jackson is a licensed Texas real estate broker who owns Noble Group Realty, LLC and manages a team of real estate agents in Texas.

7. The Department issued Respondent Diverse Settlement Services, LLC, a Texas limited liability company (Diverse Settlement) a title agency license in 2020. Diverse Settlement is owned 51% by Mr. Green and 49% by Mr. McLucas. Dr. Jackson has no ownership interest in Diverse Settlement. On March 15, 2023, Mr. McLucas notified the Department that Diverse Settlement intended to wind down business.

8. Mr. McLucas, Mr. Green, Ms. Vavrus, Ms. Wallace, and Dr. Jackson reside in Texas.

9. At one time, Paradise Settlement had an underwriter appointment from WFG National Title Insurance Company (WFG National Insurance). In 2020, WFG National Insurance was Paradise Settlement's sole underwriter appointment.

10. In January 2020, WFG National Insurance terminated its underwriting appointment with Paradise Settlement effective February 15, 2020. At the same time, WFG National Insurance terminated all its underwriting appointments with Paradise Settlement Services, LLC, an entity formed under Pennsylvania law and owned in part by Mr. McLucas (Pennsylvania Paradise Settlement).

***Violations against Paradise Settlement***

11. After WFG National Insurance terminated its appointment, Paradise Settlement purported to sell title insurance on behalf of the insurer in at least five instances, acting as the title and settlement agent in connection with Texas consumers' real estate transactions. In each transaction, Paradise Settlement issued a Texas Disclosure Form T-64 to the consumer identifying WFG National Insurance as underwriter, Paradise Settlement as settlement agent, and Mr. Green as escrow officer. And in each transaction, Paradise Settlement issued and delivered a title commitment to the consumer falsely reflecting that it could deliver a title policy issued by underwriter WFG National Insurance. In each transaction, title insurance premium was collected from the Texas consumer for title insurance policies, but no WFG

National Insurance title insurance policy was issued. Instead, Paradise Settlement converted the insurance premium money paid by the consumers to itself.

12. Paradise Settlement acted fraudulently or dishonestly after its underwriter appointment was terminated by taking insurance premium money from Texas consumers for title insurance policies and not delivering a title insurance policy to them.

13. After its underwriter appointment was terminated, Paradise Settlement was deceptive in falsely representing that it—and the title insurance commitments it issued—had sponsorship or approval from underwriter WFG National Insurance. Paradise Settlement's concealment of the underwriter termination was purposeful to induce others to continue to trust Paradise Settlement with escrow assets and title insurance premiums.

14. WFG National Insurance's final audit of Paradise Settlement's custodial escrow accounts revealed a shortage of $478,577.92, because the accounts had liabilities in the form of outstanding checks and file balances that needed to be disbursed to consumers involved in guaranty files, but there was no money. The escrow shortage was caused by multiple transfers out of Paradise Settlement's escrow accounts that were not associated with any guaranty file, including:

a. A June 4, 2020, $30,000 disbursement to an account of Land Records Abstract, a company owned by Mr. McLucas;

b. A June 16, 2020, $160,000 disbursement by telephone transfer to an unidentified account;

c. A July 1, 2020, $21,300 disbursement to an account of Land Records Abstract;

d. An August 18, 2020, $180,258.67 disbursement and an August 18, 2020, $5,000 disbursement to an account of Land Records Abstract; and

e. A September 2, 2020, $100,963.48 disbursement to Paradise Settlement, which was then disbursed to unidentified recipients.

15. Paradise Settlement failed to maintain a separate and distinct accounting of escrow funds and escrow bank accounts separate and apart from all other accounts.

*Violations against Diverse Settlement*

16. The Department's audit of Diverse Settlement in 2022, revealed Diverse Settlement's custodial escrow accounts were short $237,549.50 as a result of escrow funds previously being used by the title agent to pay salaries of its employees seven months in a row in 2022 (February through August), a personal credit card of Mr. McLucas, and for other purposes inconsistent with the escrows for which Diverse Settlement had been trusted with the money.

17. Money was transferred directly from a Diverse Settlement escrow account to pay a personal credit card of Mr. McLucas on November 20, 2020 ($5,000), on December 2, 2020 ($2,500), on November 29, 2021 ($5,000), on December 22, 2021 ($5,000), on May 24, 2022 ($4,000) and on July 26, 2022 ($6,500). Other credit card payments were made circuitously: on July 27, 2022, $8,101.50 was moved from a holding account for an escrow account to another account and then transferred from the account to a McLucas Holdings account, from which two $3,000 payments were made to Mr. McLucas's personal credit card.

18. Accounting maneuvers were employed at Diverse Settlement for Mr. McLucas to take escrow money out in cash for non-trust purposes. On September 29, 2021, book entries were made transferring money from specific guaranty files to an escheat holding file, where Mr. McLucas then withdrew the money ($20,919.69) via check signed by him and Ms. Vavrus. The $20,919,69 was booked as a disbursement against the escheat holding file. On the same day, the same accounting maneuver was made by making book entries transferring money from specific guaranty files to an escheat holding file with $4,159.52 withdrawn by Mr. McLucas via check signed by him and Ms. Vavrus. The $4,159.52 withdrawal was booked as a disbursement against the escheat holding file. Then, on the same day, the two checks (totaling $25,079.21) were deposited into another escrow account from which

Mr. McLucas made cash withdrawals to himself of $10,000 and $15,079.21 (totaling $25,079.21).

19. Nearly all of the $237,549.50 escrow shortage arose more than two months before the Department audit. After the Department identified the escrow account shortages, Mr. McLucas reimbursed the escrow accounts. Diverse Settlement and Mr. McLucas stipulate that because the escrow shortages were not reimbursed within 45 days from the closing of the bank statements showing the escrow shortages, Diverse Settlement violated Minimum Escrow Accounting Procedures and Internal Controls Number 17 of the Texas Title Insurance Basic Manual (Basic Manual).[173]

20. The money Mr. McLucas used to reimburse the $237,549.50 escrow shortage was proceeds from the sale of his 2260 Bald Eagle Way property (Eagle Way property).

21. To this day, there is a shortage of $76,361.01 in a Diverse Settlement custodial escrow account into which the purchaser of commercial property deposited escrow money to be held in trust by Diverse Settlement for the benefit of the seller of the property.

22. When the seller of the commercial property questioned whether all the escrow money was being properly held, Mr. McLucas sent the seller a Diverse Settlement account ledger falsely representing that no money was missing from the escrow account when, in fact, the sum of $76,361.01 was "disbursed" by Diverse Settlement from the account and is missing.

23. Diverse Settlement failed to maintain a separate and distinct accounting of escrow funds and escrow bank accounts separate and apart from all other accounts.

24. Diverse Settlement violated Minimum Escrow Accounting Procedures and Internal Controls Numbers 1, 2, 3, and 4 of the Basic Manual.

25. Diverse Settlement still owes underwriter Texan Title Insurance $19,991.15 for title insurance premiums, including the $573.22 premium collected by

[173] Stipulations of Parties in Attendance at 10 (filed Oct. 11, 2023).

Diverse Settlement when acting as title agent in Mr. McLucas's sale of his Eagle Way property, which closed in September 2022.

26. Diverse Settlement contracted with another title insurance agent, The Accurate Group, to purchase title evidence. On hundreds of occasions Diverse Settlement ordered title evidence from The Accurate Group but never paid the agent for the title evidence. Diverse Settlement did not pay for the title evidence it ordered from The Accurate Group for Mr. McLucas's Eagle Way property transaction, which closed in September 2022.

27. Diverse Settlement acted fraudulently or dishonestly:

   a. by misappropriating and converting custodial trust money to pay its own employees' salaries;

   b. by providing an escrow party—the seller of commercial property who questioned whether escrow funds were being properly held in trust—an account ledger falsely representing that no money was missing from the escrow account when, in fact, $76,361.01 had been "disbursed" from the account and is still missing; and

   c. by furnishing the purchasers of the Eagle Way property and their lender a Diverse Settlement title commitment that did not disclose filed tax and judgment liens against Mr. McLucas that burdened the property, when the Diverse Settlement escrow officer, Ms. Vavrus, knew of the existence of filed tax and judgment liens against Mr. McLucas from the title evidence obtained on the property.

28. Between October 2020 and April 2022, Diverse Settlement paid $21,278.81 to Dr. Jackson in return for his referral of title insurance business to Diverse Settlement.

***Violations against Mr. McLucas, Mr. Green, Ms. Vavrus, and Ms. Wallace***

29. After the WFG National Insurance termination, Mr. McLucas formed a business relationship with True Concept Title, a national title insurance

agency, so that Paradise Settlement and Pennsylvania Paradise Settlement could continue soliciting title insurance business.

30. Mr. McLucas made a work-share agreement with True Concept Title that entailed True Concept Title closing the title transaction and issuing the title insurance policies, with Paradise Settlement and Pennsylvania Paradise Settlement maintaining communications with lenders to receive title orders and process the closing packages.

31. Mr. McLucas and Mr. Green, while situated in Texas, misrepresented the True Concept Title arrangement to a mortgage lender, United Security Financial Corp. (USF). The misrepresentation was intended to give the impression Paradise Settlement and Pennsylvania Paradise Settlement could still act as a title agent so USF would be induced to continue to trust the title agents with escrow assets.

32. On February 18, 2020, Mr. McLucas and Mr. Green falsely represented to USF and its lender that True Concept was a DBA for Paradise Settlement Services, LLC. They also sent USF and its lender an assumed name certificate filed with the Texas Secretary of State that day falsely reflecting that True Concept was the assumed name for Paradise Settlement Services, LLC.

33. In May 2021, several non-Texas borrowers—who had had refinance loans recently closed—complained to USF that their prior mortgage loans were not paid off as part of the closing.

34. USF identified eight loan-refinance transactions for which just over $1.7 million was wired on behalf of USF to the credit of Paradise Settlement Services, LLC's National Escrow Account (Chase #7572) to fund the payoff of the prior mortgage loans. Mr. McLucas and Ms. Wallace are the Chase #7572 escrow account signatories. USF followed each of the eight wires with Instructions to Escrow Title/Closing Agent, Paradise Settlement Services, LLC (attn: Brandon Green at a Dallas address), and USF was provided a purported title commitment indicating WFG National Insurance would issue a title insurance policy after the transaction closed.

35. By coordinating with True Concept Title for Paradise Settlement and Pennsylvania Paradise Settlement to continue soliciting insurance business, Mr. McLucas engaged in the unauthorized business of insurance.

36. After the appointment termination, Mr. Green engaged in the unauthorized business of insurance by continuing to receive and collect premiums for title insurance and closing title insurance transactions.

37. Ms. Wallace engaged in the unauthorized business of insurance by receiving and disbursing money for title insurance transactions as an authorized signer of the Chase #7572 escrow account used in the eight USF transactions.

38. Both Mr. McLucas and Mr. Green acted fraudulently or dishonestly in misrepresenting the True Concept Title arrangement to USF to continue to sell insurance policies. Both sent USF an assumed name certificate falsely indicating that True Concept was a DBA for Paradise Settlement Services.

39. Both Mr. McLucas and Ms. Vavrus are guilty of fraudulent or dishonest practices in connection with the Eagle Way property transaction by not disclosing to the purchasers and their lender that there were tax and judgment liens filed of record against Mr. McLucas that burdened the Eagle Way property. To induce the underwriter Texan Title Insurance to issue a title insurance policy on the property, Mr. McLucas falsely swore in an Affidavit as to Debts and Liens that there were no judgment liens filed against him.

40. Ms. Vavrus, as escrow officer, did not safeguard the escrow money for the Eagle Way transaction and pay it to the parties who were entitled to it. She did not pay the $573.22 of title insurance premium owed to Texan Title Insurance. She did not pay the other title agent that furnished the title evidence, The Accurate Group, a $125 premium split owed for the title evidence. And the entire 85% split for the title agent's portion of the title insurance premium, $3,263.23, was disbursed to McLucas Holdings. Three days after McLucas Holdings received that money, Ms. Vavrus received $5,000 by Zelle from the McLucas Holdings account.

41. Mr. McLucas misappropriated or converted to his own use escrow monies from Paradise Settlement's escrow accounts, including:

a. a June 4, 2020, $30,000 disbursement to an account of Land Records Abstract;

b. a July 1, 2020, $21,300 disbursement to an account of Land Records Abstract; and

c. an August 18, 2020, $180,258.67 disbursement and an August 18, 2020, $5,000 disbursement to an account of Land Records Abstract.

42. Mr. McLucas misappropriated or converted to his own use escrow monies from Diverse Settlement's escrow accounts to pay a personal credit card of his as follows: on November 20, 2020 ($5,000), on December 2, 2020 ($2,500), on November 29, 2021 ($5,000), on December 22, 2021 ($5,000), on May 24, 2022 ($4,000), and on July 26, 2022 ($6,500). And on July 27, 2022, $8,101.50 was moved from a holding account for an escrow account to another account and then transferred from the account to a McLucas Holdings account, from which two $3,000 payments were made to Mr. McLucas's personal credit card.

43. Mr. McLucas misappropriated or converted to his own use escrow monies from Diverse Settlement's escrow accounts by withdrawing $10,000 and $15,079.21 of escrow funds in cash via two checks.

44. Mr. McLucas did not reimburse the $237,549.50 in escrow shortages—to which he contributed—until the Department's auditors discovered the defalcations.

***Violation against Dr. Jackson***

45. Between October 2020 and April 2022, Dr. Jackson received and accepted from Diverse Settlement $21,278.81 in return for his referral of title insurance business to Diverse Settlement.

***Sanction Considerations***

46. The violations of law proven were serious and involved acts of dishonesty, hurting consumers and the insurance industry by undermining public trust.

47. Paradise Settlement, Diverse Settlement, Mr. McLucas, Mr. Green, Ms. Vavrus, and Ms. Wallace are not honest, trustworthy, or reliable.

48. Respondents have not been provided with a statement of the amount of monetary penalties the Department proposes to impose against them in this proceeding, or for which specific violations.

49. There is no pleading or evidence to support a determination of how much of a monetary penalty should be imposed for any violation.

***Procedural Matters***

50. On June 26, 2023, Staff of the Department mailed a notice of hearing to Respondents. The notice of hearing contained a statement of the time, place, and nature of the hearing; a statement of legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statues and rules involved; and either a short, plain statement of the factual matters asserted or an attachment that incorporated by reference the factual matters asserted in the complaint or petition filed with the state agency.

51. The hearing in this case was held on October 9 through October 13, 2023, before Administrative Law Judge Linda J. Burgess in a hearing room at the State Office of Administrative Hearings at 300 West 15th Street, Austin, Texas, that allows parties and witnesses to participate in person and over Zoom video and telephone conference. Attorneys Casey Seeboth and Latoya Merida represented Staff. Mr. McLucas, Mr. Green, Ms. Varvus, and Dr. Jackson were self-represented. Diverse Settlement was represented by its majority shareholder, Mr. Green. Paradise Settlement and Ms. Wallace were not present at the hearing. The participating Parties stipulated to several facts, which were filed of record on October 11, 2023.

52. The record closed on January 11, 2024, after the participating Parties filed post-hearing briefs.

## VI. CONCLUSIONS OF LAW

1. The Department has jurisdiction over this matter. Tex. Ins. Code §§ 82.051-.052, 101.103, 541.107, 2502.051-.056, 2651.301, 2652.201; 28 Tex. Admin

Code § 9.1 (incorporating the Texas Title Insurance Basic Manual, available at https://www.tdi.texas.gov//title/titleman.html (Basic Manual).

2. The Commissioner of Insurance is the chief executive and administrative officer of the Department. Tex. Ins. Code § 31.021.

3. SOAH has authority to hear this matter and issue a proposal for decision with findings of fact and conclusions of law. Tex. Gov't Code ch. 2003; Tex. Ins. Code § 84.043.

4. Respondents received timely and sufficient notice of hearing. Tex. Gov't Code §§ 2001.051-.052.

5. Staff had the burden of proof to establish grounds for disciplinary action against Respondents. 1 Tex. Admin. Code § 155.427.

6. The standard of proof is by a preponderance of the evidence. *Granek v. Texas St. Bd. Of Med. Examn'rs*, 172 S.W.3d 761, 777 (Tex. App.—Austin 2005, no pet.).

7. To engage in title insurance business, a title agent must possess: (1) a title agent license issued by the Department; and (2) a valid underwriter appointment from at least one insurance company that issued title insurance policies. Tex. Ins. Code §§ 2651.001, .009-.010.

8. An act occurring in Texas that constitutes the "business of insurance" does not cease to be the "business of insurance" merely because it "affects a person in another state or jurisdiction." Tex. Ins. Code § 101.051(c).

9. Paradise Settlement violated Texas Insurance Code § 101.102 by engaging in the following acts that constitute the business of insurance, while lacking the authorization to do so:

   a. receiving or collecting premium for title insurance as described in § 101.051(b)(4) of the Texas Insurance Code; and

   b. closing transactions in Texas as described in §§ 101.051(b)(8) and 2501.005 of the Texas Insurance Code.

10. Mr. McLucas violated Texas Insurance Code § 101.102 by engaging in the following acts that constitute the business of insurance, while lacking the authorization to do so: soliciting, negotiating, procuring, or effectuating insurance as described in § 101.051(b)(6)(A) of the Insurance Code.

11. Mr. Green violated Texas Insurance Code § 101.102 by engaging in the following acts that constitute the business of insurance, while lacking the authorization to do so:

   a. receiving or collecting premiums for title insurance as described in § 101.051(b)(4) of the Texas Insurance Code; and

   b. closing transactions as described in §§ 101.051(b)(8) and 2501.005 of the Texas Insurance Code.

12. Ms. Wallace violated Texas Insurance Code § 101.102 by engaging in the following acts that constitute the business of insurance, while lacking the authorization to do so: receiving and disbursing money for title insurance transactions as described in §§ 101.051(b)(8) and 2501.005(b) of the Texas Insurance Code.

13. Staff failed to prove by a preponderance of the credible evidence that Ms. Vavrus engaged in the unauthorized business of insurance as described in §§ 101.051(b)(5) or 2501.006(a)(2) of the Texas Insurance Code.

14. Dr. Jackson engaged in the unauthorized business of insurance as prohibited by § 2502.056(a) of the Texas Insurance Code by receiving and accepting a commission or thing of value—$21,278.81—in exchange for his referring title insurance business to Diverse Settlement in violation of § 2502.051 of the Texas Insurance Code.

15. Diverse Settlement violated § 2502.051 of the Texas Insurance Code by paying Dr. Jackson a commission or thing of value—$21,278.81—in exchange for his referring title insurance business to Diverse Settlement.

16. Staff failed to prove by a preponderance of the credible evidence that Mr. Green violated § 2502.051 of the Texas Insurance Code.

17. Paradise Settlement and Diverse Settlement misappropriated or converted to the license holder's own use or illegally withheld money belonging to a title insurance company, an insured, or another person in violation of Texas Insurance Code § 2651.301(4).

18. Paradise Settlement and Diverse Settlement failed to maintain a separate and distinct accounting of escrow funds and escrow accounts separate and apart from all other accounts in violation of Texas Insurance Code § 2651.301(7).

19. Diverse Settlement violated Minimum Escrow Accounting Procedures and Internal Controls Numbers 1, 2, 3, 4, and 17 of the Basic Manual.

20. Diverse Settlement did not pay a title insurance company its share of the insurance premium in violation of Rate Rule R-2 of the Basic Manual.

21. Diverse Settlement did not pay another title agent, The Accurate Group, for furnishing and examining title evidence in violation of Procedural Rule P-24 of the Basic Manual.

22. Mr. McLucas misappropriated or converted to his own use or illegally withheld money belonging to a title insurance agent, direct operation, or another person in violation of Texas Insurance Code § 2652.201(4).

23. Staff failed to prove by a preponderance of the credible evidence that Mr. Green misappropriated or converted to his own use or illegally withheld money belonging to a title insurance agent, direct operation, or another person in violation of Texas Insurance Code § 2652.201(4).

24. Paradise Settlement and Diverse Settlement engaged in fraudulent or dishonest practices in violation of Texas Insurance Code § 2651.301(5).

25. Paradise Settlement engaged in deceptive practices prohibited under § 17.46(b)(1)-(3), (5), (12), and (24) of the Texas Business and Commerce Code and § 541.061 of the Texas Insurance Code.

26. Mr. McLucas, Mr. Green, and Ms. Vavrus engaged in fraudulent or dishonest practices in violation of Texas Insurance Code § 2652.201(5).

27. Staff failed to prove by a preponderance of the credible evidence that Ms. Vavrus failed to report to the Department a fraudulent insurance act that is a violation of a penal law in violation of Texas Insurance Code §§ 701.001(2) and .051.

28. The Commissioner is authorized to revoke the license of Paradise Settlement and the license of Diverse Settlement, including a license previously surrendered or forfeited. Tex. Insurance Code §§ 82.051, 2651.201(c).

29. The Commissioner is authorized to revoke the license of each of Mr. McLucas, Mr. Green, and Ms. Vavrus, including a license previously surrendered or forfeited. Tex. Insurance Code §§ 82.051, 2652.057(c).

30. Paradise Settlement's title insurance agent license should be revoked.

31. Diverse Settlement's title insurance agent license should be revoked.

32. The escrow officer license of Mr. McLucas should be revoked.

33. The escrow officer license of Mr. Green should be revoked.

34. The escrow officer license of Ms. Vavrus should be revoked.

35. The Commissioner should issue cease and desist orders directing Ms. Wallace and Dr. Jackson to immediately cease and desist from engaging in the violations identified in this Proposal for Decision. Tex. Ins. Code § 101.103(a)(1).

36. The Commissioner is authorized to assess monetary penalties against persons who have violated insurance laws but must first give the affected person written notice with a brief summary of each alleged violation and a statement of the amount of the recommended monetary penalty, and the notice must inform the person that they have a right to a hearing to contest the violation, penalty amount, or both. Tex. Ins. Code §§ 82.052(3), 84.021-.022, 84.041.

37. No monetary penalty—be it a monetary administrative penalty or monetary forfeiture—should be imposed against any of the Respondents.

Signed March 6, 2024.

ALJ Signature:

Linda J. Burgess

Linda J. Burgess
Presiding Administrative Law Judge

ACCEPTED
454-23-21634
4/24/2024 10:10:36 am
STATE OFFICE OF
ADMINISTRATIVE HEARINGS
Kevin Garza, CLERK

2024-8692

**Exhibit B**

FILED
454-23-21634
4/24/2024 10:06 AM
STATE OFFICE OF
ADMINISTRATIVE HEARINGS
Kevin Garza, CLERK

# State Office of Administrative Hearings

Kristofer S. Monson
Chief Administrative Law Judge

April 24, 2024

Cassie Brown
Commissioner of Insurance
Texas Department of Insurance

**VIA EFILE TEXAS**

**RE: SOAH Docket Number 454-23-21634.C; *Texas Department of Insurance v. Paradise Settlement Services, LLC et al.***

Dear Ms. Brown:

The undersigned Administrative Law Judge (ALJ) issued a Proposal for Decision in this case on March 6, 2024. On April 5, 2024, Respondents timely filed exceptions. Petitioner Texas Department of Insurance (the Department) filed no response to Respondents' exceptions.

After reviewing the exceptions filed by Respondents, the ALJ does not recommend any changes in the findings and conclusions of law contained in the Proposal for Decision. Accordingly, the ALJ recommends that the Proposal for Decision be adopted as written. Because the State Office of Administrative Hearings has concluded its involvement in this matter, the case is being remanded to the Department. *See* Tex. Gov't Code § 2003.051(a).

ALJ Signature:

Linda J. Burgess

Linda J. Burgess,
Presiding Administrative Law Judge

CC: Service List

**Office of the Secretary of State**
**Corporations Section**
**P.O. Box 13697**
**Austin, Texas 78711-3697**
**(Form 503)**

**Filed in the Office of the**
**Secretary of State of Texas**
**Filing #: 800888234 2/21/2018**
**Document #: 795238680004**
**Image Generated Electronically**
**for Web Filing**

## ASSUMED NAME CERTIFICATE
## FOR FILING WITH THE SECRETARY OF STATE

1. The assumed name under which the business or professional service is or is to be conducted or rendered is:

**First Commerical Title**

2. The name of the entity as stated in its certificate of formation, application for registration, or comparable document is:

**Paradise Settlement Services, LLC**

3. The state, country, or other jurisdiction under the laws of which it was incorporated, organized or associated is **TEXAS** and the address of its registered or similar office in that jurisdiction is:
**2260 Baldeagle Way, Grand Prairie, TX, USA 75052**

4. The period, not to exceed 10 years, during which the assumed name will be used is :
**12/31/2027**

5. The entity is a : **Domestic Limited Liability Company (LLC)**

6. The entity's principal office address is:

**401 E. Corporate Dr., Suite 290, Lewisville, TX, USA 75057**

7. The entity is not organized under the laws of Texas and is not required by law to maintain a registered agent and registered office in Texas. Its office address outside the state is:

8. The county or counties where business or professional services are being or are to be conducted or rendered under such assumed name are:

**ALL COUNTIES**

9. The undersigned, if acting in the capacity of an attorney-in-fact of the entity, certifies that the entity has duly authorized the attorney-in-fact in writing to execute this document. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument.

Paradise Settlement Services, LLC
**Name of the entity**

By: Christopher J McLucas
**Signature of officer, general partner, manager, representative or attorney-in-fact of the entity**

**FILING OFFICE COPY**