Case 24-31596 Claim 60-1 Filed 09/1?/24 Desc Main Document Page 1 of 49

6/21/2023 1:05 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 76823041
By: Gerardo Perez
Filed: 6/21/2023 1:05 PM

**CAUSE NO. ________________**

| | | |
|---|---|---|
| **WAYNE J. ADAMS, BONNIE BROWN, CLAUDE BRITTON, III, CURTIS DAVIS, CAREY D. YAZEED, DWANE BOREL, JAMES S. DARTEZ, LLOYD COX, and LYNDA L. JENKINS**<br>**Plaintiffs** | § | **IN THE DISTRICT COURT OF** |
| **V.** | § | **HARRIS COUNTY, TEXAS** |
| **McCLENNY, MOSLEY & ASSOCIATES, JAMES McCLENNY, ZACH MOSLEY, RICHARD WILLIAM HUYE, III, and TORT NETWORK, LLC**<br>**Defendants** | § | **_____ JUDICIAL DISTRICT** |

**<u>PLAINTIFFS' ORIGINAL PETITION</u>**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs, Wayne J. Adams, Bonnie Brown, Claud Britton, III, Curtis Davis, Carey D. Yazeed, Dwane Borel, James S. Dartez, Lloyd Cox, and Lynda L. Jenkins, complain of Defendants, McClenny, Mosley & Associates, James McClenny, Zach Mosley, Richard William Huye, III, and Tort Network, LLC, and would show as follows.

## DISCOVERY CONTROL PLAN

1. Based upon this Petition, this case should be controlled by a discovery control plan Level 3 pursuant to the Texas Rules of Civil Procedure, Rule 190.

## RULE 47 STATEMENT OF RELIEF

2. In accordance with Texas Rule of Civil Procedure 47, Plaintiffs seek monetary relief in excess of $1,000,000. This is not an expedited action.

**PARTIES**

3. Plaintiff, Wayne J. Adams, is a resident of Mandeville, Louisiana.

4. Plaintiff, Bonnie J. Brown, is a resident of Shreveport, Louisiana.

5. Plaintiff, Claude Britton, III is a resident of Ruston, Louisiana.

6. Plaintiff, Curtis Davis is a resident of Baton Rouge, Louisiana.

7. Plaintiff, Carey D. Yazeed is a resident of Gonzales, Louisiana.

8. Plaintiff, Dwane Borel is a resident of Jeanerette, Louisiana.

9. Plaintiff, James S. Dartez is a resident of Baton Rouge, Louisiana.

10. Plaintiff, Lloyd Cox is a resident of Benton, Louisiana.

11. Plaintiff, Lynda L. Jenkins is a resident of Covington, Louisiana.

12. Defendant, McClenny, Moseley & Associates, PLLC is a Texas Professional Limited Liability Company with its principal place of business in Harris County, Texas and may be served with citation by serving its registered agent, CT Corporation System, at 1999 Bryan St. Suite 900, Dallas, Texas, 75201.

13. Defendant, James McClenny is an attorney licensed to practice law in the State of Texas and doing business in Harris County, Texas and may be served at his principal place of business, Charger Law, PLLC at 380 Ridgelake Scenic Dr., Montgomery, Texas, or wherever he may be found.

14. Defendant, Zach Mosley is an attorney licensed to practice law in the State of Texas and doing business in Harris County, Texas and may be served at his principal place of business, McClenny Moseley & Associates, 1415 Louisiana St Suite 2900, Houston, Texas 77002, or wherever he may be found.

15. Defendant, Richard William Huye, III is a former attorney licensed to practice law in the State of Louisiana but who was employed by the Texas law firm McClenny Moseley & Associates and may be served with citation at 3500 N Hullen Street Metairie, Louisiana 70002, or wherever he may be found.

16. Defendant, Tort Network, LLC is an Arizona Limited Liability Company doing business in Texas under the trade name Velawcity and may be served with citation by serving MPBG Service, LLC at 1850 N Central Avenue Suite 1600, Phoenix, Arizona 85004.

**JURISDICTION AND VENUE**

17. This Court has subject matter jurisdiction over the controversy because the claims asserted in this petition arose, in whole or in part, in Texas and the amount in controversy exceeds the minimum jurisdictional limits of this Court.

18. This Court has personal jurisdiction over each Defendant because the acts and omissions complained of herein occurred in Texas, each Defendant does and/or did do business in the State of Texas, has committed a tort and violation of Section 82.0651 of the Texas Government Code, in whole or in part in Texas, is a resident and citizen of Texas, and/or has minimum contacts with the State of Texas during the period of time complained of herein. Venue is properly laid in Harris County, Texas because all or a substantial part of the events or omissions complained about herein occurred in Harris County, Texas.

19. More specifically, McClenny, Moseley & Associates, PLLC is a Texas law firm with its principal place of business in Harris County, Texas, and James McClenny and Zach Mosley are Texas lawyers with their principal place of business

in Harris County, Texas. Although Richard William Huye was a Louisiana lawyer, he was a partner of McClenny, Moseley & Associates, whose principal office is in Harris County, Texas. As demonstrated below, this law firm and its lawyers are alleged to have committed overt acts of barratry in Texas, such as the financing and directing of the barratry scheme from their offices in Harris County, Texas. Although Velawcity is an Arizona company, it contracted with these Texas lawyers in Texas, and received payments pursuant to those contracts from Texas, which are alleged to have constituted overt acts of barratry that violate Texas law.

## SUMMARY

20. This is a case arising out of an illegal and unethical conspiracy to commit barratry by Texas attorneys James McClenny and Zach Mosley of McClenny Moseley & Associates, PLLC ("MMA"), their Louisiana partner Richard William Huye, III, and an Arizona "marketing" company who contracted with them to provide the unlawful solicitation services. After Hurricane Ida destroyed the gulf coast, the lawyers undertook a brazen attempt to enrich themselves by accumulating a massive docket of clients using an illegal barratry scheme. The lawyers paid millions of dollars to the advertising firm Velawcity[1] to unlawfully solicit and deliver pre-screened clients and signed contingency-fee agreements to the firm at a rate of $3,500 per contract. The plaintiffs in this lawsuit are victims of this criminal barratry scheme, entitling them to seek civil remedies pursuant to Section 82.0651 of the Texas

[1] Defendant Tort Network, LLC does business as Velawcity.

Government Code, including penalties, disgorgement of attorney's fees paid, and attorney's fees incurred in pursuing this case.

## BACKGROUND

21. Hurricane Ida made landfall on August 29, 2021, causing catastrophic damage across South Louisiana. In the midst of this destruction, MMA, McClenny, Mosley and Huye ("the Lawyers") saw opportunity. Beginning in December 2021, MMA entered into five contracts with a "marketing" company named Velawcity to act as its agent and contact potential clients, pre-screen them to determine eligibility, and transmit to MMA the client's contact information and signed contingency fee agreements. In exchange, MMA would pay Velawcity a fee of $3,000 to $3,500 per client. All total, MMA paid Velawcity almost $14 million for signed contracts with approximately 4,628 clients. These contracts were executed by Velawcity and MMA in Texas.

22. Velawcity and MMA operated call centers pursuant to these agreements wherein they reached out to potential clients seeking to obtain employment for MMA and its lawyers. Velawcity and MMA initiated unsolicited telephone calls to individuals who either had not requested to be contacted, or those who had been tricked into providing their information. On these phone calls, the non-lawyers at Velawcity and MMA would tell individuals that they were contacting the individuals "on behalf of the Velawcity law firm located in Texas" or some similar variation of that statement. Individuals also received a large number of follow-up text messages and phone calls from Velawcity and MMA, pressuring them to sign an agreement with MMA.

23. MMA also contracted with construction companies like Apex and Summit construction to solicit clients. Apex and Summit would have its agents go door-to-door to neighborhood-to-neighborhood along the Louisiana coast to solicit clients, informing them that their property sustained damage and needed repair and that MMA could represent them. The construction companies would offer to perform the work, but only if the clients signed documents that included a work order and contingency fee agreement with MMA or an assignment of rights. The construction companies would then send the clients to MMA to handle the insurance claims.

24. Plaintiffs suffered damage to their homes or other properties as a result of Hurricane Ida. Thereafter, each of them was contacted by telephone, social media or electronic communication initiated by Velawcity, the construction companies, or MMA, in a live or electronically interactive manner, which solicited each of the Plaintiffs to hire MMA to handle their insurance claims. Plaintiffs entered into contingency fee contracts with MMA as a result of this unlawful and unethical in-person solicitation.

25. MMA filed lawsuits on behalf of Plaintiffs and thousands of other insurance clients in Louisiana federal court. The lawyers from MMA identified on the pleadings included Huye, but he and McClenny and Mosley were all reasonable for the litigation as partners of the firm. Some of the Plaintiffs herein made a recovery and paid MMA attorney's fees from the settlements they received. Others did not receive any settlement and lost communication with MMA when, eventually, MMA and its lawyers were suspended from filing cases in Louisiana courts, and MMA's Louisiana managing partner, Huye, was suspended from the practice of law.

26. MMA's downfall began in the fall of 2022 when multiple federal judges sanctioned MMA and its lawyers for their conduct in relation to the mass insurance filings. One federal judge in particular shed blinding light onto the "unprecedented tableau of misconduct" by MMA and its "modern-day case runner" Velawcity.[2] After multiple evidentiary hearings, the federal judge concluded that MMA and its attorneys "engaged in a pattern of misconduct on a scale likely never before seen … to enrich themselves with ill-gotten contingency fees paid to them by unwitting insurance companies ostensibly on behalf of named insureds that they and their firm did not represent."[3] The federal judge concluded:

> They have lied to numerous insurance carriers claiming to represent insureds who had never heard of them; they have invoked appraisal and even filed lawsuits on behalf of people they knew they did not represent; **they have, through non-lawyer agents in faraway places, directly solicited insureds who had never previously reached out to them**; they have filed cases in multiple districts on behalf of insureds they did represent in which they sued the wrong insurance company; **they have paid millions of dollars to an advertising firm [Velawcity] to act as their agent to "deliver" pre-screened clients and signed contingency-fee agreements to their firm at a rate of $3,500.00 per contract**; they have failed to disclose known conflicts to potential clients; and they have lied to the judge in open court.[4]

The federal judge concluded "that MMA has, through its relationship with [Velawcity], violated the Rules of Professional Conduct" and the laws prohibiting in-person solicitation of clients.[5]

---

[2] Exhibit 1, March 16, 2023 Order and Reasons, at 1.
[3] Exhibit 1, March 16, 2023 Order and Reasons, at 1.
[4] Exhibit 1, March 16, 2023 Order and Reasons, at 2 (emphasis added).
[5] Exhibit 1, March 16, 2023 Order and Reasons, at 21.

27. But those judicial findings were only the beginning. On February 17, the Louisiana Insurance Commissioner issued an emergency cease-and-desist order prohibiting MMA and its attorneys from engaging in unfair and deceptive insurance practices, concluding that the lawyers fraudulently misrepresented to multiple insurance companies that they had been retained by Louisiana policyholders to settle hurricane claims when they had not. On April 14, Moseley was suspended from practicing law for 90 days in the Eastern District of Texas, which is where the law firm's Houston headquarters is located. During an April 26 hearing, another federal judge recommended an order that Huye pay sanctions for filing lawsuits on behalf of property owners he did not represent, sometimes against the wrong insurance company. On May 2, the Louisiana Insurance Commissioner issued $2 million in fines against MMA and McClenny, Mosley and Huye – the maximum amount allowed by law – for fraudulent their behavior, including receiving and negotiating insurance settlement checks without the authority to do so from the insureds. The Louisiana Supreme Court suspended Huye from the practice of law in the state. The remaining MMA lawyers licensed in Louisiana vanished from the firm, as did McClenny, leaving thousands of MMA clients without any representation. Mosley is not licensed in Louisiana but is still attempting to obtain a fee on the cases under the table and "in the background."

**STATEMENT OF CLAIMS**

28. Section 82.0651 of the Texas Government Code allows a client "to void a contract for legal services that was procured as a result of conduct violating Section 38.12(a) or (b), Penal Code, or Rule 7.03 of the Texas Disciplinary Rules of

Professional Conduct … regarding barratry by attorneys or other persons" and to "recover from any person who committed barratry" statutory remedies. TEX. GOV'T. CODE §§ 82.0651(a), (b). The statute also allows a "person who was solicited by [the same prohibited conduct], but who did not enter into a contract as a result of that conduct, [to] file a civil action against any person who committed barratry" and recover statutory remedies. *Id.* at §§ 82.0651(c), (d).

29. Defendants, with intent to obtain an economic benefit, violated several provisions of the Texas Penal Code prohibiting barratry, including one or more of the following:

- Section 38.12(a)(2), which prohibits a person from soliciting employment, either in person or by telephone, for himself or another.
- Section 38.12(a)(4), which prohibits a person from paying or offering to pay third parties to solicit employment.
- Section 38.12(a)(6), which prohibits a person from accepting or agreeing to accept money or anything of value to solicit employment.
- Section 38.12(b)(1), which prohibits a person from knowingly financing the commission of barratry, including the personal solicitation of clients or the offering money to clients in exchange for legal representation.
- Section 38.12(b)(2), which prohibits a person from knowingly investing funds the person knows or believes are intended to

Case 24-31596 Claim 1799-3 Filed Main Document Page 10 of 49

further barratry, including the personal solicitation of clients or the offering money to clients in exchange for legal representation.

- Section 38.12(b)(3), which prohibits a person, who is a professional, from knowingly accepting employment within the scope of their license that resulted from improper personal solicitation.

30. Furthermore, MMA, McClenny and Mosley violated Texas Disciplinary Rule of Professional Conduct 7.03, which provides that "[a] lawyer shall not solicit through in-person contact, or through regulated telephone, social media, or other electronic contact, professional employment from a non-client, unless the target of the solicitation is: (1) another lawyer; (2) a person who has a family, close personal, or prior business or professional relationship with the lawyer; or (3) a person who is known by the lawyer to be an experienced user of the type of legal services involved for business matters." The rule provides that a lawyer solicits employment by making a "solicitation communication" which is "a communication substantially motivated by pecuniary gain that is made by or on behalf of a lawyer to a specific person who has not sought the lawyer's advice or services, which reasonably can be understood as offering to provide legal services that the lawyer knows or reasonably should know the person needs in a particular matter." The rule also provides that "[a] lawyer shall not pay, give, or offer to pay or give anything of value to a person not licensed to practice law for soliciting or referring prospective clients for professional employment, except nominal gifts given as an expression of appreciation that are neither intended nor reasonably expected to be a form of compensation for

recommending a lawyer's services." The comments to the rule provide that "a lawyer must not pay a lead generator that states, implies, or creates a reasonable impression that it is recommending the lawyer, is making the referral without payment from the lawyer, or has analyzed a person's legal problems when determining which lawyer should receive the referral."

31. MMA, McClenny and Mosley violated this rule by engaging in the conduct described herein. Specifically, MMA, McClenny and Mosley paid Velawcity and the construction companies they worked with more than $14 million to solicit potential clients, including Plaintiffs, who had not sought MMA's services, and who had no past relationship with MMA, nor any experience in legal matters.

32. Defendants are liable for civil conspiracy. Defendants were members of a combination of two or more persons and the object of the combination was to accomplish an unlawful purpose by unlawful means – the illegal and unethical in-person solicitation of Plaintiffs. The members, one or more of the Defendants herein, had a meeting of the minds on the object or course of action: to gain the representation of Plaintiffs by illegal and unethical solicitation. One or more of the members committed an unlawful, overt act in furtherance of the object or course of action. MMA, McClenny and Mosley paid Velawcity from their offices in Texas to carry out the unlawful in-person solicitation and financed and directed the unlawful in-person solicitation from their offices in Texas. Huye was employed by MMA, and accepted representation of clients whose cases who had been procured by barratry. Velawcity carried out the unlawful solicitation as an agent of MMA, and at the direction of

McClenny and Mosley. As such, Defendants are jointly and severally liable for each other's violations of Texas Government Code, Section 82.0651.

**DEFENSES TO LIMITATIONS**

33. To the extent necessary, Plaintiffs affirmatively plead the discovery rule and fraudulent concealment to any defense of limitations asserted by Defendants regarding any of Plaintiffs' claims or causes of action.

**DAMAGES AND PENALTIES**

34. Plaintiffs seek damages within the jurisdictional limits of this Court. Texas Government Code, Section 82.0651 provides that a person who prevails in a civil barratry action may recover from each Defendant statutory damages in the amount of $10,000 per violation per Defendant and reasonable and necessary attorney's fees as well as all fees and expenses paid under the contract, if any. TEX. GOV. CODE §§ 82.0651(b), (d).

35. Each of the nine Plaintiffs seek $40,000 from Velawcity (for a total of $360,000) because it committed four acts of barratry on each of them; it violated Section 38.12(a)(2) by soliciting employment in-person, it violated Section 38.12(a)(4) by paying or offering to pay its employees to solicit employment for MMA, it violated Section 38.12(b)(1) by knowingly financing the commission of barratry, and it violated Section 38.12(a)(6) by agreeing to accept money to solicit employment.

36. Each of the nine Plaintiffs seek $40,000 from Mosley (for a total of $360,000) because he committed four acts of barratry on each of them; he violated Section 38.12(a)(4) by paying or offering to pay Velawcity or the construction companies to solicit employment, he violated Section 38.12(b)(1) by knowingly

financing the commission of barratry, he violated Section 38.12(b)(2) by knowingly investing funds intended to further barratry, and he violated 38.12(b)(3) by knowingly accepting employment within the scope of his license that resulted from improper personal solicitation.

37. Each of the nine Plaintiffs seek $40,000 from McClenny (for a total of $360,000) because he committed four acts of barratry on each of them; he violated Section 38.12(a)(4) by paying or offering to pay Velawcity or the construction companies to solicit employment, he violated Section 38.12(b)(1) by knowingly financing the commission of barratry, he violated Section 38.12(b)(2) by knowingly investing funds intended to further barratry, and he violated 38.12(b)(3) by knowingly accepting employment within the scope of his license that resulted from improper personal solicitation.

38. Each of the nine Plaintiffs seek $40,000 from Huye (for a total of $360,000) because he committed four acts of barratry on each of them; he violated Section 38.12(a)(4) by paying or offering to pay Velawcity or the construction companies to solicit employment, he violated Section 38.12(b)(1) by knowingly financing the commission of barratry, he violated Section 38.12(b)(2) by knowingly investing funds intended to further barratry, and he violated 38.12(b)(3) by knowingly accepting employment within the scope of his license that resulted from improper personal solicitation.

39. Each of the nine Plaintiffs seek $40,000 from MMA (for a total of $360,000) because it committed four acts of barratry on them; it violated Section 38.12(a)(4) by paying or offering to pay Velawcity or the construction companies to

solicit employment, it violated Section 38.12(b)(1) by knowingly financing the commission of barratry, it violated Section 38.12(b)(2) by knowingly investing funds intended to further barratry, and it violated 38.12(b)(3) by knowingly accepting employment within the scope of its license that resulted from improper personal solicitation.

40. Therefore, Plaintiffs seek total penalties from Defendants in the amount of $1,800,000. In addition, Plaintiffs seek reasonable and necessary attorney's fees. *See* TEX. GOV. CODE §§ 82.0651(b)(5), (d)(3).

## VICARIOUS LIABILITY

41. Defendants are vicariously liable under a theory of partnership. Defendants, individually and through their respective firms or entities, formed various partnerships and entered into various agreements to associate for profit. Each Defendant received or had a right to receive a share of the profits, expressed intent to be a partner in the ventures, participated or had a right to participate in the control of the business, shared or agreed to share the losses of the business or liability, and/or contributed or agreed to contribute money. Accordingly, each Defendant is a member of the partnership formed for the purpose of carrying on the barratry activities described herein and each is liable for the conduct of one another as described herein all of which occurred within the course and scope of the partnership.

42. Defendants are also vicariously liable under a theory of joint enterprise or joint venture. Defendants were engaged in a joint enterprise or joint venture because they had express and implied agreements to carry out the actions outlined herein. Defendants had a community of pecuniary interest in that common purpose

and an equal right to direct and control the enterprise or venture. Defendants each took actions in furtherance of the purpose of the joint enterprise, which was to commit barratry.

**RESPONDEAT SUPERIOR**

43. Plaintiffs plead the legal theory of *respondeat superior* as between the individuals named herein and their respective entities. All of the acts carried out by the individuals were done while in the course and scope of their employment with their firms or corporations. Accordingly, the firms or corporations are jointly liable for all statutory penalties and attorney's fees, costs and other damages claimed herein.

**JURY DEMAND**

44. Plaintiffs desire to have a jury decide this case and make this formal request pursuant to Texas Rule of Civil Procedure 216. This request is filed more than thirty days before this case has been scheduled for trial and all fees have been paid.

**PRAYER**

WHEREFORE, Plaintiffs pray that after trial herein, that judgment be entered against Defendants jointly and severally as prayed for, that costs of court be taxed against Defendants, that Plaintiffs be given prejudgment as well as post judgment interest, and for such other and further relief, at law and in equity to which Plaintiffs may show themselves to be justly entitled, to which the Court believes Plaintiffs to be deserving, and for which Plaintiffs will ever pray.

Respectfully submitted,

**THE KASSAB LAW FIRM**

Lance Christopher Kassab
Texas State Bar No. 00794070
lance@kassab.law
David Eric Kassab
Texas State Bar No. 24071351
david@kassab.law
Nicholas R. Pierce
Texas State Bar No. 24098263
nicholas@kassab.law
1214 Elgin Street
Houston, Texas 77004
Telephone: 713-522-7400
Facsimile: 713-522-7410
Electronic Service: eserve@kassab.law

**ATTORNEYS FOR PLAINTIFFS**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

David Kassab
Bar No. 24071351
david@kassab.law
Envelope ID: 76823041
Filing Code Description: Petition
Filing Description: Plaintiff's Original Petition
Status as of 6/21/2023 1:52 PM CST

Associated Case Party: WayneJAdams

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Lance Kassab | | eserve@kassab.law | 6/21/2023 1:05:13 PM | SENT |

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **TRICIA RIGSBY FRANATOVICH** | **CIVIL ACTION** |
| **VERSUS** | **NUMBER: 22-2552** <br> **c/w 22-4927** |
| **ALLIED TRUST INSURANCE COMPANY** | **SECTION: "I"(5)** |

**ORDER AND REASONS**

## I. INTRODUCTION

When ego and greed become lawyers' guiding principles, we get cases like *Franatovich versus Allied Trust*. In these consolidated cases, the Court and the parties – indeed, our entire legal community – are confronted with an unprecedented tableau of misconduct by a Texas-based law firm, assisted in its misdeeds by an Alabama-based roofing contractor, and an Arizona-based, modern-day case runner.

We now know that the profound damage from Hurricane Ida – an historically destructive and life-altering event for many – was far from over when the storm finally drifted off the Atlantic Coast in September 2021. Thanks to out-of-state opportunists like the lawyers of McClenny, Moseley & Associates and their far-flung agents of chaos, the damage was only just beginning.

Since first appearing in this District less than a year ago, McClenny, Moseley & Associates, PLLC ("MMA") and its attorneys, in particular Zach Moseley ("Moseley") and R. William Huye, III ("Huye"), have engaged in a pattern of misconduct on a scale likely never before seen here. The record in these cases establishes that they have undertaken a brazen, multi-faceted campaign to enrich themselves with ill-gotten contingency fees paid to them by unwitting insurance companies ostensibly on behalf of named insureds that they and their firm did not represent.

They have lied to numerous insurance carriers claiming to represent insureds who had never heard of them; they have invoked appraisal and even filed lawsuits on behalf of people they knew they did not represent; they have, through non-lawyer agents in faraway places, directly solicited insureds who had never previously reached out to them; they have filed cases in multiple districts on behalf of insureds they <u>did</u> represent in which they sued the wrong insurance company; they have paid millions of dollars to an advertising firm to act as their agent to "deliver" pre-screened clients and signed contingency-fee agreements to their firm at a rate of $3,500.00 per contract; they have failed to disclose known conflicts to potential clients; and they have lied to the judge in open court.

If only this were hyperbole – alas, it is all established fact, proven by MMA's own statements and documents they have produced that are now in the record. I've been a lawyer for 25 years –I have never seen a clearer or more shameless series of violations of Federal Rule of Civil Procedure 11 and the Rules of Professional Conduct than what confronts us here. What is less clear is: What will be the ultimate impact of the violations and misconduct catalogued here on the Court and, far more importantly, on the policyholders of this District who continue to await resolution of their Hurricane Ida claims because of MMA's misconduct?

This Opinion and Order cannot answer that question, but it can and will determine the consequences (at least some of them) to be visited upon the attorneys who engaged in that misconduct. But first, the depressing facts.

## II. THE RELEVANT HISTORY OF THESE CASES

### *A. What We Know Thus Far – The Procedural History of Two Cases*

Hurricane Ida made landfall on August 29, 2021, causing catastrophic damage across South Louisiana. Trichia Franatovich (hereinafter "Franatovich" or "Plaintiff") suffered damage to her home in Hammond, Louisiana, and she thereafter timely initiated a claim with her insurer, Allied Trust Insurance Company ("Allied Trust"). (Rec. doc. 20-1 in Civil Action No. 22-cv-2552).[1] Unsatisfied with Allied Trust's handling of her claim, she retained the law firms Daly & Black, P.C. and Broussard + Williamson ("Plaintiff's Counsel") to represent her interests. (*Id.*). These lawyers sent a Letter of Representation ("LOR") to Allied Trust on October 29, 2021 (exactly two months after the storm) and thereafter negotiated with Allied Trust to resolve Franatovich's claim. (Rec. doc. 20-5). This LOR cited Plaintiff's address and Policy number – 809563. (*Id.*).

Unknown to Plaintiff or her counsel, MMA also sent a LOR to Allied Trust some six months later on May 6, 2022, stating, "Please be advised that McClenny Moseley & Associates, PLLC <u>has been retained</u> by Trichia Franatovich (hereinafter, "Client") for their [sic] above referenced insurance claim." (Rec. doc. 20-7) (emphasis added). The LOR sent by MMA cited the same policy number and date of loss as the one previously sent by Plaintiff's Counsel.

Confronted now with the prospect of dual representation, Allied Trust reached out to both law firms, who then cooperated to draft a "Law Firm Election Form," which they sent jointly to Franatovich for her signature and a definitive decision by her which law firm would represent her going forward. She chose the "team" of Daly & Black and Broussard +

[1] Unless otherwise noted, references to record documents in this Order will pertain to this case number only.

Williamson. (Rec. doc. 20-8 and 57 ("Transcript" or "Tr.") at 36-38). This choice was unsurprising, given that, by all accounts, she had never heard of MMA, much less had she retained them.

To indicate her choice, Franatovich checked the box next to the paragraph reading:

> By checking this box, I would like Daly & Black, P.C. to remain my law firm going forward, and to be my sole point of contact for all issues related to my claim. And understand that by making this election, McClenny Moseley & Associates, PLLC will no longer represent me, nor will it be responsible for the handling of my matter, including the filing or litigating of actual claims.

(Rec. doc. 20-8) (emphasis added). Franatovich signed the document on June 28, 2022. (*Id.*). She later wrote to this Court and testified at a hearing before the Court that, after filling out the election form, she received a call from Plaintiff's Counsel indicating that everything had been worked out with MMA and that Plaintiff's Counsel "would work out the rest with [MMA]." (Rec. doc. 35-1, Tr. at 8-9).

Notwithstanding Plaintiff's election to move forward with representation by Plaintiff's Counsel (as evidenced on a form co-authored by MMA's own named partner, Moseley), on July 8, 2022, MMA sent a direct, unsolicited communication to Franatovich via her cell phone. (Tr. at 42-44). Against all logic, that document opened:

> We would first like to take this opportunity to thank you once again to represent you in connection with your property-damage claim. Although we do not have your claim resolved quite yet, we are continuing to work diligently and steadfastly towards that goal. To that end, we now write specifically to request your immediate response regarding three (3) separate issues pertinent to our representation. . .

(Rec. doc. 27-1) (emphasis added). The "three separate issues" Plaintiff was asked to address were (1) which hurricane caused the damage to her home, (2) would she authorize MMA to

invoke appraisal on her behalf, and (3) would she authorize MMA to file a lawsuit on her behalf? (*Id.*).

Franatovich affirmed to the Court in writing and later testified that she believed that MMA was legitimately communicating with her based on Plaintiff's Counsel's statement to her that they were working out her claim with MMA. (Rec. doc. 35-1, Tr. at 8-9).

In any event, she checked the "Hurricane Ida" box and checked boxes giving MMA permission to (1) invoke appraisal on her behalf and (2) file a lawsuit on her behalf. (Rec. doc. 27-1).

Very shortly thereafter, on July 21, 2022, MMA – despite not having a retention letter or contingency-fee agreement with Franatovich – sent an email to Allied Trust invoking appraisal on her behalf. (Rec. doc. 20-9). This invocation was no doubt met with surprise by Allied Trust, whose representative emailed Daly & Black to inquire (1) why MMA was still claiming to represent Plaintiff and (2) why they had gone so far as to invoke appraisal on her behalf. (Rec. doc. 20-10). After receiving that inquiry, Plaintiff's Counsel emailed Moseley, asking MMA's assistance in explaining to Franatovich that its invocation of appraisal was "in error and without authority" and asking the firm's assistance in unwinding that invocation. (*Id.*). Moseley replied, "I'm on it." (*Id.*). This was on August 5, 2022.

As is evident from the record and as was confirmed at the hearing, MMA did nothing to follow up on this promise to help "unwind" its unauthorized invocation of appraisal on behalf of Franatovich. (Tr. at 37). In fact, it did much worse than nothing – on December 4, 2022, four months after Moseley promised to help unwind the improper appraisal invocation, MMA went ahead and filed suit on Franatovich's behalf in this district. (Rec. doc. 1, Civil Action No. 22-cv-4927). Given that there was already a pending suit filed on behalf

of Franatovich, the District Judge in the latter-filed case transferred it to the District Judge in the MMA-filed case, who then consolidated the two. (Rec. doc. 23).

Just before the cases were consolidated, Plaintiff's Counsel in the original case filed a Motion to Exclude and Nullify Appraisal, on the altogether unsurprising grounds that MMA was without authority to invoke appraisal. (Rec. doc. 20). Two days later, the District Judge ordered Huye to file a response to that motion on behalf of MMA (that order also directed Allied Trust to respond as well). (Rec. doc. 22). Two days after that, Huye filed a motion seeking to withdraw MMA as counsel in the consolidated action (rec. doc. 24), which motion was denied by the District Judge because the issue of dual representation was unresolved. (Rec. doc. 32).

On January 20, 2023, MMA filed its one-page response. (Rec. doc. 25). Incorrectly referring to MMA as "former counsel for the Plaintiff in this matter" and expressing "no opposition" to the relief sought in Plaintiff's motion, Huye, on behalf of his law firm, stated: "MMA would only like to point out, very simply, that Plaintiff provided written authorization to MMA on July 8, 2022, both to invoke the appraisal process and to file suit on her behalf." (*Id.*).

After receiving this response, the District Judge ordered MMA to produce evidence of that authorization (rec. doc. 26), which it did on January 22. (Rec. doc. 27). What MMA produced was the document referred to above that it had sent to Franatovich's cell phone <u>after</u> she had executed the Law Firm Election Form, choosing to be represented by Plaintiff's Counsel rather than MMA. (Rec. doc. 27-1).

The next day, Allied Trust weighed in, filing a 39-page opus in response to Plaintiff's Motion to Nullify, along with over 500 pages of exhibits. (Rec. doc. 28). While overly long,

Allied Trust's memorandum raised numerous allegations and arguments that caused the Court serious concern – serious enough that, along with the simple fact that MMA appeared to have filed a lawsuit on behalf of a person it did not represent, I thought it necessary to schedule a hearing on the entire fiasco. (Rec. doc. 33). In the Order setting that hearing, I ordered Huye and Moseley to appear in person and be fully prepared to answer a number of questions and to provide certain information, including:

> • Specific details concerning when and how Plaintiff retained MMA to represent her in connection with a claim for damages due to Hurricane Ida.
> • How many times have Huye or Moseley (or another attorney from MMA) directly spoken with or communicated by email with Plaintiff concerning their representation of her?
> • What attempts, if any, did MMA make to obtain the declarations page of Plaintiff's insurance policy? The Court expects written proof of any such attempts if they were, in fact, made.
> • When MMA sent its Letter of Representation (rec. doc. 20-7) to Allied Trust, did MMA actually represent Plaintiff or did it represent some other person or entity, including but not limited to Apex Roofing?
> • What was MMA's involvement in drafting and sending the Law Firm Election Form (rec. doc. 20-8) to Plaintiff?
> • When did MMA receive the executed Law Firm Election Form from Plaintiff?
> • Why did MMA contact Plaintiff on July 8, 2022 (rec. doc. 27-1) stating "We would first like to take this opportunity to thank you once again to represent you in connection with your property-damage claim" when Plaintiff had earlier executed the Law Firm Election Form indicating that she wished to be represented by a different law firm?
> • Did the law firm MMA contact Plaintiff on July 8, 2022 via email (rec. doc. 27-1) or was that email sent by some other person or entity acting on behalf of MMA?
> • Why was the July 8 letter sent to Plaintiff at the email address legaldocs@apexroofs.com? (*Id.*).
> • What is MMA's relationship with Apex Roofing in connection with any claim made or being made in connection with the home located at 40193 Adams Road, Hammond, LA 70403.
> • What did Moseley or MMA actually do to help "unwind the appraisal invocation" after Moseley informed Daly & Black he

was "on it" in an email sent to the latter on August 5, 2022? (Rec. doc. 20-10). Did Moseley or MMA contact (1) Allied Trust and/or (2) MMA's designated appraiser concerning its invocation of appraisal following that email?

• Was Velawcity involved in any way in Plaintiff's retention of MMA to represent her in connection with a claim for damages from Hurricane Ida? If so, counsel should be prepared to discuss in detail how that process played out in Plaintiff's case.

• How and why did MMA file suit on behalf of Plaintiff on December 8, 2022, after having been informed that MMA did not represent Plaintiff? *See* Civil Action Number 22-cv-4927,Rec. Doc. 1.

• How many lawsuits has MMA filed in this District in which they represent, not individual homeowners, but Apex Roofing?

• How many Ida claims associated with properties located in this District has MMA settled pre-suit in which Apex Roofing was the firm's actual client rather than the insured?

• Should MMA be responsible to reimburse Plaintiff and Defendant the costs of the appraisal it invoked on behalf of Plaintiff?

• Should MMA be responsible to reimburse the reasonable attorneys' fees and costs of Plaintiff's counsel in Civil Action No. 22-cv-2552 for litigating the present motion and of Allied Trust's counsel for litigating the present motion and participating in pre-litigation activities, including the appraisal invoked by MMA?

• Did MMA's filing of the Complaint in Civil Action No. 22-cv-4927 violate Federal Rule of Civil Procedure 11?

(*Id.*).

Following issuance of this Order, Franatovich, through Plaintiff's counsel, filed a response in the form of a letter, in which she advised of two salient facts: First,

> [o]n April 27th, 2022 a salesman by the name of Brandon from the Apex Roofing Company stopped and knocked at my door after seeing that I still had a blue tarp on my roof. He said that he could help me, he mentioned that they did have lawyers at their disposal that could contact the insurance company if necessary. I have witnesses that attest to the fact that I repeatedly explained to said salesman that I did Not require a lawyer as I had already retained Daly & Black and they were working with my insurance company to come to an agreement, so I signed paperwork with them to Hire them. It was Never my

> intention to hire McClenny, Moseley and Associates through the roofer.

(Rec. doc. 35-1).

Plaintiff went on to explain that, after signing the Law Firm Election Form choosing to be represented by Plaintiff's Counsel,

> [she] received a call from a Ms. Clarissa Rivera at Daly & Black Law Firm where she explained that with receipt of that letter they had everything "figured out with MMA and would work the rest out with them." I took that to mean that they were going to work with MMA to settle my claim. However, I have been VERY clear from the start that I wanted Daly & Black solely on my case.
>
> As such, in July of 2022 when [MMA] sent me the document in question I answered their questions and I signed said document electronically on my cellphone knowing that <u>we had sent the letter electing Daly & Black as MY chosen representation the month Before.</u>

(*Id.*) (emphasis in original).

On January 27, 2023, Huye filed a response memorandum addressing Allied Trust's arguments. (Rec. doc. 37). After yet again annoyingly referring to MMA as Plaintiff's former counsel, Huye mostly railed against Allied Trust's counsel, Matthew Monson ("Monson"), lodging a series of *ad hominem* attacks on him. As to the substance of the problems facing MMA and the Court that were set to be addressed at the upcoming hearing, Huye, after vaguely admitting to "some mistakes," argued primarily that, in invoking appraisal and filing suit on behalf of Franatovich, MMA was relying entirely on her electronic signature on the document it had sent unsolicited to her cell phone in July of 2022, <u>after</u> Plaintiff had elected to have Plaintiff's Counsel represent her (and after MMA had misrepresented to Allied Trust that Franatovich had retained the firm). (*Id.*).

It is crucial to understand that, at the time this document was sent to Plaintiff's cell phone by MMA, <u>she was not a client of MMA,</u> and MMA and Huye knew it. (Tr. at 36 (Huye:

"I believe [the election form] came back – I believe it was sometime in June, Judge.")). Franatovich had never signed a retention letter, and there had never existed a fee agreement or explanation of fees. She simply was not a client of MMA. Yet when asked by me to explain how his firm could nonetheless act on her behalf, Huye came into court pretending to rely entirely on Plaintiff's response to this unsolicited electronic message sent to her cell phone, as if that could establish a "legitimate" attorney-client relationship in Louisiana. And, all the while, he ignored the established fact that MMA had long ago lied to Allied Trust in its LOR, saying that Plaintiff had retained the firm.

On January 31, 2023, responding to this Court's Order to produce a copy of the Allied Trust Policy at issue in these cases, Plaintiff's counsel did so, and in the process produced two additional documents. These were a contract Plaintiff had signed with Apex Roofing & Restoration ("Apex") to repair her roof and an Assignment of Benefits ("AOB") Plaintiff signed in favor of Apex purporting to assign to Apex the rights to collect from Plaintiff's insurer a payment for the roof-repair work. I had counsel's email and the aforementioned documents entered into the record. (Rec. docs. 54-1, 54-2).

At 7:56 on the morning of the 10:30 a.m. hearing, Huye sent to the Court a number of documents, some of which the Parties and Court had seen before (the Apex contracts) but one of which we had not – a contingency-fee agreement with <u>Apex</u>, by which Apex retained MMA to pursue payment <u>on Apex's behalf</u> of insurance proceeds from Franatovich's policy based on the AOB Franatovich had signed with Apex. I had Huye's email and the Apex contract with MMA entered into the record. (Rec. docs. 41-1, 41-2).

The hearing then went forward.[2]

[2] A second hearing went forward March 3, 2023, which will be discussed below.

*B. How and Why This Happened – What We Learned at the First Hearing*

The February 1 hearing was quite a display of attorneys trying to dance on the head of a pin – a 90-minute tour-de-force of sophistry and paltering by Huye and Moseley, brazenly trying to justify their unprofessional, unethical, and untruthful conduct. As distasteful as it all is to relive, relive it we must. We begin with the fateful visit of Apex to Plaintiff's home.

**1. The Apex Scheme**

Plaintiff explained in her letter that she had initially met Apex when someone named Brandon knocked on her door and offered to help fix her roof. (Rec. doc. 35-1). Here's what we learned about that visit, what Apex did after that visit, and how it all fits into a larger scheme involving MMA, in which that firm routinely makes claims on behalf of homeowners they do not represent, negotiates settlements on their behalf without their knowledge, and takes an unauthorized fee for doing so.

The documents and MMA's statements on the record tell this story: After "Brandon" induced Plaintiff to sign a roof-repair contract and an AOB in favor of Apex on April 27, 2022, someone at Apex forwarded those documents to MMA. This occurred despite Plaintiff expressly informing Brandon "over and over again that I don't need a lawyer, I was already having legal counsel taking care of that, all I need is a roof." (Tr. at 6). Nonetheless, within a week, MMA then had Apex, not Franatovich, execute a 33% contingency-fee agreement[3] with MMA, with MMA as counsel and Apex as "Client." (Rec. doc. 41-1). That agreement was

[3] This is the only 33% MMA fee agreement I have seen, and I have seen my fair share of MMA fee agreements at this point. Every such agreement I have reviewed that purports to involve an individual homeowner provides for a 40% contingency fee. Our colleague, Judge James Cain in the Western District of Louisiana has expressed dismay over such a steep contingency fee in hurricane cases, calling MMA's 40% fee in hurricane cases "ridiculous" and "highway robbery." (Rec. doc. 8 at 28, Civil Action No. 6:22-cv-04565-JDC-DJA, W.D. La, filed Aug. 25, 2022). I agree with his assessment.

electronically signed by "Trish Drummond obo Trichia Franatovich" by someone with a mailing address in Hoover, Alabama and an email address of "legaldocs@apexroofs.com." (Rec. doc. 41-2).

Armed with this contract between itself and Apex, MMA then did something two days later that most lawyers (probably even most non-lawyers) would consider unthinkable – it sent a LOR to Allied Trust stating, among other things, "Please be advised that McClenny Moseley & Associates, PLLC has been retained by Trichia Franatovich (hereafter, "Client") as legal counsel for their [sic] above referenced insurance claim." (Rec doc. 20-7) (emphasis added). I confronted Moseley at the February 1 hearing on this blatant misrepresentation:

> THE COURT: The insurance company doesn't know who you represent. You've lied to them and you've told them you represent this lady when you don't.
> MR. MOSELEY: That was my call on . . .
> THE COURT: How many hundreds of times have you made this call?
> MR. MOSELEY: I don't know the specific number, but we believed that we are in the right by saying that we represented the interests of the insured, although we didn't put "interest" after the word. We know for a fact that insurance companies treat AOB holders different . . .
> THE COURT: You didn't say you represent her. You said she retained you. Categorically false.
> MR. MOSELEY: I agree.

(Tr. at 57).

The remainder of this LOR is a virtual checklist of what not to do as a Louisiana insurance lawyer. A good example arises from the exchange above, wherein Moseley tried to finesse an explanation for this misrepresentation by suggesting that MMA was merely trying to communicate to Allied Trust that it represented the "interests" of the actual homeowner. Besides being utter nonsense, this explanation is belied by both the facts

(Plaintiff didn't have any interests, having assigned them away) and other statements made in the LOR.

The AOB signed by Plaintiff only assigns Plaintiff's rights as they pertain to the roofing contract she signed with Apex. (Rec. doc. 54-2). Yet the LOR falsely states: "In addition to the above, this letter serves as notice that McClenny Moseley & Associates' representation relates to any and all claims made by our Client [previously identified as Franatovich] regarding their above referenced loss and property located at the address listed above." (Rec. doc. 20-7) (emphasis added).

The law firm then proceeds to inform Allied Trust – in **bold-faced** type no less – that it is "required" to list MMA as a payee on any future payments made under the policy. (*Id.*). This despite the obvious fact that Franatovich had not retained the firm, the firm did not represent her, and she had advised Apex (MMA's real client) that she already had lawyers.

This was only the beginning.

After falsely stating that "our Client continues to work diligently with undersigned counsel and their contractors, estimators, and other professionals to provide an Estimate Package for the storm-damaged property" (she actually didn't know MMA even existed, much less was she working with them "diligently"), MMA then fabricates the client's "strong preference to correspond via email," and directs that any future correspondence must be sent through the firm. (*Id.*).

This last bit emphasizes one insidious consequence of MMA's machinations – once the insurance carrier receives one of these illegitimate LORs from MMA, it will invariably cease communicating with the named insured and/or their real lawyer(s), who are actually

trying to resolve the claim. MMA's money grab doesn't just cause confusion, it actually delays the progress of any resolution of the homeowners' legitimate claim.

As for the confusion it causes, that effect is apparently not limited to the carrier and homeowner – it's clear from this record that the lawyers at MMA themselves, who are responsible for setting all this in motion, weren't able to function within the system they created. The kindest possible conclusion to be drawn here is that they failed somehow to comprehend the multiple notices they received that they were not Franatovich's lawyers and respond accordingly. Rather, they sent an LOR without a retention letter; invoked appraisal after Plaintiff elected representation by another firm; and filed a lawsuit after acknowledging they didn't represent her and promising they would help unwind that appraisal.

The question whether the filing of a lawsuit under these circumstances violated Rule 11 is not a close one.

### 2. This Conduct Violated Rule 11

Based upon the record evidence and statements made at both hearings, the Court finds that Huye, Moseley, and MMA (owing to its Apex Roofing scheme) failed to conduct a reasonable inquiry under the circumstances prior to filing suit in Civil Action No. 22-cv-4927.

The pertinent provisions of Rule 11 provide:

> (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument

for extending, modifying, or reversing existing law or for establishing new law;

(3) <u>the factual contentions have evidentiary support</u> or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

(c) Sanctions.

(1) In General. If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

. . . .

(3) On the Court's Initiative. <u>On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b).</u>

(4) Nature of a Sanction. A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Fed. Rule Civ. P. 11 (emphasis added).

The focus of the Court’s Rule 11 analysis in this case is solely on MMA’s inexplicable decision to file a federal lawsuit on behalf of Plaintiff knowing at all times they did not represent her and even acknowledging same to Plaintiff’s Counsel months before filing that lawsuit. (Rec. doc. 20-10).

This is no difficult exercise, if for no reason other than MMA admitted to the violation. (Rec. doc. 71). It ought to be obvious that a lawyer and law firm who file a lawsuit on behalf of a person they know they do not represent commit a facial violation of Rule 11. Huye, Mosely, and MMA did that here.

**3. An Appropriate Sanction under Rule 11**

Upon finding a violation of Rule 11, the Court's duty is to craft the "least severe sanction adequate to serve" the deterrent purposes of Rule 11. *Thompson v. Capital Sec. Servs., Inc.*, 836 F.2d 866, 878 (5th Cir. 1988). This would be an extreme challenge were the Court seeking to address every ethical lapse or rules violation demonstrated in this record. However, for reasons that will be explained below, I will limit this analysis solely to the appropriate sanction against MMA for filing the Franatovich lawsuit.

Regarding the "least severe sanction" analysis, the Fifth Circuit has advised:

> [w]hat is "appropriate" may be a warm friendly discussion on the record, a hard-nosed reprimand in open court, compulsory legal education, monetary sanctions, or other measures appropriate to the circumstances. Whatever the ultimate sanction imposed, the district court should utilize the sanction that furthers the purposes of Rule 11 and is the least severe sanction adequate to such purpose.

*Id.*

Following the production of the documents described above, I convened a second hearing for the purpose of determining whether and to what extent MMA should be sanctioned under Rule 11 for its misconduct in this case. (Rec. docs. 72, 73 ("Tr. II")). At that hearing, counsel for Huye, Moseley, and MMA echoed their previous concessions regarding both their violation of Rule 11 and the appropriateness of the fees and costs submitted by counsel for Franatovich and Allied Trust:

> THE COURT: . . . In reviewing that memorandum, it appears to me that MMA is essentially conceding a violation of Rule 11 in connection with filing that lawsuit. Is that a fair take?
> MR. GIBBENS: Yes, sir, Judge, and we're not contesting that the fees and costs have been submitted by the parties.

(Tr. II at 4).

Accordingly, I issued a Minute Entry following that hearing, which promised a more comprehensive Order and Reasons in due course (this one) but set forth what I had determined was the least severe sanction necessary to address the limited misconduct that is the focus of this ruling::

> While the Court will issue a more comprehensive Order and Reasons at a later date, this Minute Entry memorializes the monetary sanctions that this Court orders MMA to pay, along with the requirement that MMA produce additional documents to the undersigned. To wit, MMA shall remit to the following individuals/entities the following amounts within 15 days of this Order:
> (1) $26,138.31 to the Monson Law Firm for fees and costs incurred in connection with MMA's misconduct;
> (2) $4,875.00 to Broussard + Williamson for fees and costs incurred in connection with MMA's misconduct; and
> (3) $500.00 to Plaintiff Tricia Rigsby Franatovich for her costs incurred in missing work and attending the hearing on February 1, 2023.
>
> . . . .
>
> In addition to these monetary sanctions, MMA is hereby ordered to produce to the undersigned for *in camera* review no later than March 20, 2023:
> • A spreadsheet setting forth every pending Hurricane Ida lawsuit in which it is counsel of record in this district. That spreadsheet should include Plaintiff(s)' name(s), address, telephone number and email address; the defendant/insurance carrier; and the Policy number.
> • For each Hurricane Ida lawsuit filed by MMA in this District, the retention letter/agreement, contingency fee contract, and Letter of Representation ("LOR") sent by MMA to the plaintiff(s)' insurance carrier.
> • The spreadsheet shall be emailed to the undersigned at efile-north@laed.uscourts.gov. It shall also be included in hard copy with the additional documents, as described below.

> • The contracts, agreements, and LORs shall be produced in hard copy – bound, tabbed and sorted alphabetically, including a table of contents.

(Rec. doc. 72). Accordingly, MMA has until March 18, 2023 to remit to Franatovich, her counsel, and counsel for Allied Trust the amounts set forth above and until March 20, 2023 to provide to the Court the documents described above.

This will comprise the full extent of the Rule 11 sanction assessed against MMA for its improvident filing of the Complaint that initiated Civil Action No. 22-cv-4927. It does not, however, comprise all of the Court's findings in this matter, nor does it come close to addressing the additional misconduct revealed in these proceedings.

*C. Additional Misconduct and Whether It Warrants Further Discipline*

As I noted at the end of the March 3 hearing, I have identified numerous instances of misconduct beyond the improper filing of the *Franatovich* Complaint. I believe that misconduct, described in part below, merits further discipline but, as an individual Magistrate Judge of this District, I am not empowered to act in this regard. Rather, the question whether the conduct described herein warrants further discipline is one for the District Court and its Disciplinary Committee, to whom I intend to refer Huye and MMA for further review.

**1. The "Velawcity" Scheme**

Among the documents I ordered MMA to produce following the February 1, 2023, hearing were "each and every contract or agreement it has or has had with Velawcity for the past two years that would be applicable to advertising, marketing, or other services related to Hurricane Ida claims." (Rec. doc. 39). It had been suggested by Allied Trust's counsel in brief that MMA was paying Velawcity, a "lead generating" firm, $3,500.00 per "pre-screened

lead" or actual signed contingency-fee contract obtained by Velawcity and delivered to MMA through a marketing campaign operated by Velawcity. (Rec. doc. 28). Accordingly, at the February 1 hearing, I questioned Huye and Moseley directly about the firm's relationship with Velawcity, which Moseley described as an "advertising firm" that advertises and "helps us run a call center." (Rec. doc. 57 at p. 67).

In light of Allied Trust's allegations that MMA was paying Velawcity for "pre-screened leads" and signed contracts, I questioned Moseley and Huye on their relationship with that company, specifically whether MMA was paying on a per-plaintiff basis. Here are the pertinent passages:

> MR. MOSELEY: They're paid a marketing budget.
> THE COURT: I'm sorry?
> MR. MOSELEY: They're paid a marketing budget. Like if I want to spend a million dollars on Facebook, if I want to spend a million dollars on TV, if I want to spend a million dollars on radio, they're the ones that get me the –
> THE COURT: Is the budget dependent on how many of those people sign up or how many of these people they present to you as potential clients?
> MR. MOSELEY: No, that money goes to them and they spend it. I could come up with a big fat zero and I would never see a dollar back.
> THE COURT: No. But there's a dollar figure that you pay them. Monthly? Yearly? What is it?
> MR. MOSELEY: It's by my choice. I can enter into a one-month contract, three-month contract, whatever I want.
> THE COURT: And what services are you getting for that money?
> MR. MOSELEY: So they're professionals in negotiating rates. So I don't know how much a Facebook ad costs. That's not what I do. But we hire a company like that that tells me, "Hey, you shouldn't pay more than a dollar a click or 50 cents a click," or whatever it is. So we rely on them to make sure we're not getting screwed over by TV stations or radio stations. They negotiate the buys for us.

(*Id.* at p. 70) (emphasis added).

I then questioned them directly whether part of Velawcity's paid-for services included delivering leads to MMA:

> THE COURT: So you're saying that all of your leads are generated by McClenny Moseley directly, or are they generated by Velocity? Are some of them generated by Velocity?
> MR. HUYE: Velocity is an advertiser that we pay as a consultant to help us make –
> THE COURT: Do they send you leads?
> MR. HUYE: They don't send us leads. No, Judge.
> THE COURT: Velocity doesn't send you leads?
> MR. HUYE: No, Judge.

(*Id.* at pp. 75-76).

The documents MMA's counsel produced in response to my February 1 Order prove, not only that Moseley and Huye lied to me in open court about the firm's relationship with Velawcity, but that that relationship violates multiple ethical rules and, quite possibly, Louisiana law.

The Velawcity documents are in the record at record document 54-2. They indicate the following:

(1) In the span December 9, 2021 through August 2, 2022, MMA had in place with Velawcity five separate contracts.

(2) Each contract provides that, for a <u>per-claim fee</u>, Velawcity agrees that "[u]pon Velawcity's pre-screening intake review of a potential client's eligibility, Velawcity <u>will transmit to Law Firm, with potential client's consent, the potential client's contact information, fee agreement</u> and HIPAA release either by direct posting through established secure connection with Law Firm system or email."

(3) Each agreement further provides that "Law Firm agrees to pay Velawcity to prescreen and perform intake services and marketing <u>for a specific number of</u>

prescreened prospective clients for the Legal Claim listed below in the Order Summary."

(4) As for each contract, the "Order Summary" indicated that MMA was paying either $3,000.00 or $3,500.00 for signed contingency-fee agreements delivered to MMA by Velawcity.

(5) The five Order Summaries associated with these contracts indicate that in less than one year, MMA paid Velawcity $13,938,000.00 for signed contracts with clients that, by all accounts, no one from MMA had ever had any contact with.

(Rec. doc. 54-2) (emphasis added).

These documents establish to my satisfaction that Moseley lied to me when he stated that MMA did not pay on a per-client or per-contract basis. And they establish that Huye lied in open court when he stated – twice – that Velawcity did not provide MMA leads.

The contracts also tend to establish that MMA has, through its relationship with the company, violated the Rules of Professional Conduct and, quite possibly, Louisiana law.[4]

[4] Louisiana Revised Statute § 37:219 states:

Unlawful payments by attorneys; unlawful solicitation of employment for legal practitioners; penalty

A. It shall be unlawful for any attorney to pay money or give any other thing of value to any person for the purpose of obtaining representation of any client.

B.(1) No person, firm, or entity shall solicit employment for a legal practitioner. This Paragraph shall not apply to a communication governed by the Louisiana State Bar Articles of Incorporation, Article 16, Rules of Professional Conduct, Rule 7.1.

(2) This Section does not prevent any corporation or voluntary association formed for benevolent or charitable purposes and recognized by law from furnishing an attorney at law to give free assistance to persons without means.

C.(1) Whoever violates the provisions of this Section shall be fined not more than ten thousand dollars and imprisoned, with or without hard labor, for not less than ninety days nor more than five years.

(2) For a second and each subsequent violation of the provisions of this Section, the penalty shall be a fine of not more than twenty thousand dollars and imprisonment at hard labor for not less

In addressing these contracts at the March 3, 2023, hearing, MMA's counsel conceded the impropriety of these arrangements:

> THE COURT: I asked Mr. Huye and Mr. Moseley – I asked Mr. Huye directly at the last hearing: Does Velawcity provide leads to MMA? I asked him that question twice, and twice he said no, and that's not true. It's not true. Isn't that correct?
> MR. GIBBENS: I think that – that's the way that it worked, but, yes.
> THE COURT: I asked him a question: Does Velawcity provide leads to MMA? His answer was no. The true answer is yes, they do, or at least they did.
> MR. GIBBENS: I think that's correct.
> THE COURT: Okay. They also provide, according to this contract, signed contingency fee contracts. That's what the contract says. And MMA pays 3,000 to $3,500 per signed contingency fee contract, to use the verbiage of the contract, delivered to the law firm. That's what these contracts say.
> MR. GIBBENS: Yes, sir.
> THE COURT: You're telling me that the reality is something other than these five contracts?
> MR. GIBBENS: Well, the reality is that they paid – I mean, I'm not – I'm not trying to justify the contracts for the defendant, but the reality is –
> THE COURT: Why wouldn't you want to justify these contracts –
> MR. GIBBENS: I mean, my understanding is that this is not –
> THE COURT: It's a violation of Louisiana law.
> MR. GIBBENS: Yes, I understand that, Judge. Yes. I will say to the Court, we are not advertising with Velawcity anymore. That is done.
>
> . . . .
>
> THE COURT: Mr. Moseley told me at the first hearing, at the February 1st hearing, when I asked if the Velawcity budget was dependent upon how many people signed contracts for their services, and he said no. It sounds like you're trying to tell me the same thing. They were routinely sending this company millions of dollars, and I'm supposed to believe that it didn't matter how many contingency contracts they delivered to MMA?
> MR. GIBBENS: That is correct, Judge. Well, if they paid up front. Now, maybe, you know – I mean, I guess in hindsight, I mean, it

than three years and for not more than fifteen years without the benefit of parole, probation, or suspension of sentence for the first five years.

> did generate a lot of cases, you know, and maybe if it generated zero cases –
> THE COURT: They wouldn't have kept paying them if they weren't getting cases.
> MR. GIBBENS: Exactly. Exactly. That is my point.
> THE COURT: These documents say that MMA paid this company $13.938 million in less than a year.
> MR. GIBBENS: Then that is correct, yes.

(Rec. doc. 73 at pp. 5-9).

These records and responses to my questions in open court establish that both Huye and Moseley lied to the Court in responding to direct questions concerning MMA's relationship with Velawcity. Moreover, the documents and counsel's statements on the record indicate that what these lawyers lied about was their scheme to use an outside non-lawyer to directly solicit prospective clients and to obtain written contingency-fee contracts from those persons, at a rate of $3,000.00 or $3,500.00 per "pre-screened" client, before the "client" ever spoke with a lawyer associated with MMA, much less <u>any</u> lawyer. Such an "arrangement" violates the Rules of Professional Conduct.

### 2. Other Misconduct in this District

As noted earlier, following the February 1, 2023 hearing, I ordered MMA to produce certain documents, including a list of unfiled claims in this District in which MMA had misrepresented to an insurance carrier that it represented a homeowner when, in fact, it represented this Alabama-based roofing contractor. I also ordered MMA to produce a list of such claims that had already been settled in this district.

In response, Mr. William Gibbens ("Gibbens"), as MMA's counsel, produced two lists. The first was simply astonishing – 856 pending, yet unfiled, claims in which MMA had misrepresented to an insurance carrier that it represented a homeowner when, in fact, it

represented Apex. (Rec. doc. 54-1). Counsel also produced a list of nine such cases MMA had already settled. (*Id.*).

This record evidence establishes that MMA has made material misrepresentations more than 850 times to obtain an unauthorized fee based on claims made on behalf of persons the firm did not represent. And the firm has admitted and provided documents indicating that it settled nine such cases and actually received settlement checks in those cases. Many of those checks remain unnegotiated, and counsel is unsure where they even are today. (Rec. doc. 73 at pp. 12-13).

More concerning, at least one check appears clearly to have been negotiated by MMA by signing the homeowner's name without any authorization to do so. (*Id.*, rec. docs. 58-9, 69). In fact, when asked by MMA for permission to endorse the check after it was negotiated, the homeowner (whom MMA did not represent) refused. (Rec. doc. 69 at pp. 3-4). At the March 3, 2023 hearing, when asked about this unauthorized endorsement, counsel for MMA was unable to provide any explanation:

> MR. GIBBENS: . . . that should not have happened; and, yes, it's a problem. It's – we're trying to figure out how and why that happened, Judge.
> THE COURT: This check appears to have Mr. Bartel's name signed on the back –
> MR. GIBBENS: Yes.
> THE COURT: – and it looks like Mr. Moseley's stamped signature.
> MR. GIBBENS: Yes, sir.
> THE COURT: While you're trying to figure this out, try to figure this next thing out. This check was negotiated on August 15, 2022. They didn't even ask for Mr. Bartel's permission to negotiate it until September 19, 2022.
> MR. GIBBENS: Yes.
> THE COURT: I'm reading all of this correctly?
> MR. GIBBENS: Yes, you are, Judge. You are, Judge, and we understand. We understand that's a problem that needs to be addressed.
> THE COURT: There are a lot of problems.

MR. GIBBENS: I know.

(Tr. II at p. 15).

There is additional evidence in the record that MMA has settled cases in this District without the homeowner's consent, received payment on that settlement, yet cannot explain what happened to the settlement funds. MMA, through Gibbens, produced a "settlement breakdown" it claims was sent to a Ms. Rodrigue, to approve a $15,000 settlement between her insurer and Apex. (Rec. doc. 64 at pp. 17-18). She did not sign that approval. (*Id.*).

When asked what happened to the money received from the insurance company, Gibbens was unsure:

> THE COURT: Yeah, it's Mr. Rodrigue – its Ms. Rodrigue. It's another Apex settlement. It's the – it's the same thing. She – she didn't write it out; although, she also didn't sign it. So where is this money?
> MR. GIBBENS: So that money is – well, that is probably a check that's just still sitting.
> THE COURT: Sitting there like lots and lots and lots of checks.
> MR. GIBBENS: Yes. We know that.

(Rec. doc. 73 at p. 13).

Finally, I am aware of two cases in this District in which MMA has sued the wrong insurer. *See Allied Trust Co. v. Ripoll*, Civ. A. No. 22-cv-2811 (E.D. La.) and *Wallesverd v. State Farm Fire & Cas.*, Civ. A. No. 22-cv-4275 (E.D. La.). A review of the docket in the Western District of Louisiana reveals that Judge James D. Cain has found there that MMA filed multiple lawsuits against insurers who had no policy in place with the plaintiff. (Rec. doc. 14 in Civ. A. No. 21-cv-2258,W.D. La., filed July 30, 2021).

## III. CONCLUSION

To sum up the misconduct revealed by the filings, hearing, and documents produced in this case, the record indicates that MMA has been employing a roofing contractor to "sign

up" cases by inducing homeowners to sign Assignments of Benefits, which MMA then uses to misrepresent themselves to multiple insurers (over 850 times) as the policyholder's counsel, when they clearly were not. They have settled cases on that false premise, endorsed at least one check without authorization, and cannot today answer for where the money from other settlements went. And, in Franatovich, they filed a lawsuit on behalf of one of these homeowners they knew they did not represent. For this, the firm is being sanctioned herein pursuant to Rule 11.

The record also reflects that MMA has endorsed at least one check on behalf of a homeowner in this District without authorization to do so and has withheld settlement funds transmitted to the firm by various insurers on behalf of other homeowners.

In an entirely separate scheme, MMA has employed an out-of-state "runner" to solicit clients – and deliver signed contingency-fee agreements to the firm – at a rate of $3,500.00 per contract. The record evidence indicates that MMA has paid at least $13,938,000.00 for some 4,268 cases thus far. And when asked about this arrangement in open Court, Huye and Moseley lied about it.

Finally, records here and in the Western District of Louisiana indicate that MMA has filed multiple lawsuits against insurers who did not have policies in place with the named plaintiffs.

William Huye, Zach Moseley, and McClenny, Moseley & Associates have been nothing less than a scourge on this State and its citizens, the Court, and the Bar. The process of addressing that scourge is well underway: Huye was recently suspended by the Louisiana Supreme Court on an interim basis for threat of harm to the public. (*See In re: Richard William Huye, III*, NO. 2023-B-0277, La., Mar. 3, 2023). The law firm MMA and its attorneys

were likewise suspended by Judge Cain in the Western District of Louisiana on an interim basis, also for threat of harm to the public. (*See* Rec. doc. 14 in Civ. No. 21-cv-2258,W.D. La., filed July 30, 2021). I will be recommending Huye for similar discipline based upon the misconduct catalogued above.

In the meantime, the Court is directly addressing here that which it can – the overt and knowing violation of Rule 11 by Huye, Moseley, and MMA. Accordingly, as noted in the minute entry of March 3, 2023,

> MMA shall remit to the following individuals/entities the following amounts within 15 days of this Order:
>
> (1) **$26,138.31** to the Monson Law Firm for fees and costs incurred in connection with MMA's misconduct;
>
> (2) **$4,875.00** to Broussard + Williamson for fees and costs incurred in connection with MMA's misconduct; and
>
> (3) **$500.00** to Plaintiff Tricia Rigsby Franatovich for her costs incurred in missing work and attending the hearing on February 1, 2023.
>
> . . . .
>
> In addition to these monetary sanctions, MMA is hereby ordered to produce to the undersigned for *in camera* review no later than March 20, 2023:
>
> • A spreadsheet setting forth every pending Hurricane Ida lawsuit in which it is counsel of record in this district. That spreadsheet should include Plaintiff(s)' name(s), address, telephone number and email address; the defendant/insurance carrier; and the Policy number.
>
> • For each Hurricane Ida lawsuit filed by MMA in this District, the retention letter/agreement, contingency fee contract, and Letter of Representation ("LOR") sent by MMA to the plaintiff(s)' insurance carrier.

• The spreadsheet shall be emailed to the undersigned at efile-north@laed.uscourts.gov. It shall also be included in hard copy with the additional documents, as described below.

• The contracts, agreements, and LORs shall be produced in hard copy – bound, tabbed and sorted alphabetically, including a table of contents.

So ordered this 16th day of March, 2023, in New Orleans, Louisiana.

**MICHAEL B. NORTH**
**CHIEF MAGISTRATE JUDGE**