**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **In re:**<br><br>**CRISTÓBAL M. GALINDO, P.C.**<br>**D/B/A GALINDO LAW FIRM,**<br><br>**Debtor.**[1] | **Chapter 11**<br><br>**Case No. 26-90764** |

**DECLARATION OF CRISTÓBAL M. GALINDO IN SUPPORT**
**OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Cristóbal M. Galindo, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1. I am the President and 100% owner of Cristóbal M. Galindo, P.C. d/b/a Galindo Law Firm (the "Debtor" or "GLF").

2. I am generally knowledgeable and familiar with GLF's day-to-day operations, business and financial affairs, books and records, and the circumstances leading to the commencement of this chapter 11 case (this "Case").

3. I am authorized to submit this Declaration (this "Declaration") on behalf of GLF to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this Case and in support of GLF's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and the motions filed concurrently herewith (the "First Day Motions").[2]

---

[1] The Debtor's address is 18000 Groeschke Road, Suite A-7, Houston, Texas 77084, and the last four digits of the Debtor's federal tax identification number is 5859.
[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the First Day Motions, as applicable.

4. Except as otherwise indicated, I base the facts set forth in this Declaration on my personal knowledge, my review of relevant documents, information provided to me by GLF's management and advisors, and my experience concerning GLF's operations.

## I. OVERVIEW AND CORPORATE HISTORY

5. GLF is a Texas-based law firm incorporated as a professional corporation in the State of Texas on March 5, 2001.

6. In approximately 2021, the firm expanded from single personal injury and property damage matters into mass torts, beginning with Zantac[3] and moving into Roundup[4] and Camp Lejeune.[5] As part of its transition from single plaintiff cases, GLF developed and implemented a strategy and system for case acquisition.

7. At this time, GLF represents and is ethically responsible for over 20,000 clients nationwide.

8. Since its change in emphasis, GLF now focuses primarily on first-party insurance, personal injury, and mass tort claims. GLF is equipped to handle even the most complicated cases and has developed a strong, proven track record of identifying liable parties, calculating damages, and delivering results throughout the United States.

9. One of the primary methods GLF uses to expand its ability to represent clients is to enter into co-counsel arrangements with other law firms, whereby GLF and the other firm or firms will agree to a sharing of fees. Similarly, GLF will enter into co-counsel agreements

---

[3] The Zantac lawsuits allege that manufacturers failed to warn consumers that the heartburn medication contained or could degrade into dangerous levels of N-nitrosodimethylamine (NDMA), a probable human carcinogen linked to various types of cancer.

[4] In the Roundup lawsuits, thousands of plaintiffs allege that long-term exposure to the glyphosate-based weedkiller caused them to develop non-Hodgkin lymphoma and that the manufacturer, Monsanto (now Bayer), knew of the risks but represented the product as safe.

[5] The Camp Lejeune litigation allows veterans, their families, and civilian workers to seek compensation from the United States government for serious illnesses, including multiple forms of cancer and Parkinson's disease, caused by decades of exposure to toxic chemicals in the water supply at Marine Corps Base Camp Lejeune in North Carolina.

Case 24-90764 Document 182-1 Filed in TXSB on 08/26/24 Page 3 of 35

whereby GLF has the initial relationship with the client. Consistent with professional obligations, all clients are aware of, and agree to, the sharing of fees. Further, GLF continues to maintain responsibility for ensuring the clients are well-represented.

10. GLF will not enter into a Consent to Associate ("CTA")[6] with any firm where the engagement letter does not permit the retention of additional counsel or if the client has not specifically given their authority in writing to such agreement. Similarly, GLF will not enter into a Memorandum of Understanding ("MOU")[7] with any firm that does not have similar provisions in its engagement letters.

11. GLF's continency fee agreements are pure contingency fee agreements in that nothing is owed to GLF until there is a settlement or successful litigation and the client has received a distribution. In other words, GLF does not even have the right to reimbursement of expenses unless and until there is a recovery for the benefit of the client and the client has signed the release approving the settlement and the disbursement approving the attorney fee and reimbursable expense amount. The agreements that GLF has with its clients specifically permit GLF to enter into agreements with other counsel.

12. In order to reach potential clients, GLF incurs significant costs related to marketing and other similar expenses, primarily with Decibel (as defined below). GLF complies with the strictures of the American Bar Association related to attorney advertising. If cases are only within a single state, then GLF also takes such actions as are required by that state. As an example, claims related to a hurricane in Louisiana. In such an event, GLF has, and will continue to comply with, Louisiana ethical and disciplinary requirements for advertising or otherwise seeking clients.

---

[6] A CTA is generally executed on a case-by-case basis.
[7] An MOU is generally executed in connection with multiple or mass cases.

GLF does not share legal fees with any non-lawyers or entities controlled by non-lawyers. GLF does not pay or receive a fee purely for referral of a case with no comparable work.

13. GLF has various contracts with entities owned and/or controlled by Sergio P. De La Canal, including Decibel Legal Services, LLC and its affiliates (together, "Decibel"). Decibel is a marketing, administrative, and operational services firm that maintains a broad and multifaceted relationship with GLF across several distinct service areas. GLF and Decibel are parties to various master service agreements for Decibel to provide marketing, administrative services, data management, and case tracking services to GLF. Beyond these services, Damage Resources (defined below), an affiliate of Decibel, acts as GLF's private professional employer organization, managing all payroll, tax obligations, and related payments for GLF's operations. GLF also maintains an office lease and several commercial aircraft lease agreements with Decibel, through its affiliates Alpha Seven LLC, Pajaro Uno LLC, and Twin Diamond LLC.

14. Since inception, GLF has been successful in recovering millions of dollars for its clients.

## II. EVENTS LEADING TO CHAPTER 11

15. GLF is a party to a series of credit facilities, which were used to fund GLF's case acquisition and general operations. First, on May 9, 2024, GLF executed that certain *Credit Agreement* for $25,000,000 with GLF, together with Galindo & Mott, LLP, as "Borrower," CMG Funding 2024 LLC, as "Lender and Administrative Agent," Deer Finance, LLC ("Deer"), as "Servicer," and JBSL Legal Finance LLC ("JBSL"), as "Participation Administrator." Second, on February 26, 2025, GLF, together with Galindo & Mott, LLP, as "Borrower," CMG Funding 2025 LLC, as the Lender and Administrative Agent ("CMG"), Deer, and JBSL (collectively, the

"Lender") executed a second *Credit Agreement* for $45,000,000 (the "Credit Agreement"), which restructured and refinanced existing obligations to provide continued liquidity.

16. The Credit Agreement functioned as a revolving facility where the amount of available credit was tied to a "Borrowing Base." The Borrowing Base (as defined in the Credit Agreement) is calculated based on the estimated value of GLF's Eligible Cases (as defined in the Credit Agreement), including high-value mass tort dockets. The Borrowing Base can go up or down depending on the Lender's opinion as to the value of the GLF Eligible Cases. Creation of the Borrowing Base involved extensive discussions with the Lender, who had final approval on each Borrowing Base and any adjustments.

17. To receive funds under the Credit Agreement, GLF previously submitted periodic draw request to the Lender. These requests typically align with GLF's immediate operational needs, such as case-specific costs or general overhead.

18. GLF previously requested funds on a quarterly basis to manage the high-volume cash flow requirements of a nationwide mass tort practice.

19. Funding was contingent on GLF maintaining sufficient Borrowing Base, remaining in compliance with the covenants contained in the Credit Agreement and providing all information regarding GLF's cases to the Lender.

20. On or about February 13, 2026, Lender refused to advance any additional funds without new conditions and changes to funding requirements.

## III. OPERATIONAL STRUCTURE AND WORKFORCE

21. GLF is a professional corporation. I am the 100% owner. I also serve as President, Sole Director, and Sole Shareholder of the firm.

22. GLF's staffing is provided through an employee services agreement with Damage Resources LLC ("Damage Resources").[8] Through this agreement, GLF utilizes the services of approximately fifteen (15) staff members who provide essential support to the GLF's legal operations.

## IV. BANKING

23. GLF maintains its banking relationship entirely with JPMorgan Chase Bank, N.A. ("Chase") and utilizes a centralized cash management system (the "Cash Management System") to efficiently collect, transfer, and disburse funds generated by its legal operations. GLF utilizes eight (8) essential accounts:

a. Operating Account (ending in x8765): Serves as the primary account for general business expenses;

b. DACA – Deer Finance Account (ending in x6963): A designated "Receipts Account", allegedly subject to a Deposit Account Control Agreement ("DACA");

c. Primary IOLTA Account (ending in x0666): Used for the retrieval and holding of funds meant for case clientele;

d. TPC IOLTA Account (ending in x1757): A specialized IOLTA account developed for segregating specific case funds;

e. MMA IOLTA Account (ending in x6872): A specialized IOLTA account developed for segregating funds related to the MMA bankruptcy;

[8] Damage Resources is owned by Mr. De La Canal. Mr. De La Canal is a lawyer admitted to practice in Mexico. Mr. De La Canal is also the owner of Decibel. Decibel provides marketing and other services to GLF and hosts GLF's case management database. Decibel has a judgment against GLF for $10,277,103.10 plus post-judgment interest. Decibel has exercised an alleged right to garnish funds owed to GLF. Brenda Galindo, my spouse, is also an employee of Decibel. Mr. De La Canal also controls Alpha Seven LLC, which is the landlord for GLF's office.

Case 24-21-5-90 Document 18-2 Filed in TXSB on 08/21/24 Page 7 of 35

f. Collection Account (ending in x8872): A designated account for fee sharing in connection with a co-counsel agreement;

g. California IOLTA Account (ending in x2818): a specialized IOLTA account developed for segregating specific case funds in California;

h. TPC DOJ IOLTA Account (ending in x0699): a specialized IOLTA account developed for segregating specific case funds.

24. GLF's revenue primarily consists of attorney's fees derived from client recoveries, which are initially deposited into one of the five (5) IOLTA accounts. Funds belonging to clients are not deposited into any account other than an IOLTA account. Funds in the IOLTA accounts are not commingled with funds attributable to other operations or income.

25. The account ending in x6963 is governed by a DACA between CMG and Chase. Under this prior arrangement, the DACA Receipts Account receives portions of funds meant for GLF and automatically diverts 75% of those funds to the Lender as debt distributions while transferring the remaining 25% to the Operating Account to provide necessary cash for daily operations.

26. To maintain this integrated system, GLF incurs monthly bank fees of approximately $2,315.50.

## V. RESTRUCTURING STRATEGY AND OBJECTIVES

27. GLF intends to file a plan of reorganization.

28. GLF will seek a determination regarding the claims it may have against any co-counsel firms or other third parties.

29. GLF intends to ask the Court for authority to use any alleged cash collateral and to challenge any alleged security interest in funds in any IOLTA account or future recoveries from continued representation of any client.

30. GLF will explore whether there are avoidance actions which can be brought.

31. On August 18, 2026, GLF entered into that certain *Cristóbal M. Galindo, P.C. d/b/a Galindo Law Restructuring Support Agreement Term Sheet* (the "RSA Term Sheet") with Mr. De La Canal and his affiliated entities (collectively, the "SPD Parties"), containing the material terms of the proposed comprehensive restructuring of the existing debt and other obligations of GLF that will be consummated through a chapter 11 plan of reorganization in this Case. A true and correct copy of the RSA Term Sheet is attached hereto as **Exhibit A**.

## VI. THE FIRST DAY MOTIONS

32. To enable GLF to continue operating effectively and minimize potential adverse effects from the commencement of this Case, GLF is requesting certain emergency and other relief from the Court pursuant to the First Day Motions. I believe that the relief requested in each of the First Day Motions is in the best interests of GLF, its creditors, and its clients, and should be approved.

### A. Complex Case Procedures

33. Due to GLF having over 20,000 clients and numerous parties in interest, GLF seeks to implement the Procedures for Complex Cases in the Southern District of Texas (the "Complex Case Procedures") to ensure efficient case administration and notice.

34. GLF qualifies for complex case treatment under the Complex Case Procedures because: (1) the Debtor has total liquidated, non-contingent debt exceeding $10 million; and (2) there are more than 50 parties in interest in this Case.

35. Implementation of the Complex Case Procedures is necessary to minimize administrative burdens on the Court and the Debtor's estate, while ensuring all parties in interest receive adequate and organized notice of the proceedings.

36. Given that GLF represents over 20,000 clients nationwide, the administrative burden of noticing and claims management requires the expertise of a specialized agent. Accordingly, the Debtor has sought to employ Stretto, Inc. ("Stretto") as its claims, noticing, and solicitation agent.

**B. Motion to Extend Time to File Schedules and SOFA**

37. Contemporaneously with this Declaration, GLF has filed its *Emergency Motion For Entry of an Order Extending Time to File (I) Schedules of Assets and Liabilities; and (II) Statement of Financial Affairs* [ECF No. 5] (the "Motion to Extend Time"). By the Motion to Extend Time, GLF requests an additional thirty-day extension to file its required Schedules and SOFA (both as defined in the Motion to Extend Time). Given the volume of clients and parties in interest in this Case, completing the Schedules and SOFA within the 14-day statutory timeframe would be unduly burdensome and distract GLF's management team from necessary restructuring tasks.

38. In the ordinary course of its business, GLF maintains voluminous and complex books, records, and accounting systems. As a result of GLF's work as a law firm specializing in personal injury and mass tort lawsuits, it has a large number of current and former clients and records pertaining to same. In order to prepare the Schedules and SOFA, GLF will need to compile information from books, records, and documents, relating to its many current and former clients, in addition to information pertaining to its assets, creditors, and contracts with third-parties. Therefore, the requested extension is necessary for the ongoing operation of GLF.

39. The extension requested in the Motion to Extend Time will not prejudice creditors or other parties in interest. Instead, the requested extension will benefit all parties in interest because it will ensure that the Schedules and SOFA are accurate and complete. Accurate and complete Schedules and SOFA will promote the efficient administration of this Case. Even under the requested deadline, GLF anticipates filing its Schedules and SOFA in advance of the requested extended deadline.

**C. Utilities Motion**

40. GLF has filed its *Emergency Motion for Entry of Final Order (I) Authorizing Debtor's Adequate Assurance of Payment to Utility Companies, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service* [ECF No. 8] (the "Utilities Motion"). Uninterrupted utility services are essential to GLF's nationwide law practice.

41. In connection with the operation of the business, GLF obtains internet, telecommunications, and other similar services from various utility companies. A true and correct non-exhaustive list of GLF's utility providers is attached to the Utilities Motion. GLF pays its utility providers by credit card. Based on my review of GLF's books and records, GLF owes $18,437.22 on account of utility services charges incurred before the Petition Date. On average, over the last six months, GLF has paid approximately $6,520.36 each month for utility services, with some fluctuations depending on the season.

42. The continued provision of the utility services is necessary for GLF to continue operating. If any of GLF's utility providers cuts off services for any reason, even if only for a brief time, GLF's business would be severely disrupted and this disruption would divert attention away from GLF's reorganization efforts.

**D. Cash Management Motion**

43. GLF has filed its *Emergency Motion for Entry of an Order (I) Authorizing the Continued Use of the Cash Management System; (II) Authorizing Continued Use of the Existing Card Processing System; (III) Authorizing the Continued Use of Existing Business Forms and Bank Accounts; and (IV) Granting Related Relief* [ECF No. 9] (the "Cash Management Motion"). As detailed above, GLF utilizes accounts at Chase which are critical to its daily operations and client trust obligations.

44. GLF's Cash Management System consists of eight (8) accounts at JPMorgan Chase Bank, N.A., including five (5) IOLTA accounts essential for protecting client trust funds. Any disruption to this system would not only paralyze GLF's ability to fund its daily operations but would also risk interrupting critical disbursements to the firm's 20,000+ clients.

45. GLF seeks a waiver of the requirement to close existing accounts and open new debtor-in-possession accounts and authority to maintain its Cash Management System. Given the volume of GLF's transactions and the integrated nature of its banking with its case management software, forcing a transition to new account numbers would create an administrative bottleneck, increase the risk of accounting errors, and cause immediate and irreparable harm to the estate.

46. To maintain the integrity of these financial channels, GLF incurs approximately $2,315.50 in monthly bank fees.

**E. Motion to Limit Notice**

47. GLF has filed the *Emergency Motion for Entry of an Order (I) Implementing Procedures to Maintain the Confidentiality of Certain Client Information; (II) Authorizing the Debtor to Redact Certain Personal Identifying Information; (III) Modifying the Required Notice*

*Procedures Under the Bankruptcy Rules; (IV) Approving the Form and Manner of the Notice of Commencement; and (V) Granting Related Relief* [ECF No. 10] (the "Motion to Limit Notice").

48. In connection with its representation of its more than 20,000 former and current clients, GLF is required to maintain the confidentiality of certain protected health information of such clients. This is particularly true with respect to personal injury and mass tort cases in which the respective clients' medical conditions and records are a central part of such cases. In addition to protected health information, GLF also maintains information and records that are protected by the attorney-client privilege, and therefore must be kept confidential. The requirements of confidentiality with respect to protected health information and attorney-client privileged information may conflict with GLF's duty to disclose certain information under the Bankruptcy Code, including the duty to file a list of creditors under section 521(a)(1)(A) and the duty to file schedules of all assets and liabilities under section 521(a)(1)(B)(i).

49. In an effort to comply with both the confidentiality requirements of applicable healthcare privacy laws and the ethical rules applicable to attorneys, as well as the disclosure requirements of the Bankruptcy Code, GLF seeks authorization to maintain a separate schedule of claims as well as a separate creditor matrix that each redact the names and addresses of GLF's clients. Without such relief, GLF may unintentionally violate applicable healthcare privacy laws, contractual obligations, or ethical rules applicable to attorneys by fulfilling its duties under the Bankruptcy Code to disclose certain information. Any violations of such healthcare privacy laws, contractual obligations, or ethical rules applicable to attorneys could expose GLF to severe monetary penalties that could threaten GLF's ability to successfully reorganize and would unnecessarily jeopardize the privacy of GLF's clients.

50. In addition to redacting protected or confidential information about GLF's clients for legal reasons, redaction of such information is also necessary to protect GLF's clients from potential identity theft or other risks to the clients' safety and welfare. I believe that redaction of any personal identifying information of GLF's clients is fair, reasonable, does not impair the rights of any parties, and is within the Court's authority under the Bankruptcy Code.

51. Finally, by the Motion to Limit Notice, GLF seeks authority to modify the notice procedures provided by Bankruptcy Rule 2002 by authorizing GLF to provide service of documents in this Case to GLF's clients by email, where possible. GLF often communicates with its thousands of clients through electronic means, including by email. Given the volume of clients and parties in interest in this Case, I believe that email service is the most efficient and cost-effective manner by which service to such parties can be completed. If GLF is able to provide service to parties in interest by email, where possible, such authority will help alleviate administrative burdens and costs on GLF's bankruptcy estate and is therefore reasonable. Additionally, I believe that allowing Stretto to undertake all mailings and required notices as directed by the Court, the United States Trustee, the Bankruptcy Code, or the Bankruptcy Rules, will maximize efficiency in administering this Case and would ease any administrative burdens that would otherwise fall upon the Court and the United States Trustee.

**F. Cash Collateral Motion**

52. Contemporaneously with this Declaration, GLF filed its *Motion for Entry of an Order (I) Authorizing Debtor's Use of Cash Collateral, to the Extent Applicable, and (II) Granting Related Relief* [ECF No. 13] (the "Cash Collateral Motion").

53. Lender asserts that obligations under the Prepetition Credit Agreement are secured by a first-priority lien on substantially all of GLF's assets, including, but not limited to:

a. Case inventory and fees—all rights to attorney fees and expense reimbursements from GLF's client files (including the Zantac and TPC dockets).

b. Deposit accounts—all funds held in GLF's operating and merchant accounts, excluding funds in an IOLTA account.

c. General intangibles—all intellectual property, the "secret sauce" marketing models, and contractual rights.

54. Lender is not a law firm. Lender provides no legal services to any GLF client. Lender has no right to any share of any fees in an IOLTA account. *See* TEX. DISCIPLINARY RULES OF PROF'L CONDUCT R. 1.04(f),(g); 1.15. Settlement proceeds remain in an IOLTA account and any interest of GLF in funds in an IOLTA account is contingent until the client has executed any necessary documentation and been delivered its share of any settlement. In other words, GLF is not entitled to any funds in an IOLTA account unless and until the client has been paid and the fee is "earned." It is well settled that the lawyer's interest in a contingency fee contract is not vested until the contingency occurs and there is no legal or equitable interest in the contract until final judgment or settlement.[9] With few exceptions not applicable here, GLF is not permitted to share fees with a non-lawyer. *See* TEX. DISCIPLINARY RULES OF PROF'L CONDUCT R. 5.04.

55. In other words, while GLF did grant a security interest in funds deposited into an account which was subject to a Deposit Control Agreement, no security interest could attach to fees which have not yet been earned as that would constitute fee-sharing with a non-lawyer.[10]

---

[9] *See Floyd v. Dykeswill, Ltd. (In re Dykeswill, Ltd.)*, 365 B.R. 683, 687 (Bankr. S.D Tex. 2007)("the attorney does not receive a legal or equitable interest pursuant to a contingency fee contract until the contingency occurs").

[10] *See, e.g.*, Tex. Comm. on Prof'l Ethics, Op. 576 (Dec. 2006), https://tcle-web.s3.amazonaws.com/public/documents/Opinion-576_kSgMgPG.pdf. A true and correct copy of Opinion No. 576 is attached hereto as **Exhibit B**.

56. Further, the Credit Agreement appears to fall within Title 5 of the Texas Finance Code, Chapter 398 related to "Sales-based financing[11]".

57. Lender received approximately $182,000 dollars within the 90 days prior to the Petition Date. Pursuant to section 502(d) of the Bankruptcy Code, any claim of the Lender will not be allowed until all avoidable transfers are repaid and/or returned.

58. GLF also disputes the stated amount of the Lender's claim.

59. Reimbursement of expenses received after the Petition Date but incurred prior to the Petition Date are arguably cash collateral of Lender. To the extent that funds attributable to pre-petition expenses are reimbursed after the Petition Date ("Pre-Petition Expense Reimbursements"), GLF will segregate such funds subject to further order of the Court.

60. While GLF disputes the validity, priority, enforceability, perfection, extent, and amount of any asserted lien on funds in an IOLTA account, client funds, unearned attorneys' fees, post-petition-earned fees, future recoveries, and other disputed categories of property, GLF filed the Cash Collateral Motion out of an abundance of caution to avoid any disruption to its operations during the initial stages of this Case. By the Cash Collateral Motion, GLF seeks authority to use Cash Collateral, solely to the extent applicable, in accordance with the budget attached to the Cash Collateral Motion. The budget reflects projected disbursements of $127,957 for the interim period through the week ending September 18, 2026, and projected disbursements of $594,305 for the period through the week ending January 1, 2027. GLF is not seeking authority to use client funds held in IOLTA accounts for operating expenses.

---

[11] Sales-based financing is a transaction that is to be repaid "as a percentage of sales or revenue, in which the payment amount may increase or decrease according to the volume of sales made or revenue received by the recipient; or that "provides for a reconciliation process that adjusts the payment to an amount that is a percentage of sales or revenue". TEX. FIN. CODE § 398.001(8).

Case 24-31596 Document 1889 Filed in TXSB on 08/21/24 Page 16 of 35

61. The Budget was prepared by GLF with the assistance of its proposed financial advisor, Harney Partners, based on GLF's books and records, projected receipts, projected operating disbursements, and projected restructuring-related expenses. The Budget reflects the GLF's good-faith estimate of the limited cash required to maintain operations, preserve estate value, continue client-service functions, and administer this Case during the Budget period.

## VII. CONCLUSION

GLF has run the best process possible in light of the facts presented and is confident this path is the best path for the company and all stakeholders.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: August 26, 2026.

Respectfully submitted,

*/s/ Cristóbal M. Galindo*
Cristóbal M. Galindo
Cristóbal M. Galindo, P.C. d/b/a Galindo Law Firm
President, Sole Director, Sole Shareholder

# Exhibit A

## RSA Term Sheet

**SUBJECT TO FRE 408 & ITS EQUIVALENTS**
**PRIVILEGED AND CONFIDENTIAL**
*Execution Version*

# CRISTÓBAL M. GALINDO, P.C. D/B/A GALINDO LAW RESTRUCTURING SUPPORT AGREEMENT TERM SHEET[1]

**August 18, 2026**

This binding term sheet (the "Term Sheet")[2] between (i) Cristóbal M. Galindo, P.C. d/b/a Galindo Law Firm ("GLF" or the "Company"), and (ii) Sergio P. De La Canal ("SPD") and his affiliated entities (each, an "SPD Party, " collectively, the "SPD Parties," (as further identified below) and together with GLF, the "Parties") constitutes the material terms of the proposed comprehensive restructuring (the "Restructuring") of the existing debt and other obligations of GLF that will be consummated through a chapter 11 plan of reorganization (the "Plan") as part of GLF's anticipated chapter 11 bankruptcy case (the "Case") commenced under title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court").

This Term Sheet does not constitute—nor shall it be construed as—an offer with respect to a solicitation of acceptances or rejections as to any chapter 11 plan of reorganization of GLF. Any such solicitation will only be made in strict compliance with the Bankruptcy Code.

**THIS TERM SHEET IS PROVIDED IN CONFIDENCE AND MAY BE DISTRIBUTED ONLY WITH THE EXPRESS WRITTEN CONSENT OF GLF AND THE SPD PARTIES. FURTHER, NOTHING IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR DEEMED BINDING ON GLF OR THE SPD PARTIES.**

This Term Sheet is a settlement proposal in furtherance of settlement discussions amongst the Parties and is protected by Rule 408 of the Federal Rules of Evidence and any other applicable statutes and/or doctrines protecting the use or disclosure of confidential settlement discussions.

[1] This Term Sheet is subject to ongoing review by GLF, the SPD Parties, and each of their respective professionals, is subject to material change, and is being distributed for discussion purposes only. Moreover, the treatment set forth in this Term Sheet remains subject to ongoing discussion among the Parties.

[2] For the avoidance of doubt, this Term Sheet shall only become binding upon execution by all parties hereto.

| **Terms of the Restructuring** | |
|---|---|
| **Term** | **Description** |
| Venue | The Case shall be filed in the Southern District of Texas, Houston Division and designated as a Complex Case under the Procedures for Complex Cases in the Southern District of Texas. |
| Plan Filing | The chapter 11 plan of reorganization that reflects the terms of this Term Sheet (the "Plan") and the corresponding disclosure statement describing the Plan shall be filed no later than 30 days after commencement of the Case (the "Plan Filing Deadline") or such later date as mutually agreed to in writing by GLF and the SPD Parties.<br><br>Any Plan shall be in form and substance acceptable to the SPD Parties and shall be consistent with this Term Sheet in all material respects. |
| Confirmation Order Entered | The order confirming the Plan (the "Confirmation Order") shall be entered no later than November 30, 2026 (the "Confirmation Deadline") or such later date as mutually agreed to in writing by GLF and the SPD Parties.<br><br>The Confirmation Order shall be in form and substance acceptable to the SPD Parties and shall be consistent with this Term Sheet in all material respects. |
| Plan Effective Date | The Plan Effective Date shall occur no later than December 31, 2026. |
| Term Sheet Effective Date | This Term Sheet shall become effective and binding upon each of the Parties according to its terms on the date (the "Term Sheet Effective Date") when each of the Parties shall have executed and delivered counterpart signature pages of this Term Sheet. |
| Forbearance | On the Term Sheet Effective Date, as long as this Term Sheet has not been terminated pursuant to the terms hereof, each SPD Party agrees to forbear from pursuing any other remedies against GLF and Cristóbal M. Galindo ("Mr. Galindo") until the Plan Effective Date. For the avoidance of doubt, this forbearance shall not constitute a waiver of any kind with respect to defaults or remedies available under the |

| | |
|---|---|
| | SPD Agreements with respect to GLF, Mr. Galindo or any other party. |
| Termination | Upon the occurrence of any of the events set forth below (each, a "<u>Termination Event</u>"), this Term Sheet may be terminated by the applicable Party as specified below:<br><br><u>SPD Parties Termination Events</u>. The SPD Parties may terminate this Term Sheet upon written notice to GLF and its counsel (email being sufficient) upon the following:<br>i. a receiver is appointed over GLF or substantially all of its assets;<br>ii. the Case is not filed in the Venue by September 1, 2026;<br>iii. GLF obtains debtor-in-possession financing from any person or entity other than the SPD Parties;<br>iv. the Plan Effective Date shall not have occurred by December 31, 2026, or such later date as mutually agreed to in writing by GLF and the SPD Parties;<br>v. the Bankruptcy Court enters an order converting the Case to a case under chapter 7 of the Bankruptcy Code or enters an order dismissing the Case;<br>vi. the Bankruptcy Court enters an order appointing a trustee or an examiner with expanded powers in the Case;<br>vii. GLF breaches any obligation under this Term Sheet, which breach is not cured within five (5) days after the SPD Parties provide written notice of such breach, solely to the extent such breach is curable;<br>viii. GLF does not file the Plan by the Plan Filing Deadline, or GLF otherwise withdraws or revokes the Plan after filed;<br>ix. GLF does not obtain confirmation of the Plan by the Confirmation Deadline;<br>x. GLF commences any adversary proceeding against any of the SPD Parties;<br>xi. the Bankruptcy Court or other governmental authority with jurisdiction issues any order, injunction, or other decree or takes any other action, which has become final and non-appealable and which restrains, enjoins, or otherwise prohibits the implementation of the Restructuring in a way that cannot be remedied by GLF or the effect of |

| | |
|---|---|
| | which would be to (A) render this Term Sheet or any portion unenforceable or enjoin or otherwise restrict the consummation of the Restructuring in a way that cannot reasonably be remedied by GLF or (B) render the Plan incapable of consummation on the terms set forth in this Term Sheet;<br>xii. the entry of an order by the Bankruptcy Court or any other court with appropriate jurisdiction denying confirmation of the Plan, or if the Confirmation Order is reversed, vacated, modified, amended, supplemented, or in any way altered by order of a court of competent jurisdiction;<br>xiii. GLF files any Plan or Disclosure Statement that is inconsistent with the requirements of this Term Sheet and such inconsistency has not been agreed to or waived by the SPD Parties in accordance with the terms hereof;<br>xiv. the Bankruptcy Court enters an order in the Case terminating GLF's exclusive right to file a plan pursuant to Bankruptcy Code section 1121 or such exclusivity period otherwise expires;<br>xv. the Bankruptcy Court enters an order authorizing or directing the assumption, assumption and assignment, or rejection of an executory contract or unexpired lease, other than any assumption or rejection that (A) is approved in advance by the SPD Parties or (B) is expressly contemplated by the Plan;<br>xvi. GLF files any motion seeking to reject or to assume and assign any SPD Agreement without the approval and consent by such applicable SPD Party;<br>xvii. GLF files any objection or challenge to a claim of the SPD Parties, including but not limited to the PEO Claims, the Pre-Petition SPD Claims, Post-Petition SPD Claims, Sergio De La Canal Claims, or the SPD Judgment Claim;<br>xviii. If any amounts garnished pursuant to the Writ of Garnishment After Judgment issued on March 6, 2026 by Marilyn Burgess, District Clerk, Harris County Texas, are ordered to be paid, repaid, or otherwise returned, in whole or in part, from any SPD Party to any other party;<br>xix. the Company files with the Bankruptcy Court any motion or application seeking authority to sell any |

assets without the prior written consent of the SPD Parties.

GLF Termination Events. GLF may terminate this Term Sheet upon written notice delivered to the SPD Parties and their counsel (email being sufficient), upon the following:

i. any of the SPD Parties breaches any obligation under this Term Sheet which breach is not cured within five (5) days after GLF provides written notice of such breach from GLF, solely to the extent such breach is curable;
ii. GLF exercises its Fiduciary Out hereunder; or
iii. the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling or order declaring this Term Sheet or any portion hereof to be unenforceable or enjoining or otherwise restricting the consummation of the Restructuring in a way that cannot reasonably be remedied by GLF.

Mutual Termination. This Term Sheet may be terminated by mutual agreement among (a) GLF and (b) the SPD Parties for any reason at any time.

Termination Upon Consummation of the Restructuring. This Term Sheet shall terminate automatically without any further required action or notice upon the occurrence of the Plan Effective Date.

Automatic Termination. The Term Sheet shall terminate automatically, without any further action required by any Party, upon any court of competent jurisdiction entering a final, non-appealable judgment or order declaring the Term Sheet to be invalid, void, or otherwise unenforceable in any respect.

Effect of Termination.
Upon the termination of this Term Sheet, this Term Sheet shall be of no further force and effect and each Party hereto shall be released from its commitments, undertakings, and agreements under or related to this Term Sheet and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that they would have been entitled to take had they not entered into this Term Sheet.

| | |
|---|---|
| | Notwithstanding the foregoing, any claim for breach of this Term Sheet that accrued prior to the date of termination of this Term Sheet and all rights and remedies of the Parties hereto shall not be prejudiced as a result of termination.<br><br>If this Term Sheet is terminated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights and any and all of their remedies, claims, and interests, including, without limitation, the right to challenge the validity of any such termination. Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Term Sheet and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms. This Term Sheet shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.<br><br>Following the commencement of the Case, GLF acknowledges and agrees that the termination of this Term Sheet upon the occurrence of a Termination Event, and the giving notice of termination by any SPD Party pursuant to this Term Sheet, is not a violation of the automatic stay pursuant to section 362 of the Bankruptcy Code (and GLF waives the applicability of the automatic stay to the giving of such notice); *provided that* nothing herein shall prejudice GLF's rights to argue that the termination of this Term Sheet was not proper under its terms. |
| Fiduciary Out | Notwithstanding anything to the contrary herein, but without prejudice to the rights of the SPD Parties to terminate this Term Sheet upon any Termination Event: (A) GLF shall be permitted to take (or permitted to refrain from taking) any action with respect to the Restructuring to the extent GLF determines, in good faith based upon advice of outside counsel, that taking such action, or refraining from taking such action, as applicable, is reasonably required to comply with applicable law, including its fiduciary duties, and may take such action without incurring any liability, and (B) the owners, officers, and employees of GLF shall not be required to take any action inconsistent with applicable law. |

| | |
|---|---|
| Management Compensation & Employment Terms | On the Term Sheet Effective Date, Mr. Galindo shall execute an employment agreement to serve as Chief Executive Officer / Managing Attorney of GLF as a W-2 salaried employee.<br><br>Mr. Galindo's annual compensation shall be fixed at $800,000 per annum (payable in accordance with standard payroll) until such time that the Plan is confirmed and such Plan Effective Date has occurred.<br><br>Mr. Galindo shall be entitled to receive equity distributions, shareholder draws, or discretionary bonuses, but in no event in excess of 25%, so long as obligations under the Plan are kept current and not in default. |
| **Plan Definitions** | |
| **Defined Terms** | **Definition** |
| AWD | "AWD" means Aspey, Watkins & Diesel, Attorneys at Law, P.L.L.C. and all parties acting directly or indirectly through AWD including without limitation, Whitney Cuningham in both his individual capacity as a managing partner of AWD, and all affiliates, partners, officers, directors, and related parties. |
| CMG | "CMG" means CMG Funding 2025 LLC (as lender and administrative agent), Deer Finance, LLC (as servicer), and all affiliates, officers, directors, members, managers, and related parties. |
| Convenience Class | "Convenience Class" shall mean the class of General Unsecured Creditors holding allowed claims in the maximum dollar amount of $10,000 or less, or who hold claims in a greater amount in the aggregate but who otherwise make an election (the "Convenience Class Election") on the ballot for voting on the Plan to have such claim treated as a claim in the Convenience Class. |
| Convenience Class Creditors | "Convenience Class Creditors" means General Unsecured Creditors holding allowed claims of $10,000 or less, or that otherwise make the Convenience Class Election. |

| | |
|---|---|
| Plan Effective Date | "Plan Effective Date" means the effective date of the confirmed Plan. |
| Galindo & Mott | "Galindo & Mott" means Galindo & Mott, LLP, the Texas law firm in which GLF owns a 50% interest. |
| General Unsecured Creditors | "General Unsecured Creditors" shall mean creditors holding allowed general unsecured claims. For the avoidance of doubt, General Unsecured Creditors shall specifically exclude CMG, SPD Parties, K&K, Galindo & Mott, and AWD. |
| K&K | "K&K" shall mean Krause and Kinsman Group, LLP, Krause & Kinsman Law Firm LLC, and Krause and Kinsman Group, LLC, collectively, and all affiliates, officers, directors, partners, managers, members, attorneys, and related parties, specifically including Adam Krause and Robert Kinsman. GLF owns a 50% interest in Krause and Kinsman Group, LLP, a Washington D.C. law firm, doing business as Galindo D.C. |
| PEO Claims | "PEO Claims" shall mean all claims of Damage Resources LLC under the January 1, 2025 *Professional Employer Organization (PEO) Client Service Agreement* that arise in whole or in part after the Case's petition date. |
| Pre-Petition SPD Claims | "Pre-Petition SPD Claims" shall mean all claims of any SPD Party which arise in whole or in part before the Case's petition date, other than the SPD Judgment Claim and the Sergio De La Canal Claims. |
| Post-Petition SPD Claims | "Post-Petition SPD Claims" shall mean all claims of any SPD Party which arise in whole or in part on or after the Case's petition date, other than the PEO Claims. |
| Reorganized GLF | As reorganized pursuant to the Restructuring, GLF shall be referred to as "Reorganized GLF". |
| Sergio De La Canal Claims | "Sergio De La Canal Claims" shall mean all amounts owed by GLF to Sergio De La Canal arising prior to the petition date. |
| SPD Agreements | "SPD Agreements" means the agreements between GLF and the SPD Parties, including, but not limited to: |

**SUBJECT TO FRE 408 & ITS EQUIVALENTS**
**PRIVILEGED AND CONFIDENTIAL**
*Execution Version*

| | |
|---|---|
| | 1. *Commercial Aircraft Lease Agreement* [N776CD], effective September 4, 2020, with Triple Crown Aviation LLC;<br>2. *Master Services Agreement* – Camp Lejeune, effective October 13, 2022, with Decibel LLC;<br>3. *Commercial Aircraft Lease Agreement* [N502LA], effective March 14, 2023, with Twin Diamond LLC;<br>4. *Independent Contractor Services Agreement*, effective June 28, 2023, with Decibel LLC;<br>5. *Independent Contractor Services Agreement*, effective March 1, 2024, with Sergio De La Canal;<br>6. *Master Services Agreement* – Zantac, effective June 2, 2024, with Decibel LLC;<br>7. *Master Services Agreement* – Houston Storm, effective July 23, 2024, with Decibel LLC;<br>8. *Master Services Agreement* – PDiddy, effective October 6, 2024, with Decibel LLC;<br>9. *Master Services Agreement* – TPC, effective October 21, 2024, with Decibel LLC;<br>10. *Professional Employer Organization (PEO) Client Service Agreement*, effective January 1, 2025, with Damage Resources;<br>11. *Master Services Agreement* – Southern California Wildfires, effective January 13, 2025, with Decibel LLC;<br>12. *Commercial Aircraft Lease Agreement* [N434SC], effective May 1, 2026, Pajaro Uno, LLC; and<br>13. *Texas Commercial Lease Agreement*, effective May 1, 2026, with Alpha Seven LLC. |
| SPD Parties | "SPD Parties" means Sergio P. De La Canal, individually; Decibel Legal Services LLC; Damage Resources LLC; Damage Reports, LLC; LevelUp Law, LLC; Alpha Seven LLC; Pajaro Uno, LLC; Twin Diamond LLC; Triple Crown Aviation LLC; and any future-formed entity owned by Sergio P. De La Canal that does business with GLF, and all officers, directors, and/or managers and members, as applicable, of the forgoing. |
| SPD Judgment Claim | "SPD Judgment Claim" means all amounts awarded pursuant to the Final Judgment Confirming Arbitration Award signed on December 1, 2025 by Judge Garrison in the 157th Judicial District Court of Harris County, Texas (Cause No. 2024-89003). |

**SUBJECT TO FRE 408 & ITS EQUIVALENTS**
**PRIVILEGED AND CONFIDENTIAL**
*Execution Version*

| **Plan Treatment** | |
|---|---|
| **Claim or Interest** | **Treatment** |
| SPD Parties Claims | SPD Parties Claims shall be treated under the Plan as follows:<br>• All SPD Agreements shall be assumed by GLF on the Plan Effective Date pursuant to 11 U.S.C. § 365. Cure claims related to the SPD Agreements shall be treated and payable as follows:<br>  ○ PEO Claims arising and accruing on or after the petition date and for the duration of the first six full months of the Case shall be treated as an allowed Administrative Claim, but shall be paid in full on the first business day of the seventh (7th) full month following the Petition Date.<br>  ○ PEO Claims arising and accruing on the first business day of the seventh (7th) full month following the Petition Date and thereafter shall be paid net 60.<br>  ○ Post-Petition SPD Claims (other than PEO Claims) shall be treated as allowed Administrative Claims, but shall be paid in full from the Plan Payment Account on the first business day following the eighteen (18) month anniversary of the Plan Effective Date.<br>  ○ All Pre-Petition SPD Claims, in the allowed amount of $4,999,860.50, shall be treated and paid as allowed General Unsecured Claims.<br>  ○ The SPD Judgment Claim shall be treated and paid as an allowed General Unsecured Claim.<br>• The Sergio De La Canal Claims, in the allowed amount of $930,929.23, shall be treated and paid as allowed General Unsecured Claims. |
| Convenience Claims | Allowed Convenience Class Claims will be paid in full, without interest, over 18 months on a quarterly basis from funds in the Plan Payment Account. |
| General Unsecured Claims | General Unsecured Creditors who hold allowed General Unsecured Claims and who are not Convenience Class Creditors shall be paid in full, without interest, over the lesser of 7 years or the life of the Plan through *pro rata* distribution of funds in the Plan Payment Account. |

| | |
|---|---|
| Galindo & Mott Claims | All unexpired and executory contracts, memorandums of understanding, and other agreements with Galindo & Mott will be assumed. Cure Claims shall be paid in full without interest on the first business day following the eighteen (18) month anniversary of the Plan Effective Date from the Plan Payment Account.<br><br>Galindo & Mott Claims unrelated to executory contracts shall be paid in full, without interest, over the lesser of 7 years or the life of the Plan through *pro rata* distribution of funds in the Plan Payment Account. |
| CMG Claims | All allowed CMG Claims will be paid in full over the lesser of 7 years or the life of the Plan through *pro rata* distribution of funds in the Plan Payment Account. The amount of the claim will be agreed to by CMG and the Parties hereto or otherwise determined by the Court. Interest will accrue at the federal judgment rate solely to the extent it is agreed or otherwise determined that some or all of the CMG Claims are allowed secured claims. |
| K&K Claims | All unexpired and executory contracts, memorandums of understanding, and other agreements with K&K will be assumed. Cure Claims shall be paid in full on the first business day following the eighteen (18) month anniversary of the Plan Effective Date from the Plan Payment Account. K&K Claims unrelated to executory contracts shall be paid in full, without interest, over the lesser of 7 years or the life of the Plan through *pro rata* distribution of funds in the Plan Payment Account. |
| AWD Claims | Any AWD claims, to the extent allowed by entry of a final order, shall be paid without interest through *pro rata* distribution of funds in the Plan Payment Account over the lesser of 7 years or the life of the Plan with the first payment, if any, due on the first business day that is one calendar year after entry of the final order allowing any AWD claim. |
| Equity Interests | Cristóbal M. Galindo will retain his equity interests in Reorganized GLF. |
| Executory Contracts | All unexpired leases and executory contracts not expressly assumed shall be rejected on the Plan Effective Date. |

| **Plan Implementation** | |
|---|---|
| Post-Plan Effective Date Trade Payables to SPD Parties | Payment of any post-Plan Effective Date amounts arising or otherwise accruing, other than PEO Claims (as treated above), with any SPD Party during the first eighteen (18) months following the Plan Effective Date shall be deferred in full and payable in a single lump sum on the first business day following the eighteen (18) month anniversary of the Plan Effective Date from the Plan Payment Account. Thereafter, payment terms for any post-Plan Effective Date obligations owed to any SPD Party shall be on net 60 terms. |
| Plan Payment Account | The Plan shall provide that 55% of (i) GLF's net revenue of all recoveries from any claims asserted on behalf of clients, directly or indirectly, (ii) any payments attributable to GLF's interest in Galindo & Mott and Krause and Kinsman Group, LLP; and (iii) any payments attributable to recoveries where GLF is counsel of record or otherwise pursuant to a Memorandum of Understanding, Co-Counsel Agreement, or such other agreement with other attorneys (collectively, the "Litigation Recoveries") shall be transferred from the applicable IOLTA account to a separate, segregated account established for purpose of making plan disbursements (the "Plan Payment Account"). |
| Waiver of Default Interest and Make-Whole | The Plan shall provide for a waiver of any provision in CMG's February 2025 credit and loan documents with GLF and Galindo & Mott relating to default interest or a make-whole fee. |
| Appointment / Duties of Disbursing Agent | The Plan shall provide for the appointment of a disbursing agent (the "Disbursing Agent"), which individual or entity shall be independent of Mr. Galindo, GLF, or any of the SPD Parties; *provided however*, that SPD and Mr. Galindo shall consult and be entitled to appoint a mutually agreeable Disbursing Agent in their sole discretion.<br><br>The Disbursing Agent will be paid reasonable compensation from funds on deposit in the Plan Payment Account. The duties of the Disbursing Agent shall include, but will not necessarily be limited to, preparing a report of all funds deposited into and disbursed from the Plan Payment Account, verification that Litigation Recoveries have been properly paid into the Plan Payment Account, disbursing |

| | |
|---|---|
| | payments as required under the Plan, and maintaining a reasonable reserve amount in the Plan Payment Account. |
| Reorganized GLF Corporate Existence | Reorganized GLF shall be registered, formed, or organized in accordance with the applicable laws of Puerto Rico. |
| Releases & Injunctions | Effective as of the Plan Effective Date, the Parties shall grant customary mutual releases of all pre-petition and post-petition claims.<br><br>For the avoidance of doubt, releases shall expressly exclude AWD, Priority Responsible Funding, LLC ("PRF"), Casey Gard, Bruce Copeland, and any related non-released defendants (collectively, the "Excluded Parties").<br><br>All estate claims, preference actions, and fraudulent transfer claims against the Excluded Parties under Sections 547, 548, and 549 of the Bankruptcy Code shall be preserved and transferred, and any recoveries on account of such preserved claims, shall be transferred to the Plan Payment Account for the benefit of creditors as set forth herein. |
| Other Plan Terms | The Plan shall contain all other customary terms reasonably acceptable to GLF and the SPD Parties. |

*[signature page to follow]*

**SUBJECT TO FRE 408 & ITS EQUIVALENTS**
**PRIVILEGED AND CONFIDENTIAL**
*Execution Version*

**<u>AGREED TO</u>:**

**CRISTÓBAL M. GALINDO, P.C.**
**D/B/A GALINDO LAW**

By: DocuSigned by: Cristobal M. Galindo
763AB7419A374A4...
Name: Cristóbal M. Galindo
Title: President/Owner

**SPD PARTIES**

By: Sergio P. De La Canal
Sergio P. De La Canal (Aug 18, 2026 16:53:17 PDT)
Name: Sergio P. De La Canal
Title: Authorized Representative/Owner

# <u>Exhibit B</u>

## Opinion No. 576

**The Professional Ethics Committee**
**For the State Bar of Texas**
**Opinion No. 576**

**December 2006**

## QUESTION PRESENTED

May a lawyer who represents a client in a contingent fee personal injury case enter into an agreement with a lending company owned by non-lawyers under the terms of which the lending company would agree to reimburse the lawyer for litigation expenses in the case as incurred and the lawyer would agree to repay, in the event of a recovery in the lawsuit, the amounts advanced plus a funding fee equal to a fixed percentage of any amount recovered in the case but subject to an agreed maximum?

## STATEMENT OF FACTS

A lawyer represents a client on a contingent fee basis in a personal injury case. Because the client cannot afford to fund the litigation expenses necessary to prosecute the lawsuit, the lawyer must advance all such expenses. A lending company owned by non-lawyers has offered to fund the litigation expenses in the case for the promise of a funding fee contingent on the client's recovery in the lawsuit. The agreement between the lending company and the lawyer would call for the lending company to reimburse the lawyer for litigation expenses actually incurred and for the lawyer to repay the amounts advanced for expenses plus a funding fee equal to a fixed percentage of any amount recovered (net of litigation expenses but not legal fees) when and if the client recovered in the lawsuit. The maximum amount of the funding fee would be limited by a cap equal to a specified multiple of the litigation expenses incurred in the case. For example, under an agreement where the funding fee percentage was 1% and the cap amount was equal to two times the litigation expenses, if the client's recovery net of expenses was $1,000,000 and the litigation expenses were $50,000, then the funding fee that the lawyer would be obligated to pay to the lending company would be $10,000 (1% of $1,000,000) and the agreed cap would not limit the amount of the funding fee.

The agreement would be solely between the lawyer and the lending company. The client would not be a party to the contract and would not owe money or have any other obligations to the lending company. The agreement would provide that the lending company would have no special rights to any of the proceeds of the lawsuit, such as a lien or security interest in the client's portion of the recovery or in the lawyer's contingent fee. Instead, the agreement would provide that the obligation to pay the lending company would be merely the general unsecured obligation of the lawyer. The agreement would provide further that the funding fee would not be charged to the client as an expense. In the example above, the litigation expenses advanced would be repaid from the proceeds of the recovery, but the $10,000 funding fee would be paid by the lawyer (presumably, but not necessarily, from his portion of the contingent fee). Additionally, the agreement between the lawyer and the lending company would require full disclosure to the client of the agreement and consent from the client for the lawyer to enter into the agreement. The agreement would also require the lawyer to maintain independence of judgment as to all aspects of the lawsuit and control of the litigation. The lending company

would not be permitted to have any control of the lawsuit or contact with the client and would not be permitted access to any confidential information except as was necessary to determine the expenses to be reimbursed and the amount of the client's ultimate recovery.

**DISCUSSION**

Whether the proposed arrangement constitutes a fee-sharing agreement with a non-lawyer is the primary concern here. Rule 5.04(a) of the Texas Disciplinary Rules of Professional Conduct clearly prohibits lawyers from sharing legal fees with non-lawyers. Rule 5.04(a) provides that, with exceptions not here relevant, "A lawyer or law firm shall not share or promise to share legal fees with a non-lawyer . . . ." The principal reasons for this prohibition are to prevent solicitation by lay persons of clients for lawyers and to avoid encouraging or assisting non-lawyers in the practice of law. See Comment 1 to Rule 5.04(a).

Recently, in a context similar to the one presented here, this Committee, citing Rule 5.04(a), determined that the Texas Disciplinary Rules would be violated by a lawyer who agreed, as a term of a loan agreement with a finance company that was loaning the lawyer money for litigation expenses in a contingent fee case, to pay to the finance company a percentage of his contingency fee in addition to the principal and interest on the loan. Professional Ethics Committee Opinion 558 (May 2005). There, the lawyer's agreement with the non-lawyer finance company plainly called for paying to a non-lawyer a specific portion of the lawyer's fee, unquestionably the very practice forbidden by Rule 5.04(a).

In a different context, this Committee approved in Opinion 481 (January 1994) an arrangement under which a client paid for legal services by borrowing monies equal to the legal fee from a for-profit finance company, which paid the lawyer directly 90% of the funds borrowed by the client. The finance company retained the remaining 10% and additionally charged lawyers a fee to participate in the program. Recognizing the principal reasons for the prohibition on fee splitting as set forth in Comment 1 to Rule 5.04(a) and noting that the finance company did not solicit clients for any participating lawyer and that it did not perform any legal services, the Committee expressed its belief that under these circumstances ". . . the retention by the finance corporation of a reasonable portion of the amount borrowed by the client is properly viewed as [a] finance arrangement rather than a fee-splitting arrangement subject to the prohibition."

The proposed arrangement here is similar to the fee-splitting arrangement rejected in Opinion 558 rather than the finance arrangement approved in Opinion 481. The funding fee in the circumstances here addressed would be tied directly to the amount of the recovery in the underlying litigation just as was the payment to the finance company in Opinion 558. The amount of the recovery in a lawsuit is largely determined by the lawyer's knowledge, skill, experience and time expended. See American Bar Association Standing Committee on Ethics and Professional Responsibility Formal Opinion 94-389 (December 5, 1994). By tying the proposed funding fee to a percentage of the recovery, the lending company would be directly benefiting from the lawyer's knowledge, skill, experience and time expended to the detriment of the lawyer, who would be solely responsible for paying the funding fee. This would be tantamount to fee splitting.

Finally, this result is consistent with the policy considerations underlying Rule 5.04(a). In Opinion 467 (November 1990), this Committee ruled that a law firm's office lease with a non-lawyer landlord that provided for rent that could be a percentage of the law firm's gross receipts constituted an agreement to share legal fees with a non-lawyer in violation of Rule 5.04(a). The

Case 24-31596 Document 682 Filed in TXSB on 08/21/24 Page 35 of 35

Committee reasoned that a percentage rental agreement is prohibited for lawyers because an arrangement under which a non-lawyer landlord could receive a percentage of legal fees earned by a law firm would create an incentive for the landlord to refer legal business to the law firm, a result that Rule 5.04(a) is intended to prevent. Similarly, the proposed arrangement here would create an incentive for the lending company to refer cases to lawyers using its services.

**CONCLUSION**

Under the Texas Disciplinary Rules of Professional Conduct, a lawyer who represents a client in a contingent fee personal injury case may not enter into an agreement with a lending company owned by non-lawyers under the terms of which the lending company would agree to reimburse the lawyer for litigation expenses in the case as incurred and the lawyer would agree, in the event of a recovery in the case, to repay the lending company the amount advanced by the lending company and to pay a funding fee equal to a specified percentage of the amount recovered in the case net of expenses but subject to an agreed maximum.